**E-FILED**
Friday, 21 July, 2006  11:59:32 AM
Clerk, U.S. District Court, ILCD

U.S. DISTRICT COURT
FOR CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| CHEMTREAT, INC. a Virginia corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 05 CV 1336 |
| GREGORY P. KINSMAN, MICHELLE M. KINSMAN and RHEMA ELPIS ENTERPRISES, LLC, | ) ) ) ) | |
| Defendants. | ) ) | |

**MOTION FOR SUMMARY JUDGMENT AS TO COUNTS IV, V AND X AND MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNTS I - III AND COUNTS VI - IX OF PLAINTIFF'S SECOND AMENDED COMPLAINT**

NOW COMES CHEMTREAT, INC., a Virginia corporation ("CHEMTREAT") by its attorneys, Cassidy & Mueller, and for its Motion for Partial Summary Judgment against the Defendants, GREGORY P. KINSMAN and MICHELLE M. KINSMAN and RHEMA ELPIS ENTERPRISES, LLC state as follows:

**I.**

**STATEMENT OF THE CASE**

This is cause of action seeking damages and injunctive relief against the Defendants, GREGORY P. KINSMAN, MICHELLE M. KINSMAN and RHEMA ELPIS ENTERPRISES LLC (RHEMA) arising from their concerted action to establish a chemical supply business to compete with and divert customers from GREGORY KINSMAN'S employer, CHEMTREAT, INC., in violation of his Employment Agreement and his fiduciary duty to his employer. The Amended Complaint consists of 10 counts, as follows:

Count I - Breach of Employment Contract against GREGORY KINSMAN

Count II - Intentional interference with existing business relationships against GREGORY KINSMAN

Count III - Breach of fiduciary obligation - damages - against GREGORY KINSMAN

Count IV - Breach of fiduciary obligation - injunctive relief against GREGORY KINSMAN

Count V - Breach of Contract (covenant not to compete) - injunctive relief - against GREGORY KINSMAN

Count VI - Intentional interference with Employment Contract against MICHELLE M. KINSMAN

Count VII - Intentional interference with Employment Contract against RHEMA

Count VIII - Aiding and abetting interference with existing business relationships against MICHELLE M. KINSMAN and RHEMA

Count IX - Aiding and abetting breach of fiduciary obligation against MICHELLE M. KINSMAN

Count X - Aiding and abetting breach of fiduciary obligation - injunctive relief - against MICHELLE M. KINSMAN and RHEMA.

The present Motion is brought pursuant to FRCP 56(a) and CDIL Local Rule 7-1(D)(1) seeking summary judgment for Plaintiff as to each of the counts for injunctive relief (Counts IV, V and X) and partial summary judgment as to the issue of liability as to each of the counts seeking money damages (Counts I-III and VI-IX).

## II.

## EXHIBITS

Exhibit 1 - GREGORY KINSMAN Employment Agreement

Exhibit 2 - RHEMA ELPIS ENTERPRISES sales by customer March 2004 - December 2005

Exhibit 3 - Selected records of National Manufacturing Company

Exhibit 4 - Selected records of Duke Energy Company

Exhibit 5 - Selected records of Urich Chemical Company

Exhibit 6 - Selected records of Monmouth College

Exhibit 7 - Affidavit of Randy Azzarello, Executive Vice President and Chief Operating Officer of CHEMTREAT, INC.

Exhibit 8 - Deposition of GREGORY KINSMAN including deposition exhibits 1-18

Exhibit 9 - Deposition of MICHELLE M. KINSMAN including deposition exhibits 1-3

Exhibit 10 - Deposition of Tom Moshage

## III.

## STATEMENT OF UNDISPUTED FACTS

1.      CHEMTREAT, INC. is a Virginia corporation engaged in the sale and distribution of water treatment chemicals for use in boilers, cooling towers, heating and air conditioning systems and other related products and servicing equipment. (Def's Answer to Pltf's Complaint Count I, Para's 1 and 2).

2.      GREGORY P. KINSMAN joined the employ of CHEMTREAT as a sales representative on or about August 17, 1995. (G. Kinsman dep. pg. 23; Ex. #1).

3.      At the commencement of his employment with CHEMTREAT GREGORY KINSMAN entered into a written Employment Agreement which provides, inter alia;

    a)      "Employee covenants and agrees that he will devote his entire time and energy exclusively to the business of CHEMTREAT and that during the period of his employment, he will not engage in any other business, either for himself or for the account of any other person, firm or corporation …"

    b)      During the eighteen (18) month period following the effective date of termination by either party of the employment relationship created hereunder, Employee shall not in his own name, or as a consultant, or in any other capacity on behalf of any other person or entity solicit, call upon, communicate with, enter into any sales or servicing agreements with, or

3

> attempt to communicate with any CHEMTREAT customer or prospective customer, as defined herein, for the purpose of selling, offering for sale, influencing the purchase of, or otherwise providing any product, service or equipment competitive with any product, service or equipment then sold, offered for sale, provided, or under development by CHEMTREAT.
> (Exhibit 1).

4.      GREGORY KINSMAN remained in the employ of CHEMTREAT from August 17, 1995 until his termination on October 11, 2005 (G. Kinsman dep. pg. 265 and Dep. Ex. 17).

5.      MICHELLE M. KINSMAN is the wife of GREGORY KINSMAN. (G. Kinsman dep. pg. 6).

6.      In late February or early March, 2004 MICHELLE KINSMAN started a competing chemical supply business, which was eventually formally registered with the State of Illinois as RHEMA ELPIS ENTERPRISES, LLC (M. Kinsman dep. pg. 9-12 and dep. ex. 1).

7.      MICHELLE KINSMAN is the sole member and employee of RHEMA ELPIS ENTERPRISES, LLC. (M. Kinsman dep. pg. 16).

8.      RHEMA ELPIS ENTERPRISES LLC was formed after discussions between GREGORY KINSMAN and MICHELLE KINSMAN that his current CHEMTREAT customers were going to be seeking competing bids for their chemical supply needs. (M. Kinsman dep. pg. 11).

9.      In March 2004, and prior and subsequent thereto, Carus Chemical Company was a CHEMTREAT customer for which GREGORY KINSMAN had primary sales responsibility. (G. Kinsman dep. pg. 96-96).

10.      In March 2004, and prior and subsequent thereto, National Manufacturing was a CHEMTREAT customer for which GREGORY KINSMAN had primary sales responsibility. (G. Kinsman dep. pg. 108).

4

11.    In March 2004, and prior and subsequent thereto, Monmouth College was a CHEMTREAT customer for which GREGORY KINSMAN had primary sales responsibility. (G. Kinsman dep. pg. 108).

12.    In March 2004, and prior and subsequent thereto, Bob Evans Farms was a CHEMTREAT customer for which GREGORY KINSMAN had primary sales responsibility. (G. Kinsman dep. pg. 108).

13.    In March 2004, and prior and subsequent thereto, Duke Energy was a CHEMTREAT customer for which GREGORY KINSMAN had primary sales responsibility. (G. Kinsman dep. pg. 137, 143-144).

14.    In March 2004, and prior and subsequent thereto, Illinois Cement was a CHEMTREAT customer for which GREGORY KINSMAN had primary sales responsibility. (G. Kinsman dep. pg. 137).

15.    In March 2004, and prior and subsequent thereto, The Kensington was a CHEMTREAT customer for which GREGORY KINSMAN had primary sales responsibility. (G. Kinsman dep. pg. 141).

16.    In March 2004, and prior and subsequent thereto, St. Mary's Square was a CHEMTREAT customer for which GREGORY KINSMAN had primary sales responsibility. (G. Kinsman dep. pg. 234).

17.    During a visit to Carus Chemical Company in late 2003 as a sales representative for CHEMTREAT, GREGORY KINSMAN told Tom Moshage, the purchasing agent, that he was thinking of setting his wife up in a competing business. (Moshage dep. pg. 14).

18.    During a subsequent sales call at Carus Chemical Company, GREGORY KINSMAN advised them that his wife had formed a chemical business and to contact her to

obtain a quote for chemicals to replace those being sold by CHEMTREAT. (G. Kinsman dep. pg. 107-108, 118-119, Moshage dep. pg. 14-15).

19.    Shortly after GREGORY KINSMAN advised Carus Chemical Company that they could get a competing quote for RHEMA, MICHELLE KINSMAN contacted Tom Moshage by phone to request the opportunity to submit a quote. (Moshage dep. pg. 16).

20.    On March 12, 2004 MICHELLE KINSMAN and/or RHEMA submitted a written quote to Carus Chemical Company which included not only the RHEMA prices but also proprietary CHEMTREAT pricing information and anticipated price increases for comparison purposes. (M. Kinsman dep. pg. 52-56 and dep. ex. 3; Moshage dep. pg. 17-18 and dep. ex. 1).

21.    GREGORY KINSMAN also advised CHEMTREAT customers, National Manufacturing, Monmouth College, Bob Evans Farms, Illinois Cement and Duke Entergy while making contact on behalf of CHEMTREAT, that they could obtain competitive quotes from his wife and RHEMA. (G. Kinsman dep. pgs. 108, 140-141).

22.    At the time that GREGORY KINSMAN advised his CHEMTREAT customers to obtain competing quotes from his wife/RHEMA, he was aware that his wife/RHEMA would undercut the CHEMTREAT price and likely take the business. (G. Kinsman dep. pgs. 122-123).

23.    MICHELLE KINSMAN and/or RHEMA made sales to all of the CHEMTREAT customers directed her way by GREGORY KINSMAN during the term of his employment with CHEMTREAT. (Ex. 2).

24.    Prior to the creation of RHEMA, MICHELLE KINSMAN had no education, training or experience in the chemical and/or water treatment business. (M. Kinsman dep. pgs. 5-8, 51).

25.    MICHELLE KINSMAN and/or RHEMA established a business relationship for the procurement of chemicals with Ulrich Chemical Company - a supplier regularly utilized by GREGORY KINSMAN on behalf of CHEMTREAT. (M. Kinsman dep. pgs. 18-20).

26.    MICHELLE KINSMAN and/or RHEMA did not advertise and did not ever make cold calls on any potential customers. (M. Kinsman dep. pgs. 17-18).

27.    MICHELLE KINSMAN has never met the representatives of any RHEMA customers in her professional capacity, nor has she ever visited any of the plants where the chemicals are sold and utilized. (M. Kinsman dep. pgs. 30-35).

28.    All customers of RHEMA, since its inception, are the result of calls received from prospective customers. (M. Kinsman dep. pg. 16).

29.    To MICHELLE KINSMAN'S knowledge every prospective customer to call RHEMA resulted from GREGORY KINSMAN'S referrals. (M. Kinsman dep. pg. 16-17, 20).

30.    Since its inception RHEMA has never received a call for a price quote nor made a sale to any customer who was not previously a CHEMTREAT customer for which GREGORY KINSMAN had primary responsibility. (M. Kinsman dep. pg. 20).

31.    MICHELLE KINSMAN understood at all times that by selling to CHEMTREAT customers, RHEMA was actually taking CHEMTREAT business. (M. Kinsman dep. pg. 62).

32.    Subsequent to March 2004 and prior to his termination of employment with CHEMTREAT, GREGORY KINSMAN made sales and/or service calls to Carus Chemical Company on behalf of RHEMA. (T. Moshage dep. pg. 22).

33.    Subsequent to March 2004 and prior to his termination of employment with CHEMTREAT, GREGORY KINSMAN repeatedly made service calls and conducted boiler inspections at National Manufacturing on behalf of RHEMA. (Ex. 3).

7

34.    On September 16, 2005 GREGORY KINSMAN made a sales call to Duke Energy Company on behalf of RHEMA (Ex. 4).

35.    Subsequent to March 2004 and prior to his termination of employment with CHEMTREAT, GREGORY KINSMAN repeatedly acted on behalf of RHEMA in its business dealings with its chemical supplier, Ulrich Chemical Co. (Ex. 5)

36.    On October 25, 2005, GREGORY KINSMAN conducted boiler inspections and prepared a report for Monmouth College as a representative of RHEMA in violation of the non-compete provisions of his Employment Agreement. (Ex. 6).

37.    MICHELLE KINSMAN and/or RHEMA has continued to make sales for CHEMTREAT customers which were procured through the referrals of GREGORY KINSMAN in willful violation of the injunction entered by this Court on November 9, 2005. (Ex. 5).

IV

## APPLICABLE LAW - STANDARD OF REVIEW

### A.
### Applicable Law

Counts I and V are actions based solely upon the written Employment Agreement between CHEMTREAT and GREGORY KINSMAN. The Employment Agreement includes a choice of law provision establishing that its terms will be governed under Virginia law. The remaining counts of the Amended Complaint are governed by the common law of the State of Illinois.

### B.
### Standard of Review

Under Rule 56(c), summary judgment shall be granted if the record shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as to a

matter of law." <u>Black v. Henry Pratt Co.</u>, 778 F.2d 1278, 1281 (7th Cir. 1985). The moving party

has the burden of providing proper verified evidence to show the absence of a genuine issue of

material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986). A genuine issue of material fact

exists when "there is sufficient evidence favoring the non-moving party for a jury to return a

verdict for that party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). Once the

moving party has met its burden the opposing party must come forward with specific evidence,

not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue

for trial. <u>Howland v. Kilquist</u>, 833 F.2d 639 (7th Cir. 1987). Furthermore, "where the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is

no genuine issue for trial." <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S.

574, 587 (1986).

## V.

## <u>ARGUMENT</u>

### <u>Count I</u>
### <u>Breach of Contract</u>

Count I of the Amended Complaint seeks money damages for GREGORY KINSMAN'S

breach of his Employment Agreement with CHEMTREAT.

The validity and/or enforceability of that contract is not in dispute. GREGORY

KINSMAN has acknowledged that he executed the Employment Agreement voluntarily and with

full knowledge of its contents. (Ex. 8 pgs. 23-24). Consequently, the only issue before the Court

is whether or not KINSMAN'S conduct constitutes a breach of the terms of that Agreement.

The Employment Agreement provides, in relevant part, as follows:

> CHEMTREAT hereby employs employee to conduct the business of
> CHEMTREAT with those customers and prospective customers of
> CHEMTREAT as designated by CHEMTREAT and/or developed by

employee. Employee covenants and agrees that he will devote his entire time and energy exclusively to the business of CHEMTREAT and that during the period of his employment he will not engage in any other business, either for himself or for the account of any other person, firm or corporation without the prior consent of the Board of Directors of CHEMTREAT. (Ex. 1 pg. 1)

Further, the Employment Agreement includes a Trade Secrets and Confidentiality Agreement which provides, in relevant part, as follows:

I recognize that the corporation has a substantial investment in its development and use of commercially valuable technically and non-technical information which the corporation desires to protect by patents or by holding such information secret or confidential. Such proprietary information is vital to the corporation's business. … Except as authorized in writing by the corporation, I will not disclose to persons not employed by the corporation … or use directly or indirectly, during or after the employment with the Corporation, any information of the Corporation I obtain during the course of my employment relating to … products, product specifications, processes, procedures, prices, discounts, manufacturing costs, business affairs, … customer lists (customer lists to include among other things customer requirements, products purchased by customers and customer contacts and other business information pertaining to such customer), product formulations, marketing techniques and cost data. … (Ex. 1 pg. 7).

Moreover, under Virginia law (which governs the contract), every contract contains an implied covenant of good faith and fair dealing in the performance of the agreement. Pennsylvania Life Insurance Co. v. Bumbrey, 665 F.Supp. 1190, 1195 (E.D.VA. 1987) citing McMullen v. Entre Computer Center, Inc. 819 F.2d 1279 (4th Cir. 1987).

The record before the Court clearly establishes GREGORY KINSMAN'S breach of each of the foregoing covenants under the contract. There is little doubt that GREGORY KINSMAN did not devote his entire time and energy exclusively to the business of CHEMTREAT or that he actively engaged in another business. Both GREGORY and MICHELLE KINSMAN have testified that all of the sales made by RHEMA were the direct result of referrals from

GREGORY KINSMAN. (Ex. 8 pg. 107-108, 118-119, 140-141; Ex. 9 pg. 16-17, 20).

Additionally, Plaintiffs established that GREGORY KINSMAN would take and call in orders on

behalf of RHEMA which were being sold to his CHEMTREAT customers. (Ex. 9 pg. 61). The

records of Ulrich Chemical Company conclusively establish that GREGORY KINSMAN was

accepting and signing off on deliveries to RHEMA and that he would make visits to the plant in

Bartonville, Illinois to return chemical containers. (Ex. 5). During his discovery deposition,

GREGORY KINSMAN acknowledged acting on behalf of RHEMA in these respects.

Moreover, the records of National Manufacturing Company conclusively established that

GREGORY KINSMAN was calling upon the company, conducting boiler inspections and

submitting reports of those inspections as *"Technical Representative"* of RHEMA. Similarly, the

"Visitor's Register" employed by Duke Energy Company shows that GREGORY KINSMAN,

while making a sales call, signed in on September 16, 2005 as a representative of "REI" (Ex. 4)

and the records received via subpoena from Monmouth College include e-mail correspondence

from GREGORY KINSMAN reporting on a recent boiler tube inspection and recommended

remedies. (Ex. 6). Consistent with this pattern of calling upon his CHEMTREAT customers as a

representative of RHEMA is the testimony of Tom Moshage of Carus Chemical Company to the

effect that his water testing reports would be submitted on behalf of RHEMA. (Ex. 10 pg. 22-23,

38-39).

The record before the Court establishes a breach of the Trades Secret and Confidentiality

Agreement provisions of the contract. As set forth previously, the covenants contained therein

precluded the disclosure of any proprietary information of CHEMTREAT, including pricing,

cost data and information as to products being purchased by CHEMTREAT customers.

Following GREGORY KINSMAN'S initial referral of Carus Chemical Company to RHEMA,

MICHELLE KINSMAN submitted a written quote which included a side by side comparison of the current prices being charged by CHEMTREAT, the future prices of CHEMTREAT based upon an anticipated price increase as well as the price at which RHEMA would sell the identical products. (Ex. 10 pg. 19). Although GREGORY KINSMAN denies having provided the pricing, price increase and product information to his wife and claimed that it must have come from Carus Chemical Company itself, Tom Moshage expressly denies having provided such information to MICHELLE KINSMAN. In fact, he was quite adamant as to the impropriety of providing such information to a potential bidder. (Ex. 10 pg. 19, 40-41).

The only reasonable inference based upon the record is that this information was provided by GREGORY KINSMAN for the purpose of preparing the written proposal. MICHELLE KINSMAN would have (1) no other source to obtain the identity of the chemicals being purchased by Carus - which were identified in her product letter by the CHEMTREAT product number, (2) no other source for the current price being paid by CHEMTREAT and (3) certainly would have no ability to calculate how the anticipated price increase from CHEMTREAT would affect the ultimate amount charged to Carus as it was clearly established that the end price is solely determined by the sales rep. Indeed, based upon MICHELLE KINSMAN'S total lack of knowledge, training or experience in the water treatment chemical business it is reasonable to assume that the letter was prepared by GREG KINSMAN himself - or at least with intimate involvement on his part.

Finally, the record conclusively establishes GREGORY KINSMAN'S breach of the post-employment covenants contained in the Employment Agreement. The records received via subpoena from Monmouth College include e-mail correspondence from GREG KINSMAN dated October 25, 2005, establishing a boiler inspection conducted by himself on the day prior

12

thereto and recommending various remedies for the problems observed. Similarly, Tom Moshage of Carus Chemical Company testified to GREGORY KINSMAN'S sales calls to him on behalf of RHEMA and the preparation of boiler inspection reports from that entity. Even absent this conclusive evidence as to GREGORY KINSMAN'S active involvement with RHEMA, the mere fact that he has a direct financial interest in RHEMA'S continued sales of products to his former CHEMTREAT customers - which were procured by RHEMA through his efforts - would attest to his violation of the post-employment covenants.

Based on the foregoing, it is respectfully submitted that, as a matter of law, GREGORY KINSMAN should be found to have intentionally and willfully breached both the express terms of his Employment Agreement and the implied covenants of good faith and fair dealings which are a part thereof. It is therefore respectfully submitted that summary judgment as to the issue of liability should be entered in Plaintiff's favor as to Count I of the Amended Complaint and against the Defendant, GREGORY P. KINSMAN.

## COUNT II

### Intentional Interference With Business Relationship

Count II seeks money damages against GREGORY KINSMAN for his intentional interference with CHEMTREAT'S existing business relationship with the customers for which GREGORY KINSMAN had primary responsibility. In order to prevail a claim for intentional interference with an existing business relationship, the Plaintiff must establish:

1.    The existence of a valid business relationship;

2.    Defendant's knowledge of Plaintiff's relationship;

3.    A purposeful interference by Defendant that causes a breach or termination of the relationship; and

4.    Damages to the Plaintiff.

<u>Dowd & Dowd, Ltd. v. Gleason</u>, 352 Ill.App.3d 365, 380 (1st Dist. 2004).

As the following establishes, there are no material issues of fact in dispute as to the ability to prove each of these necessary elements.

**a.**
**<u>Existence Of A Valid Business Relationship</u>**

The existence of a valid business relationship between CHEMTREAT and the customer at issue is clear. GREGORY KINSMAN testified as to the existence of the relationship and explained that he had been calling on these customers on behalf of CHEMTREAT since his initial employment in 1995. Consequently, not only was there an existing relationship but the evidence establishes that it had been longstanding. Despite this fact, GREGORY KINSMAN claims that any of the customers that he referred to RHEMA were considering leaving CHEMTREAT due to recent price increases. However, this is insufficient to raise a material question of fact as to this issue. While it is conceded that any of the CHEMTREAT customers could have terminated their relationship at any time, until terminated a relationship which is terminable at will by other parties will presumptively continue in effect so long as the parties are satisfied, and, therefore, such a relationship is sufficient to support an action for tortious interference. <u>Dowd & Dowd,</u> 352 Ill.App.3d at 381; <u>Grund v. Donegan,</u> 298 Ill.App.3d 1034, 1038 (1st Dist. 1998). Consequently, absent some evidence by Defendant that a business relationship between CHEMTREAT and the individual customers at issue had been effectively terminated prior to his referrals of those customers to RHEMA, this element of the cause of action has been established in the record.

**b.**
**Defendant's Knowledge Of Plaintiff's Relationship**

GREGORY KINSMAN had been employed at CHEMTREAT for nine years calling upon these various customers. As the sales representative primarily responsible for each of them he was undeniably aware of the existence of the business relationship and the benefits to CHEMTREAT as a result thereof.

**c.**
**Purposeful Interference By Defendant**

The element of "purposeful" or "intentional" interference refers to some impropriety committed by the Defendant in interfering with the Plaintiff's valid business relationship with an identifiable third party. Romanek v. Connelly, 324 Ill.App.3d 393, 406 (1st Dist. 2001) citing Dowd & Dowd. The only reasonable inference from the evidence of GREGORY KINSMAN'S conduct in directing his CHEMTREAT customers to RHEMA was to divert those customers to an entity in which he had a more direct and complete financial interest. As a matter of law, his status as an employee of CHEMTREAT carried with it an obligation of good faith and fair dealing as well as a fiduciary obligation to act in CHEMTREAT'S best interest. It is inarguable that the referral of the various customers to a competing entity in which he held a direct or indirect financial interest is in violation of those legal obligations and would be considered improper as a matter of law.

**d.**
**Damages To Plaintiff As A Result Of The Breach**

Again, there can be little doubt that CHEMTREAT has sustained damages as a result of GREGORY KINSMAN'S conduct. For instance, prior to GREGORY KINSMAN'S diversion of Carus Chemical Company to RHEMA, CHEMTREAT enjoyed annual sales from that customer in excess of $100,000.00. (Ex. 7). Consistent with that sales history, following GREGORY

KINSMAN'S diversion of Carus Chemical Company, RHEMA realized a little over $182,000.00 in sales to it between March, 2004, and December, 2005, while CHEMTREAT sales fell through the floor. (Ex. 2). Although CHEMTREAT has not yet been able to determine a precise amount of damages which has been caused by GREGORY KINSMAN'S improper conduct, the existence of some damages has been conclusively established and satisfies the final element of this cause of action.

Therefore, it is respectfully submitted that summary judgment as to the issue of liability should be entered in Plaintiff's favor as to Count II of the Amended Complaint.

### COUNTS III AND IV

### Breach Of Fiduciary Duty

Counts III and IV allege GREGORY KINSMAN'S breach of his fiduciary duty to his employer, CHEMTREAT. Count III seeks damages as a result of the alleged breach while Count IV seeks injunctive relief.

Fiduciary duties are found in a variety of relationships, including employer-employee and principal-agent. Mulaney Wells & Company v. Savage, 66 Ill.App.3d 853, 865 (1st Dist. 1978). The fiduciary duty of an employee to his employer is to act solely for the employer in all matters related to the employment and to refrain from competing with the employer. Mulaney Wells & Company v. Savage, 78 Ill.2d 534, 546 (1980). It has been held therefore that a breach of a fiduciary obligation has occurred where a person seizes for his own advantage a business opportunity which rightfully belongs to the company by which he is employed. Mulaney Wells & Company v. Savage, 78 Ill.2d at 545-546. Although it has been recognized that an employee, absent a restrictive contractual provision, has a right to enter into competition with the former employer upon leaving such employ and may even go so far as to form a rival corporation while

still employed, an employee will be held accountable for breaching his fiduciary duty to his employer when he goes beyond such preliminary competitive activities and commences business as a rival concern while still employed. <u>Lauder International, Inc. v. Carroll,</u> 116 Ill.App.3d 717, 733-734.

In the present case, there can be no doubt that there existed a fiduciary relationship between GREGORY KINSMAN and CHEMTREAT. Moreover, as has been previously addressed, the record clearly establishes that GREGORY KINSMAN was actively working on behalf of RHEMA in competing with CHEMTREAT prior to the termination of his employment in October, 2005. This consisted not only of the customer referrals by him to RHEMA but also the conduct of boiler inspections as a *"Technical Representative"* of RHEMA as well as the direct dealings with RHEMA'S chemical supplier, Ulrich Chemical Company.

Based on the foregoing, it is respectfully submitted that summary judgment should be entered in favor of Plaintiff and against Defendants as to Count IV of the Amended Complaint subject to a future hearing on the issue of damages. It is further submitted that any existing relationship between RHEMA and any of its customers can be directly traced to the wrongful conduct of GREGORY KINSMAN and thus, he should not be allowed to continue to benefit as a result of his indirect interest in that corporation. As such, summary judgment should be entered in favor of CHEMTREAT and against Defendant, GREGORY KINSMAN, as to Count IV of the Amended Complaint and a permanent injunction should issue precluding any communications, sales, or business dealings of any kind with CHEMTREAT'S former customers.

## COUNT V

### Enforcement Of Covenant Not To Compete - Injunctive Relief

Count V is an action for injunctive relief seeking enforcement of the contractual covenant-not-to-compete. With respect to post-employment activities, the Employment Agreement between GREGORY KINSMAN and CHEMTREAT provided as follows:

> During the eighteen (18) month period following the effective date of termination to either party of the employment relationship created hereunder, employee shall not in his own name, or as a consultant, or in any other capacity on behalf of any other person or entity solicit, call upon, communicate with, enter into any sales or servicing agreements with, or attempt to communicate with any CHEMTREAT customer or perspective customer, as defined herein, for the purpose of selling, offering for sale, influencing the purchase of, or otherwise providing any product, service or equipment competitive with any product, service or equipment then sold, offered for sale, provided, or under development by CHEMTREAT.

> For purposes of this Agreement, "customer" shall mean any person or entity that is a customer of CHEMTREAT (or any representative of such person or entity) with whom employee had any contact, communication, or for which employee had supervisory sales or service responsibility during any of the eighteen (18) consecutive calendar months preceding the effective date of termination of his CHEMTREAT employment… (Ex. 1).

Restrictive covenants serve a real and measurable social utility in that they protect the employer from unwanted erosion of either confidential information or the loss of goodwill of its business. Tower Oil & Tech Company v. Buckley, 99 Ill.App.3d 637 (1st Dist. 1981). In order for restrictive covenants in employment contracts to have anything but a hollow meaning, they must be enforced where equitable. Shorr Paper Products, Inc. v. Frary, 74 Ill.App.3d 498 (2nd Dist. 1979). A determination of whether a restrictive covenant is enforceable is a question of law. Woodfield Group, Inc. v. DeLisle, 295 Ill.App.3d 935 (1st Dist. 1998). A post-employment

restrictive covenant will be enforced if it is necessary to protect a legitimate business interest of the employer and is reasonable in scope. <u>Woodfield Group, Inc.</u>, 295 Ill.App.3d at 938.

While the evidence in this case would clearly establish both a protectable business interest and the restrictions are reasonable in scope, in the interest of brevity it is not necessary to review that evidence. Rather, on November 9, 2005, following a hearing on Plaintiff's Motion, this Court entered a Temporary Restraining Order against GREGORY KINSMAN which included a finding of fact by the Court that, <u>inter alia</u>, the Plaintiff possesses a clear right or interest that needed protection. This finding by the Court is entirely consistent with the Affidavit of CHEMTREAT'S Executive Vice President and Chief Operating Officer, Randy Azzarello, (Ex. 7) as well as the testimony of GREGORY KINSMAN concerning the product formulations of CHEMTREAT and the customer relationships which had been developed.

Further, the reasonableness of the terms of the contractual restrictions is not disputed. It does not establish an arbitrary geographical area but rather, precludes competitive activities only with respect to KINSMAN'S customers. The eighteen month time period is also reasonable. As testified to by GREGORY KINSMAN the business requires a one to two year period of time of training to understand the products and needs of customers. Thus, it is certainly reasonable for CHEMTREAT to request that period of time for a new sales representative to become established before being confronted with competition from the former salesman.

Based upon the foregoing, it is respectfully submitted that the post employment covenant not to compete should be enforced as written and that summary judgment in favor of CHEMTREAT and against the Defendant, GREGORY KINSMAN, is appropriate. Moreover, it is further submitted that the injunction should extend to MICHELLE KINSMAN and/or RHEMA as the competition by those Defendants arises solely from the wrongful activities of

GREGORY KINSMAN, and the evidence has clearly established that MICHELLE KINSMAN and RHEMA are nothing more than a shell entity allowing GREGORY KINSMAN to financially benefit by indirectly competing with CHEMTREAT through his former customers.

## COUNTS VI AND VII

### Intentional Interference With Contract - Michelle Kinsman And Rhema

Count VI is a claim for money damages against MICHELLE KINSMAN alleging that she intentionally interfered with the Employment Contract between GREGORY KINSMAN and CHEMTREAT causing the breach thereof. Count VII is an identical claim against RHEMA.[1] Under Illinois law, in order to prevail on a claim for intentional interference with contract the Plaintiff must establish the following elements:

1.      A valid and enforceable contract between the Plaintiff and a third party;

2.      Defendant's awareness of the existence of the contract;

3.      Defendant's intentional and unjust inducement of a breach of the contract;

4.      Defendant's wrongful conduct which proximately caused the breach; and

5.      Damages as a result of the breach.

Durmal v. Robert Wadington, 354 Ill.App.3d 715 (1st Dist. 2004).

The evidence of record in the present case clearly establishes each and every one of these elements as a matter of law.

There is no dispute in this case that there was a valid and enforceable employment contract in existence between CHEMTREAT and GREGORY KINSMAN during the spring of 2004 when MICHELLE KINSMAN began her competing business. It is equally inarguable that MICHELLE KINSMAN was fully aware of the existence of the contractual relationship between

---

[1] As the sole member and employee of RHEMA, MICHELLE KINSMAN is for all intents and purposes RHEMA. Therefore, for the sake of brevity the evidence as to both of those Defendants will be addressed only as it relates to MICHELLE KINSMAN.

CHEMTREAT and her husband, GREGORY KINSMAN. The determination of this claim therefore, turns upon the conclusiveness of the evidence of MICHELLE KINSMAN'S intentional/wrongful inducement of her husband to breach that contract.

MICHELLE KINSMAN testified unequivocally that she decided to start the chemical supply business in order to compete with CHEMTREAT. (Ex. 9, pg. 62). This was done only after conversations with her husband, GREGORY KINSMAN, that several of his customers may be interested in purchasing their chemicals from somebody other than CHEMTREAT. (Ex. 9, pg. 11-12). Thereafter, she utilized GREGORY KINSMAN as her sole source of procuring customers for RHEMA (Ex. 9, pg. 16-17, 20). The foregoing conduct was all undertaken with the full knowledge that her husband continued to be employed by CHEMTREAT, that he was continuing to receive a salary in that capacity and that he owed them his undivided loyalty. His course of conduct was certainly wrongful under the circumstances and based upon the knowledge which she held at the time that she undertook this course it must be deemed as intentionally so.

As for the final element of such a cause of action, as previously set forth there is clear evidence of damages having been sustained as a result of the resulting breach of the Employment Agreement by GREGORY KINSMAN. Consequently, it is respectfully submitted that summary judgment as to Counts VI and VII of the Amended Complaint should be entered in favor of CHEMTREAT and against the Defendant, MICHELLE KINSMAN, as to the issue of liability subject to a future hearing on the extent of the damages sustained.

## COUNTS VIII THROUGH X

### Aiding And Abetting

Counts VIII through X are counts against MICHELLE KINSMAN and/or RHEMA for aiding and abetting the tortious conduct undertaken by GREGORY KINSMAN. Count VIII seeks recovery against both MICHELLE KINSMAN and RHEMA for aiding and abetting GREGORY KINSMAN'S interference with CHEMTREAT'S existing business relationship. Count IX seeks recovery against MICHELLE KINSMAN (and therefore RHEMA) for aiding and abetting GREGORY KINSMAN'S breach of fiduciary duty to CHEMTREAT. Count X seeks injunctive relief against MICHELLE KINSMAN (and therefore RHEMA) for aiding and abetting GREGORY KINSMAN'S breach of fiduciary duty to CHEMTREAT.

In Illinois, a claim for aiding and abetting includes the following elements:

1.      The party whom the Defendant aids must perform a wrongful act which causes an injury;

2.      Defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance;

3.      The Defendant must knowingly and substantially assist the principal violation.

Thornwood, Inc. v. Jenner & Block, 344 Ill.App.3d 15, 27-28 (1st Dist. 2003).

Additionally, the Restatement (Second) of Torts provides for recovery under a theory of concert of action, as follows:

> "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he,
>
> a.      Does a tortious act in concert with the other or pursuant to a common design with him, or
>
> b.      Knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

    c.      Gives substantial assistance to the other accomplishing a tortious result and his own conduct, severally considered, constitutes a breach of duty to the third person."

This portion of the Restatement has been adopted by Illinois Courts. <u>Wolf v. Liberis,</u> 153 Ill.App.3d 488 (1st Dist. 1987).

In the present case, separate areas of recovery would exist for MICHELLE KINSMAN'S aiding and abetting of each of the separate tortious activities undertaken by her husband. In that regard, this Motion has already addressed the liability of GREGORY KINSMAN for his intentional interference with the business relationship between CHEMTREAT and its customers as well as his breach of his fiduciary duty to CHEMTREAT. As to each of these tortious activities, MICHELLE KINSMAN acted in concert with her husband to achieve the required result.

MICHELLE KINSMAN unequivocally testified that the decision to start a chemical supply business was made only after discussions with her husband about the potential for CHEMTREAT customers to seek competitive bids. In moving forward with the creation of RHEMA, MICHELLE KINSMAN fully understood that they would be competing with CHEMTREAT in attempting to lure those customers away. MICHELLE KINSMAN and GREGORY KINSMAN acted in concert in diverting the CHEMTREAT customers in that GREGORY KINSMAN would either make a referral to his wife or would at least clear the way for his wife to make contact with the customer. MICHELLE KINSMAN would then follow up with the customer in order to put forth a competing bid. For instance, following GREGORY KINSMAN'S notification to Tom Moshage of Carus Chemical Company that his wife had started a chemical supply business, MICHELLE KINSMAN contacted him the very next day. She then followed up with a written quote which was replete with proprietary pricing and

product information concerning the current items being purchased from CHEMTREAT. The only reasonable inference from this piece of evidence is that GREGORY KINSMAN worked in concert with his wife to prepare this particular quote.

The tag-team efforts of the KINSMANS resulted in the diversion of CHEMTREAT customers to RHEMA including Carus Chemical Company, the Kensington, Duke Energy, Bob Evans Farms, National Manufacturing Company, Illinois Cement Company, Monmouth College and St. Mary's Square all to the financial detriment of CHEMTREAT. As such, the necessary elements to establish an aiding and abetting theory of recovery has been established with respect to both the intentional interference with business relationship and breach of fiduciary duty causes of action. It is therefore respectfully submitted that summary judgment should be entered in favor of CHEMTREAT as to the issue of liability under Counts VIII and IX of the Amended Complaint subject to a further hearing on the issue of damages.

Moreover, it has been conclusively established that any present and/or past customers of RHEMA were achieved solely as a result of the wrongful concerted action of GREGORY and MICHELLE KINSMAN. Consequently, the continued sales and service of former CHEMTREAT customers by RHEMA will result in continuing damages which are impossible to determine. As such, equity requires that MICHELLE KINSMAN and/or RHEMA be permanently enjoined from any future business dealings with any of the CHEMTREAT customers for which GREGORY KINSMAN had primary responsibility prior to his termination. As such, it is respectfully submitted that summary judgment should be entered in favor of CHEMTREAT and against Defendants, MICHELLE KINSMAN and RHEMA, as to Count X of the Amended Complaint permanently enjoining them from future business dealings with the subject CHEMTREAT customers.

# VI.

## CONCLUSION

Based upon the foregoing, Plaintiff, CHEMTREAT, INC., respectfully prays for an Order

of this Court granting relief as to each count of the Amended Complaint as follows:

a.    Entry of a partial summary judgment in favor of the Plaintiff and against the Defendant, GREGORY KINSMAN, as to the issue of liability under Count I.

b.    Entry of a partial summary judgment in favor of the Plaintiff and against the Defendant, GREGORY KINSMAN, as to the issue of liability under Count II.

c.    Entry of a partial summary judgment in favor of the Plaintiff and against the Defendant, GREGORY KINSMAN, as to the issue of liability under Count III.

d.    Entry of summary judgment in favor of the Plaintiff and against the Defendant, GREGORY KINSMAN, under Count IV including the issuance of a permanent injunction enjoining him from any future business dealings with his former CHEMTREAT customers which have been improperly diverted to RHEMA.

e.    Entry of a summary judgment in favor of Plaintiff and against the Defendant, GREGORY KINSMAN, under Count V enforcing the terms of his post-employment covenant-not-to-compete and entering an injunction against him consistent therewith.

f.    Entry of a partial summary judgment in favor of Plaintiff and against the Defendant, MICHELLE KINSMAN, as to the issue of the liability under Count VI.

g.    Entry of a partial summary judgment in favor of the Plaintiff and against the Defendant, RHEMA ELPIS ENTERPRISES, LLC, as to the issue of liability under Count VII.

h.    Entry of a partial summary judgment in favor of Plaintiff and against Defendants, MICHELLE KINSMAN and RHEMA ELPIS ENTERPRISES, LLC, as to the issue of liability under Count VIII.

i.    Entry of a partial summary judgment in favor of the Plaintiff and against the Defendants, MICHELLE KINSMAN and RHEMA ELPIS ENTERPRISES LLC, as to the issue of liability under Count IX.

j.    Entry of a summary judgment in favor of the Plaintiff and against the Defendants, MICHELLE KINSMAN and RHEMA ELPIS ENTERPRISES, LLC, under Count X including the entry of a permanent injunction enjoining them from any

future business relationship with former CHEMTREAT customers who have been wrongfully diverted to RHEMA through the tortious conduct of the Defendant herein.

k.    For an award of Plaintiff's attorney's fees and costs incurred by Plaintiff, CHEMTREAT, INC., in this action.

l.    For such other and further relief as the Court deems just and reasonable.

CASSIDY & MUELLER

By: s/  Andrew D. CASSIDY
        Attorneys for the Plaintiff,
        CHEMTREAT, INC., a Virginia corporation

Andrew D. Cassidy
CASSIDY & MUELLER
416 Main Street, Ste. 323
Peoria, Illinois 61602
309/676-0591

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that on July 21, 2006, I electronically filed the foregoing Motion for Partial Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Kevin Wolfe       jkwolfe@hslaw.us

         s/  ANDREW D. CASSIDY
          CASSIDY & MUELLER
          416 Main Street, Suite 323
          Peoria, IL 61602
          Telephone: 309/676-0591
          Fax: 309/676-8036
          E-mail: dcassidy@cassidymueller.com

E-FILED
Friday, 21 July, 2006  12:00:06 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 1 - GREGORY KINSMAN EMPLOYMENT AGREEMENT

# EMPLOYMENT AGREEMENT

THIS AGREEMENT by and between CHEMTREAT, INC., a Virginia corporation ("CHEMTREAT") and Gregory P. Kinsman ("Employee") recites and provides as follows:

WHEREAS, CHEMTREAT is engaged in the business of selling and distributing chemicals, chemical products and other miscellaneous products at retail or wholesale and servicing equipment which uses or consumes products sold by CHEMTREAT; and

WHEREAS, Employee is desirous of working for CHEMTREAT in whatever capacity as may be determined by the Board of Directors of CHEMTREAT;

NOW, THEREFORE, in consideration of the employment relationship created hereby, the remuneration paid hereunder, and the mutual covenants and conditions hereinafter set forth, CHEMTREAT and Employee agree as follows:

1.    Employment

CHEMTREAT hereby employs Employee to conduct the business of CHEMTREAT with those customers and prospective customers of CHEMTREAT as designated by CHEMTREAT and/or developed by Employee. Employee covenants and agrees that he will devote his entire time and energy exclusively to the business of CHEMTREAT and that during the period of his employment, he will not engage in any other business, either for himself or for the account of any other person, firm or corporation without the prior consent of the Board of Directors of CHEMTREAT.

2.    Compensation

For all services to be rendered by Employee in any capacity hereunder, CHEMTREAT agrees to pay Employee such compensation as may be mutually agreed upon between Employee and CHEMTREAT from time to time.

1

3.    <u>Termination of Previous Employment Agreements</u>

Employee does hereby represent and warrant that he has the right to enter into this contract and that he has terminated all previous employment agreements and is free from any previous employment contracts, except for post-termination covenants not to compete, if any, and restrictions on disclosure of confidential information.

4.    <u>Termination</u>

Employee may resign and CHEMTREAT may terminate Employee at any time with or without cause by giving the other party written notice of termination. Termination is effective upon receipt by the non-terminating party of the written notice of termination. No commissions or compensation shall be payable to Employee by CHEMTREAT for sales or services (or any portion thereof) which are not delivered or performed as of the effective date of Employee's termination of employment with CHEMTREAT.

If Employee dies while this Agreement is in effect, the Agreement shall automatically terminate on the date of Employee's death, and CHEMTREAT shall be obligated to pay to Employee's estate Employee's monthly compensation or commissions computed as though Employee died on the last day of the month in which his death occurs.

The provisions of this Agreement contained in Paragraphs 6 through 11 hereof, as applicable, shall survive any termination of employment described herein.

5.    <u>Disability</u>

In the event the Employee suffers a permanent, total disability as determined by a physician selected by the Company, this Agreement shall automatically terminate ninety (90) days after the date said physician determines that the employee became disabled. In such event, CHEMTREAT shall be obligated

2

to pay Employee his monthly compensation or accrued commissions up to the date of termination.

6.    **Non-Compete Agreement**

The parties hereto acknowledge that CHEMTREAT is engaged in the business of the sale of equipment and chemical formulations for treatment of boilers, cooling towers, heating and cooling systems, raw water and waste water systems and the sale of fuel oil treatments and providing servicing activities incidental to the sale of the above products. Employee hereby acknowledges that during the course of his employment he has or will receive or have access to certain confidential and proprietary information which is essential to the sales and service activities of CHEMTREAT including, but not limited to, selling methods, price sheets and product manuals. Employee hereby further acknowledges that the customers of CHEMTREAT constitute a valuable asset to CHEMTREAT and that CHEMTREAT has legitimate business interests to protect by the restrictions contained herein.

During the eighteen (18) month period following the effective date of termination by either party of the employment relationship created hereunder, Employee shall not in his own name, or as a consultant, or in any other capacity on behalf of any other person or entity solicit, call upon, communicate with, enter into any sales or servicing agreements with, or attempt to communicate with any CHEMTREAT customer or prospective customer, as defined herein, for the purpose of selling, offering for sale, influencing the purchase of, or otherwise providing any product, service or equipment competitive with any product, service or equipment then sold, offered for sale, provided, or under development by CHEMTREAT.

For the purposes of this Agreement, "customer" shall mean any person or entity that is a customer of CHEMTREAT (or any representative of such person or entity) with whom Employee had any contact, communication, or for which Employee had supervisory, sales or service responsibility during any of the eighteen

3

(18) consecutive calendar months preceding the effective date of termination of his CHEMTREAT employment. For the purposes of this Agreement, "prospective customer" shall mean any person or entity (or representative or such person or entity) for which Employee performed or participated in a survey or written proposal during the twelve (12) consecutive calendar months preceding termination of Employee's employment with CHEMTREAT.

Employee further agrees that the above restrictions upon him are reasonable in all respects including the description of CHEMTREAT's business and the time, customer, and prospective customer restrictions. Employee further expressly acknowledges that such restrictions will not unreasonably restrict him in earning a livelihood.

7. **Interference With Contractual Relations**

For the eighteen (18) consecutive calendar months immediately following the effective date of termination of Employee's CHEMTREAT employment, Employee agrees that he shall not induce, encourage, or solicit any other employee of CHEMTREAT to terminate his employment with CHEMTREAT.

8. **Injunctive Relief**

Employee acknowledges and agrees that it would be difficult to quantify or to fully compensate CHEMTREAT in damages for the breach of Employee's obligations hereunder. Accordingly, Employee specifically agrees that CHEMTREAT shall be entitled to temporary and permanent injunctive relief to enforce the provisions of this Agreement and that such relief may be granted without the necessity of proving actual damages or irreparable injury or harm. Nothing contained herein, however, shall diminish the right of CHEMTREAT to claim and recover damages as appropriate.

4

9.    Attorneys' Fees

In the event CHEMTREAT files suit against Employee to enforce any provision of this Agreement and a court of competent jurisdiction finds in favor of CHEMTREAT, Employee shall reimburse CHEMTREAT its reasonable costs and attorneys' fees incurred in maintaining such suit.

10.    Miscellaneous

This Agreement shall not be binding until signed by an officer of CHEMTREAT at its corporate offices in Richmond, Virginia.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legatees, devisees, administrators, executors, successors and assigns, and its terms shall not be amended except by a writing signed by both parties.

If any portion of this contract shall be determined unenforceable by a court of competent jurisdiction, the remaining provisions of this Agreement shall remain in full force and effect. If any of the covenants or restraints provided in this Agreement are adjudicated to be excessively broad or otherwise unenforceable, said covenant or restraint shall be reduced to and enforced to whatever extent deemed reasonable by said court.

Employee acknowledges that he was provided an unsigned copy of this Agreement in advance of accepting initial employment or continued employment and was accorded ample opportunity to read and seek whatever counsel relative to the Agreement he deemed necessary.

11.    Governing Law

This Agreement is made in, and shall be construed under and governed by the laws of, the Commonwealth of Virginia exclusive of its choice of law provisions.

5

IN WITNESS WHEREOF, Employee has read, understood and duly executed this Agreement, and CHEMTREAT, INC., has caused this Agreement to be executed in its name and on its behalf by its duly authorized officers.

CHEMTREAT, INC.

Date: <u>August 17, 1995</u>          By: _____
                                            Harrison R. Tyler, President

Date: <u>August 17, 1995</u>          EMPLOYEE:

                                      _____
                                            Signature

                                      _____
                                            Print Name

6

## TRADE SECRETS AND CONFIDENTIALITY AGREEMENT

In consideration of my employment by ChemTreat, Inc. (Corporation) and of the salary and wages paid to me in connection with such employment, and other good and valuable consideration, I agree as follows:

1.    I recognize that the Corporation has a substantial investment in its development and use of commercially valuable technical and nontechnical information which the Corporation desires to protect by patents or by holding such information secret or confidential. Such proprietary information is vital to the success of the Corporation's business. I also recognize that during my employment, I will receive, develop or otherwise acquire such secret or confidential technical and nontechnical information. Except as authorized in writing by the Corporation, I will not disclose to persons not employed by the Corporation or to those persons employed by the Corporation to whom disclosure has not been previously approved by the president or any vice president of the Corporation, or use directly or indirectly, during or after my employment with the Corporation, any information of the Corporation I obtain during the course of my employment relating to inventions, products, product specifications, processes, procedures, prices, discounts, manufacturing costs, business affairs, future plans, technical data, customer lists (customer lists to include among other things customer requirements, products purchased by customers, and customer contacts and other business information pertaining to such customer), product formulations, marketing techniques and cost data. The foregoing sentence shall not be construed to apply to the direct or indirect use of information by employees of the Corporation in the performance of their duties and responsibilities during the course of their employment by the Corporation. This agreement also covers other information which is of a secret or confidential nature (whether or not acquired or developed by me) designated from time to time by the Corporation as being proprietary, trade secret or confidential information.

2.    Upon termination of my employment, for any reason, I shall not remove or retain without the Corporation's prior written consent any figures, calculations, letters, papers, drawings, reports, financial statements, product specifications, customer lists, product formulations, cost data or other confidential information of any type or description, or copies, summaries or extracts thereof, and I shall promptly return to the Corporation all such items which may be in my possession or control at the time of termination of my employment, other than information and documents belonging to me that were prepared or created prior to my employment by the Corporation which I shall be entitled to retain after termination of my employment.

3.    I will communicate to the Corporation promptly and fully all discoveries, improvements, processes, devices and inventions (hereinafter collectively called "inventions") made, discovered, conceived or developed by me

7

(either solely or jointly with others) during my employment and for six months thereafter which may be useful in or relate to the lines of the actual or anticipated business, work or investigations of the Corporation or which result from or are suggested by any work I may do for the Corporation; and such inventions, whether patented or not, shall be and remain the sole and exclusive property of the Corporation or its nominees or assigns.

4.    I will keep and maintain adequate and current written records of all such inventions, in the form of notes, sketches, drawings and reports relating thereto, which records shall be and remain the property of and available to the Corporation at all times. All such records shall remain on the premises of the Corporation at all times. Further, during and after my employment, without charge to the Corporation but at its request and expense, I will assist the Corporation and its nominees in every proper way to obtain and vest in it or them title to patents or such inventions in all countries by executing all necessary or desirable documents, including applications for patents and assignments thereof. I understand that as consideration for my assignment of any patent to the Corporation I will receive a cash bonus within the then current fiscal year of the Corporation.

5.    I understand and agree that in the event of any breach, violation or evasion of the terms of this agreement, any such breach, violation or evasion will result in immediate and irrevocable injury or harm to the Corporation and the Corporation shall be entitled to equitable and legal relief to protect its interest, including the recovery of its costs, expenses and attorney's fees in pursuing any such remedies.

6.    This agreement shall be construed according to the laws of the State of Virginia, and shall be binding upon my heirs, legal representatives and assigns and shall inure to the benefit of any successors and assigns of the Corporation.

7.    It is our intention that the provision of this agreement be enforceable to the fullest extent permissible under applicable law, and that unenforceability (or modification to conform to applicable law) of any provision, in whole or in part, shall not render unenforceable, or impair, the remainder of this agreement which shall be deemed to be amended to delete or modify, as necessary, the offending provision and to alter the balance of this agreement in order to render it valid and enforceable.

CHEMTREAT, INC.

BY: _Hanson Doyle_

_Gregory P. Kinsman_
Employee's Signature

Date: _August 17, 1995_

8

E-FILED
Friday, 21 July, 2006  12:00:35 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 2 - RHEMA ELPIS ENTERPRISES SALES (3/04 - 12/05)

RHEMA Elpis Enterprises, LLC
## Sales by Customer Summary
### March 2004 through December 2005

|  | Mar '04 - Dec 05 |
| --- | --- |
| Bob Evans Farms | 3,324.20 |
| Carus Chemical Company | 132,374.28 |
| Duke Energy | 605.00 |
| Illinois Cement Co. | 8,244.91 |
| Kensington of Galesburg | 1,646.06 |
| LCN Closers | 5,223.91 |
| Monmouth College | 24,309.17 |
| National Manufacturing Co. | 8,338.11 |
| St. Mary's Square | 1,569.48 |

EXHIBIT

2

tabbies

**E-FILED**
Friday, 21 July, 2006  12:01:51 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 3 – SELECTED RECORDS OF NATIONAL MANUFACTURING CO.

**Molina, Jackie**

**From:**    Rhema Enterprises LLC [rhema_enterprises@earthlink.net]
**Sent:**    Thursday, September 23, 2004 7:50 PM
**To:**       Molina, Jackie
**Subject:** RE: Pricing

Jackie,

Here are the products and pricing for the products that were delivered last week.  Bill really needed them so I ordered them and had them shipped.  This was the 1st time we ordered the 830 resin cleaner so I needed to wait for weight and pricing.

Thank you for the opportunity to be of service.


RE740 is 473 lbs @ 2.35/lb
RE620 is 500 lbs @ 2.17/lb

## Molina, Jackie

**From:**     Rhema Enterprises LLC [rhema_enterprises@earthlink.net]
**Sent:**     Tuesday, March 08, 2005 10:11 AM
**To:**       Molina, Jackie
**Subject:** Re: Sodium Nitrite for Hot Water Closed Loop

Jackie,

I checked out several options for a product that would work for your system.  All of the liquid products come in 55 gallon drums which is much more than we would ever use under normal conditions.  I was able to locate a dry form of sodium nitrite which comes in 50 # bags.  We could then mix this product with water and add to the closed loop system.  This could be stored in a sealed 5 gallon pail and would stay active virtually forever as long as it did not get wet.  In order to save on the shipping charge I will send it with the RE 730 to Sterling and then bring it over to the Rock Falls plant.  The pricing on this product is $91.50 and I will add it to the system and maintain the level once the system leaks are repaired.  We will need to start an online blowdown to clean the system and I can set this up when you want to get started.  Once we have this system cleaned up we should be fine until another leak occurs.  Please let me know what you decide.

Thank you for the opportunity to be of service.


Greg

## Molina, Jackie

| | |
|---|---|
| **From:** | Rhema Enterprises LLC [rhema_enterprises@earthlink.net] |
| **Sent:** | Sunday, August 07, 2005 9:57 PM |
| **To:** | Molina, Jackie |
| **Subject:** | Re: Catalyzed Sodium Bisulfite |

Jackie,

Here is the information you requested regarding the catalyzed sodium bisulfite for the boiler lay-up. This product will be delivered in a 55 gallon drum weighing 572 lbs. Pricing on the product will be $1.04/lb. I will also service the facility during the various shut downs to insure we maintain a proper level of oxygen scavenger in the boiler. Bill and I should easily be able to develop the formula for shutdowns after a time or two of experimentation. This will make the shutdowns very easy and almost fool proof. Please let me know if you have any further questions.

Thank you.

Greg

| Rhema Ent. LLC | BOILER SERVICE REPORT |
| | National MFG. Inc. |

**Company:** National Mfg. Co.          **Engineer:** Mr. Bill Buckingham

**Location:** Sterling, IL               **Date:** 7/20/05

**Copies:** Jackie Molina, Mike King                                    Page: 1

| | Well | Dealk. | Feed water | Boiler water | Cond. | Recommended readings |
|---|---|---|---|---|---|---|
| **pH** | | 6.60 | 8.40 | 10.64 | 8.24 | Boiler < 11.5 cond. > 8.3 |
| **Total Alkalinity ( ppm)** | | 30 | 29 | 290 | | Boiler < 500 dealk. < 60 |
| **Total Hardness (ppm)** | | .5 | 2.0 | | .3 | Feedwater < .5 |
| **Erythorbate (ppb)** | | | | | | 120-150 ppb |
| **Polymer (ppm)** | | | | | | 10-20 |
| **Conductivity (uMhos)** | | 720 | 560 | 7100 | 5 | Boiler 6000-7000 |
| **Phosphate (ppm)** | 1.2 | | | | | .5 – 1.5 |

**Comments:**

1) Our well treatment chemical level was just over the upper limits today due to the low water usage and the fact that our boilers are going up and down. We will be turning the pump off when the boilers go down.

2) We still have condensate coming back to the boiler house with all the diverter valves being in the on position. The condensate conductivity was very good at 5 uMhos but we are getting metal back into the system from time to time. The only way to stop this is to deadhead the condensate lines which is not going to happen at this point in time.

3) Our dealkalizer performance and chemistries have improved greatly since Bill started valving out and turning our caustic pumps off after regeneration of the units.

**Technical Representative:**     *Gregory P. Kinsman*

| Rhema Ent. LLC | BOILER SERVICE REPORT |
| --- | --- |
| | National MFG. Inc. |

4) Feed water chemistries were as expected today based on our other readings. Conductivity was measured at 560 uMhos with the system hardness at 2 ppm. Our total alkalinity was down at only 29 ppm. Bill has been monitoring the residual polymer reading closely to insure we are handling the hardness and protecting the boiler.

5) Our boiler chemistries looked very good today with all our readings well within the operating parameters even with the boiler conductivity up at 7100 uMhos. Chemical levels were good. Loading on the boiler was minimal as it cycled up and down. Bill is waiting for instruction on how the boilers will be layed up.

Thank you for the opportunity to be of service.

**Technical Representative:**    *Gregory P. Kinsman*

| | | BOILER SERVICE REPORT |
|---|---|---|
| **Rhema Ent. LLC** | | **National MFG. Inc.** |

Company: National Mfg. Co.

Location: Sterling, IL

Engineer: Mr. Bill Buckingham

Date: 5/10/05

Copies: Jackie Molina, Mike King

Page: 1

| | Well | Dealk. #1 5,000 | Feed water | Boiler water | Cond. | Recommended readings |
|---|---|---|---|---|---|---|
| pH | | 8.73 | 8.5 | 10.57 | 8.83 | Boiler < 11.5 cond. > 8.3 |
| Total Alkalinity ( ppm) | | 34 | 25 | 364 | 0.0 | Boiler < 500 dealk. < 60 |
| Total Hardness (ppm) | | .1 | ???? | | 0.0 | Feedwater < .5 |
| Erythorbate (ppb) | | | | | | 120-150 ppb |
| Polymer (ppm) | | | | | | 10-20 |
| Conductivity (uMhos) | | 655 | 540 | 5800 | 6 | Boiler 6000-7000 |
| Phosphate (ppm) | 1.01 | | | | | .5 – 1.5 |

Comments:
1) Well water treatment levels were at the target level of 1 ppm today. No changes in the settings are required.
2) Our condensate quality remains excellent with extremely pure condensate at the time I tested. Total hardness and alkalinity were both 0 ppm today. Conductivity was measured at only 6 uMhos. Bill is going to have a sample collected 1st thing in the morning as we had hardness cycled up in the feed water. I think we are still getting contamination when the Hobbs 2 unit shuts down and the coils cool. This is when the contamination takes place. Bill says the hardness only comes on certain days so it may be when particular tanks are used. The bottom line is that our diverter, even though closed, must be leaking by. Bill will check these possibilities out over the next couple days.

**Technical Representative:** *Gregory P. Kinsman*

| | BOILER SERVICE REPORT |
|---|---|
| Rhema Ent. LLC | National MFG. Inc. |

3) Feed water conductivity was elevated today due to the higher hardness levels.  The total alkalinity and pH readings were fine.
4) Boiler chemistries looked good today with the boiler just getting cycled up to 6000 uMhos.  Both pH and alkalinity readings were good.  Bill is going to try and get the controller probe cleaned and the line flushed when the boiler goes down.

Thank you for the opportunity to be of service.

**Technical Representative:**  _Gregory P. Kinsman_

| Rhema Ent. LLC | BOILER SERVICE REPORT |
| --- | --- |
| | National MFG. Inc. |

**Company:** National Mfg. Co.   **Engineer:** Mr. Bill Buckingham

**Location:** Sterling, IL   **Date:** 4/26/05

**Copies:** Jackie Molina, Mike King   **Page:** 1

| | Well | Dealk. #1 4000 r | Feed water | Boiler water | Cond. | Recommended readings |
| --- | --- | --- | --- | --- | --- | --- |
| **pH** | | 6 | 8.36 | 10.69 | 8.43 | Boiler < 11.5 cond. > 8.3 |
| **Total Alkalinity ( ppm)** | | 34 | 29 | 332 | 2 | Boiler < 500 dealk. < 60 |
| **Total Hardness (ppm)** | | <.1 | 0 | | 0 | Feedwater < .5 |
| **Erythorbate (ppb)** | | | | | | 120-150 ppb |
| **Polymer (ppm)** | | | | | | 10-20 |
| **Conductivity (uMhos)** | | 680 | 400 | 6000 | 7 | Boiler 6000-7000 |
| **Phosphate (ppm)** | 1.61 | | | | | .5 – 1.5 |

Comments:

1) Well water phosphate levels remain very consistent with the level being measured at 1.61 ppm. It has been here now for my last two visits over the past month. This level insures no scaling of the system and scale prevention in the air compressors.

2) Our #1 dealkalizer was online today with 4,000 gallons remaining on the run. Total alkalinity was measured at 34 ppm which is very good at this stage in the run. Total hardness was measured at <.1 ppm indicating the resin is clean and free of hardness. This allows the dealkalizer to maximize efficiency.

3) Feedwater quality remains very good with the total hardness at 0 ppm and the total alkalinity at 29 ppm. The pH was good at 8.36 with the conductivity at 400 uMhos. The lack of condensate is the reason for the elevated conductivity.

**Technical Representative:**   *Gregory P. Kinsman*

| Rhema Ent. LLC | BOILER SERVICE REPORT |
|---|---|
| | National MFG. Inc. |

4) Condensate quality is excellent. The conductivity remains in the single digits at 7 uMhos today. Our total hardness was 0 ppm with the total alkalinity at .1 ppm. Bill has the pH perfect with a reading of 8.43 being measured. This indicates the amine feed is matched to the steam line flow which is not that easy to achieve. We are still dumping the little bit of condensate from the Walgren unit which has a hole in the coil.

5) Boiler chemistries were good today with all our readings well within the operating parameters. The boiler is still cycling up from the valve which stuck open. Bill caught it quickly when he came in so we recovered quickly as well.

6) Inventory levels were good today with no chemicals being required.

Thank you for the opportunity to be of service.

**Technical Representative:**    *Gregory P. Kinsman*

| Rhema Ent. LLC | BOILER SERVICE REPORT |
| --- | --- |
|  | National MFG. Inc. |

**Company:** National Mfg. Co.

**Location:** Sterling, IL

**Engineer:** Mr. Bill Buckingham

**Date:** 3/29/05

**Copies:** Jackie Molina, Mike King

**Page:** 1

|  | Well | Dealk. | Feed water | Boiler water | Cond. | Recommended readings |
| --- | --- | --- | --- | --- | --- | --- |
| pH |  | 6.54 | 9.27 | 11.06 | 7.90 | Boiler < 11.5 cond. > 8.3 |
| Total Alkalinity ( ppm) |  | 48 | 50 | 398 | 0 | Boiler < 500 dealk. < 60 |
| Total Hardness (ppm) |  | .8 | 2.9 |  | 0 | Feedwater < .5 |
| Erythorbate (ppb) |  |  |  |  |  | 120-150 ppb |
| Polymer (ppm) |  |  |  |  |  | 10-20 |
| Conductivity (uMhos) |  | 640 | 375 | 7000 | 3.6 | Boiler 6000-7000 |
| Phosphate (ppm) | 2.21 |  |  |  |  | .5 – 1.5 |

Comments:

1) The City is over feeding a phosphate corrosion inhibitor to the water. The phosphate level in the City water was up at 2.21 ppm today. Bill has turned our treatment pump off for now.

2) Condensate quality was extremely good today with the Hobbs unit valved out. There is a leak in one of the coils sending solution back in the condensate. The condensate today had a conductivity of only 3.6 uMhos which is as pure as it gets from a process facility. Our pH was slightly depressed with the total hardness and total alkalinity both at 0 ppm. Bill was going to make a small adjustment on the amine feed.

3) Our #1 dealkalizer was on line with 1000 gallons thru the unit. pH looked good at 6.54 with the total alkalinity at 48 ppm. The total hardness was higher today at .8 ppm. Further investigation indicated the timer for the brine feed never activated during the last regeneration. Bill has a work order in to get this repaired. It will back on track once it is regenerated again.

**Technical Representative:**   *Gregory P. Kinsman*

| | BOILER SERVICE REPORT |
|---|---|
| **Rhema Ent. LLC** | **National MFG. Inc.** |

4) Boiler chemistries were good today with the boiler fully cycled to 7000 uMhos. pH was excellent at 11.06 and our total alkalinity was 398 ppm. All these readings indicate we are operating at the maximum efficiency possible under the current situation.

5) Bill and I have discussed the proper lay-up procedure for the boilers during the intermittent operation which could occur, from time to time, during the summer months. I am sending an MSDS sheet for the product of choice which will best fulfill the requirements.

Thank you for the opportunity to be of service.

**Technical Representative:**     *Gregory P. Kinsman*

| | | BOILER SERVICE REPORT |
|---|---|---|
| **Rhema Ent. LLC** | | **National MFG. Inc.** |

Company: National Mfg. Co.

Location: Sterling, IL

Copies: Jackie Molina, Mike King

Engineer: Mr. Bill Buckingham

Date: 3/15/05

Page: 1

| | Well | Dealk. | Feed water | Boiler water | Cond. | Recommended readings |
|---|---|---|---|---|---|---|
| pH | | 7.98 | 9.34 | 10.99 | 8.34 | Boiler < 11.5 cond. > 8.3 |
| Total Alkalinity ( ppm) | | 50 | 56 | 360 | 0 | Boiler < 500 dealk. < 60 |
| Total Hardness (ppm) | | 0 | .1 | | 0 | Feedwater < .5 |
| Erythorbate (ppb) | | | | | | 120-150 ppb |
| Polymer (ppm) | | | | | | 10-20 |
| Conductivity (uMhos) | | 720 | 340 | 6900 | 9.2 | Boiler 6000-7000 |
| Phosphate (ppm) | 1.29 | | | | | .5 – 1.5 |

Comments:

1) Our Well water phosphate level was excellent today with the reading at 1.29 ppm. No changes or adjustments are required in this system as of today.

2) Condensate quality remains exceptional but we just don't have enough of it. Conductivity was down to only 9.2 uMhos today with both the total hardness and total alkalinity at 0 ppm.

3) The #1 dealkalizer had just come on line today when I sampled. It had only 100 gallons through it when I tested. The pH was elevated along with the alkalinity and conductivity. All of these readings should drop off quickly once we have some more water through the unit. Bill will check the readings later to insure they are within the operating parameters. Total hardness in the unit was 0 ppm which indicates the units are very clean.

4) Feedwater readings were good based on our pretreatment system performance. This too will improve as the dealkalizer improves.

**Technical Representative:**  *Gregory P. Kinsman*

| Rhema Ent. LLC | **BOILER SERVICE REPORT** |
|---|---|
| | National MFG. Inc. |

5) Boiler chemistries were very good today with the boiler conductivity up at 6900 uMhos and our pH only at 10.99. Total alkalinity was down at 360 uMhos which is very good. We calibrated the controller again today and Bill will check it again later. It usually takes an additional calibrate later in the day to get the reading where it belongs.

6) Chemical inventories are good with a drum of RE 730 being delivered today.

Thank you for the opportunity to be of service.

**Technical Representative:**    *Gregory P. Kinsman*

# Rhema Ent. LLC

## BOILER SERVICE REPORT

# National MFG. Inc.

Company: National Mfg. Co.

Location: Sterling, IL

Engineer: Mr. Bill Buckingham

Date: 2/25/05

Copies: Jackie Molina, Mike King

Page: 1

| | Well | Dealk. 2,000 remain. | Feed water | Boiler water | Cond. | Recommended readings |
|---|---|---|---|---|---|---|
| pH | | 7.78 | 8.83 | 10.55 | 9.24 | Boiler < 11.5 cond. > 8.3 |
| Total Alkalinity ( ppm) | | 44 | 8 | 270 | 2 | Boiler < 500 dealk. < 60 |
| Total Hardness (ppm) | | .1 | 0 | | 0 | Feedwater < .5 |
| Erythorbate (ppb) | | | | | | 120-150 ppb |
| Polymer (ppm) | | | | | | 10-20 |
| Conductivity (uMhos) | | 620 | 300 | 6200 | 26 | Boiler 6000-7000 |
| Phosphate (ppm) | 1.78 | | | | | .5 – 1.5 |

Comments:

1) Well water phosphate treatment was average today with the reading at 1.78 ppm. We have the pump as low as possible and shut the system down besides. This is pretty good under the current situation.

2) The #2 dealkalizer was on line with 2,000 gallons remaining on the run. Total alkalinity was good at 44 ppm with the total hardness down at .1 ppm. This indicates the resin is extremely clean and the reason for the excellent readings.

Technical Representative: *Gregory P. Kinsman*

| Rhema Ent. LLC | BOILER SERVICE REPORT |
| | National MFG. Inc. |

3) Our feedwater sample was good today considering the low steam usage. Total hardness was 0 ppm with a total alkalinity of 8 ppm which is very good. The pH was 8.83 with the conductivity at 300 uMhos. We can't really expect much more with the low steam flow and limited condensate return.

4) Boiler chemistries were good today with all our readings well within the operating parameters. Our pH was one whole unit below the upper limit. Total alkalinity was excellent at 270 uMhos with the conductivity up at 6200 uMhos. The boiler will hit 7000 uMhos by the end of the day. Bill recalibrated the controller as it was reading low.

I stopped and checked the closed loop hot water boiler at Rock Falls this morning. I ran a nitrite test and a phosphate test on the boiler sample. Results indicated no nitrite residual and an excessively high phosphate level. The only source of phosphate in this system is the heat exchanger which is apparently leaking. Once this is repaired we will need to flush the system, probably slowly while the unit is online, until it is clean again and then treat with nitrite. I will check into product sizing and pricing and let you know.

Thank you for the opportunity to be of service.

Technical Representative:    *Gregory P. Kinsman*

| Rhema Ent. LLC | BOILER SERVICE REPORT |
| --- | --- |
|  | National MFG. Inc. |

**Company:** National Mfg. Co.　　　　　**Engineer:** Mr. Bill Buckingham

**Location:** Sterling, IL　　　　　　　　**Date:** 2/11/05

**Copies:** Jackie Molina, Mike King　　　　　　　　　　　　　　**Page:** 1

|  | Well | Dealk. #1 3,000 gal. rem. | Feed water | Boiler water | Cond. | Recommended readings |
| --- | --- | --- | --- | --- | --- | --- |
| pH |  | 9.34 | 9.33 | 10.45 | 9.24 | Boiler < 11.5 cond. > 8.3 |
| Total Alkalinity ( ppm) |  | 21 | 30 | 272 | 0 | Boiler < 500 dealk. < 60 |
| Total Hardness (ppm) |  | .1 | 0 |  | 0 | Feedwater < .5 |
| Erythorbate (ppb) |  |  |  |  |  | 120-150 ppb |
| Polymer (ppm) |  |  |  |  |  | 10-20 |
| Conductivity (uMhos) |  | 680 | 290 | 6600 | 10 | Boiler 6000-7000 |
| Phosphate (ppm) | 1.70 |  |  |  |  | .5 – 1.5 |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

Comments:

1) The well water treatment level was pretty good today with the phosphate being measured at 1.70 ppm. This is about as close as we are going to get under the current conditions. This level will insure our compressors and water system will remain clean and free of scale.
2) Return condensate quality remains extremely good. We just don't have enough of it.
3) Our feedwater continues to look good with the chemical level for the erythorbate right where it needs to be. Conductivity would be better only if we had more condensate.

**Technical Representative:**　　*Gregory P. Kinsman*

| | BOILER SERVICE REPORT |
|---|---|
| Rhema Ent. LLC | National MFG. Inc. |

4) Boiler chemistries were exceptionally good today. The boiler was operating at 6600 uMhos with the pH down at 10.45 and the total alkalinity down at only 272 ppm. There is still plenty of room to cycle up the boiler even more. Today the boiler was operating at 23 cycles. We should be able to get to 30 cycles with no problems based on today's readings. This has always been our goal.

5) We are fine with chemical inventory today with no chemicals being required at this point in time.

Thank you for the opportunity to be of service.

**Technical Representative:**    *Gregory P. Kinsman*

| Rhema Ent. LLC | BOILER SERVICE REPORT |
|---|---|
| | National MFG. Inc. |

Company: National Mfg. Co.

Location: Sterling, IL

Engineer: Mr. Bill Buckingham

Date: 1/14/05

Copies: Jackie Molina, Mike King

Page: 1

| | Well | Dealk. | Feed water | Boiler water | Cond. | Recommended readings |
|---|---|---|---|---|---|---|
| pH | | | 9.04 | 10.77 | 8.48 | Boiler < 11.5 cond. > 8.3 |
| Total Alkalinity ( ppm) | | 22 | 14 | 246 | 0 | Boiler < 500 dealk. < 60 |
| Total Hardness (ppm) | | 0 | 0 | | 0 | Feedwater < .5 |
| Erythorbate (ppb) | | | | | | 120-150 ppb |
| Polymer (ppm) | | | | | | 10-20 |
| Conductivity (uMhos) | | 720 | 220 | 6200 | 10 | Boiler 6000-7000 |
| Phosphate (ppm) | 2.84 | | | | | .5 – 1.5 |

Comments:

1) With the water usage down our phosphate level in the well water sample was elevated today. Bill will reduce the feed until the level falls back in range. This will probably require shutting off the pump for the weekend or at least one day and night. We do not want to operate the compressors with a lower level than recommended due to possible scaling. We have not had a compressor go down on high temperature since we started the program and they have always been spotless during inspections.

2) Condensate today was the best I have ever seen. We only have a unit or two operating and all the condensate is being returned. A conductivity of 10 uMhos is incredible. Our pH was good.

3) The dealkalizer on line was producing excellent water with a total alkalinity of only 22 uMhos. The units are now exceptionally clean with a total hardness reading of 0 ppm today. Bill has really cleaned up the units and them operating very efficiently.

Technical Representative:   *Gregory P. Kinsman*

| Rhema Ent. LLC | BOILER SERVICE REPORT |
| --- | --- |
| | National MFG. Inc. |

4) Feed water quality remains fine, as expected, with the large percentage of condensate from the heating system. We just don't have the volumes we used to have. Today's sample had a conductivity of 220 uMhos which is good under the current circumstances.

5) Our boiler was operating just under 30 cycles today. The boiler is cycling up and will be up over 30 cycles over the weekend. With the #2 boiler slated for inspection next Friday, we will have this one on-line for a few weeks. The longer they can stay on-line the better the efficiency and results. Today's pH was down at 10.77 with the total alkalinity at only 246. We have plenty of room to get this boiler cycled up fully especially now with the available running time.

6) Inventory levels look good with none being needed at this time.

Thank you for the opportunity to be of service.

Technical Representative:    *Gregory P. Kinsman*

| Rhema Ent. LLC | BOILER SERVICE REPORT |
| --- | --- |
| | National MFG. Inc. |

Company: National Mfg. Co.  
Location: Sterling, IL

Engineer: Mr. Bill Buckingham  
Date: 12/3/04

Copies: Jackie Molina, Mike King

Page: 1

| | Well | Dealk. | Feed water | Boiler water | Cond. | Recommended readings |
| --- | --- | --- | --- | --- | --- | --- |
| pH | | 6.74 | 9.21 | 11.26 | 8.87 | Boiler < 11.5 cond. > 8.3 |
| Total Alkalinity ( ppm) | | 54 | 24 | 420 | 1 | Boiler < 500 dealk. < 60 |
| Total Hardness (ppm) | | .1 | <.1 | | 0 | Feedwater < .5 |
| Erythorbate (ppb) | | | | | | 120-150 ppb |
| Polymer (ppm) | | | | | | 10-20 |
| Conductivity (uMhos) | | 650 | 300 | 7600 | 11 | Boiler 6000-7000 |
| Phosphate (ppm) | 2.01 | | | | | .5 – 1.5 |

Comments:

1) Well water phosphate was measured at 2.01 ppm today which is just above the upper limit of 1.5 ppm. Bill and I talked about shutting the pump off over night if we can still maintain the proper level in the water during the day when most the usage occurs.
2) Condensate quality is the best we have seen with the heating lines all open. Conductivity was measured at 11 uMhos with the condensate making up just over 50% of our makeup water. Total hardness was 0 ppm with the total alkalinity down at only 1 ppm. This is very good water.
3) The #2 dealkalizer was online with only 500 gallons remaining on the run. Total alkalinity was excellent at 54 ppm and the total hardness was down to only .1 ppm. Bill did an excellent job getting the units back up and running after they went bad.

**Technical Representative:**   *Gregory P. Kinsman*

| | BOILER SERVICE REPORT |
|---|---|
| Rhema Ent. LLC | National MFG. Inc. |

4) Feedwater quality was as expected today based on our other readings. The pH was 9.21 with the total hardness at <.1 ppm. Total alkalinity was 24 ppm which is very good. With 47% or our feedwater being new makeup our conductivity was 300 uMhos

5) Boiler chemistries were very good with the pH at 11.26 and the total alkalinity at 420 ppm. These were especially good with the boiler conductivity up over 7000 uMhos. Bill started blowing down the boiler and was going to calibrate the probe. The conductivity was just over the upper limit.

Thank you for the opportunity to be of service.

**Technical Representative:**    *Gregory P. Kinsman*

| | | BOILER SERVICE REPORT |
|---|---|---|
| Rhema Ent. LLC | | National MFG. Inc. |

Company: National Mfg. Co.

Engineer: Mr. Bill Buckingham

Location: Sterling, IL

Date: 10/15/04

Copies: Jackie Molina, Mike King

Page: 1

| | Well | Dealk. | Feed water | Boiler water | Cond. | Recommended readings |
|---|---|---|---|---|---|---|
| pH | | | 9.45 | 10.37 | 9.02 | Boiler < 11.5 cond. > 8.3 |
| Total Alkalinity ( ppm) | | 28 | 16 | 400 | 4 | Boiler < 500 dealk. < 60 |
| Total Hardness (ppm) | | .8 | 0 | | 0 | Feedwater < .5 |
| Erythorbate (ppb) | | | | | | 120-150 ppb |
| Polymer (ppm) | | | | | | 10-20 |
| Conductivity (uMhos) | | 650 | 255 | 7200 | 22 | Boiler 6000-7000 |
| Phosphate (ppm) | 2.28 | | | | | .5 – 1.5 |
| | | | | | | |

**Comments:**

1) The well phosphate level was elevated today due to the low water usage. Bill set the pump down considerably to offset the drop in water usage. We may need to go to an intermittent feed if the levels remain elevated.

2) Our pretreatment system was operating very efficiently today with the total alkalinity from the dealkalizers down to only 28 ppm and the total hardness in the sample at .8 ppm. The cleaning of the units on a regular basis has really improved their performance.

3) Feedwater quality was very good today even without the heating condensate return coming yet. The conductivity was 255 uMhos with the total hardness at 0 ppm and the alkalinity down at only 16 ppm. The operators are doing an excellent job with the oxygen scavenger readings considering the very high amount of air in the entire feed system. This is the most critical area of treatment regarding boiler treatment and protection.

**Technical Representative:**    *Gregory P. Kinsman*

| | BOILER SERVICE REPORT |
|---|---|
| Rhema Ent. LLC | National MFG. Inc. |

4) Boiler chemistries looked good considering the higher conductivity in the boiler. Today's conductivity was up at 7200 uMhos. Even at this level the pH and total alkalinity were well within the operating parameters. The boiler was operating at just under 30 cycles which is very good with no heating condensate returning yet. Bill calibrated the controller to insure we had accurate readings. These were exceptional readings considering the boiler conductivity and number of cycles which were being obtained.

5) The condensate treatment inventory is getting down and Bill will need to order over the next couple weeks. All the rest of the inventories look fine.

Thank you for the opportunity to be of service.

**Technical Representative:**    *Gregory P. Kinsman*

E-FILED
Friday, 21 July, 2006  12:02:33 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 4 – SELECTED RECORDS OF DUKE ENERGY CO.

# 'Visitors' Register

2002

| DATE | NAME | FIRM | ADDRESS | | | TO SEE | |
|---|---|---|---|---|---|---|---|
| | | | STREET | | | | |
| 10/7 | Tony Cope | D.P. MHTC | 1900 N Main St | | | | |
| | | | CITY NLT | STATE NC | TIME IN | TIME OUT | |
| | | | STREET | | | | |
| 10/7 | Steve Arkels | Arkels Const | CITY Princeton | STATE IL | TIME IN | TIME OUT | |
| | | | STREET | | | | |
| 10/8 | James Thaine | USFilter | CITY | STATE | TIME IN | TIME OUT | |
| | | | STREET | | | Jim | |
| 10/9/02 | Dan Miller | CIE | CITY Fern | STATE IL | TIME IN | TIME OUT | |
| | | | STREET | | | | |
| 10/9 | Gary Arnett | Kinder Morgan | CITY Geneseo | STATE ILL | TIME IN 10:55 | 11:15 TIME OUT | |
| | | | STREET 207 W 2nd St | | | Cable Locate | |
| 10/9 | Dave Blaine | Gallatin River | CITY Dixon | STATE Ill | TIME IN | OUT TIME OUT | |
| | | | STREET | | | | |
| 10/9 | GREG KINSMAN | CTI | CITY PRINCETON | STATE | TIME IN | 2:30 TIME OUT | |
| | | | STREET | | | | |
| 10/10 | Rick Uraneta | PHALEN STEEL | CITY MENDOTA | STATE | TIME IN 2:15 | 4:25 TIME OUT | |
| | | | STREET | | | | |
| 10/10 | MARK LANE | PHALEN STEEL | CITY MENDOTA | STATE IL | TIME IN 2:45 | 4:25 TIME OUT | |
| | | | STREET | | | | |
| 10/11 | Rick Uraneta | PHALEN Steel | CITY MENDOTA | STATE IL | TIME IN 7:00 | 8:30 TIME OUT | |
| | | | STREET | | | | |
| 10-11 | Glent Strabow | Morrison Blacktop | CITY Morris | STATE IL | TIME IN 7:10 | 12:03 TIME OUT | |
| | | | STREET | | | | |
| 10/11 | Danny Strand | Morrison Blacktop | CITY Morrison | STATE IL | TIME IN 7:10 | 12:03 TIME OUT | |
| | | | STREET | | | | |
| 10/11 | STEVE ARKELS | ARKELS Const | CITY PRINCETON | STATE IL | TIME IN 7:15 | 12:00 pm TIME OUT | |
| | | | STREET | | | | |
| | Chad Arkels | Arkels Const | CITY Princeton | STATE IL | TIME IN 7:15 | 12:00 pm TIME OUT | |
| | | | STREET | | | | |
| 10/11 | Gary Arnett | Kinder Morgan | CITY Geneseo | STATE ILL | TIME IN 8:15 | 11: Am. TIME OUT | |

# *Visitors' Register*

| DATE | NAME | FIRM | ADDRESS | | | TO SEE | |
|------|------|------|---------|---|---|--------|---|
| | | | STREET | CITY / STATE | TIME IN | | TIME OUT |
| 10/25 | WILL HOWARD | ComEd METERING | 1919 SWIFT DRIVE | OAKBROOK  STATE IL | 11:30 AM | 4:00 |
| 10/30/02 | SAM CHILDERS | MGE | 1017 JOLIET ST | LA SALLE  STATE IL | 0640 | |
| 10/30/02 | DON MILLER | C&E | | PERU  STATE | Jim— | |
| 10/31/02 | SAM CHILDERS | MGE | 1017 JOLIET ST | LA SALLE  STATE IL | 0930 | 1400 |
| 11/1/02 | Chad Arkels | Arkels Construction | | Princeton  STATE IL | 7:30 | 2:24 |
| 11/1/02 | Paul Heid | Ecolochem | | ST. PETERS  STATE MO | 8:30 | 9:00 |
| 11-1-02 | Valerie Johnston | Gallatin River | 200 Enterprise | Pekin  STATE IL | 10:15 | 4:30 |
| 11/1 | WILL HOWARD | ComEd METERING | 1919 SWIFT Dr | | 12:45 | 4:15 |
| 11/04 | MICHAEL DIEMER | WORK TECHNOLOGY | | | | |
| 11/05 | FUZZY MERRITT | Duke Energy | S Church St | Charlotte  STATE NC | 07:00An | 05:30p |
| 11/6/02 | DON MILLER | C&E | | PERU  STATE IL | Jim— | |
| 11/6/02 | GREG KINSMAN | CTI | | PRINCETON, IL. | 12:30 | 2:00 |
| 11/8 | Sawnya Hambly | JA | | Moline  STATE | 1:30 | 2:00 |
| 11/11 | ROB BAUGHMAN Bmen | CBI/PHALEN'S | | MENDOTA  STATE | 7:36 | 4:00 |
| 11/11 | SAM CHILDERS | MGE  UPS SYSTEMS | 1017 JOLIET ST | LASALLE  STATE IL | 0800 | |

# Visitors' Register

2003

| DATE | NAME | FIRM | ADDRESS | | TO SEE | |
|------|------|------|---------|--|--------|--|
| | | | STREET | | | 10:30 |
| 7/10 | CHAD COUNARD | ANSUL | CITY __ STATE | TIME IN 8:00 | TIME OUT | |
| | | | STREET | | | 10:30 |
| 7/10 | GALE BEHNKE | ANSUL | CITY __ STATE | TIME IN 8:00 | TIME OUT | |
| | | | STREET | | | |
| 7/10 | Don Tonozzi | CIE | CITY Peru STATE | 8:35 TIME IN | TIME OUT | |
| | | | STREET | | | |
| 7/22 | Jim Schulta | MENARDS | CITY __ STATE | 9:51 TIME IN | TIME OUT | |
| | | | STREET | | | |
| 7/23 | Don Tonozzi | CIE | CITY Peru STATE | 8:40 TIME IN | TIME OUT | |
| | | | STREET | | | |
| 7/23 | Dan Picwolla | Central State | CITY __ STATE | 3:00 TIME IN | 3:50 TIME OUT | |
| | | | STREET | | | |
| 7/24 | Steve Brown | Central River | CITY __ STATE | TIME IN | TIME OUT | |
| | | | STREET | | | 11:15 |
| 7/29 | DOUG Eney | " " | CITY __ STATE | 10:30 TIME IN | TIME OUT | |
| | | | STREET | | | 10:45 |
| 8/5 | JOE GLASS | Duke Power | CITY __ STATE | 9:45 TIME IN | TIME OUT | |
| | | | STREET | | | |
| 8/6 | Don Tonozzi | CIE | CITY Peru STATE | 8:50 TIME IN | TIME OUT | |
| | | | STREET | | | |
| 8/7 | Rob Strober | Duke | CITY __ STATE | 2:45 TIME IN | 5:00 TIME OUT | |
| | | | STREET | | | |
| 8/8 | Greg Kinsman | CTI | CITY Princeton STATE | 11:29 TIME IN | TIME OUT | |
| 8/13 | Dixon Rural F.D. Chief Kevin Lalley + 25 men | | STREET | | | |
| | | | CITY __ STATE | 7:20 PM TIME IN | 8:56 P TIME OUT | |
| 15 Aug | Scott Schindler | Morse Electric | STREET | J-Curbo | | |
| | | | CITY __ STATE | 1:15 p TIME IN | 15:45 TIME OUT | |
| 21 Aug | Scott Schindler Shawn Gaffny | Morse/IES | STREET | J-Curbo | | |
| | | | CITY __ STATE | 10 am TIME IN | 12 pm TIME OUT | |

# Visitors' Register

| DATE | NAME | FIRM | ADDRESS | | TO SEE | |
|------|------|------|---------|---|--------|---|
| 9-2-04 | MARTY WINTERLAND | SJOSTROM | STREET ROCKFORD D<br>CITY                    STATE | | TIME IN 7:00 | TIME OUT 3:30 |
| 9-2-04 | Stu Thompson | Sjostrom + Sons Inc. | STREET Harrison Ave<br>CITY Rockford STATE IL | | TIME IN 7:00 | TIME OUT 3 30 |
| 9-2-04 | Doug Negus | STOStrom | STREET<br>CITY Rockford STATE IL | | TIME IN 7:00 | TIME OUT 3:30 |
| 9-2-04 | Lett Nelson MARTIN + Co | MARTIN + Co | STREET<br>CITY Chance STATE IL | | TIME IN 7:00 | TIME OUT |
| 9-2-04 | Doug Taylor | Rigging Servic | STREET RKFD     Il<br>CITY            STATE | | TIME IN 7:30 | TIME OUT 9:10 |
| 9-2-04 | Bill CATTANI | CATTANI CRANE | STREET<br>CITY LADD STATE IL | | TIME IN 7:30 | TIME OUT 9:20 |
| 9/3/04 | Bruce Binger | Morse | STREET<br>CITY Pilott STATE | | TIME IN 6:40 | TIME OUT 8:30 |
| 9-3-04 | Charles Tabor | SJOStrom | STREET<br>CITY Rockford STATE IL | | TIME IN 7:00 | TIME OUT 1:30 |
| 9-3-04 | VAN Johnson | SJOSTROM | STREET<br>CITY Rockford STATE IL | | TIME IN 7:05 | TIME OUT 1:30 |
| 9-3-04 | Steve ① Austin | MARTIN | STREET<br>CITY Oregon STATE | | TIME IN 7:22 | TIME OUT 7:45 |
| 9/3/04 | GREG KINSMAN | CTI | STREET PRINCETON IL<br>CITY            STATE | | TIME IN 8:55 | TIME OUT 10:16 |
| 9-7-04 | JAY Hoefle | MORSE | STREET Durand<br>CITY            STATE | | TIME IN 7:01 | TIME OUT 1:30 |
| 9-7-04 | IAN Johnson | SJOSTROM | STREET<br>CITY Rockford STATE IL | | TIME IN 7:00 | TIME OUT 1:45 |
| 9-8-04 | Steve ② Austin | MARTIN | STREET<br>CITY Oregon STATE | | TIME IN 6:30 | TIME OUT 3:00 |
| 9/8/04 | Bruce Binger | Morse ③ | STREET<br>CITY Pilott STATE IL | | TIME IN 6:55 | TIME OUT 3:30 |

# Visitors' Register

2005

| DATE | NAME | FIRM | ADDRESS | | TO SEE | |
|------|------|------|---------|---|--------|---|
| 8/24 | Duey Johnson | DENA | STREET / CITY STATE | | 7:30A TIME IN | 4:30 TIME OUT |
| 8/25 | Duey Johnson | DENA | STREET / CITY STATE | | 7:30A TIME IN | 1:30 TIME OUT |
| 8/26 | Duey Johnson | DENA | STREET / CITY STATE | | 7:30A TIME IN | 6:00 TIME OUT |
| 8/26 | Dick Womack | ORKIN Pest Control | STREET / CITY STATE | | 10:48 TIME IN | 11:37A TIME OUT |
| 9/15 | JON HART | S.J. CARLSON | STREET / CITY STATE | | 7:30 TIME IN A.M. | TIME OUT |
| 9/15 | Ben Weller | S.J. Carlson | STREET / CITY STATE | | 7:30 TIME IN A.M. | TIME OUT |
| 9/15 | Kevin Lally | Dixon Roof Fix | STREET / CITY STATE | | 8:35 TIME IN | 10:4 TIME OUT |
| 9/16 | GREG KINSMAN | REI | STREET / CITY STATE | | 8:30 TIME IN | TIME OUT |
| 9/16 | Doug Finn | Finn Exc | STREET / CITY STATE | | 9:15 TIME IN | 9:40 TIME OUT |
| 9/26 | Dick Womack | ORKIN | STREET / CITY STATE | | 12:00P TIME IN | 12:3 TIME OUT |
| 10/10 | Rod Shidler Mike Hoogsteden | ATS Inc. (Borescope) | STREET / CITY STATE | | 0718 TIME IN | 1700 TIME OUT |
| 10/18 | Dick Womack | ORKIN | STREET / CITY STATE | | 08:43 TIME IN | 9:15 TIME OUT |
| 10/18 | C. Kinsman | | STREET / CITY STATE | | 10:00 TIME IN | 12:00 TIME OUT |
| 10-31 | Dave Heinz | Automatic Fire | STREET / CITY Freeport STATE IL | | 9:30AM TIME IN | 11:45 TIME OUT |
| 11-3 | BOB BURNER | DENA | STREET / CITY STATE | | 8:00 TIME IN | TIME OUT |

E-FILED
Friday, 21 July, 2006  12:03:35 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 5 - SELECTED RECORDS OF URICH CHEMICAL CO.

# Ulrich Chemical, Inc.

**INVOICE**

(317) 898-8632 **PHONE**
(317) 895-0614 **FAX**

| | Customer Number | |
|---|---|---|
| 1005855 | 11 | |

| Date | Invoice # |
|---|---|
| 03/10/2004 | 107871 |
| Date Shipped | Order # |
| 03/10/2004 | 86998 |

**S O L D  T O**
Rhema Enterprises LLC
P O Box 127
Tiskilwa , IL 61368-
USA

**S H I P  T O**
National Manufacturing Co.
One First Avenue
Sterling , IL 61081-
USA

R

| Customer PO # | FOB Remark | Freight Terms |
|---|---|---|
| Verbal-Greg | Delivered | Prepaid |

| Requisition # | Terms | Due Date | Ship Via | Warehouse | Sales ID |
|---|---|---|---|---|---|
| | Net 30 | 04/09/2004 | Ulrich | 06 | 06074 |

| Units | Package | Product Name | Total Quantity | Unit Price | Amount |
|---|---|---|---|---|---|
| 0.94 | 500 lb DrP Ret Blue | 6000168-Pr0550-Blend RE 680 | 471.00 lb | 0.2400 /lb | 113.04 |

Line Item Remarks:   Packaging: Pr0550, Deposit: 1 container(s) at 50.00 USD per container = 50.00 USD
Packaging: Pr0550, Service: 1 container(s) at 5.00 USD per container = 5.00 USD

| | |
|---|---|
| Container Deposit | 50.00 |
| Container Service Charge | 5.00 |
| Fuel Surcharge | 10.00 |
| Delivery Charge | 25.00 |

**Total:** 203.04

| 02 - Evansville | 03 - Terre Haute | 04 - Fort Wayne | 05 - Louisville | 06 - Bartonville | 07 - Georgetown |
|---|---|---|---|---|---|
| (812) 424-2966 Phone | (812) 234-7757 Phone | (260) 749-9950 Phone | (502) 448-6200 Phone | (309) 697-8400 Phone | (502) 863-0084 Phone |
| (812) 421-2077 Fax | (812) 234-3349 Fax | (260) 749-9650 Fax | (502) 448-6204 Fax | (309) 697-9644 Fax | (502) 863-2523 Fax |

ical, Inc.   P.O. Box 66030   Indianapolis , IN 46266-6030   USA

Page 1 of 1



# Ulrich Chemical, Inc.

Customer Number
1005855    11

Associated Invoice #:  107871

S
O  Rhema Enterprises LLC
L  P O Box 127
D  Tiskilwa , IL 61368-
   USA

T
O

(317) 898-8632 **PHONE**
(317) 895-0614 **FAX**

S  National Manufacturing Co.
H  One First Avenue
I  Sterling , IL 61081-
P  USA

T
O

## CREDIT MEMO

| Date | Memo # |
|------|--------|
| 03/23/2004 | 109538 |
| Date Shipped | Order # |
| 03/10/2004 | 86998 |

R

| Customer PO # | | FOB Remark | | Freight Terms | | |
|---|---|---|---|---|---|---|
| Verbal-Greg | | | | | | |
| Requisition # | | Terms | Due Date | Ship Via | Warehouse | Sales ID |
| | | Net 30 | 04/22/2004 | Ulrich | 06 | 06074 |

| Units | Package | Product Name | Total Quantity | Unit Price | Amount |
|-------|---------|--------------|----------------|------------|--------|
| -0.94 | 500 lb DrP Ret Blue | 6000168-Pr0550-Blend RE 680 | -471.00 lb | 0.2400 /lb | -113.04 |

| | |
|---|---|
| Container Deposit | -50.00 |
| Container Service Charge | -5.00 |
| Fuel Surcharge | -10.00 |
| Delivery Charge | -25.00 |

**Total:**    **-203.04**

**01 - Indianapolis**
(317) 898-8632 Phone
(317) 895-0614 Fax

**02 - Evansville**
(812) 424-2966 Phone
(812) 421-2077 Fax

**03 - Terre Haute**
(812) 234-7757 Phone
(812) 234-3349 Fax

**04 - Fort Wayne**
(260) 749-9950 Phone
(260) 749-9650 Fax

**05 - Louisville**
(502) 448-6200 Phone
(502) 448-6204 Fax

**06 - Bartonville**
(309) 697-8400 Phone
(309) 697-9644 Fax

**07 - Georgetown**
(502) 863-0084 Phone
(502) 863-2523 Fax

Remit To: Ulrich Chemical, Inc.    P.O. Box 66030    Indianapolis , IN 46266-6030    USA

Page 1 of 1

# Ulrich Chemical, Inc.

(317) 898-8632 **PHONE**
(317) 895-0614 **FAX**

| Customer Number | |
|---|---|
| 1005855 | 11 |

S O L D **TO**
Rhema Enterprises LLC
P O Box 127
Tiskilwa , IL 61368-
USA

S H I P **TO**
National Manufacturing Co.
One First Avenue
Sterling , IL 61081-
USA

## INVOICE

| Date | Invoice # |
|---|---|
| 03/10/2004 | 109553 |
| Date Shipped | Order # |
| 03/10/2004 | 86998 |

R

| Customer PO # | FOB Remark | Freight Terms |
|---|---|---|
| Verbal-Greg | Delivered | Prepaid |

| Requisition # | Terms | Due Date | Ship Via | Warehouse | Sales ID |
|---|---|---|---|---|---|
| | Net 30 | 04/09/2004 | Ulrich | 06 | 06074 |

| Units | Package | Product Name | Total Quantity | Unit Price | Amount |
|---|---|---|---|---|---|
| 1.00 | 471 lb DrP Ret Blue | 6000168-Pr0550-Blend RE 680 | 471.00 lb | 135.0000 /E | 135.00 |

Line Item Remarks:    Packaging: Pr0550, Deposit: 1 container(s) at 50.00 USD per container = 50.00 USD
Packaging: Pr0550, Service: 1 container(s) at 5.00 USD per container = 5.00 USD

| | |
|---|---|
| Container Deposit | 50.00 |
| Container Service Charge | 5.00 |
| Fuel Surcharge | 10.00 |

| | Total: | 200.00 |
|---|---|---|

| 01 - Indianapolis | 02 - Evansville | 03 - Terre Haute | 04 - Fort Wayne | 05 - Louisville | 06 - Bartonville | 07 - Georgetown |
|---|---|---|---|---|---|---|
| (317) 898-8632 Phone | (812) 424-2966 Phone | (812) 234-7757 Phone | (260) 749-9950 Phone | (502) 448-6200 Phone | (309) 697-8400 Phone | (502) 863-0084 Phone |
| (317) 895-0614 Fax | (812) 421-2077 Fax | (812) 234-3349 Fax | (260) 749-9650 Fax | (502) 448-6204 Fax | (309) 697-9644 Fax | (502) 863-2523 Fax |

Remit To: Ulrich Chemical, Inc.    P.O. Box 66030    Indianapolis , IN 46266-6030    USA



# Ulrich Chemical, Inc.

(317) 898-8632 **PHONE**
(317) 895-0614 **FAX**

**INVOICE**

| Customer Number | |
|---|---|
| 1005855 | 10 |

| Date | Invoice # |
|---|---|
| 04/21/2004 | 115748 |

| Date Shipped | Order # |
|---|---|
| 04/21/2004 | 95107 |

**SOLD TO:**
Rhema Enterprises LLC
P O Box 127
Tiskilwa , IL 61368-
USA

**SHIP TO:**
Rhema Enterprises LLC
754 1st Street
LaSalle , IL 61301-
USA

R

| Customer PO # | FOB Remark | Freight Terms | | |
|---|---|---|---|---|
| Verbal-Greg | Ulrich-Bartonville | Will Call | | |

| Requisition # | Terms | Due Date | Ship Via | Warehouse | Sales ID |
|---|---|---|---|---|---|
| | Net 30 | 05/21/2004 | Will Call | 06 | 06074 |

| Units | Package | Product Name | Total Quantity | Unit Price | Amount |
|---|---|---|---|---|---|
| 1.00 | 50 lb BagPa BrSAD1 | 2000609-B05000-Soda Ash Grade 100 TG | 50.00 lb | 7.6700 /E | 7.67 |

**Total:**   7.67

01 - Indianapolis
(317) 898-8632 Phone
(317) 895-0614 Fax

02 - Evansville
(812) 424-2966 Phone
(812) 421-2077 Fax

03 - Terre Haute
(812) 234-7757 Phone
(812) 234-3349 Fax

04 - Fort Wayne
(260) 749-9950 Phone
(260) 749-9650 Fax

05 - Louisville
(502) 448-6200 Phone
(502) 448-6204 Fax

06 - Bartonville
(309) 697-8400 Phone
(309) 697-9644 Fax

07 - Georgetown
(502) 863-0084 Phone
(502) 863-2523 Fax

Remit To: Ulrich Chemical, Inc.   P.O. Box 66030   Indianapolis , IN 46266-6030   USA

Page 1 of 1



# Ulrich Chemical, Inc.

**Customer Number**
1005855     13

(317) 898-8632 **PHONE**
(317) 895-0614 **FAX**

**INVOICE**

| Date | Invoice # |
|---|---|
| 04/23/2004 | 116218 |

| Date Shipped | Order # |
|---|---|
| 04/23/2004 | 95259 |

S O L D T O
Rhema Enterprises LLC
P O Box 127
Tiskilwa , IL 61368-
USA

S H I P T O
LCN Closures Division
Ingersoll/Rand Company
121 West Railroad Avenue
East Dock
Princeton , IL 61356-
USA

R

| Customer PO # | | FOB Remark | | Freight Terms | | |
|---|---|---|---|---|---|---|
| Verbal-Greg | | Delivered | | Prepaid | | |
| Requisition # | | Terms | Due Date | Ship Via | Warehouse | Sales ID |
| | | Net 30 | 05/23/2004 | Ulrich | 06 | 06074 |

| Units | Package | Product Name | Total Quantity | Unit Price | Amount |
|---|---|---|---|---|---|
| 3.00 | 50 lb BagPaper V | 2000003-B05000-Lime Rotary Hydrate | 150.00 lb | 5.2500 /E | 15.75 |

Pallet                8.00

**Total:**          23.75

**01 - Indianapolis**
(317) 898-8632 Phone
(317) 895-0614 Fax

**02 - Evansville**
(812) 424-2966 Phone
(812) 421-2077 Fax

**03 - Terre Haute**
(812) 234-7757 Phone
(812) 234-3349 Fax

**04 - Fort Wayne**
(260) 749-9950 Phone
(260) 749-9650 Fax

**05 - Louisville**
(502) 448-6200 Phone
(502) 448-6204 Fax

**06 - Bartonville**
(309) 697-8400 Phone
(309) 697-9644 Fax

**07 - Georgetown**
(502) 863-0084 Phone
(502) 863-2523 Fax

Remit To: Ulrich Chemical, Inc.     P.O. Box 66030     Indianapolis , IN 46266-6030     USA

Page 1 of 1



# Ulrich Chemical, Inc.

**(317) 898-8632 PHONE**
**(317) 895-0614 FAX**

| Customer Number | |
|---|---|
| 1005855 | 13 |

**INVOICE**

| Date | Invoice # |
|---|---|
| 05/07/2004 | 118742 |

| Date Shipped | Order # |
|---|---|
| 05/07/2004 | 97493 |

S O L D T O
Rhema Enterprises LLC
P O Box 127
Tiskilwa , IL 61368-
USA

S H I P T O
LCN Closures Division
Ingersoll/Rand Company
121 West Railroad Avenue
East Dock
Princeton , IL 61356-
USA

R

| Customer PO # | FOB Remark | Freight Terms | | |
|---|---|---|---|---|
| Verbal-Greg | Ulrich-Indianapolis | Collect-Consignee | | |
| Requisition # | Terms | Due Date | Ship Via | Warehouse | Sales ID |
| | Net 30 | 06/06/2004 | Ulrich | 01 | 06074 |

| Units | Package | Product Name | Total Quantity | Unit Price | Amount |
|---|---|---|---|---|---|
| 1.00 | 40 lb CbyCPNewClr | 2000836-P00500-Ulrich Polymer 2002 | 40.00 lb | 112.0000 /E | 112.00 |

**Total:** 112.00

01 - Indianapolis
(317) 898-8632 Phone
(317) 895-0614 Fax

02 - Evansville
(812) 424-2966 Phone
(812) 421-2077 Fax

03 - Terre Haute
(812) 234-7757 Phone
(812) 234-3349 Fax

04 - Fort Wayne
(260) 749-9950 Phone
(260) 749-9650 Fax

05 - Louisville
(502) 448-6200 Phone
(502) 448-6204 Fax

06 - Bartonville
(309) 697-9400 Phone
(309) 697-9644 Fax

07 - Georgetown
(502) 863-0084 Phone
(502) 863-2523 Fax

Remit To: Ulrich Chemical, Inc.  P.O. Box 66030  Indianapolis , IN 46266-6030  USA

Page 1 of 1



**Ulrich Chemical, Inc.**

(317) 898-8632 **PHONE**
(317) 895-0614 **FAX**

**INVOICE**

| Customer Number | |
|---|---|
| 1005855 | 13 |

| Date | Invoice # |
|---|---|
| 07/06/2004 | 133838 |

| Date Shipped | Order # |
|---|---|
| 07/06/2004 | 110193 |

S O L D  T O

Rhema Enterprises LLC
P O Box 127
Tiskilwa , IL 61368-
USA

S H I P  T O

LCN Closures Division
Ingersoll/Rand Company
121 West Railroad Avenue
East Dock
Princeton , IL 61356-
USA

R

| Customer PO # | FOB Remark | Freight Terms | | |
|---|---|---|---|---|
| Verbal-Greg | Ulrich-Bartonville | Will Call | | |
| Requisition # | Terms | Due Date | Ship Via | Warehouse | Sales ID |

| Requisition # | Terms | Due Date | Ship Via | Warehouse | Sales ID |
|---|---|---|---|---|---|
| | Net 30 | 08/05/2004 | Will Call | 06 | 06074 |

| Units | Package | Product Name | Total Quantity | Unit Price | Amount |
|---|---|---|---|---|---|
| 10.00 | 50 lb BagPaper V | 2000003-B05000-Lime Rotary Hydrate | 500.00 lb | 5.2500 /E | 52.50 |

**Total:** 52.50

01 - Indianapolis
(317) 898-8632 Phone
(317) 895-0614 Fax

02 - Evansville
(812) 424-2966 Phone
(812) 421-2077 Fax

03 - Terre Haute
(812) 234-7757 Phone
(812) 234-3349 Fax

04 - Fort Wayne
(260) 749-9950 Phone
(260) 749-9650 Fax

05 - Louisville
(502) 448-6200 Phone
(502) 448-6204 Fax

06 - Bartonville
(309) 697-8400 Phone
(309) 697-9644 Fax

07 - Georgetown
(502) 863-0084 Phone
(502) 863-2523 Fax

Remit To: Ulrich Chemical, Inc.   P.O. Box 66030   Indianapolis , IN 46266-6030   USA



# Ulrich Chemical, Inc.

**(317) 898-8632 PHONE**
**(317) 895-0614 FAX**

| Customer Number | |
|---|---|
| 1005855 | 12 |

## INVOICE

| Date | Invoice # |
|---|---|
| 07/09/2004 | 135732 |

| Date Shipped | Order # |
|---|---|
| 07/09/2004 | 108357 |

S O L D T O
Rhema Enterprises LLC
P O Box 127
Tiskilwa , IL 61368-
USA

S H I P T O
Carus Chemical Company
1500 Eighth Street
LaSalle , IL 61301-
USA

R

| Customer PO # | FOB Remark | | Freight Terms | | |
|---|---|---|---|---|---|
| 41957 | Delivered | | Prepaid | | |
| Requisition # | Terms | Due Date | Ship Via | Warehouse | Sales ID |
| | Net 30 | 08/08/2004 | Ulrich | 06 | 06074 |

| Units | Package | Product Name | Total Quantity | Unit Price | Amount |
|---|---|---|---|---|---|
| 2.00 | 3,600 lb Tote Poly | 2000593-P3300B-Versene 100 | 7,200.00 lb | 0.4600 /lb | 3,312.00 |
| 1.00 | 2,827 lb Tote Poly | 6000168-P3300B-Blend RE 680 | 2,827.00 lb | 0.2400 /lb | 678.48 |
| 2.00 | 2,907 lb Tote Poly | 6000177-P3300B-Blend RE 730 | 5,814.00 lb | 1,395.3600 /E | 2,790.72 |

Fuel Surcharge                                              10.00

**Total:**                                              6,791.20

01 - Indianapolis          02 - Evansville          03 - Terre Haute          04 - Fort Wayne          05 - Louisville          06 - Bartonville          07 - Georgetown
(317) 898-8632 Phone    (812) 424-2966 Phone    (812) 234-7757 Phone    (260) 749-9950 Phone    (502) 448-6200 Phone    (309) 697-8400 Phone    (502) 863-0084 Phone
(317) 895-0614 Fax      (812) 421-2077 Fax      (812) 234-3349 Fax      (260) 749-9650 Fax      (502) 448-6204 Fax      (309) 697-9644 Fax      (502) 863-2523 Fax

Remit To: Ulrich Chemical, Inc.    P.O. Box 66030    Indianapolis , IN 46266-6030    USA

Page 1 of 1

Customer Number

1005855    13



# Ulrich Chemical, Inc.

(317) 898-8632 **PHONE**
(317) 895-0614 **FAX**

**INVOICE**

| Date | Invoice # |
|------|-----------|
| 07/21/2004 | 138181 |

| Date Shipped | Order # |
|--------------|---------|
| 07/21/2004 | 110234 |

S O L D T O

Rhema Enterprises LLC
P O Box 127
Tiskilwa , IL 61368-
USA

S H I P T O

LCN Closures Division
Ingersoll/Rand Company
121 West Railroad Avenue
East Dock
Princeton , IL 61356-
USA

R

| Customer PO # | FOB Remark | | Freight Terms | | |
|---------------|------------|--|---------------|--|--|
| Verbal-Greg | Delivered | | Prepaid | | |

| Requisition # | Terms | Due Date | Ship Via | Warehouse | Sales ID |
|---------------|-------|----------|----------|-----------|----------|
| | Net 30 | 08/20/2004 | Ulrich | 06 | 06074 |

| Units | Package | Product Name | Total Quantity | Unit Price | Amount |
|-------|---------|--------------|----------------|------------|--------|
| 30.00 | 50 lb BagPaper V | 2000003-B05000-Lime Rotary Hydrate | 1,500.00 lb | 5.2500 /E | 157.50 |
| | | Pallet | | | 8.00 |
| | | Fuel Surcharge | | | 10.00 |
| | | Delivery Charge | | | 25.00 |

**Total:**    200.50

01 - Indianapolis
(317) 898-8632 Phone
(317) 895-0614 Fax

02 - Evansville
(812) 424-2966 Phone
(812) 421-2077 Fax

03 - Terre Haute
(812) 234-7757 Phone
(812) 234-3349 Fax

04 - Fort Wayne
(260) 749-9950 Phone
(260) 749-9650 Fax

05 - Louisville
(502) 448-8200 Phone
(502) 448-6204 Fax

06 - Bartonville
(309) 697-8400 Phone
(309) 697-9644 Fax

07 - Georgetown
(502) 863-0084 Phone
(502) 863-2523 Fax

Remit To: Ulrich Chemical, Inc.    P.O. Box 66030    Indianapolis , IN 46266-6030    USA

Page 1 of 1

| Customer Number | |
|---|---|
| 1005855 | 13 |

# Ulrich Chemical, Inc.

(317) 898-8632 **PHONE**
(317) 895-0614 **FAX**

## INVOICE

| Date | Invoice # |
|---|---|
| 07/30/2004 | 140735 |
| Date Shipped | Order # |
| 07/30/2004 | 114482 |

**S**
**O** Rhema Enterprises LLC
**L** P O Box 127
**D** Tiskilwa , IL 61368-
 USA

**T**
**O**

**S** LCN Closures Division
**H** Ingersoll/Rand Company
**I** 121 West Railroad Avenue
**P** East Dock
**T** Princeton , IL 61356-
**O** USA

R

| Customer PO # | | FOB Remark | | Freight Terms | | |
|---|---|---|---|---|---|---|
| Verbal-Greg | | Delivered | | Prepaid | | |
| Requisition # | | Terms | Due Date | Ship Via | Warehouse | Sales ID |
| | | Net 30 | 08/29/2004 | Ulrich | 06 | 06074 |

| Units | Package | Product Name | Total Quantity | Unit Price | Amount |
|---|---|---|---|---|---|
| 1.00 | 612 lb DrP Ret Nat | 5000001-Pr0550-Blend KD1 | 612.00 lb | 256.2000 /E | 256.20 |

Line Item Remarks:  Packaging: Pr0550, Deposit: 1 container(s) at 50.00 USD per container = 50.00 USD
 Packaging: Pr0550, Service: 1 container(s) at 5.00 USD per container = 5.00 USD

| | |
|---|---|
| Pallet | 8.00 |
| Container Deposit | 50.00 |
| Container Service Charge | 5.00 |
| Fuel Surcharge | 10.00 |

**Total:** 329.20

01 - Indianapolis    02 - Evansville    03 - Terre Haute    04 - Fort Wayne    05 - Louisville    06 - Bartonville    07 - Georgetown
(317) 898-8632 Phone    (812) 424-2966 Phone    (812) 234-7757 Phone    (260) 749-9950 Phone    (502) 448-6200 Phone    (309) 697-8400 Phone    (502) 863-0084 Phone
(317) 895-0614 Fax    (812) 421-2077 Fax    (812) 234-3349 Fax    (260) 749-9650 Fax    (502) 448-6204 Fax    (309) 697-9644 Fax    (502) 863-2523 Fax

Remit To: Ulrich Chemical, Inc.    P.O. Box 66030    Indianapolis , IN 46266-6030    USA

Page 1 of 1

# Ulrich Chemical, Inc.

**(317) 898-8632 PHONE**
**(317) 895-0614 FAX**

| Customer Number | |
|---|---|
| 1005855 | 11 |

**INVOICE**

| Date | Invoice # |
|---|---|
| 09/16/2004 | 151571 |
| Date Shipped | Order # |
| 09/16/2004 | 123032 |

SOLD TO
Rhema Enterprises LLC
P O Box 127
Tiskilwa , IL 61368-
USA

SHIP TO
National Manufacturing Co.
One First Avenue
Sterling , IL 61081-
USA

R

| Customer PO # | | FOB Remark | | Freight Terms | | |
|---|---|---|---|---|---|---|
| Verbal-Greg | | Delivered | | Prepaid | | |
| Requisition # | | Terms | Due Date | Ship Via | Warehouse | Sales ID |
| | | Net 30 | 10/16/2004 | Ulrich | 06 | 06074 |

| Units | Package | Product Name | Total Quantity | Unit Price | Amount |
|---|---|---|---|---|---|
| 1.00 | 473 lb DrP Ret Nat | 6000173-Pr0550-Blend RE 740 | 473.00 lb | 255.4200 /E | 255.42 |

Line Item Remarks:    Packaging: Pr0550, Deposit: 1 container(s) at 50.00 USD per container = 50.00 USD
Packaging: Pr0550, Service: 1 container(s) at 5.00 USD per container = 5.00 USD

| | | | | | |
|---|---|---|---|---|---|
| 1.00 | 500 lb DrP Ret Nat | 6000189-Pr0550-Blend RE 620 | 500.00 lb | 0.2600 /lb | 130.00 |

Line Item Remarks:    Packaging: Pr0550, Deposit: 1 container(s) at 50.00 USD per container = 50.00 USD
Packaging: Pr0550, Service: 1 container(s) at 5.00 USD per container = 5.00 USD

| | |
|---|---|
| Pallet | 8.00 |
| Container Deposit | 100.00 |
| Container Service Charge | 10.00 |
| Fuel Surcharge | 10.00 |

**Total:** 513.42

| 01 - Indianapolis | 02 - Evansville | 03 - Terre Haute | 04 - Fort Wayne | 05 - Louisville | 06 - Bartonville | 07 - Georgetown |
|---|---|---|---|---|---|---|
| (317) 898-8632 Phone | (812) 424-2966 Phone | (812) 234-7757 Phone | (260) 749-9950 Phone | (502) 448-6200 Phone | (309) 697-8400 Phone | (502) 863-0084 Phone |
| (317) 895-0614 Fax | (812) 421-2077 Fax | (812) 234-3349 Fax | (260) 749-9650 Fax | (502) 448-6204 Fax | (309) 697-9644 Fax | (502) 863-2523 Fax |

Remit To: Ulrich Chemical, Inc.    P.O. Box 66030    Indianapolis , IN 46266-6030    USA

Page 1 of 1

# Ulrich Chemical, Inc.

**INVOICE**

| Customer Number | | (317) 898-8632 **PHONE** | Date | Invoice # |
|---|---|---|---|---|
| 1005855 | 12 | (317) 895-0614 **FAX** | 09/23/2004 | 153240 |

| Date Shipped | Order # |
|---|---|
| 09/23/2004 | 124528 |

S
O Rhema Enterprises LLC
L P O Box 127
D Tiskilwa , IL 61368-
  USA
T
O

S Carus Chemical Company
H 1500 Eighth Street
I LaSalle , IL 61301-
P USA
T
O

R

| Customer PO # | FOB Remark | | Freight Terms | | |
|---|---|---|---|---|---|
| Verbal-Greg | Delivered | | Prepaid | | |

| Requisition # | Terms | Due Date | Ship Via | Warehouse | Sales ID |
|---|---|---|---|---|---|
| | Net 30 | 10/23/2004 | Ulrich | 06 | 06074 |

| Units | Package | Product Name | Total Quantity | Unit Price | Amount |
|---|---|---|---|---|---|
| 1.00 | 2,907 lb Tote Poly | 6000177-P3300B-Blend RE 730 | 2,907.00 lb | 1,395.3600 /E | 1,395.36 |
| 1.00 | 2,661 lb Tote Poly | 6000190-P33000-Blend RE 820 | 2,661.00 lb | 0.7000 /lb | 1,862.70 |

Line Item Remarks:     Packaging: Tote, Deposit: 1 container(s) at 1,000.00 USD per container = 1,000.00 USD
Packaging: Tote, Service: 1 container(s) at 10.00 USD per container = 10.00 USD

| | |
|---|---|
| Container Deposit | 1,000.00 |
| Container Service Charge | 10.00 |
| Fuel Surcharge | 10.00 |

**Total:** 4,278.06

| 01 - Indianapolis | 02 - Evansville | 03 - Terre Haute | 04 - Fort Wayne | 05 - Louisville | 06 - Bartonville | 07 - Georgetown |
|---|---|---|---|---|---|---|
| (317) 898-8632 Phone | (812) 424-2966 Phone | (812) 234-7757 Phone | (260) 749-9950 Phone | (502) 448-6200 Phone | (309) 697-8400 Phone | (502) 863-0084 Phone |
| (317) 895-0614 Fax | (812) 421-2077 Fax | (812) 234-3349 Fax | (260) 749-0650 Fax | (502) 448-6204 Fax | (309) 697-9644 Fax | (502) 863-2523 Fax |

Remit To: Ulrich Chemical, Inc.     P.O. Box 66030     Indianapolis , IN 46266-6030     USA

Page 1 of 1

Customer Number

1005855    12



# Ulrich Chemical, Inc.

(317) 898-8632 **PHONE**
(317) 895-0614 **FAX**

## INVOICE

| Date | Invoice # |
|---|---|
| 04/20/2005 | 191134 |

| Date Shipped | Order # |
|---|---|
| 04/20/2005 | 155667 |

S
O  Rhema Enterprises LLC
L  P O Box 127
D  Tiskilwa , IL 61368-
   USA
T
O

S  Carus Chemical Company
H  1500 Eighth Street
I  LaSalle , IL 61301-
P  USA
T
O

R

| Customer PO # | FOB Remark | Freight Terms |
|---|---|---|
| Verbal - Greg | Delivered | Prepaid |

| Requisition # | Terms | Due Date | Ship Via | Warehouse | Sales ID |
|---|---|---|---|---|---|
|  | Net 30 | 05/20/2005 | Ulrich | 06 | 06074 |

| Units | Package | Product Name | Total Quantity | Unit Price | Amount |
|---|---|---|---|---|---|
| 1.00 | 300 lb DrF VenOHNew | 2000706-VOF300-Sodium Sulfite Catalyzed | 300.00 lb | 179.0400 /E | 179.04 |

|  |  |  |
|---|---|---|
| Fuel Surcharge |  | 20.00 |
| Delivery Charge |  | 20.96 |

**Total:** 220.00

01 - Indianapolis      02 - Evansville        03 - Terre Haute       04 - Fort Wayne        05 - Louisville        06 - Bartonville       07 - Georgetown
(317) 898-8632 Phone   (812) 424-2966 Phone   (812) 234-7757 Phone   (260) 749-9950 Phone   (502) 448-6200 Phone   (309) 697-8400 Phone   (502) 863-0084 Phone
(317) 895-0614 Fax     (812) 421-2077 Fax     (812) 234-3349 Fax     (260) 749-9650 Fax     (502) 448-6204 Fax     (309) 697-9644 Fax     (502) 863-2523 Fax

Remit To: Ulrich Chemical, Inc.    P.O. Box 66030    Indianapolis , IN 46266-6030    USA

Page 1 of 1

| Customer Number | |
|---|---|
| 1005855 | 10 |



# Ulrich Chemical, Inc.

(317) 898-8632 **PHONE**
(317) 895-0614 **FAX**

## INVOICE

| Date | Invoice # |
|---|---|
| 04/25/2005 | 191927 |
| Date Shipped | Order # |
| 04/25/2005 | 157005 |

S
O  Rhema Enterprises LLC
L  P O Box 127
D  Tiskilwa , IL 61368-
   USA
T
O

S   Rhema Enterprises LLC
H   754 1st Street
I   LaSalle , IL 61301-
P   USA
T
O

R

| Customer PO # | | FOB Remark | | Freight Terms | | |
|---|---|---|---|---|---|---|
| Verbal - Greg | | Ulrich-Bartonville | | Will Call | | |
| Requisition # | | Terms | Due Date | Ship Via | Warehouse | Sales ID |
| | | Net 30 | 05/25/2005 | Will Call | 06 | 06074 |

| Units | Package | Product Name | Total Quantity | Unit Price | Amount |
|---|---|---|---|---|---|
| 1.00 | 50 lb PIP VNew OH | 2002140-VOP050-CCH 3" Cal Hypo Tablets | 50.00 lb | 80.6100 /E | 80.61 |

Pallet                                                                          -8.00

Total:          72.61

01 - Indianapolis    02 - Evansville    03 - Terre Haute    04 - Fort Wayne    05 - Louisville    06 - Bartonville    07 - Georgetown
(317) 898-8632 Phone  (812) 424-2906 Phone  (812) 234-7757 Phone  (260) 749-9950 Phone  (502) 448-6200 Phone  (309) 697-8400 Phone  (502) 863-0084 Phone
(317) 895-0614 Fax    (812) 421-2077 Fax    (812) 234-3349 Fax    (260) 749-9650 Fax    (502) 448-6204 Fax    (309) 697-9644 Fax    (502) 863-2523 Fax

Remit To: Ulrich Chemical, Inc.    P.O. Box 66030    Indianapolis , IN 46266-6030    USA



# Ulrich Chemical, Inc.

309) 697-8400   **PHONE**
309) 697-9644   **FAX**

*# 226867*

**Straight Bill of Lading** - Short Form - Original - Not Negotiable

| B/L DATE |
|---|
| 09/09/2005 |

| B/L NO. |
|---|
| 185002 |

Page 1 of 2

'ROM:   Ulrich Chemical (06)
AT:    Bartonville, IL USA

Rhema Enterprises LLC
754 1st Street
LaSalle , IL 61301-
USA

**CARRIER** Will Call

S   Rhema Enterprises LLC
O   P O Box 127
L   Tiskilwa , IL 61368-
D   USA
T
O

| CUST. NO. | SALES AGENT | OPERATOR | REQ. NO. | SHIP VIA | PO NUMBER | CUST ORDER NUMBER |
|---|---|---|---|---|---|---|
| 1005855 | 06074 | amercer | | Other | 10999 | 185002 |

| SHIP DATE | WAREHOUSE | FREIGHT | | FOB REMARK | DELIVERY DATE | DELIVERY TIME | DELIVERY TYPE |
|---|---|---|---|---|---|---|---|
| 09/12/2005 | 06 | Will Call | | Ulrich-Bartonville | 09/12/2005 | 00:00:00 | Ship Date |

| QUANTITY ORDERED | QUANTITY OPEN | PACKAGING | HM | DESCRIPTION | NET WEIGHT LBS | GROSS WEIGHT LBS | FRT CLASS |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 50.00 lb BagPaper V | X | SODIUM NITRITE | 50.00 | 51.00 | |
| | | Qty Shipped:   *1* | | 5.1 (6.1) UN 1500,PG III, Contains: | | | |
| | | | | ERG 140 Sodium Nitrite Gr FF TG 2000627-B05000 | | | |
| | | | | Lot #: *SY5032*    Qty *1* | | | |
| | | | | Lot #: _____ | | | |
| | | | | Total Weight (lbs): | 50.00 | 51.00 | |

*Gregory P. Kinninman* (signature)

# ULRICH CHEMIC L, INC.

111 North Post Road    Indianapolis, IN 46226

ease make "X" in correct address below.

| FOR HELP IN CHE...CAL SPILL, LEAK,<br>FIRE EXPOSURE OR ACCIDENT<br>DIAL TOLL FREE 1-800-424-9300 |
|---|

CM 75396
267437

| INDIANAPOLIS, IN | ☐ TERRE HAUTE, IN | ☐ EVANSVILLE, IN | ☐ FT. WAYNE, IN | ☐ LOUISVILLE, KY | ☐ BARTONVILLE, IL | ☐ GEORGETOWN, KY |
|---|---|---|---|---|---|---|
| 3111 N. Post Road<br>PHONE: (317) 898-8632<br>FAX: (317) 895-0614 | 1400 Lockport Rd.<br>PHONE: (812) 234-7757<br>FAX: (812) 234-3349 | 4219 Garrison Rd.<br>PHONE: (812) 424-2966<br>FAX: (812) 421-2077 | 1615 Estella Avenue<br>PHONE: (260) 749-9950<br>FAX: (260) 749-9660 | 3900 Tucker Ave.<br>PHONE: (502) 448-6200<br>FAX: (502) 448-6204 | 4616 South Enterprise Dr.<br>PHONE: (309) 697-8400<br>FAX: (309) 697-9644 | 324 E. Yusen Dr.<br>PHONE: (502) 863-0084<br>FAX: (502) 863-2523 |

Customer No. _____    RECEIVED FROM _Khema Enterprises (Illinois Cement)_
Customer Name

## EMPTY CONTAINER RECEIPT

CITY _____    STATE _____

| TY | HM | UM | HAZARDOUS MATERIAL DESCRIPTION | HAZARD CLASS | ID NO. | PG | PLACARDS REQUIRED |
|---|---|---|---|---|---|---|---|
|  | RQ 100# | EA | POUND CYLINDER RESIDUE:<br>LAST CONTAINED AMMONIA ANHYDROUS, LIQUEFIED<br>INHALATION HAZARD | 2.2 | UN 1005 | --- | NON-FLAMMABLE GAS 2 |
|  | RQ 10# | EA | POUND CYLINDER RESIDUE: LAST CONTAINED CHLORINE<br>POISON INHALATION HAZARD / ZONE B / MARINE POLLUTANT | 2.3 | UN 1017 | --- | POISON GAS 2 |
|  | RQ 10# | EA | POUND CYLINDER RESIDUE: LAST CONTAINED CHLORINE<br>POISON INHALATION HAZARD / ZONE B / MARINE POLLUTANT | 2.3 | UN 1017 | --- | POISON GAS 2 |
|  | X | EA | POUND CYLINDER RESIDUE: LAST CONTAINED HYDROGEN CHLORIDE ANHYDROUS<br>POISON INHALATION HAZARD / ZONE C | 2.3 | UN 1050 | --- | POISON GAS 2 |
|  | X | EA | POUND CYLINDER RESIDUE: LAST CONTAINED SULFUR DIOXIDE, LIQUEFIED<br>POISON INHALATION HAZARD / ZONE C | 2.3 | UN 1079 | --- | POISON GAS 2 |
|  |  | EA | GALLON DRUM RESIDUE:<br>LAST CONTAINED |  |  |  |  |

TE: 1. Use RQ in HM column if material shipped is in quantities greater than RQ in one package.
    2. ID# must be used on placard for containers with over 119 gallons capacity (i.e. totes, bulk, ton cylinders, etc.)

REV. 4/03

## MISCELLANEOUS RECEIPT

| TY | HM | UM | HAZARDOUS MATERIAL DESCRIPTION | HAZARD CLASS | ID NO. | PG | GROSS WT. |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |

| CHLORINE<br>N CYLS.<br>(C20000)<br>QTY. | CHLORINE 150# CYLS.<br>(C01500)<br>QTY. | | CHLORINE 100# CYLS.<br>(C01000)<br>QTY. | AMMONIA<br>150# CYLS.<br>(AA0150)<br>QTY. | SULPHUR DIOXIDE | | 150# CYLS.<br>(So0150)<br>QTY. |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  | TON CYLS.<br>(So2000)<br>QTY. | | |
| 1 | 1 | 13 | 25 | 1 | 1 | 1 | 1 |
| 2 | 2 | 14 | 26 | 2 | 2 | 2 | 2 |
| 3 | 3 | 15 | 27 | 3 | 3 | 3 | 3 |
| 4 | 4 | 16 | 28 | 4 | 4 | 4 | 4 |
| 5 | 5 | 17 | 29 | 5 | 5 | 5 | 5 |
| 6 | 6 | 18 | 30 | 6 | 6 | 6 | 6 |
| 7 | 7 | 19 | 31 | 7 | 7 | 7 | 7 |
| 8 | 8 | 20 | 32 | 8 | 8 | 8 | 8 |
| 9 | 9 | 21 | 33 | 9 | 9 | 9 | 9 |
| 10 | 10 | 22 | 34 | 10 | 10 | 10 | 10 |
| 11 | 11 | 23 | 35 | 11 | 11 | 11 | 11 |
| 12 | 12 | 24 | 36 | 12 | 12 | 12 | 12 |

| TITY | DESCRIPTION | QUANTITY | DESCRIPTION | QUANTITY | DESCRIPTION |
|---|---|---|---|---|---|
|  | 5 GAL. POLY CARBOYS (Pr0050) |  | NO DEPOSIT: |  | FOR DISPOSAL: |
|  | 15 GAL. DELDRUMS (Pr0150) |  | 55 GAL. DELDRUMS - NO DEPOSIT |  | 55 GAL. DELDRUMS |
|  | 15 GAL. STAINLESS STEEL DRUMS (SSr150) |  | 55 GAL. STEEL DRUMS - NO DEPOSIT |  | 55 GAL. STEEL DRUMS |
|  | 30 GAL. DELDRUMS (Pr0300) |  |  |  | 55 GAL. POLY LINED STEEL DRUMS |
|  | 55 GAL. DELDRUMS (Pr0550) |  |  |  | 55 GAL. PHENOLIC LINED STEEL DRUMS |
|  | 55 GAL. STAINLESS STEEL DRUMS (SSr550) |  | CUSTOMER DRUMS: |  | JUNK PALLETS |
|  | 55 GAL. STEEL DRUMS (St0550) |  | 55 GAL. DELDRUMS - CUSTOMER |  | TOTE TANKS |
|  | PALLETS |  | 55 GAL. STEEL DRUMS CUSTOMER |  |  |
|  | PLASTIC PALLETS |  |  |  |  |

| CHECKED BY | RECEIVED BY | VIA | CUSTOMER SIGNATURE |
|---|---|---|---|
|  |  |  | _Gregory P. Kinsman_ |

TURNABLE CONTAINERS REMAIN THE PROPERTY OF THE SELLER AND MAY BE RETURNED FOR FULL CREDIT WITHIN 120 DAYS OF SHIPMENT
IF IN GOOD CONDITION. PALLETS AND EMPTY CONTAINERS ARE PICKED UP FOR CREDIT SUBJECT TO FINAL INSPECTION IN OUR PLANT.

I, _____ a representative of the above listed company, hereby authorize that the empty _____ (Quantity/Drum Type/Tote Type)
operty of Ulrich Chemical for inspection and reconditioning.

# ULRICH CHEMICAL, INC.

3111 North Post Road     Indianapolis, IN 46226

Please make "X" in correct address below.

| FOR HELP IN CHEMICAL SPILL, LEAK, FIRE EXPOSURE OR ACCIDENT DIAL TOLL FREE 1-800-424-9300 | 75368 |
|---|---|

☐ INDIANAPOLIS, IN
3111 N. Post Road
PHONE: (317) 898-8632
FAX: (317) 895-0614

☐ TERRE HAUTE, IN
1400 Lockport Rd.
PHONE: (812) 234-7757
FAX: (812) 234-3349

☐ EVANSVILLE, IN
4219 Garrison Rd.
PHONE: (812) 424-2986
FAX: (812) 421-2077

☐ FT. WAYNE, IN
1615 Estella Avenue
PHONE: (260) 749-9950
FAX: (260) 749-9650

☐ LOUISVILLE, KY
3900 Tucker Ave.
PHONE: (502) 448-6200
FAX: (502) 448-6204

☐ BARTONVILLE, IL
4616 South Enterprise Dr.
PHONE: (309) 697-8400
FAX: (309) 697-9644

☐ GEORGETOWN, KY
324 E. Yusen Dr.
PHONE: (502) 863-0084
FAX: (502) 863-2523

( _____ )          RECEIVED FROM _Rhema_
Customer No.                                        Customer Name

## EMPTY CONTAINER RECEIPT

CITY _____          STATE _____

| QTY | HM | UM | HAZARDOUS MATERIAL DESCRIPTION | HAZARD CLASS | ID NO. | PG | PLACARDS REQUIRED |
|---|---|---|---|---|---|---|---|
| --- | RQ 100# | EA | POUND CYLINDER RESIDUE: LAST CONTAINED AMMONIA ANHYDROUS, LIQUEFIED INHALATION HAZARD | 2.2 | UN 1005 | --- | NON-FLAMMABLE GAS 2 |
| --- | RQ 10# | EA | POUND CYLINDER RESIDUE: LAST CONTAINED CHLORINE POISON INHALATION HAZARD / ZONE B / MARINE POLLUTANT | 2.3 | UN 1017 | --- | POISON GAS 2 |
| --- | RQ 10# | EA | POUND CYLINDER RESIDUE: LAST CONTAINED CHLORINE POISON INHALATION HAZARD / ZONE B / MARINE POLLUTANT | 2.3 | UN 1017 | --- | POISON GAS 2 |
| --- | X | EA | POUND CYLINDER RESIDUE: LAST CONTAINED HYDROGEN CHLORIDE ANHYDROUS POISON INHALATION HAZARD / ZONE C | 2.3 | UN 1050 | --- | POISON GAS 2 |
| --- | X | EA | POUND CYLINDER RESIDUE: LAST CONTAINED SULFUR DIOXIDE, LIQUEFIED POISON INHALATION HAZARD / ZONE C | 2.3 | UN 1079 | --- | POISON GAS 2 |
| --- | | EA | GALLON DRUM RESIDUE: LAST CONTAINED | | | | |

(handwritten: OXII 203624 625 626 627)

NOTE:  1. Use RQ in HM column if material shipped is in quantities greater than RQ in one package.
2. ID# must be used on placard for containers with over 119 gallons capacity (i.e. totes, bulk, ton cylinders, etc.)

REV. 4/03

## MISCELLANEOUS RECEIPT

| QTY | HM | UM | HAZARDOUS MATERIAL DESCRIPTION | HAZARD CLASS | ID NO. | PG | GROSS WT. |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| CHLORINE TON CYLS. (C20000) QTY. | CHLORINE 150# CYLS. (C01500) QTY. | CHLORINE 100# CYLS. (C01000) QTY. | AMMONIA 150# CYLS. (AA0150) QTY. | SULPHUR DIOXIDE TON CYLS. (So2000) QTY. | 150# CYLS. (So0150) QTY. |
|---|---|---|---|---|---|
| 1 | 1 / 13 / 25 | 1 | 1 | 1 | 1 |
| 2 | 2 / 14 / 26 | 2 | 2 | 2 | 2 |
| 3 | 3 / 15 / 27 | 3 | 3 | 3 | 3 |
| 4 | 4 / 16 / 28 | 4 | 4 | 4 | 4 |
| 5 | 5 / 17 / 29 | 5 | 5 | 5 | 5 |
| 6 | 6 / 18 / 30 | 6 | 6 | 6 | 6 |
| 7 | 7 / 19 / 31 | 7 | 7 | 7 | 7 |
| 8 | 8 / 20 / 32 | 8 | 8 | 8 | 8 |
| 9 | 9 / 21 / 33 | 9 | 9 | 9 | 9 |
| 10 | 10 / 22 / 34 | 10 | 10 | 10 | 10 |
| 11 | 11 / 23 / 35 | 11 | 11 | 11 | 11 |
| 12 | 12 / 24 / 36 | 12 | 12 | 12 | 12 |

| QUANTITY | DESCRIPTION | QUANTITY | DESCRIPTION | QUANTITY | DESCRIPTION |
|---|---|---|---|---|---|
| | 5 GAL. POLY CARBOYS (Pr0050) | | NO DEPOSIT: | | FOR DISPOSAL: |
| | 15 GAL. DELDRUMS (Pr0150) | | 55 GAL. DELDRUMS - NO DEPOSIT | | 55 GAL. DELDRUMS |
| | 15 GAL. STAINLESS STEEL DRUMS (SSr150) | | 55 GAL. STEEL DRUMS - NO DEPOSIT | | 55 GAL. STEEL |
| | 30 GAL. DELDRUMS (Pr0300) | | | | 55 GAL. POLY LINED STEEL DRUMS |
| 7 | 55 GAL. DELDRUMS (Pr0550) | | CUSTOMER DRUMS: | | 55 GAL. PHENOLIC LINED STEEL DRUMS |
| | 55 GAL. STAINLESS STEEL DRUMS (SSr550) | | 55 GAL. DELDRUMS - CUSTOMER | | JUNK PALLETS |
| | 55 GAL. STEEL DRUMS (Sr0550) | | 55 GAL. STEEL DRUMS CUSTOMER | | TOTE TANKS |
| | PALLETS | | | | |
| | PLASTIC PALLETS | | | | |

| DATE | CHECKED BY | RECEIVED BY | VIA | CUSTOMER SIGNATURE |
|---|---|---|---|---|
| 6-13-05 | | | | _Gregory P. Kinsman_ |

RETURNABLE CONTAINERS REMAIN THE PROPERTY OF THE SELLER AND MAY BE RETURNED FOR FULL CREDIT WITHIN 120 DAYS OF SHIPMENT IF IN GOOD CONDITION. PALLETS AND EMPTY CONTAINERS ARE PICKED UP FOR CREDIT SUBJECT TO FINAL INSPECTION IN OUR PLANT.

(Quantity/Drum Type/Tote Type)

# Ulrich Chemical, Inc.

(309) 697-8400   **PHONE**

(309) 697-9644   **FAX**

#191927

**Straight Bill of Lading** - Short Form - Original - Not Negotiable

| B/L DATE |
|---|
| 04/25/2005 |

| B/L NO. |
|---|
| 157005 |

Page 1 of 2

FROM:   Ulrich Chemical (06)
AT:     Bartonville,IL  USA

| CARRIER  Will Call |
|---|

S
H  Rhema Enterprises LLC
I  754 1st Street
P  LaSalle , IL 61301-
   USA

S
O  Rhema Enterprises LLC
L  P O Box 127
D  Tiskilwa , IL 61368-
T  USA
O

| CUST. NO. | SALES AGENT | OPERATOR | REQ. NO. | SHIP VIA | PO NUMBER | CUST ORDER NUMBER |
|---|---|---|---|---|---|---|
| 1005855 | 06074 | dmorris | | Other | Verbal - Greg | 157005 |

| SHIP DATE | WAREHOUSE | FREIGHT | FOB REMARK | DELIVERY DATE | DELIVERY TIME | DELIVERY TYPE |
|---|---|---|---|---|---|---|
| 04/26/2005 | 06 | Will Call | Ulrich-Bartonville | 04/26/2005 | 00:00:00 | Regular |

| QUANTITY ORDERED | QUANTITY OPEN | PACKAGING | HM | DESCRIPTION | NET WEIGHT LBS | GROSS WEIGHT LBS | FRT CLASS |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 50.00 lb PIP VNew OH | RQ | CALCIUM HYPOCHLORITE MIXTURES, DRY,5.1,UN1748,PGII | 50.00 | 52.00 | |
| | | Qty Shipped: | | ERG# 140 CCH 3" Cal Hypo Tablets 2002140-VOP050 | | | |
| | | | | Lot #: 4CH128D    Qty  1 | | | |
| | | | | Lot #: | | | |
| | | | | Total Weight (lbs): | 50.00 | 52.00 | |

*Gregory P. Kinsman*

# Ulrich Chemical, Inc.

309) 697-8400  **PHONE**

309) 697-9644  **FAX**

TRUCK RUN #: 34330

STOP #: 4

FROM:  Ulrich Chemical (06)
AT:    Bartonville, IL  USA

**Straight Bill of Lading** - Short Form - Original - Not Negotiable

# 191134

| B/L DATE |
|---|
| 04/19/2005 |

| B/L NO. |
|---|
| 155667 |

Page 1 of 2

| CARRIER  Ulrich |
|---|



S
H
I
P

Carus Chemical Company
1500 Eighth Street
LaSalle, IL 61301-
USA

S
O
L
D

T
O

Rhema Enterprises LLC
P O Box 127
Tiskilwa , IL 61368-
USA

| CUST. NO. | SALES AGENT | OPERATOR | REQ. NO. | SHIP VIA | PO NUMBER | CUST ORDER NUMBER |
|---|---|---|---|---|---|---|
| 1005855 | 06074 | dbrooks | | Truck | Verbal - Greg | 155667 |

| SHIP DATE | WAREHOUSE | FREIGHT | | FOB REMARK | DELIVERY DATE | DELIVERY TIME | DELIVERY TYPE |
|---|---|---|---|---|---|---|---|
| 04/22/2005 | 06 | Prepaid | | Delivered | 04/22/2005 | 00:00:00 | Regular |

| QUANTITY ORDERED | QUANTITY OPEN | PACKAGING | HM | DESCRIPTION | NET WEIGHT LBS | GROSS WEIGHT LBS | FRT CLASS |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 300.00 lb DrF VenOHNew | | NON DOT REGULATED CHEMICALS, N.O.S. | 300.00 | 314.00 | |
| | | Qty Shipped: ___|___ | | Contains:  SODIUM SULFITE | | | |
| | | | | Sodium Sulfite Catalyzed 2000706-VOF300 | | | |
| | | | | Lot #: 501280015B      Qty ___|___ | | | |
| | | | | Lot #: _____ | | | |
| | | | | Total Weight (lbs): | 300.00 | 314.00 | |

Deliv. chg
$20.96

FSC

M. Schw

# ULRICH CHEMICAL, INC.

3111 North Post Road    Indianapolis, IN 46226

Please make "X" in correct address below.

FOR HELP IN CHEMICAL SPILL, LEAK,
FIRE EXPOSURE OR ACCIDENT
DIAL TOLL FREE 1-800-424-9300

*CM 170513 77476*
*170514*

| ☐ INDIANAPOLIS, IN | ☐ TERRE HAUTE, IN | ☐ EVANSVILLE, IN | ☐ FT. WAYNE, IN | ☐ LOUISVILLE, KY | ☐ BARTONVILLE, IL | ☐ GEORGETOWN, KY |
|---|---|---|---|---|---|---|
| 3111 N. Post Road | 1400 Lockport Rd. | 4219 Garrison Rd. | 1615 Estella Avenue | 3900 Tucker Ave. | 4616 South Enterprise Dr. | 324 E. Yusen Dr. |
| PHONE: (317) 898-8632 | PHONE: (812) 234-7757 | PHONE: (812) 424-2966 | PHONE: (260) 749-9950 | PHONE: (502) 448-6200 | PHONE: (309) 697-6400 | PHONE: (502) 863-0084 |
| FAX: (317) 895-0614 | FAX: (812) 234-3349 | FAX: (812) 421-2077 | FAX: (260) 749-9650 | FAX: (502) 448-6204 | FAX: (309) 697-9644 | FAX: (502) 863-2523 |

( _____ )     RECEIVED FROM _Kena_

Customer No.                                         CITY _Princeton_    Customer Name    STATE _IN_

## EMPTY CONTAINER RECEIPT

| QTY | HM | UM | HAZARDOUS MATERIAL DESCRIPTION | HAZARD CLASS | ID NO. | PG | PLACARDS REQUIRED |
|---|---|---|---|---|---|---|---|
| ---- | RQ 100# | EA | POUND CYLINDER RESIDUE: LAST CONTAINED AMMONIA ANHYDROUS, LIQUEFIED INHALATION HAZARD | 2.2 | UN 1005 | | NON-FLAMMABLE GAS 2 |
| ---- | RQ 10# | EA | POUND CYLINDER RESIDUE: LAST CONTAINED CHLORINE POISON INHALATION HAZARD / ZONE B / MARINE POLLUTANT | 2.3 | UN 1017 | | POISON GAS 2 |
| ---- | RQ 10# | EA | POUND CYLINDER RESIDUE: LAST CONTAINED CHLORINE POISON INHALATION HAZARD / ZONE B / MARINE POLLUTANT | 2.3 | UN 1017 | | POISON GAS 2 |
| ---- | X | EA | POUND CYLINDER RESIDUE: LAST CONTAINED HYDROGEN CHLORIDE ANHYDROUS POISON INHALATION HAZARD / ZONE C | 2.3 | UN 1050 | | POISON GAS 2 |
| ---- | X | EA | POUND CYLINDER RESIDUE: LAST CONTAINED SULFUR DIOXIDE, LIQUEFIED POISON INHALATION HAZARD / ZONE C | 2.3 | UN 1079 | | POISON GAS 2 |
| ---- | | EA | GALLON DRUM RESIDUE: LAST CONTAINED | | | | |

NOTE:  1. Use RQ in HM column if material shipped is in quantities greater than RQ in one package.
2. ID# must be used on placard for containers with over 119 gallons capacity (i.e. totes, bulk, ton cylinders, etc.)

REV. 4/03

## MISCELLANEOUS RECEIPT

| QTY | HM | UM | HAZARDOUS MATERIAL DESCRIPTION | HAZARD CLASS | ID NO. | PG | GROSS WT. |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| CHLORINE TON CYLS. (C20000) | CHLORINE 150# CYLS. (C01500) | CHLORINE 100# CYLS. (C01000) | AMMONIA 150# CYLS. (AA0150) | SULPHUR DIOXIDE TON CYLS. (So2000) | 150# CYLS. (So0150) |
|---|---|---|---|---|---|
| QTY. | QTY. | QTY. | QTY. | QTY. | QTY. |
| 1 | 1   13 | 25 | 1 | 1 | 1 |
| 2 | 2   14 | 26 | 2 | 2 | 2 |
| 3 | 3   15 | 27 | 3 | 3 | 3 |
| 4 | 4   16 | 28 | 4 | 4 | 4 |
| 5 | 5   17 | 29 | 5 | 5 | 5 |
| 6 | 6   18 | 30 | 6 | 6 | 6 |
| 7 | 7   19 | 31 | 7 | 7 | 7 |
| 8 | 8   20 | 32 | 8 | 8 | 8 |
| 9 | 9   21 | 33 | 9 | 9 | 9 |
| 10 | 10   22 | 34 | 10 | 10 | 10 |
| 11 | 11   23 | 35 | 11 | 11 | 11 |
| 12 | 12   24 | 36 | 12 | 12 | 12 |

*CM 170515*

| QUANTITY | DESCRIPTION | QUANTITY | DESCRIPTION | QUANTITY | DESCRIPTION |
|---|---|---|---|---|---|
| | 5 GAL. POLY CARBOYS (Pr0050) | | NO DEPOSIT: | | FOR DISPOSAL: |
| | 15 GAL. DELDRUMS (Pr0150) | | 55 GAL. DELDRUMS - NO DEPOSIT | | 55 GAL. DELDRUMS |
| | 15 GAL. STAINLESS STEEL DRUMS (SSr150) | | 55 GAL. STEEL DRUMS - NO DEPOSIT | | 55 GAL. STEEL DRUMS |
| | 30 GAL. DELDRUMS (Pr0300) | | | | 55 GAL. POLY LINED STEEL DRUMS |
| 4 | 55 GAL. DELDRUMS (Pr0550) | | CUSTOMER DRUMS: | | 55 GAL. PHENOLIC LINED STEEL DRUMS |
| | 55 GAL. STAINLESS STEEL DRUMS (SSr550) | | 55 GAL. DELDRUMS - CUSTOMER | | JUNK PALLETS |
| | 55 GAL. STEEL DRUMS (St0550) | | 55 GAL. STEEL DRUMS CUSTOMER | | TOTE TANKS |
| 1 | PALLETS | | | | |
| | PLASTIC PALLETS | | | | |

| DATE | CHECKED BY | RECEIVED BY | VIA | CUSTOMER SIGNATURE |
|---|---|---|---|---|
| 12-28-04 | | | | _Gregory P. Kinsman_ |

RETURNABLE CONTAINERS REMAIN THE PROPERTY OF THE SELLER AND MAY BE RETURNED FOR FULL CREDIT WITHIN 120 DAYS OF SHIPMENT
IF IN GOOD CONDITION. PALLETS AND EMPTY CONTAINERS ARE PICKED UP FOR CREDIT SUBJECT TO FINAL INSPECTION IN OUR PLANT.

_____ a representative of the above listed company, hereby authorize that the empty _____ (Quantity/Drum Type/Tote Type)

# Ulrich Chemical, Inc.

(317) 898-8632 PHONE
(317) 895-0614 FAX

Straight Bill of Lading - *Short Form - Original - Not Negotiable*

153240

| B/L DATE |
| --- |
| 09/21/2004 |

| B/L NO. |
| --- |
| 124528 |

Page 1 of 2

TRUCK RUN #: 27249

STOP #: 1

FROM:  Ulrich Chemical (06)
AT:    Bartonville, IL  USA

S  Carus Chemical Company
H  1500 Eighth Street
I  LaSalle , IL 61301-
P  USA
T
O

| CARRIER  Ulrich |
| --- |

S  Rhema Enterprises LLC
O  P O Box 127
L  Tiskilwa , IL 61368-
D  USA
T
O

| CUST. NO. | SALES AGENT | OPERATOR | REQ. NO. | | SHIP VIA | PO NUMBER | CUST ORDER NUMBER |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 1005855 | 06074 | dbrooks | | | Truck | Verbal-Greg | 124528 |

| SHIP DATE | WAREHOUSE | FREIGHT | | FOB REMARK | DELIVERY DATE | DELIVERY TIME | DELIVERY TYPE |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 09/22/2004 | 06 | Prepaid | | Delivered | 09/22/2004 | 00:00:00 | Ship Date |

| QUANTITY ORDERED | QUANTITY OPEN | PACKAGING | HM | DESCRIPTION | NET WEIGHT (LB) | GROSS WEIGHT (LB) | FRT CLASS |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 1 | 1 | 2,661.00 lb Tote Poly | X | CORROSIVE LIQUID, N.O.S. | 2,661.00 | 2,949.00 | |
| | | Qty Shipped:         l | | 8 UN 1760,PG II, Contains: CYCLOHEXYLAMINE, DIETHANOLAMINE | | | |
| | | | | ERG 154 Blend RE 820 6000190-P33000                    Qty | | | |
| | | | | Lot #:  613 - 3224           l | | | |
| | | | | Lot #: | | | |
| 1 | 1 | 2,907.00 lb Tote Poly | | NON DOT REGULATED CHEMICALS, N.O.S. | 2,907.00 | 3,195.00 | |
| | | Qty Shipped:         l | | Contains: BLEND RE 730 | | | |
| | | | | Blend RE 730 6000177-P3300B | | | |
| | | | | Qty | | | |
| | | | | Lot #:  011 - 10392           l | | | |
| | | | | Lot #: | | | |
| | | | | Total Weight (lbs): | 5,568.00 | 6,144.00 | |

# Ulrich Chemical, Inc.

(317) 898-8632 **PHONE**
(317) 895-0614 **FAX**

#151571

**Straight Bill of Lading** - Short Form - Original - Not Negotiable

| B/L DATE |
|---|
| 09/15/2004 |

| B/L NO. |
|---|
| 123032 |
| Page 1 of 2 |

TRUCK RUN #: 27024
STOP #: 1

FROM:     Ulrich Chemical (06)
AT:     Bartonville, IL  USA

| CARRIER  Ulrich |
|---|

S H I P T O
National Manufacturing Co.
One First Avenue
Sterling , IL 61081-
USA

S O L D T O
Rhema Enterprises LLC
P O Box 127
Tiskilwa , IL 61368-
USA

| CUST. NO. | SALES AGENT | OPERATOR | REQ. NO. | SHIP VIA | PO NUMBER | CUST ORDER NUMBER |
|---|---|---|---|---|---|---|
| 1005855 | 06074 | dbrooks | | Truck | Verbal-Greg | 123032 |

| SHIP DATE | WAREHOUSE | FREIGHT | FOB REMARK | | DELIVERY DATE | DELIVERY TIME | DELIVERY TYPE |
|---|---|---|---|---|---|---|---|
| 09/16/2004 | 06 | Prepaid | | Delivered | 09/16/2004 | 00:00:00 | Regular |

| QUANTITY ORDERED | QUANTITY OPEN | PACKAGING | HM | DESCRIPTION | NET WEIGHT (LB) | GROSS WEIGHT (LB) | FRT CLASS |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 500.00 lb DrP Ret Nat | X | CORROSIVE LIQUID, ACIDIC, ORGANIC, N.O.S. | 500.00 | 519.00 | |
| | | Qty Shipped: _____ /  | | 8 UN 3265,PG III, Contains: CITRIC ACID 50%, PHOS 6 ERG 153 Blend RE 620 6000189-Pr0550 | | | |
| | | | | Lot #: _011-10282_     Qty  / | | | |
| | | | | Lot #: _____ | | | |
| 1 | 1 | 473.00 lb DrP Ret Nat | | NON DOT REGULATED CHEMICALS, N.O.S. | 473.00 | 492.00 | |
| | | Qty Shipped: _____ / | | Contains: BLEND RE 740 Blend RE 740 6000173-Pr0550 | | | |
| | | | | Lot #: _011-8047_     Qty  / | | | |
| | | | | Lot #: _____ | | | |
| | | | | Total Weight (lbs): | 973.00 | 1,011.00 | |

1 pallet  FSC

# Ulrich Chemical, Inc.

(317) 898-8632 PHONE
(317) 895-0614 FAX

147396

Straight Bill of Lading - Short Form - Original - Not Negotiable

| B/L DATE |
| --- |
| 08/27/2004 |

| B/L NO. |
| --- |
| 120369 |
| Page 1 of 2 |

FROM:     Ulrich Chemical (06)
AT:     Bartonville,IL  USA

CARRIER  Ulrich

S
H     Carus Chemical Company
I      1500 Eighth Street
P      LaSalle , IL 61301-
       USA
T
O

S
O     Rhema Enterprises LLC
L     P O Box 127
D     Tiskilwa , IL 61368-
      USA
T
O

| CUST. NO. | SALES AGENT | OPERATOR | REQ. NO. | SHIP VIA | PO NUMBER | CUST ORDER NUMBER |
| --- | --- | --- | --- | --- | --- | --- |
| 1005855 | 06074 | lhill | | Truck | 42040 | 120369 |

| SHIP DATE | WAREHOUSE | FREIGHT | | FOB REMARK | DELIVERY DATE | DELIVERY TIME | DELIVERY TYPE |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 08/27/2004 | 06 | Prepaid | | Delivered | 08/27/2004 | 00:00:00 | Ship Date |

| QUANTITY ORDERED | QUANTITY OPEN | PACKAGING | HM | DESCRIPTION | NET WEIGHT (LB) | GROSS WEIGHT (LB) | FRT CLASS |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 1 | 1 | 386.00 lb DrS VenOHNew | X | CYCLOHEXYLAMINE | 386.00 | 423.00 | |
| | | Qty Shipped:  /  | | 8 (3) UN 2357,PG II, Contains: ERG 132 Cyclohexylamine 98% 2000269-VS0550 | | | |
| | | | | Lot #:  030668          Qty   / | | | |
| | | | | Lot #: | | | |
| | | | | Total Weight (lbs): | 386.00 | 423.00 | |

1 pallet

Gregory P. Kussman

# Ulrich Chemical, Inc.

317) 898-8632 PHONE
317) 895-0614 FAX

**Straight Bill of Lading** - Short Form - Original - Not Negotiable

#140735

| B/L DATE |
|---|
| 07/29/2004 |

| B/L NO. |
|---|
| 114482 |
| Page 1 of 2 |

TRUCK RUN #: 25166

STOP #: 3

FROM:    Ulrich Chemical (06)
AT:      Bartonville,IL  USA

S  LCN Closures Division
H  Ingersoll/Rand Company
I  121 West Railroad Avenue
P  East Dock
T  Princeton , IL 61356-
O  USA

S  Rhema Enterprises LLC
O  P O Box 127
L  Tiskilwa , IL 61368-
D  USA
T
O

CARRIER  Ulrich

| CUST. NO. | SALES AGENT | OPERATOR | REQ. NO. | | SHIP VIA | PO NUMBER | CUST ORDER NUMBER |
|---|---|---|---|---|---|---|---|
| 1005855 | 06074 | breed | | | Truck | Verbal-Greg | 114482 |

| SHIP DATE | WAREHOUSE | FREIGHT | | FOB REMARK | DELIVERY DATE | DELIVERY TIME | DELIVERY TYPE |
|---|---|---|---|---|---|---|---|
| 07/29/2004 | 06 | Prepaid | | Delivered | 07/29/2004 | 00:00:00 | Regular |

| QUANTITY ORDERED | QUANTITY OPEN | PACKAGING | HM | DESCRIPTION | NET WEIGHT (LB) | GROSS WEIGHT (LB) | FRT CLASS |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 612.00 lb DrP Ret Nat | | NON DOT REGULATED CHEMICALS, N.O.S. | 612.00 | 631.00 | |
| | | Qty Shipped: | | Contains: BLEND KD1 | | | |
| | | | | Blend KD1 5000001-Pr0550 | | | |
| | | | | Lot #: OLI - 8907      Qty     1 | | | |
| | | | | Lot #: | | | |
| | | | | General Remarks:      Total Weight (lbs) | 612.00 | 631.00 | |
| | | | | Deliver blends to East Dock | | | |

FSC
1pallet

# Ulrich Chemical, Inc.

(317) 898-4632 PHONE
(317) 895-0614 FAX

**Straight Bill of Lading** - Short Form - Original - Not Negotiable

#138181

| B/L DATE |
|---|
| 07/20/2004 |

| B/L NO. |
|---|
| 110234 |
| Page 1 of 2 |

FROM: Ulrich Chemical (06)
AT: Bartonville, IL USA

| CARRIER | Ulrich |
|---|---|

S H I P T O
LCN Closures Division
Ingersoll Rand Company
121 West Railroad Avenue
East Dock
Princeton, IL 61356-
USA

S O L D T O
Rhema Enterprises LLC
P O Box 127
Tiskilwa , IL 61368-
USA

| CUST. NO. | SALES AGENT | OPERATOR | REQ. NO. | SHIP VIA | PO NUMBER | CUST ORDER NUMBER |
|---|---|---|---|---|---|---|
| 1005855 | 06074 | lhill | | Truck | Verbal-Greg | 110234 |

| SHIP DATE | WAREHOUSE | FREIGHT | FOB REMARK | DELIVERY DATE | DELIVERY TIME | DELIVERY TYPE |
|---|---|---|---|---|---|---|
| 07/21/2004 | 06 | Prepaid | Delivered | 07/21/2004 | 00:00:00 | Ship Date |

| QUANTITY ORDERED | QUANTITY OPEN | PACKAGING | HM | DESCRIPTION | NET WEIGHT (LB) | GROSS WEIGHT (LB) | FRT CLASS |
|---|---|---|---|---|---|---|---|
| 30 | 30 | 50.00 lb BagPaper V | | NON DOT REGULATED CHEMICALS, N.O.S. | 1,500.00 | 1,530.00 | |
| | Qty Shipped: 30 | | | Contains: LIME | | | |
| | | | | Lime Rotary Hydrate 2000003-B05000 | | | |
| | | | | | Qty | | |
| | | | | Lot #: MRH062804   30 | | | |
| | | | | Lot #: _____ | | | |
| | | | | General Remarks:    Total Weight (lbs): | 1,500.00 | 1,530.00 | |
| | | | | Deliver blends to East Dock | | | |

Delv chg

Charles Mason LCN

1 pallet

FSC

# Ulrich Chemical, Inc.

(317) 898-8632 PHONE
(317) 895-0614 FAX

# 133838

**Straight Bill of Lading** - Short Form - Original - Not Negotiable

| B/L DATE |
|---|
| 07/06/2004 |

| B/L NO. |
|---|
| 110193 |

Page 1 of 2

FROM:    Ulrich Chemical (06)
AT:       Bartonville, IL  USA

S H I P T O:
LCN Closures Division
Ingersoll/Rand Company
121 West Railroad Avenue
East Dock
Princeton , IL 61356-
USA

CARRIER  Will Call

S O L D T O:
Rhema Enterprises LLC
P O Box 127
Tiskilwa , IL 61368-
USA

| CUST. NO. | SALES AGENT | OPERATOR | REQ. NO. | SHIP VIA | PO NUMBER | CUST ORDER NUMBER |
|---|---|---|---|---|---|---|
| 1005855 | 06074 | lhill | | Other | Verbal-Greg | 110193 |

| SHIP DATE | WAREHOUSE | FREIGHT | | FOB REMARK | DELIVERY DATE | DELIVERY TIME | DELIVERY TYPE |
|---|---|---|---|---|---|---|---|
| 07/06/2004 | 06 | Will Call | | Ulrich-Bartonville | 07/06/2004 | 00:00:00 | Regular |

| QUANTITY ORDERED | QUANTITY OPEN | PACKAGING | HM | DESCRIPTION | NET WEIGHT (LB) | GROSS WEIGHT (LB) | FRT CLASS |
|---|---|---|---|---|---|---|---|
| 10 | 10 | 50.00 lb BagPaper V | | NON DOT REGULATED CHEMICALS, N.O.S. | 500.00 | 510.00 | |
| | | Qty Shipped: *10* | | Contains: LIME | | | |
| | | | | Lime Rotary Hydrate 2000003-B05000 | | | |
| | | | | Lot #: *MRHO51704*   Qty *10* | | | |
| | | | | Lot #: | | | |
| | | | | General Remarks:   Total Weight (lbs): | 500.00 | 510.00 | |
| | | | | Deliver blends to East Dock | | | |

# Ulrich Chemical, Inc.

(217) 898-8632 PHONE
(217) 895-0614 FAX

**Straight Bill of Lading** - Short Form - Original - Not Negotiable

116218

| B/L DATE |
|---|
| 04/22/2004 |

| B/L NO. |
|---|
| 95259 |

Page 1 of 2

TRUCK RUN #: 21238
STOP #: 2

FROM:  Ulrich Chemical (06)
AT:  Bartonville, IL  USA

| CARRIER  Ulrich |
|---|

LCN Closures Division
Ingersoll/Rand Company
121 West Railroad Avenue
East Dock
Princeton , IL 61356-
USA

S
O  Rhema Enterprises LLC
L  P O Box 127
D  Tiskilwa , IL 61368-
 USA
T
O

| CUST. NO. | SALES AGENT | OPERATOR | REQ. NO. | SHIP VIA | PO NUMBER | CUST ORDER NUMBER |
|---|---|---|---|---|---|---|
| 1005855 | 06074 | breed | | Truck | Verbal-Greg | 95259 |

| SHIP DATE | WAREHOUSE | FREIGHT | FOB REMARK | DELIVERY DATE | DELIVERY TIME | DELIVERY TYPE |
|---|---|---|---|---|---|---|
| 4/23/2004 | 06 | Prepaid | Delivered | 04/23/2004 | 00:00:00 | Ship Date |

| QUANTITY ORDERED | QUANTITY OPEN | PACKAGING | HM | DESCRIPTION | NET WEIGHT (LB) | GROSS WEIGHT (LB) | FRT CLASS |
|---|---|---|---|---|---|---|---|
| 3 | 3 | 50.00 lb BagPaper V | | NON DOT REGULATED CHEMICALS, N.O.S. | 150.00 | 153.00 | |
| | | | | Contains: LIME | | | |
| | Qty Shipped: | 3 | | Lime Rotary Hydrate 2000003-B05000 | | | |
| | | | | Lot #: MRH020904    Qty  3 | | | |
| | | | | Lot #: _____ | | | |
| | | | | General Remarks:    Total Weight (lbs): | | | |
| | | | | Deliver blends to East Dock | 150.00 | 153.00 | |

1 Pallet

(LCN)
Kevin Atkinson
4-23-04

No extra charges due to our error
per Client

115748

# Irich Chemical, Inc.

7) 898-8632 PHONE
7) 895-0614 FAX

Straight Bill of Lading   - Short Form - Original - Not Negotiable

| B/L DATE |
| --- |
| 04/21/2004 |

| B/L NO. |
| --- |
| 95107 |

Page 1 of 2

:OM:   Ulrich Chemical (06)
:AT:   Bartonville,IL  USA

CARRIER  Will Call

Rhema Enterprises LLC
754 1st Street
LaSalle , IL 61301-
USA

S
O  Rhema Enterprises LLC
L  P O Box 127
D  Tiskilwa , IL 61368-
   USA
T
O

| CUST. NO. | SALES AGENT | OPERATOR | REQ. NO. | SHIP VIA | PO NUMBER | CUST ORDER NUMBER |
| --- | --- | --- | --- | --- | --- | --- |
| 1005855 | 06074 | lhill | | Other | Verbal-Greg | 95107 |

| SHIP DATE | WAREHOUSE | FREIGHT | FOB REMARK | DELIVERY DATE | DELIVERY TIME | DELIVERY TYPE |
| --- | --- | --- | --- | --- | --- | --- |
| 4/21/2004 | 06 | Will Call | Ulrich-Bartonville | 04/21/2004 | 00:00:00 | Regular |

| QUANTITY ORDERED | QUANTITY OPEN | PACKAGING | HM | DESCRIPTION | NET WEIGHT (LB) | GROSS WEIGHT (LB) | FRT CLASS |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 1 | 1 | 50.00 lb BagPa BrSAD1 | | NON DOT REGULATED CHEMICALS, N.O.S. | 50.00 | 51.00 | |
| | | Qty Shipped: | | Contains: SODA ASH | | | |
| | | / | | Soda Ash Grade 100 TG 2000609-B05000 | | | |
| | | | | Lot #: 035-117    Qty  / | | | |
| | | | | Lot #: | | | |
| | | | | Total Weight (lbs): | | | |
| | | | | | 50.00 | 51.00 | |

*Gregory P. Kussman* (signature)

# Ulrich Chemical, Inc

4616 S. Enterprise Drive
Bartonville , IL 61607-
USA

(815)625-1320  (Phone)
()-  (Fax)

| | DATE |
|---|---|
| | 03/01/2004 |
| | ORDER NO. |
| | 86998 |

## Order Acknowledgment

| S O L D T O | Rhema Enterprises LLC<br>P O Box 127<br>Tiskilwa , IL 61368-<br>USA |
|---|---|

| S H I P T O | National Manufacturing Co.<br>One First Avenue<br>Sterling , IL 61081-<br>USA<br>Attn:  Bill Buckingham |
|---|---|

Route

#109553

| CUST NO. | SHIP TO ID | SALES ID | OPERATOR | REQUISITION  NO. | PO NUMBER | ORDER TYPE |
|---|---|---|---|---|---|---|
| 1005855 | 11 | 06074 | lhill | | Verbal-Greg | Warehouse |

| SHIP DATE | SHIP VIA | DELV. DATE | DELV. TIME | FREIGHT TERMS | F.O.B. REMARK | Del Type | Order Terms |
|---|---|---|---|---|---|---|---|
| 03/18/2004 | Ulrich | 3/18/2004 | | Prepaid | Delivered | Regular | Net 30 |

| QUANTITY ORDERED | PACKAGING | DESCRIPTION | ST | UNITS | PRICE/UNIT | EXTENDED PRICE . |
|---|---|---|---|---|---|---|
| 1 | 471.00 lb<br>DrP Ret Blue | Blend RE 680<br>6000168-Pr0550<br>Whs: 06<br>Lot: TBD-LOT | * | 1.00 | 135.0000/E | 135 00 |

TOTAL:  135.00



FSC

This is new inv. for correct price.

Page 1 of 1

| Customer Number | |
|---|---|
| 1005855 | 11 |

# Ulrich Chemical, Inc.

(317) 898-8632 **PHONE**
(317) 895-0614 **FAX**

**INVOICE**

| Date | Invoice # |
|---|---|
| 03/10/2004 | 109553 |
| Date Shipped | Order # |
| 03/10/2004 | 86998 |

S
O
L
D
T
O

Rhema Enterprises LLC
P O Box 127
Tiskilwa , IL 61368-
USA

S
H
I
P
T
O

National Manufacturing Co.
One First Avenue
Sterling , IL 61081-
USA

R

| Customer PO # | | FOB Remark | | Freight Terms | | |
|---|---|---|---|---|---|---|
| Verbal-Greg | | Delivered | | Prepaid | | |
| Requisition # | | Terms | Due Date | Ship Via | Warehouse | Sales ID |
| | | Net 30 | 04/09/2004 | Ulrich | 06 | 06074 |

| Units | Package | Product Name | Total Quantity | Unit Price | Amount |
|---|---|---|---|---|---|
| 1.00 | 471 lb DrP Ret Blue | 6000168-Pr0550-Blend RE 680 | 471.00 lb | 135.0000 /E | 135.00 |

Line Item Remarks:    Packaging: Pr0550, Deposit: 1 container(s) at 50.00 USD per container = 50.00 USD
Packaging: Pr0550, Service: 1 container(s) at 5.00 USD per container = 5.00 USD

| | |
|---|---|
| Container Deposit | 50.00 |
| Container Service Charge | 5.00 |
| Fuel Surcharge | 10.00 |

*This is the correct invoice*

**Total:**    200.00

| 01 - Indianapolis | 02 - Evansville | 03 - Terre Haute | 04 - Fort Wayne | 05 - Louisville | 06 - Bartonville | 07 - Georgetown |
|---|---|---|---|---|---|---|
| (317) 898-8632 Phone | (812) 424-2966 Phone | (812) 234-7757 Phone | (260) 749-9950 Phone | (502) 448-6200 Phone | (309) 697-8400 Phone | (502) 863-0084 Phone |
| (317) 895-0614 Fax | (812) 421-2077 Fax | (812) 234-3349 Fax | (260) 749-9650 Fax | (502) 448-6204 Fax | (309) 697-9644 Fax | (502) 863-2523 Fax |

Remit To: Ulrich Chemical, Inc.    P.O. Box 66030    Indianapolis , IN 46266-6030    USA

Page 1 of 1

| Customer Number |
|---|
| 1005855    11 |

Associated Invoice #:  107,871

S Rhema Enterprises LLC
O P O Box 127
L Tiskilwa , IL 61368-
D USA
T
O

# Ulrich Chemical, Inc.

(317) 898-8632 **PHONE**
(317) 895-0614 **FAX**

S National Manufacturing Co.
H One First Avenue
I Sterling , IL 61081-
P USA
T
O

| CREDIT MEMO | |
|---|---|
| . Date | Memo #, |
| 03/23/2004 | 109538 |
| Date Shipped | Order # |
| 03/10/2004 | 86998 |

R

| Customer PO # | | FOB Remark | | Freight Terms | | |
|---|---|---|---|---|---|---|
| Verbal-Greg | | | | | | |
| Requisition # | | Terms | Due Date | Ship Via | Warehouse | Sales ID |
| | | Net 30 | 04/22/2004 | Ulrich | 06 | 06074 |

| Units | Package | Product Name | Total Quantity | Unit Price | Amount |
|---|---|---|---|---|---|
| -0.94 | 500 lb DrP Ret Blue | 6000168-Pr0550-Blend RE 680 | -471.00 lb | 0.2400 /lb | -113.04 |

| | | |
|---|---|---|
| Container Deposit | | -50.00 |
| Container Service Charge | | -5.00 |
| Fuel Surcharge | | -10.00 |
| Delivery Charge | | -25.00 |

*This credit is to reverse inv. # 107871*

| Total: | -203.04 |
|---|---|

01 - Indianapolis    02 - Evansville    03 - Terre Haute    04 - Fort Wayne    05 - Louisville    06 - Bartonville    07 - Georgetown
(317) 898-8632 Phone    (812) 424-2966 Phone    (812) 234-7757 Phone    (260) 749-9950 Phone    (502) 448-6200 Phone    (309) 697-8400 Phone    (502) 863-0084 Phone
(317) 895-0614 Fax    (812) 421-2077 Fax    (812) 234-3349 Fax    (260) 749-9650 Fax    (502) 448-6204 Fax    (309) 697-9644 Fax    (502) 863-2523 Fax

Remit To: Ulrich Chemical, Inc.    P.O. Box 66030    Indianapolis , IN 46266-6030    USA

Page 1 of 1

E-FILED
Friday, 21 July, 2006  12:04:10 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 6 -
# SELECTED RECORDS OF
# MONMOUTH COLLEGE

## Wilfong, Earl

| | |
|---|---|
| **From:** | Greg Kinsman [gpkinsman@earthlink.net] |
| **Sent:** | Tuesday, October 25, 2005 9:21 AM |
| **To:** | Wilfong, Earl |
| **Subject:** | boiler tube failure |

Earl,

After reviewing the boiler tube yesterday my feeling is that we have a circulation problem with the #4 boiler. This is probably related to the problems we have had in the past trying to get the boiler to operate up to capacity. The difference between this particular boiler and other 3 units we have is that the feed water is fed into this boiler halfway up the side whereas the others are all fed at the bottom of the boiler. Dennis, Mark and myself identified a place where the feedwater could be routed to the bottom of the boiler with a minor piping change. Dennis said this could be done quickly if he had the proper piping on hand. Now would be the time to try it as the boiler is empty.

It was also noticed that we had a steam header leak into the boiler which was returning condensate back to the boiler. It was running down across the tubes and out the bottom of the boiler. This condition will cause corrosion of the tubes where the condensate comes in contact. We can eliminate this condition by pickling the boiler. This involves filling the boiler totally full and adding sufficient sulfite to insure there is no oxygen present in the boiler. We have sufficient chemical on hand to do this.

I am recommending we reroute the feedwater, as long as the boiler is empty, and try operating the boiler with the new feed point. If this works we have solved the circulation problem with the new boiler. If there is no difference then the boiler will be full of water and ready for pickling. This is the most efficient use of manpower, water and chemicals.

Please contact me if you have any questions or concerns.

**E-FILED**
Friday, 21 July, 2006  12:04:52 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 7 - AFFIDAVIT OF RANDY AZZARELLO

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION

CHEMTREAT, INC.,

               Plaintiff,

v.

GREGORY P. KINSMAN, and
MICHELLE M. KINSMAN, individually
and d/b/a REMA CHEMICALS.

               Defendants.

**AFFIDAVIT OF RANDALL L.
AZZARELLO IN SUPPORT OF
PLAINTIFF'S MOTION FOR
TEMPORARY INJUNCTION**

---

COMMONWEALTH OF VIRGINIA

COUNTY OF HENRICO, to-wit:

      Randall L. Azzarello, being first duly sworn, states as follows:

      1.     I am, and at all times relevant hereto have been, employed by ChemTreat, Inc.

("ChemTreat") as Executive Vice President and Chief Operating Officer. In the course of my

responsibilities with ChemTreat, I have personal familiarity with the matters set forth herein.

      2.     ChemTreat is a Virginia corporation with its home office located at 4461 Cox

Road, Glen Allen, Virginia. ChemTreat supplies proprietary industrial water treatment products

and attendant services to approximately 7,000 locations in North America, most of which are

large manufacturing, institutional or industrial facilities or large commercial office towers.

ChemTreat principally supplies the products, services and expertise to maintain the heating and

cooling water systems within the physical plants of its customers and process treatment

applications of its customers.

3.     ChemTreat currently employs approximately 551 people in the United States and 14 persons elsewhere in North America.  ChemTreat's product line consists of approximately 1,200 proprietary products which it has developed since the company was established in 1968. To develop, refine and preserve its product line, ChemTreat maintains a fully staffed Research and Development Department, which currently consists of approximately 20 persons.  That department creates all of the company's proprietary product formulations for use in its water treatment services.

4.     The products and services provided by ChemTreat are of a highly technical nature requiring extensive technical expertise not only from its laboratory and corporate technical staff but also its field sales personnel.  Most ChemTreat salesmen are chemists, biologists or chemical engineers by training.

5.     The product formulations of ChemTreat are extremely valuable assets of the Company from which it derives significant competitive advantage in the marketplace. ChemTreat's unique and proprietary formulations are a cornerstone of the comprehensive water treatment services ChemTreat provides for its customers.

6.     Since its inception, ChemTreat has pursued an intentional market strategy of maintaining the strict confidentiality of its product formulary through the protection of trade secret laws rather than patent protection.  Accordingly, ChemTreat goes to great lengths to protect its proprietary formulations.

7.     In addition, ChemTreat's customers are a valuable and important asset of the Company, and ChemTreat goes to great lengths to provide optimum service for its customers and to maintain longstanding relationships with those customers.

8.      All technical staff, field personnel and corporate staff are required to sign a Trade Secrets and Confidentiality Agreement as a condition of employment with the Company. Pursuant to the Trade Secrets and Confidentiality Agreement, the employees agree to hold all proprietary company information in strict confidence.

9.      Gregory P. Kinsman ("Kinsman") was hired as a sales representative for ChemTreat and entered into an Employment Agreement (the "Employment Agreement") with ChemTreat on August 17, 1995.

10.      The Employment Agreement provides, among other things, that during the period of his employment, Kinsman would "not engage in any other business, either for himself or for the account of any other person, firm or corporation without the prior consent of the Board of Directors of CHEMTREAT."

11.      The Employment Agreement also contains the following non-solicitation provision:

> During the eighteen (18) month period following the effective date of termination by either party of the employment relationship created hereunder, Employee shall not in his own name, or as a consultant, or in any other capacity on behalf of any other person or entity solicit, call upon, communicate with, enter into any sales or servicing agreements with, or attempt to communicate with any CHEMTREAT customer or prospective customer, as defined herein, for the purpose of selling, offering for sale, influencing the purchase of, or otherwise providing any product, service or equipment competitive with any product, service or equipment then sold, offered for sale, provided or under development by CHEMTREAT.

12.      The Employment Agreement further provides:

> For the purposes of this Agreement, "customer" shall mean any person or entity that is a customer of CHEMTREAT ... with whom Employee had any contact, communication, or for which Employee had supervisory, sales or service responsibility during any of the eighteen (18) consecutive calendar months preceding the effective date of termination of his CHEMTREAT employment.

3

13.     Also on August 17, 1995 and in conjunction with the Employment Agreement,

Kinsman entered into a Trade Secrets and Confidentiality Agreement (the "Confidentiality

Agreement") in the form presented to all technical staff, field personnel and corporate staff.

14.     The Confidentiality Agreement provides, among other things, that Kinsman

would not disclose or use any information he obtained during the course of his employment with

ChemTreat. Specifically, the Confidentiality Agreement provides, in pertinent part, as follows:

> I [Kinsman] will not disclose to persons not employed by the
> Corporation [ChemTreat, Inc.] or to those persons employed by the
> Corporation to whom disclosure has not been previously approved by the
> president or any vice president of the Corporation, or use directly or
> indirectly, during or after my employment with the Corporation, any
> information of the Corporation I obtain during the course of my
> employment relating to inventions, products, product specifications,
> processes, procedures, prices, discounts, manufacturing costs, business
> affairs, future plans, technical data, customer lists (customer lists to
> include among other things customer requirements, products purchased
> by customers, and customer contacts and other business information
> pertaining to such customer), product formulations, marketing
> techniques and cost data.

15.     On or about October 10, 2005, I learned that Kinsman had diverted at least five

customer accounts from ChemTreat to a competing chemical treatment company owned by

Kinsman's wife, which company is called, upon information and belief, Rema, Inc. ("REMA").

Upon learning of this violation of Kinsman's duties to ChemTreat, I telephoned Kinsman

personally on October 10, 2005. During the course of our conversation, Kinsman initially denied

diverting any business from ChemTreat to REMA. Later in the conversation, however, he

acknowledged diverting the ChemTreat customers and that those customers were now REMA

customers.

16.     During our conversation, Kinsman listed the names of the customers he had

diverted from ChemTreat (the "Diverted Customers") beginning in approximately September

2004, all of whom were customers for whom Kinsman had supervisory, sales or service responsibility during the eighteen (18) calendar months preceding October 10, 2005. Those include Ingersoll Rand, Monmouth College, Bob Evans Farms, Illinois Cement, and The Kensington. The annual sales generated by ChemTreat from the accounts of the Diverted Customers prior to their diversion by Kinsman was approximately $37,000.

17.     After our conversation, I learned that Kinsman had also diverted another of ChemTreat's customers, Carus Chemical, to his wife's company, REMA. For this account alone, ChemTreat had generated annual sales in excess of $100,000 prior to Kinsman's diversion of the account. Kinsman failed to disclose Carus Chemical as one of the customers he diverted from ChemTreat. Carus Chemical was a customer that, like the other Diverted Customers, was serviced by Kinsman during the eighteen calendar months preceding October 10, 2005.

18.     Kinsman's employment with ChemTreat was terminated effective October 11, 2005.

19.     In addition, Kinsman has failed to provide satisfactory service to other ChemTreat customers in his service area and such failure has resulted in the loss of those customers to other competing companies. As a result of Kinsman's failure to adhere to his Employment Agreement and the misdirection of his energies toward gaining customers for his wife's company instead of carrying out his duties as an employee of ChemTreat, ChemTreat has lost virtually all of its business serviced by Kinsman in central Illinois.

20.     Further, by virtue of his employment with ChemTreat, Kinsman possesses confidential information and other proprietary information of ChemTreat.

21.     The disclosure of such information to REMA and/or to manufacturers of REMA's products, and the solicitation of ChemTreat customers within eighteen (18) months following

Kinsman's termination are acts prohibited by Kinsman's Employment and Confidentiality

Agreements, and have the potential to destroy the competitive advantage that ChemTreat enjoys

from its product line and, therefore, are significant threats to the business of ChemTreat in the

central Illinois area.

22.    The value of the information removed from ChemTreat is not subject to ready

valuation and the diversion of customers by Kinsman is an ongoing violation of the terms of

Kinsman's Employment and Confidentiality Agreements.

This ends the affidavit.


Dated: _10/31/05_

_Randall L. Azzarello_
Randall L. Azzarello


Sworn to and subscribed before me this _31_ day of October, 2005 by Randall L.
Azzarello, who personally appeared before me and executed this affidavit.


_Phyllis B. Bagent_
Notary Public


My commission expires: _9/30/08_


#712436 v1    017255.00100

6

E-FILED
Friday, 21 July, 2006  12:06:05 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 8 - DEPOSITION OF GREGORY KINSMAN (1 OF 8)

ORIGINAL

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

CHEMTREAT, INC., A )
VIRGINIA CORPORATION, )
)
Plaintiff, )
)
-vs- ) No. 05 CV 1336
)
GREGORY P. KINSMAN, and )
MICHELLE M. KINSMAN, )
individually and d/b/a )
REKA CHEMICALS, )
)
Defendants. )

THE DEPOSITION OF GREGORY P. KINSMAN,
a defendant, called by the Plaintiff, for
examination pursuant to notice, taken before Gina
Fick, Illinois CSR 084-003872, RMR, a Notary
Public, on Wednesday, the 3rd day of May, 2006,
commencing at the hour of 10:00 a.m., and
continued on Thursday, the 11th day of May, 2006,
at 331 Fulton Street, Suite 650, in the City of
Peoria, County of Peoria, and State of Illinois.

**Page 3**

I N D E X

| EXHIBITS | PAGE |
| --- | --- |
| Exhibit No. 1 | 22 |
| Exhibit No. 2 | 23 |
| Exhibit No. 3 | 36 |
| Exhibit No. 4 | 89 |
| Exhibit No. 5 | 94 |
| Exhibit No. 6 | 98 |
| Exhibit No. 7 | 170 |
| Exhibit No. 8 | 170 |
| Exhibit No. 9 | 170 |
| Exhibit No. 10 | 186 |
| Exhibit No. 11 | 214 |
| Exhibit No. 12 | 234 |
| Exhibit No. 13 | 241 |
| Exhibit No. 14 | 247 |
| Exhibit No. 15 | 255 |
| Exhibit No. 16 | 261 |
| Exhibit No. 17 | 263 |
| Exhibit No. 18 | |

RECEIVED
MAY 2 5 2006
CASSIDY & MUELLER

**Page 2**

PRESENT:

CASSIDY & MUELLER
323 Commerce Bank Building
416 Main Street
Peoria, Illinois 61602
BY:  Andrew D. Cassidy, Esq.
      for the Plaintiff;

HARVEY & STUCKEL, CHTD.
331 Fulton Street
Suite 650
Peoria, Illinois 61602
BY:  J. Kevin Wolfe, Esq.
      for the Defendant;

ALSO PRESENT:

Michelle M. Kinsman

Mike Klausegger

I N D E X

| WITNESS | PAGE |
| --- | --- |
| GREGORY P. KINSMAN, | |
| Examination by Mr. Cassidy | 4 |
| Certificate of Reporter | 282 |

**Page 4**

GREGORY P. KINSMAN,
having been first duly sworn, was examined and
testified as follows:

EXAMINATION BY MR. CASSIDY:

Q.  Could you state your full name, please.

A.  Gregory P. Kinsman.

Q.  Okay.  Mr. Kinsman, have you ever given a
deposition before?

A.  No, I have not.

Q.  Okay.  I'm going to have a series of
questions for you about the background,
about the subject matter of this lawsuit.

        The court reporter here is going
to take everything down.  We have a tendency
to say uh-huh, huh-uh sometimes, and that
doesn't come across.  So we need to try to
say yes or no if it calls for a yes or no
answer, okay.

        If you give me a nod of the head
or say uh-huh, huh-uh, I will step in and
ask, "Is that a yes or no," so that we're
clear on the record.

**5**

1    A.   Okay.
2    Q.   Sometimes I will throw too much information
3       into a question, because my mind is going
4       faster than my mouth or vice versa, and it
5       won't make any sense. Please just tell me.
6       I'll be happy to re-ask any question that
7       doesn't make any sense to you. Fair enough?
8    A.   Yes.
9    Q.   The final thing is, also because I'll try to
10      put too much information in a question,
11      you'll know really what the question is
12      before I'm done talking. If you could wait
13      until I'm done asking my question before you
14      start answering, I will wait until you are
15      done with your answer before I go on to the
16      next question, and that will make it much
17      easier for the court reporter, okay?
18    A.   Yes.
19    Q.   Anything else, we'll just wing it as we go
20      along here.
21             What is your current address?
22    A.   My mailing address or my physical address?
23    Q.   What is your residential address?

**6**

1    A.   It's 1949 1250 North Avenue, Princeton,
2       Illinois.
3    Q.   And is the mailing address different?
4    A.   I have two mailing addresses.
5    Q.   Is the mailing address for the residence
6       different?
7    A.   No.
8    Q.   Okay. And who lives there with you?
9    A.   My wife, Michelle.
10    Q.   Okay. So on the tax returns you produced
11      today it shows you have two children,
12      correct?
13    A.   Right.
14    Q.   Do they live there with you?
15    A.   They are in school.
16    Q.   College?
17    A.   College.
18    Q.   Okay. They are still dependent upon you?
19    A.   My son has his own apartment, lives in town,
20      works two jobs and is a full-time student.
21    Q.   What is your date of birth?
22    A.   7/16/55.
23    Q.   Okay. And just so I can have a better idea

**7**

1       about your children, how old is Justin?
2       What's his date of birth?
3    A.   Justine, that's my daughter.
4    Q.   Justine, I'm sorry.
5    A.   She'll be 19 in May.
6    Q.   And how about Matthew?
7    A.   They are twins.
8    Q.   Okay. I want to discuss your educational
9       background a little bit. I assume you
10      finished high school.
11    A.   Yes.
12    Q.   Where did you finish high school at?
13    A.   Rice Lake High School.
14    Q.   Rice Lake?
15    A.   Rice Lake.
16    Q.   Where is that at?
17    A.   Rice Lake, Wisconsin.
18    Q.   What year did you graduate from high school?
19    A.   1973.
20    Q.   Did you continue on to college?
21    A.   Yes, I did.
22    Q.   Immediately?
23    A.   Yes.

**8**

1    Q.   And where did you go to college?
2    A.   Freshman year I went to the University of
3       Wisconsin, O'Claire.
4    Q.   Okay.
5    A.   And years two through four I went to
6       University of Wisconsin, River Falls.
7    Q.   Graduate from U of W, River Falls, in 1977?
8    A.   I believe so.
9    Q.   In other words, you completed college in
10      four years?
11    A.   Yes.
12    Q.   What degree or degrees did you graduate
13      with?
14    A.   I graduated with a bachelor's degree in
15       animal science with a chemistry emphasis.
16    Q.   When you say a chemistry emphasis, is that
17       like a minor?
18    A.   It's an emphasis within the animal science
19       program.
20    Q.   Okay. I'm not familiar with the animal
21       science program. Can you tell me what that
22       is.
23    A.   It's a general curriculum program with an

9

1  emphasis in chemistry --
2  Q. Okay.
3  A. -- biology, whatever emphasis you wanted to
4      choose. I chose the chemistry.
5  Q. Okay. And I think you indicated that's a
6      bachelor of science degree?
7  A. Yes.
8  Q. Did you do any postgraduate schooling?
9  A. I went to Marquette University in the dental
10     program.
11 Q. Did you complete the dental program?
12 A. No, I didn't.
13 Q. How long were you in the dental program?
14 A. One year.
15 Q. Okay. '77, '78 school year?
16 A. That sounds right.
17 Q. The year right after you graduated from
18     college?
19 A. Right.
20 Q. What did you do then after you quit the
21     dental program at Marquette?
22 A. I went to work for Moorman Manufacturing
23     Company out of Quincy, Illinois.

11

1      explain to me what it is you were doing for
2      them.
3  A. I would do forage analysis, send stuff in
4      to be analyzed and then balance the rations
5      whether they be dairy cows or beef cows
6      or --
7  Q. Were you in plant or out with customers?
8  A. I was out in the field with customers.
9  Q. So when you are figuring nutritional
10     requirement you are talking about for some
11     particular customer?
12 A. Right. Each, individual customers.
13 Q. Okay. How long were you with Moorman?
14 A. Nine years.
15 Q. Do you remember when you started, the year?
16 A. I started after -- right after school, so
17     I'm not sure what year it was. I can't
18     remember.
19 Q. Well, if we were correct, up to the point
20     that you left Marquette we're in 1978, the
21     spring of '78 would have been the end at
22     Marquette, so you would have started with
23     Moorman sometime in '78?

10

1  Q. What did you do for Moorman Manufacturing?
2  A. I was a nutritionist.
3  Q. A nutritionist?
4  A. A nutritionist.
5  Q. Can you kind of give me a little more detail
6      as to what that job would entail?
7  A. Ration and balancing feed sales, minerals.
8  Q. What kind of business is Moorman
9      Manufacturing in?
10 A. They sold feed --
11 Q. Okay.
12 A. -- animal feed.
13 Q. Was there a specific department that you
14     worked in?
15 A. No.
16 Q. Okay. And as a nutritionist one of your
17     jobs was to determine --
18 A. Balance rations for dairy cows, cattle,
19     pigs, horses, dogs.
20 Q. You were formulating the feed to a certain
21     extent?
22 A. No.
23 Q. I'm just a local lawyer here. You have to

12

1  A. Somewhere in there, I believe.
2  Q. Until approximately 1987; is that right?
3      The best you can recall.
4  A. Probably. The best I can remember.
5  Q. Then where did you go.
6  A. I had my own business.
7  Q. What kind of business?
8  A. I did financial services.
9  Q. Why did you leave Moorman Manufacturing?
10 A. Limited income.
11 Q. It was a voluntary termination?
12 A. Yes. Well, it wasn't a termination. I
13     left.
14 Q. Voluntary resignation/termination?
15 A. Big difference between resignation and
16     termination.
17 Q. Was there a name to your financial services
18     business?
19 A. No.
20        MR. WOLFE: If you remember.
21 A. I don't remember.
22 Q. (BY MR. CASSIDY) Okay. Where did you have
23     this financial services business?

13

1  A.  In Ellsworth, Wisconsin.
2  Q.  Is that where you were living at the time?
3  A.  Yes.
4  Q.  Can you just briefly describe the scope of
5      the financial services you were giving.
6  A.  I worked for Primerica Corporation, and I
7      did investments, profit and pension plans.
8  Q.  For Primerica?
9  A.  Retirements, yes.
10 Q.  Now, I need to understand this:  You started
11     your own business?
12 A.  Right.
13 Q.  But that business was contracted to
14     Primerica?  I guess I'm trying to understand
15     how you could work for Primerica and have
16     your own business.
17 A.  I went in -- I was recruited to do financial
18     services for Primerica Corporation.
19 Q.  Okay.  Were you an employee of Primerica
20     Corporation?
21 A.  I was paid by them, commission.
22 Q.  So when you would give investment advice, or
23     whatever financial service advice you would

14

1      give, you would be steering them towards
2      products or services provided by Primerica?
3  A.  Yes.
4  Q.  How long did you do that?
5  A.  Four years.
6  Q.  Okay.  Sometime in 1991 then or around
7      there?
8  A.  I believe so.
9  Q.  And why did you leave that business?
10 A.  Too much responsibility.
11 Q.  What did you do next?
12 A.  I went to work for Nalco Chemical Company.
13 Q.  Where were you stationed out of for Nalco?
14 A.  Princeton, where I live now.
15 Q.  Did you move to Princeton because of the job
16     with Nalco or had you moved there during
17     your financial --
18 A.  No.  I moved there for Nalco.  I was
19     transferred to this area.
20 Q.  What did you do for Nalco?
21 A.  Chemical sales and service.
22 Q.  Is Nalco primarily a water treatment
23     chemical company?

15

1  A.  Specialty water treatment chemical company.
2  Q.  That was the scope of your sales was for
3      water treatment applications?
4  A.  Yes.
5  Q.  What was your sales territory for Nalco?
6  A.  I had this region of Illinois, Davenport,
7      down to Fort Madison over through Peoria
8      back up to Sterling/Rock Falls.
9  Q.  When you started with Nalco were you taking
10     over a customer territory that had
11     previously been served by another sales rep?
12 A.  I split a territory --
13 Q.  Okay.  Was the territory --
14 A.  -- with new areas added to it.
15 Q.  Okay.  Were you given an existing customer
16     base?
17 A.  No.
18 Q.  Okay.  So you started with Nalco with no
19     customer base?
20 A.  I started assisting an established
21     representative and selling on my own.
22 Q.  Okay.  When you started with Nalco did you
23     undergo any type of training program with

16

1      them?
2  A.  Yes.
3  Q.  Was it at their corporate headquarters?
4      Tell me about it.
5  A.  I was put into a -- started in an initial
6      study program through the district office in
7      Davenport.
8  Q.  Okay.
9  A.  And I worked with an established salesman in
10     the area.
11 Q.  Okay.  Was the initial study program
12     classroom-type work?
13 A.  Self-study.
14 Q.  Okay.  Did you attend seminars, classes put
15     on by Nalco at their district headquarters?
16 A.  District meetings.
17 Q.  Okay.  How long did the initial study
18     program continue?
19 A.  The self-study was six months.
20 Q.  Okay.  Now, during the same time that you
21     were -- strike that.
22          That would have been the first six
23     months you were with Nalco; is that correct?

17

1    A.   Right.
2    Q.   During the same six months you were out in
3       the field with an established sales rep?
4    A.   Yes.
5    Q.   Okay. What type of testing or completion of
6       the self-study was given to you to determine
7       that you had learned what you needed to
8       learn?
9    A.   I had to turn in assignments and tests.
10   Q.   Okay. At the end of the six-month period
11       did you continue to then apprentice, I
12       guess, with the existing sales rep?
13   A.   I apprenticed with him and worked on my own
14       until he left Nalco.
15   Q.   Tell me what you mean by you worked with him
16       and on your own.
17   A.   Two or three days of work -- two or three
18       days a week I would spend time with the
19       established representative, and then the
20       other days I would work on it myself and
21       make sales calls.
22   Q.   During this period of time when you were
23       still doing part-time work with the sales

18

1       rep had you been assigned any customers of
2       your own?
3    A.   Not at that point in time.
4    Q.   Okay. So any work you were doing on your
5       own was essentially cold calls or at least
6       following up on leads?
7    A.   Off of prospect lists.
8    Q.   Prospect lists provided by Nalco?
9    A.   Yes.
10   Q.   And do you know how Nalco put together their
11       prospect list?
12   A.   No, I didn't.
13   Q.   How long did you continue in that fashion,
14       part time with the sales rep, part time
15       making your own sales calls?
16   A.   I worked with that rep probably for a year
17       and a half or two years.
18   Q.   And then he left the company?
19   A.   He left the company.
20   Q.   Did you take over his region then?
21   A.   Yes, I did --
22   Q.   And all of his --
23   A.   -- plus mine.

19

1    Q.   And all of his customers that you had been
2       calling on with him the prior year and a
3       half?
4    A.   Right.
5    Q.   Was it -- in doing the water treatment type
6       sales that Nalco did, you need to understand
7       workings of boilers and cooling towers, and
8       things such as that, correct?
9    A.   Yes.
10   Q.   How did you gain that knowledge?
11   A.   Experience and training.
12   Q.   With Nalco?
13   A.   Right.
14   Q.   Okay. Was that part of the self-study
15       learning about the component parts of a
16       system --
17   A.   Right.
18   Q.   -- you would have to be worrying about?
19   A.   Right.
20   Q.   As well as chemical issues for formulating
21       the water, correct?
22   A.   Yes.
23   Q.   And then with the year and a half to two

20

1       years of apprenticeship with the existing
2       sale rep, you had on-the-job training as
3       well, correct?
4    A.   Yes.
5    Q.   Did Nalco sell its own chemicals?
6    A.   Excuse me? Could you repeat that, please.
7    Q.   Did Nalco sell its own chemicals? Were they
8       a supplier?
9    A.   Nalco supplied chemicals to the customers.
10   Q.   Would the chemicals that Nalco would sell to
11       its customers basically be preformulated
12       chemicals or would you as a sales rep
13       determine formulations that would need to be
14       used for a particular application?
15   A.   The majority of chemicals were premixed.
16   Q.   Okay.
17   A.   Certain situations required testing and
18       manufacturing of new chemicals for that
19       application.
20   Q.   Okay. Is that something you as the sales
21       rep would do?
22   A.   Based on the testing we would work on that
23       with the formulators from the company.

21

1  Q.  How long were you with Nalco?
2          MR. WOLFE:  Nalco?
3          MR. CASSIDY:  Did I stutter?
4          MR. WOLFE:  I thought you said
5  NAFTA.
6          MR. CASSIDY:  Nalco.
7  A.  Somewhere over five years.
8  Q.  (BY MR. CASSIDY)  Where did you go after
9  Nalco?
10  A.  I started work for ChemTreat.
11  Q.  Why did you leave Nalco for ChemTreat?
12  A.  I had a philosophical problem with the way
13  they had changed their business.
14  Q.  With the way that Nalco was operating its
15  business or with your compensation package
16  with Nalco?
17  A.  With the way they were doing business.
18  Q.  Do you know when that occurred, when you
19  changed from -- or to ChemTreat?
20  A.  I believe it was in -- I can't remember
21  which year it was.
22  Q.  Were you still working at Nalco when you
23  applied for work with ChemTreat, or did you

22

1  leave Nalco without having another job lined
2  up?
3  A.  I was working for Nalco when I was hired by
4  ChemTreat.
5          [Exhibit No. 1 marked.]
6  Q.  Okay.  I'll show you what I've marked as
7  Exhibit 1, which indicates it's a ChemTreat,
8  Inc., application for employment.
9  Unfortunately the only copy I have has a
10  Post-It Note on there before it was xeroxed.
11          Do you recognize that document?
12  A.  Yes, I do.
13  Q.  Okay.  And that is an application that you
14  filled out for employment with ChemTreat?
15          MR. WOLFE:  Do you just want him
16  to look at the first page?
17          MR. CASSIDY:  No.
18          MR. WOLFE:  Okay.
19  A.  Yes.
20  Q.  (BY MR. CASSIDY)  And that is your signature
21  on Page 2 of that exhibit that's entitled
22  Acknowledgment and Release, correct?
23  A.  Yes.

23

1  Q.  Now, does that help refresh your
2  recollection as to when you went to work for
3  ChemTreat?
4  A.  Right.
5  Q.  Sometime in the summer of '95?
6  A.  Right.
7  Q.  Okay.  Now, in response to having applied
8  for employment you were offered employment,
9  correct?
10  A.  Yes.
11          [Exhibit No. 2 marked.]
12  Q.  (BY MR. CASSIDY)  I'll show you what is
13  marked Exhibit 2.  Will you please take a
14  look at that document.
15  A.  (The witness complied.)
16  Q.  You recognize that as your employment
17  agreement with an attached Trade Secrets and
18  Confidentiality Agreement that you executed
19  at the time you took employment with
20  ChemTreat?
21  A.  Yes.
22  Q.  And that is -- on Page 6 that is your
23  signature on there, correct?

24

1  A.  Yes.
2  Q.  And on Page 8, which is part of the Trade
3  Secrets and Confidentiality Agreement, that
4  is also your signature on there,
5  correct?
6  A.  Yes.
7  Q.  Had you read this document, which is made up
8  of the two separate agreements, prior to
9  signing it?
10  A.  Yes.
11  Q.  Did you review the terms of this contract
12  with any legal counsel prior to executing
13  it?
14  A.  No.
15  Q.  Did you believe that you understood the
16  contents of this document at the time that
17  you signed it?
18  A.  Yes.
19  Q.  Okay.  You signed it voluntarily at the time
20  of starting employment, correct?
21  A.  Would you repeat that, please.
22  Q.  You signed it voluntarily at the outset of
23  your employment with ChemTreat?

**25**

1  A.  Yes.
2  Q.  Okay.
3  A.  I signed several papers that they put in
4      front of me.
5  Q.  When you started with ChemTreat -- well,
6      strike that.  Let me go back.
7          We have the application that I
8      showed you that was dated June 11.  These
9      documents are dated August 17, Exhibit 2.
10     Was Exhibit 2 signed after you started work,
11     or is this about the time that you began
12     work, August 17?
13 A.  I don't remember.
14 Q.  Okay.  Was there any period of time, you
15     know, more than a couple days to get it
16     straight, where you weren't working from the
17     switch between Nalco to ChemTreat?
18 A.  There might have been.  I don't remember for
19     sure.
20 Q.  Was it your understanding that ChemTreat was
21     essentially in the same type of business as
22     Nalco?
23 A.  Yes.

**26**

1  Q.  They were direct competitors; is that right?
2  A.  Yes.
3  Q.  When you started with ChemTreat were you
4      given your own sales area or region right
5      away?
6  A.  Yes.
7  Q.  And can you kind of give me the boundaries
8      of what that sales area was.
9  A.  It was the same as my Nalco territory.
10 Q.  Was that a exclusive region for yourself, or
11     were there other ChemTreat representatives
12     covering the same area?
13 A.  At that time my territory with ChemTreat was
14     exclusive.
15 Q.  Were you taking over for another sales rep
16     who had left, or was this a new area?
17 A.  It was a new area as I understood it.
18 Q.  Were you given any existing customers to
19     service?
20 A.  I don't believe so.
21 Q.  Okay.  So similar to what you were
22     describing with Nalco, you were given a
23     blank slate, and your job was to go build up

**27**

1      a customer base; is that correct?
2  A.  Right.
3  Q.  Okay.  Were you provided with customer leads
4      like ChemTreat?
5  A.  Yes.
6  Q.  Okay.  Did you do cold calling?
7  A.  Some.
8  Q.  Okay.  Do you know how ChemTreat put
9      together its leads?
10 A.  No.
11 Q.  Okay.  Explain to me how you would get the
12     lead from ChemTreat.
13 A.  The field leads that I got I was given a
14     list that said these are people that you
15     need to call, and other than that I did it
16     completely on my own.
17 Q.  Okay.  Were you given any information as to
18     whether or not they had called in and asked
19     for quotes or whether it was just somebody
20     that ChemTreat targeted?
21 A.  The few leads I had were targeted by
22     ChemTreat.  The rest I did on my own.
23 Q.  Did you bring any of your Nalco customers

**28**

1      with you over to ChemTreat when you
2      switched?
3  A.  When I started?
4  Q.  Yes.
5  A.  Could you rephrase that question.
6  Q.  When you started with ChemTreat did any of
7      your customers that you had called upon
8      while working for Nalco switch over with
9      you?
10 A.  Yes, they did.
11 Q.  Okay.  What customers, if you can recall?
12 A.  Is this a list?
13 Q.  Yeah, the best you can tell me.  What Nalco
14     customers switched to ChemTreat because of
15     your switch?
16 A.  Ameren-Cilco, Caterpillar, National
17     Manufacturing, Monmouth College.  That's all
18     I can think of right now.
19 Q.  Was the Caterpillar business a particular
20     division or facility?
21 A.  All of the facilities that I had with Nalco.
22 Q.  Okay.  Can you tell me what those were,
23     though?  I mean it wasn't the entire

29

1  Caterpillar Corporation, was it?
2  A.  No.
3  Q.  Okay.
4  A.  It was Caterpillar AD.
5  Q.  Is that a building designation?
6  A.  Yes, East Peoria.
7       What was the big powerhouse, Mike?
8  What's the big powerhouse designation for
9  Caterpillar, the one that they shut down?
10      MIKE KLAUSEGGER:  N.
11      THE WITNESS:  What was it?
12      MIKE KLAUSEGGER:  I think it was
13  Building N.  I don't know.  I've never
14  worked there.
15      THE WITNESS:  Caterpillar.
16  Q.  (BY MR. CASSIDY)  That's okay.  I'm
17  interested in what you can recall.
18  A.  The main powerhouse, East Peoria, cooling
19  systems, East Peoria, Building LC, Building
20  AB.
21  Q.  Is this all in East Peoria?
22  A.  No.  The ones in East Peoria were
23  Caterpillar AD, the main powerhouse and the

30

1  main cooling at that facility.
2  Q.  Okay.
3  A.  And then all of the downtown facilities.
4  Q.  Okay.  With respect to Ameren-Cilco was that
5  a customer that you initially brought to
6  Nalco, or is that one that you inherited
7  when the sales rep that you trained under
8  left?
9  A.  I brought that to Nalco.
10 Q.  How about Caterpillar, same question?
11 A.  Two facilities in East Peoria I took over
12 with the Nalco rep when he left, and I sold
13 these facilities in Peoria.
14 Q.  When you say the facilities in Peoria, are
15 you talking about the main corporate
16 headquarters?
17 A.  Corporate headquarters and all of the
18 buildings and plants here in Peoria.
19 Q.  Okay.  Was National Manufacturing a customer
20 that you originally brought in, or did you
21 inherit it from your training rep?
22 A.  I inherited that.
23 Q.  And Monmouth College, inherited or you

31

1  completed the sale?
2  A.  I think I inherited that one, too.
3  Q.  Okay.
4  A.  It's hard to remember.  It was fourteen
5  years ago.
6  Q.  I understand.  When you switched over to
7  ChemTreat were you put through any new
8  training by them?
9  A.  I went down to the corporate headquarters in
10 Virginia, had minimal training, picked up
11 the manuals, and I was sent home.
12 Q.  How long were you in Virginia for this
13 training?
14 A.  Three days.  I had a physical, that was part
15 of it.
16 Q.  And what do you mean by minimal training?  I
17 mean was there some classroom study or
18 seminars?
19 A.  We met with the technical people for maybe
20 two hours one day and two hours the next.
21 Q.  Did you -- were you brought up to speed on
22 their R & D Department and their formulation
23 processes?

32

1  A.  No.  We got a tower of the manufacturing
2  plant, the corporate headquarters, had my
3  physical, got my manuals, and that was it.
4  Q.  What did the manuals consist of?
5  A.  There was a product guide manual and a
6  product manual.
7  Q.  Okay.  Product guide manual meaning their
8  chemicals that they were selling?
9  A.  Applications, suggested chemicals for
10 suggested applications.
11 Q.  Did it include formulations which were
12 unique to ChemTreat?
13 A.  No.
14 Q.  Would these be what are simply called
15 commodity chemicals?
16 A.  Not all of them, but in the chemical
17 business there are really no secrets.
18 Q.  Okay.  Now, I am way below your level on
19 this chemical stuff, so I want to make sure
20 we're talking about the same thing.  What do
21 you understand the term "commodity chemical"
22 to refer to?
23 A.  Commodity chemical would be like a generic

33

1    chemical sold in large volumes that's
2    designed for a particular application.
3    Q.  Okay.  Would it essentially be any widely
4    used chemical that would not fall under the
5    category of a specific formulation of
6    chemicals that you had put together for a
7    specific application?
8    A.  Bleach is bleach wherever you use bleach.
9    Q.  Right.
10   A.  All companies sell it.  You can get it from
11   anybody.
12   Q.  But as you indicated before, and we haven't
13   gotten to ChemTreat yet, but when you were
14   with Nalco there would be occasions when as
15   a sales rep you would formulate a
16   combination of chemicals for their
17   particular application and ask that it be
18   blended and mixed and sold to them, correct?
19   A.  We could recommend what we thought might be
20   needed, but it was up to the blenders to
21   make sure that the chemicals matched.
22   Q.  Okay.  And I guess what I'm trying to just
23   distinguish for purposes of using the right

34

1    terms here, if we refer to it as either a
2    commodity chemical, you say generic, for
3    instance bleach, or a blend, does that cover
4    the two things we might be talking about on
5    any sales to a customer?
6    A.  The basic elements of a blend are common
7    between all of the chemical companies;
8    unless they have a proprietary patent on it,
9    they are basically the same.  Phosphate is
10   phosphate, bleach is bleach.
11   Q.  Okay.  Were there particular blends or
12   formulations of chemicals that ChemTreat
13   suggested for use by its sales reps?
14   A.  They had several depending on the
15   application.
16   Q.  Okay.  And was this included in the manuals
17   that you received:  In this particular
18   application, you might consider this blend
19   that we've seen works in the past, et
20   cetera?
21   A.  In the product bulletin -- or in the manual
22   I was talking about they said that, okay, in
23   the deaerator if your oxygen is over five

35

1    parts per billion, you need to use sulfite.
2    Q.  Okay.
3    A.  If it's less than five parts per billion,
4    you can use erythorbate.
5    Q.  How thick is this manual?
6    A.  Probably about, I don't know, 80 pages, 70
7    pages.
8    Q.  Did you have a similar manual when you were
9    with Nalco?
10   A.  Yes, I did.
11   Q.  Okay.  Were the -- for instance, the example
12   you just gave me, was it the same type of
13   application to be put in there?
14   A.  Exactly.  Yes.  Industry standards.
15   Q.  Okay.  If you are going to go in for
16   ChemTreat and try to take business away from
17   Nalco, what is your sales pitch?  If you are
18   selling the exact same chemicals and
19   formulas, why would you be different?
20   A.  Price.
21   Q.  Okay.  Your testimony is all that one
22   company has to offer against another out in
23   the marketplace is price?

36

1    A.  Price and service, if service is required.
2        (Exhibit No. 3 marked.)
3    Q.  Okay.  We'll get there.  I'll show you what
4    I have marked as Exhibit No. 3.
5            I realize that document is over
6    ten years old, but do you recall ever seeing
7    it before?
8    A.  I don't remember.
9    Q.  Having reviewed it today, does this appear
10   to set forth the training that you were
11   telling me about?
12   A.  Yes.
13   Q.  Okay.  This shows three days of going from
14   8:30 in the morning until 4:30 or 4:45 in
15   the afternoon.  Does this help refresh your
16   recollection as to the extent of training
17   that you would have gone through when you
18   came to ChemTreat?
19   A.  Yes.
20   Q.  Okay.  And did you attend all of these
21   training sessions that are listed on here?
22   A.  Yes.
23   Q.  Okay.  I want to talk about basically what

37

1  the scope of your work involved once you
2  went with ChemTreat. You indicated before
3  you make sales calls based upon leads
4  given by the company, correct?
5  A. Yes.
6  Q. Did you ever do any cold calling?
7  A. Yes.
8  Q. Okay. How would you determine who you were
9  going to go call on when you were going to
10  go do a cold call?
11  A. Biggest plant I could find.
12  Q. And how would you identify the appropriate
13  individual to make contact with?
14  A. I would ask.
15  Q. Okay. Just walk in to the plant and say, "I
16  want to talk with whoever is in charge of
17  the boilers"?
18  A. Yes.
19  Q. Okay. And if you get an audience with this,
20  whoever this person may be, what would be
21  necessary for you to do to be able to give
22  them a quote?
23  A. I would have to find out what type of

38

1  equipment they had.
2  Q. Would it be necessary for you to go actually
3  inspect the equipment?
4  A. Sometimes they would let you, sometimes they
5  wouldn't.
6  Q. In cases where they wouldn't, how would you
7  know what it is you were bidding?
8  A. They would provide you with the information.
9  Q. Okay. What kind of information would they
10  give you?
11  A. In the application of a boiler they would
12  give you steam production.
13  Q. Basically the specs for their boiler system?
14  A. Specs they had; sometimes they would be five
15  years old, sometimes they would be current.
16  Q. So you either get the specs from them or you
17  go determine yourself by inspecting the
18  equipment as to the application you need to
19  sell chemicals for, correct?
20  A. Yes. Many times they would just tell me
21  what they were using and how much and say
22  give me a bid.
23  Q. Other times you needed to determine,

39

1  correct?
2  A. Sometimes you had to determine, sometimes
3  not necessary.
4  Q. I mean have there been instances in your
5  career with ChemTreat where you attempted to
6  make a sale by telling the customer that the
7  formulation or the chemicals you are using
8  aren't the best for this particular
9  application and we can do better?
10  A. Sometimes.
11  Q. Okay. Now, the ability to read specs or
12  inspect the equipment that you need to
13  determine an application for, that is
14  something you learned from your years of
15  training with Nalco and riding with the
16  prior salesman and working with him,
17  correct, correct?
18  A. Yes.
19  Q. Similarly, determination as to what
20  chemicals or combination of chemicals would
21  be best for the long-term health of any
22  particular equipment was based upon training
23  and experience in working in the field,

40

1  correct?
2  A. Sometimes.
3  Q. Okay. I don't know what you mean. Can you
4  explain to me what you mean by "sometimes".
5  A. Certain accounts, the person in charge would
6  say, "I've had excellent results with these
7  chemicals over the 20-year period. I have
8  no desire to change. I just want cheaper
9  product."
10  Q. But anytime that a review of the particular
11  chemicals being used or combination of
12  chemicals for a particular application, that
13  is your own expertise coming into play to
14  determine if something is better, correct?
15  A. Sometimes.
16  Q. I mean there is no book you can open and
17  say, okay, I have such-and-such manufacturer
18  or model number boiler and it's going to
19  tell you exactly what to use there, is
20  there?
21  A. There are several applications for the same
22  boiler --
23  Q. Okay.

**41**

1  A.  -- depending on whether you are going for
2      cost or whether you are going for ultimate
3      treatment.
4  Q.  Okay. And which of the several applications
5      may be best for any particular piece of
6      equipment is something you would just learn
7      from years in the field, correct? That's
8      your experience and expertise, that's what
9      you offer the customers, right?
10 A.  In some cases.
11 Q.  Now, you indicated before, when I asked you
12     about the difference between various
13     companies what it is you have to offer, you
14     indicated price and service. Tell me what
15     kind of service as a sales representative of
16     either Nalco or ChemTreat you offered your
17     customers.
18 A.  Depending on the requirements of the
19     customer, it would entail service calls.
20     Some places had to do their own testing and
21     don't require many service calls. Water
22     analysis, if needed. Some places require
23     lunch.

**42**

1  Q.  Client relations?
2  A.  Client relations.
3  Q.  Okay. All right. Let's focus on your years
4      with ChemTreat here just so we have a focus
5      of when to talk about. What would be
6      involved in a service call? Anytime you
7      have a service call what are you talking
8      about?
9  A.  Typical service call would consist of going
10     into the facility, finding out how things
11     are doing, if they needed anything, if they
12     expected anything and some type of
13     follow-up, whether it be verbal or written,
14     with whoever is in charge.
15 Q.  So you are just talking about your basic
16     showing up, making sure everything is okay,
17     correct?
18 A.  If that's what they require.
19 Q.  How often would you visit a particular
20     customer of yours?
21 A.  Some customers, twice a year.
22 Q.  Any of them more often?
23 A.  Yes. Some of them weekly, some of them

**43**

1      monthly.
2  Q.  In addition to the just calling on them to
3      make sure everything is okay, would you be
4      called out for problem-solving issues?
5  A.  At some plants, yes.
6  Q.  And just, again, so we know we're talking
7      about the same thing, when I think of
8      problem solving, I'm thinking of a customer
9      calling and saying, Look, the boiler is not
10     working right or the cooling tower is not
11     working right; can you come out and take a
12     look at it and see what it is. Is that it?
13 A.  That happens.
14 Q.  When you get a call like that, what would
15     you do?
16 A.  I would go.
17 Q.  Okay. Would you contact the corporate
18     headquarters at all?
19 A.  No.
20 Q.  Did you have any technical people that would
21     assist you in making a call like that from
22     ChemTreat?
23 A.  If I had an immediate problem, I would call

**44**

1      technical, find out what the recommendations
2      were, usually from the plant.
3  Q.  So initially you would go and, I assume,
4      look at the equipment and see what the
5      problem is, correct?
6  A.  (The witness nodded.)
7  Q.  Yes?
8  A.  Yes.
9  Q.  And you would know what you were looking at
10     based upon your expertise from your years of
11     doing this type of business, I assume,
12     correct?
13 A.  In most cases.
14 Q.  And in some cases you would be able to spot
15     a problem and remedy it, whether it's an
16     equipment problem or chemical problem; other
17     times you would call corporate and ask for
18     their advice?
19 A.  Yes.
20 Q.  You indicated that you also, in addition to
21     service calls which include these problem-
22     solving calls, would be asked to do some
23     water analysis, correct?

**45**

1  A.  From time to time.
2  Q.  Okay. Would that be from existing customers
3      or prospective customers or both?
4  A.  Both.
5  Q.  When you are asked -- let's concentrate on
6      existing customers. If you are asked to do
7      a water analysis -- first of all, what is
8      the purpose of the water analysis?
9  A.  To find out what's in the water.
10 Q.  Okay. Is it sort of double checking that
11     the chemicals that are being used are proper
12     for this application?
13 A.  Most water analysis is not done to check
14     chemical levels. It's done to see what
15     contaminants are in the water.
16 Q.  How would you perform a water analysis?
17 A.  Except for the simple tests that I would run
18     myself, I would send it in.
19 Q.  You have to explain the process for me,
20     please. You take a water sample, put it in
21     a jar of some kind?
22 A.  To send in.
23 Q.  Okay. And then when you send it in, you are

**46**

1      sending it where?
2  A.  Corporate headquarters.
3  Q.  And I assume that corporate headquarters has
4      a lab that then runs the analysis?
5  A.  Yes.
6  Q.  And provides you back a report?
7  A.  Yes.
8  Q.  Okay. In addition to the report does
9      corporate give any remedial suggestions?
10 A.  Not on a basic water sample.
11 Q.  Okay. It wouldn't come back and say, You
12     have X, Y and Z contaminants in this, and we
13     suggest the following chemical application?
14 A.  Not the ones that I did, no.
15 Q.  So is that something that you would
16     determine?
17 A.  Yes.
18 Q.  Okay. Based upon what is in there, you
19     would know what chemicals application would
20     be necessary?
21 A.  I would make an educated guess.
22 Q.  Based upon your experience and training?
23 A.  Yes.

**47**

1  Q.  Is that what -- the results you would get
2      back from corporate, is that what is
3      referred to as a lab data sheet?
4  A.  No. It would be a lab analysis.
5  Q.  Okay. Now, you have a customer. Tell me
6      how the regular orders come about. Are
7      these done when you call upon them, or do
8      they call in orders? Are things on a
9      straight calendar? How is it done?
10 A.  Some customers phone in their own orders.
11 Q.  Okay. Directly to you?
12 A.  Directly to corporate.
13 Q.  But this is your customer based on those
14     sales? That's still credited to you as the
15     sales rep, right?
16 A.  Right.
17 Q.  When they call in the order, corporate then
18     ships it directly to them?
19 A.  Yes.
20 Q.  Okay. Do other customers require you to
21     come in in person to take orders?
22 A.  They don't require that I take orders, but I
23     send in orders. I call in orders.

**48**

1  Q.  Okay. I don't know what you mean by
2      calling. You are the one that calls
3      corporate you mean?
4  A.  I call customer service and place an order
5      of chemical for that customer.
6  Q.  Once the chemical is shipped by corporate --
7      strike that. Is all of ChemTreat -- strike
8      that again.
9          Does ChemTreat provide chemicals
10     for all of its customers that are shipped
11     from ChemTreat?
12 A.  Not all of the chemicals are shipped from
13     ChemTreat.
14 Q.  Some chemicals, some of their chemical
15     formulations, come directly from ChemTreat,
16     correct?
17 A.  I don't understand the question.
18 Q.  Okay. Well, to put it in perspective, with
19     the documents you've provided to us in this
20     case, orders that you have made or that your
21     wife -- that your customers have made
22     through Rhema are sent to Ulrich Chemical,
23     and Ulrich Chemical direct ships to the

**49**

1     customers, correct?
2 A.   Correct.
3 Q.   I'm curious. In that context does ChemTreat
4     provide their own chemical or do they use an
5     outside --
6 A.   They use an outside supplier. Certain
7     products are shipped -- they find the
8     closest local supplier, and they are shipped
9     from that to the application point.
10 Q.   Now, when the chemicals are shipped to the
11     customer, who is responsible for getting the
12     chemicals into the system?
13 A.   In most cases the customer.
14 Q.   They have their own operators who do this?
15 A.   Yes.
16 Q.   After you determine the proper chemical
17     basis to be used for a particular
18     application, do you train those operators as
19     to how to put it in or how to mix it?
20 A.   Can you rephrase that again.
21 Q.   Let's assume that you come in, you do a
22     water analysis, you determine here is the
23     chemical mix you need for this application,

**51**

1     chemicals in the system or show them how to
2     do it?
3 A.   I had an account where I had to transfer
4     chemical from the incoming containers into
5     their holding tanks.
6 Q.   Every time they ordered?
7 A.   Some of the applications, when I was sick,
8     they would do it themselves, but when I was
9     able to do it, yes.
10 Q.   Okay. Now, let's go back to the example of
11     you have a new customer. You've done a
12     water analysis, you tell them what they
13     need, and you want to give them a quote for
14     what to use. How do you set the price, or
15     is that dictated by corporate?
16 A.   ChemTreat?
17 Q.   Yes.
18 A.   ChemTreat had a salesman's price.
19 Q.   And that's the end user's price or that's
20     your cost?
21 A.   That's my cost.
22 Q.   And how would you determine your cost in any
23     particular week or month? Did they send out

**50**

1     you make the sale, chemicals are ordered,
2     okay. Do you then follow up with the
3     operator at that company to train them or to
4     show them the mixture that they should be
5     making to put into the system?
6 A.   In most applications the chemicals are a
7     direct injection into the system. There is
8     no mixing.
9 Q.   They come from the company or an outside
10     supplier in usable form?
11 A.   Right.
12 Q.   Okay. Are there applications that require
13     mixing on site?
14 A.   I didn't have any, but there are -- if they
15     order a dry product, they may need to add
16     water.
17 Q.   Okay. Now, you said that most customers
18     have their own operators. Did you have some
19     customers that did not?
20 A.   I did not have any customers that did not
21     have an operator.
22 Q.   Okay. Were there any customers that you
23     were ever asked to come and put the

**52**

1     a price sheet every week? Was there a web
2     site you could check? How do you --
3 A.   You could ask. That's the only way how I
4     knew to get a salesman's cost was to ask
5     customer service.
6 Q.   Okay. You would have to make a phone call?
7 A.   Right.
8 Q.   Okay. And you would call them up, you would
9     say, What's my cost per unit or pound, or
10     however its sold on --
11 A.   On a new account. On existing accounts, I
12     didn't have any -- once the price was set,
13     they would use that set price, and price
14     increases, and stuff, would come off of that
15     initial price once it was set.
16 Q.   Okay. Let's talk about the new one first,
17     okay. You want to put together a quote for
18     a customer. You would call in, you would
19     say, What's my cost per whatever the unit is
20     on such-and-such, correct?
21 A.   Right.
22 Q.   And they would just give it to you; isn't
23     that right?

53

```
1   A.   Right.
2   Q.   Now, is that the price that you would quote
3        the customer?
4   A.   No.
5   Q.   Okay.  You would quote them something --
6        some price with a markup, correct?
7   A.   The company had one drum price, several drum
8        price, you know, and five or more, something
9        like that, ten or more; I'm not sure.
10  Q.   Okay.
11  A.   And that's what we would follow.
12  Q.   As far as your cost?
13  A.   As far as their cost.
14  Q.   Okay.  I'm trying to get this right.  You
15       call in customer service and you get what
16       your cost on an item would be, correct?
17  A.   On a new account that was not related to
18       any.  Caterpillar, if you charge one
19       Caterpillar facility one price, they all got
20       the same price.
21  Q.   Okay.
22  A.   But on a strictly independent, you would
23       find your cost, look at ChemTreat's pricing,
```

55

```
1        drum from ChemTreat and then make sure that
2        shipping and handling was covered, and
3        that's the price that would go out.
4   Q.   So in addition to a cost price that they
5        would give you, ChemTreat was sending out
6        suggested retail price figures?
7   A.   Right.
8            MR. WOLFE:   Can I interrupt
9        because he's answered the question already.
10       We're using terms "cost" and "price" here --
11           MR. CASSIDY:  Right.
12           MR. WOLFE:  -- kind of
13       interchangeably.
14           MR. CASSIDY:  I don't mean to.
15  Q.   (BY MR. CASSIDY)  When I say cost, I mean
16       what does the item cost for you before any
17       markup, any profit is applied to it.
18           You've understood that when I
19       say cost, that is what I've been referring
20       to?
21  A.   Right.
22  Q.   And then the retail price or just price is
23       what the customer is paying, including
```

54

```
1        which was one drum, three drum, five plus,
2        and that's what you would use for a price,
3        plus or minus depending on shipping costs.
4   Q.   Could I call in to ChemTreat and get the
5        same cost information that you are getting?
6   A.   I think you would have to be a
7        representative of the company.
8   Q.   Okay.  Well, this is a service for the sales
9        rep to determine what their cost on the
10       equipment is -- or on the material is,
11       right?
12  A.   Right.
13  Q.   Now, I'm trying to figure out what you mean
14       when you say the one barrel -- or one drum,
15       two drum.  Who is setting the ultimate end
16       user cost?
17  A.   The ultimate end user cost is set by the
18       sales rep.
19  Q.   Okay.  So you get your cost, you determine
20       what markup, I assume as much markup you can
21       get and still get the business, and you
22       apply it to that and quote it?
23  A.   I would follow the recommended price per
```

56

```
1        markup.  Did you understand that as well?
2   A.   Yes.
3   Q.   Okay.  And you indicate that ultimately it's
4        the sales rep's discretion to establish that
5        markup, but you kind of follow suggested
6        guidelines by the company?
7   A.   Yes.
8   Q.   In what format do you get suggested
9        guidelines from the company?
10  A.   Price sheet.
11  Q.   How often do you get updated price sheets
12       from ChemTreat?
13  A.   Whenever there is a price increase.
14  Q.   Are you obligated as a sales rep of
15       ChemTreat to follow their suggested price?
16  A.   We have -- we had some leeway.
17  Q.   If you have sold to a customer, and let's
18       assume you've taken it from somebody else
19       based solely on price, and then ChemTreat
20       comes down with a price increase, which I
21       assume you mean on cost when you say they
22       have a cost increase?
23  A.   They pass a price increase along to the
```

57

1    customers.
2  Q. If you've sold within the last two months,
3     you've taken business away from Nalco,
4     because it's another company I know, and
5     you've done it, you know you've done it
6     solely based upon having a lower price,
7     ChemTreat has a price increase, do you have
8     the discretion to ignore that and just keep
9     your price the same because you want to keep
10    that customer happy?
11 A. Within the first -- the way I understood it,
12    within the first year of that sale, yes.
13 Q. Okay. After a year, are you obligated to
14    pass on that price to the customer or you
15    can simply say, No, I would rather make less
16    profit on this one?
17 A. You can do that.
18 Q. Is that the salesman's discretion?
19 A. That's the salesman's discretion because --
20    yes.
21 Q. Would the sales rep also have the discretion
22    to pass on the cost increase with a markup?
23    Let me give you an example --

58

1  A. That would not be very good business sense.
2  Q. Well, I mean the job is to make profit, and
3     if you have a solid customer that you think
4     can bear an increase in their cost or their
5     price -- well, let me give an example, and I
6     may be way off here on what I'm talking
7     about.
8            Let's assume that an item has a
9     5-cent per pound increase. Does that even
10    make sense, 5 cents per pound on chemicals?
11 A. (The witness nodded.)
12 Q. And you get that, you have a good customer.
13    You say, you know, I'm going to pass that on
14    as a 10- or 12-cent per pound increase,
15    could you do that if you wanted, if you
16    thought your customer would stand for it?
17 A. You could, but it would be a very bad
18    business decision.
19 Q. But it is your discretion as a sales rep to
20    determine the ultimate price the customer is
21    paying, either at the initial start or when
22    you are passing on increases; is that fair?
23 A. Yes.

59

1  Q. With a particular customer who is ordering
2     chemicals -- I had asked you before about
3     taking orders, and sometimes they call them
4     in, sometimes you go meet with them and call
5     it in yourself. Are there some customers
6     who are simply on a set delivery time, that
7     you know every seven weeks a delivery should
8     go to that customer?
9  A. That could be the case if production stayed
10    exactly the same from week to week to week
11    to week.
12 Q. Okay. I guess what I'm trying to figure out
13    is, is everything based upon a per order
14    price, or do some companies simply have a
15    contract with you that you provide the
16    chemicals they need for this period of time
17    at this cost?
18 A. There are contracts available.
19 Q. Okay. Six months, annual? How would those
20    work?
21 A. Normal length of time I believe is one year.
22    It could be multiple years.
23 Q. And in those cases they are paying a set

60

1     price for that year to get however much
2     chemical they need for the year; is that
3     right?
4  A. That would not be a very good contract, but
5     it is possible.
6  Q. Okay. Why don't you educate me a little bit
7     about the difference between per order
8     pricing with a customer and what contract
9     pricing would be?
10 A. Per order pricing would be as-needed pricing
11    based on current cost of chemical, their
12    current price of chemical.
13 Q. Okay.
14 A. Contract pricing, because of the variables,
15    would be based on cost of chemical plus any
16    expected increases, plus 15 to 20 percent
17    added in case of change in production.
18 Q. Okay. So they are still paying based upon
19    the chemical that comes in; they are
20    basically buying certainty as to their cost.
21    Is that what you are telling me? You are
22    locking in a price for a certain amount of
23    time for them?

**61**

1　A.　In that contract there are variables based
2　　　on production. If you exceed 10 percent,
3　　　your price will go up.
4　Q.　Let me make sure I understand again. What
5　　　is the benefit to a customer of having a
6　　　contract as opposed to a per order price?
7　A.　Equalized billing.
8　Q.　Okay.
9　A.　It costs them more money to have equalized
10　　billing.
11　Q.　Could I loosely analogize it to level pay
12　　that you can set up with Cilco so you know
13　　what your budget is going to be every month?
14　A.　Insurance premiums.
15　　　　　　MR. CASSIDY: Okay. I didn't tell
16　　you at the beginning here, but anytime
17　　anybody wants a break, please just let me
18　　know. We've been going for an hour and
19　　fifteen minutes.
20　　　　　　MR. WOLFE: I even told you that
21　　you could have coffee and I didn't even
22　　offer it, but did you need to take a break?
23　　　　　　THE WITNESS: I'm fine.

**62**

1　　　　　　MR. WOLFE: Okay.
2　Q.　(BY MR. CASSIDY) Okay. Now, I've thrown
3　　　out a couple of applications or types of
4　　　equipment that you are giving water
5　　　treatment for, cooling tower, boilers. What
6　　　other types of equipment do you deal with as
7　　　a water chemical salesman?
8　A.　What type did I used to deal with?
9　Q.　Yeah.
10　A.　I'm no longer employed.
11　Q.　Okay. As a water chemical salesman what
12　　types of equipment would you be determining
13　　applications for?
14　A.　I have done waste treatment applications. I
15　　have done municipal water treatment
16　　applications. Chillers.
17　Q.　Okay.
18　A.　Dynos, dynamometers.
19　Q.　I don't know what that is. What is that?
20　A.　It measures horsepower for motors,
21　　horsepower and torque. Basically heating,
22　　cooling and waste treatment.
23　Q.　In addition to -- we've touched on this a

**63**

1　　　little bit, but in addition to the water
2　　　treatment, you will occasionally need to
3　　　address some engineering or problem-solving
4　　　type issues with a customer and their
5　　　equipment, correct?
6　A.　Yes.
7　Q.　Okay. And in order to be -- certainly I
8　　　can't go in and do that, so I assume you
9　　　need to have some technical expertise with
10　　respect to waste treatment centers,
11　　chillers, cooling towers, boilers. You need
12　　to know what is going on there, right?
13　A.　It's a benefit.
14　Q.　How did you get your technical knowledge as
15　　to the workings of these various types of
16　　equipment?
17　A.　Training and practical application.
18　Q.　When you say training, you are not talking
19　　about your college or any of your schooling,
20　　correct?
21　A.　No.
22　Q.　You are talking about training on the job
23　　with either Nalco or ChemTreat?

**64**

1　A.　Yes, mainly Nalco.
2　Q.　What percentage, if you can -- the best you
3　　　can do -- I know this is a rough estimation,
4　　　but what percentage of your customers count
5　　　on you to address engineering problems or
6　　　technical problems with them as opposed to
7　　　simply selling them chemical?
8　A.　Very few. Most of the applications I had
9　　　all had their own engineering staffs.
10　Q.　Okay. Did you only address technical issues
11　　for companies that didn't have their own
12　　engineering staff, or would you sometimes
13　　work with their engineering staff?
14　A.　Most of the time their engineering staff
15　　knew what the problem was and just wanted me
16　　to comment.
17　Q.　Okay. Let's switch gears a little bit and
18　　talk about your compensation package with
19　　ChemTreat. When you first started, how was
20　　your -- how would you get paid?
21　A.　I had a salary.
22　Q.　Okay.
23　A.　I received a small commission, 10 percent

65

1    commission, and I had a company vehicle.
2  Q. Okay. Now, this goes back to '95 when you
3    started with them, correct, salary plus
4    10 percent?
5  A. (The witness nodded.)
6  Q. That's yes?
7  A. Yes, and a company vehicle.
8  Q. And with the company vehicle, obviously they
9    provided the vehicle, I assume insurance on
10   the vehicle, correct?
11 A. Fuel.
12 Q. And fuel. And maintenance? All costs
13   associated with the vehicle?
14 A. Yes.
15 Q. Did that compensation package ever change
16   during your time with ChemTreat?
17 A. Several times.
18 Q. Okay. I know -- I don't expect you to tell
19   me exactly when these things triggered, but
20   take me chronologically through, and tell me
21   what changed about your compensation
22   package.
23 A. As my sales increased, they -- let me get

66

1    this right. I started out with a
2    commission, salary and a vehicle. Later on
3    they reduced my salary, increased my
4    commission, left me with a vehicle.
5         Then as my sales started to climb,
6    they reduced my commission, increased my
7    salary, left me with a vehicle. That was at
8    the peak of my sales.
9  Q. So you went from --
10       MR. WOLFE:  Are you done?
11       THE WITNESS:  Pardon?
12       MR. WOLFE:  Were you done with
13   that answer?
14       THE WITNESS:  No.
15 Q. (BY MR. CASSIDY) I'm sorry. Go ahead.
16 A. And then from that package they went to --
17   they dropped my salary, increased my
18   commission and took my vehicle.
19 Q. Is that how it was at the end?
20 A. Yep.
21 Q. Okay. Let me follow it. You started with a
22   salary, plus some percentage of commission?
23 A. (The witness nodded.)

67

1  Q. Initially the first change you would have
2    had with the company would have been a
3    higher commission, a little smaller salary,
4    correct?
5  A. Right.
6  Q. At some point again, and we don't need to
7    pinpoint the years, the salary went back up
8    and the commission percentage went down; is
9    that right?
10 A. Back to the original.
11 Q. Okay. And then eventually the fourth -- in
12   each of those cases you had a company
13   vehicle, correct?
14 A. Right.
15 Q. And then the final change went to straight
16   commission?
17 A. Right.
18 Q. In addition to the company automobile, what
19   other benefits did you have?
20 A. We have an employee stock option plan. We
21   had a 401(K) program, and we had insurance.
22 Q. Health insurance?
23 A. Yes. And I believe there may have been a

68

1    life insurance policy.
2  Q. Did you have to contribute to the health, or
3    was that all paid for as a benefit?
4  A. We had to contribute.
5  Q. Okay. In addition to the ESOP, 401(K),
6    health and life, you had the auto. Did you
7    also have some kind of expense account?
8  A. Had an expense account.
9  Q. Was there a limit on that or was it simply
10   whatever you spent for client relations you
11   would get reimbursed?
12 A. There may have been a limit. I had a very
13   small expense account.
14 Q. If there was a limit, you never hit it?
15 A. Not even close, I don't believe.
16 Q. Okay. As I've been able to tell, the final
17   switch in your compensation package to go to
18   full commission was scheduled to take place
19   on January 1st of 2004. Do you recall that?
20 A. I'm not sure what date that it happened.
21 Q. Okay. Tell me -- and I'm only interested in
22   this last switch because we don't need to
23   figure out ten years' worth of stuff here.

69

1  How did that come about, the decision to
2  change the compensation package?
3  A.  I was notified that the package was changed
4  from ChemTreat.
5  Q.  Was there any discussion with you as to
6  whether you wanted to do this and what the
7  pros and cons would be for you and the
8  company?
9  A.  No.  At that point I met with Dan O'Brien
10  when I was informed that that was going to
11  take place.  He said that the commission
12  would be approximate to my salary.
13  Q.  Did you have any say in the change in your
14  compensation package?
15  A.  Not that I remember.
16  Q.  Okay.  Was there any explanation given by
17  Mr. O'Brien or anybody at the company as to
18  why they wanted to go this route?
19  A.  Because of the length of time I had been
20  with the company.
21  Q.  Okay.  And did you understand that to mean
22  that this was going to be more beneficial to
23  you and due to your seniority you deserved

70

1  it?
2  A.  I didn't look at it that way.
3  Q.  Changing from salary plus commission to
4  straight commission, how, if at all, was
5  that going to affect the other benefits?
6  MR. WOLFE:  Are you asking him
7  what its impact was or whether there were
8  also changes in other benefits?
9  MR. CASSIDY:  The latter.
10  Q.  (BY MR. CASSIDY)  Were there also changes in
11  any of the benefit packages?
12  A.  It would directly affect my ESOP if my sales
13  were not maintained.
14  Q.  The ESOP stayed the same, but obviously if
15  you are --
16  A.  Percentage.
17  Q.  Right.  Well, let's talk about the vehicle.
18  Did you indicate to me when you were going
19  to go straight to commission you weren't
20  going to get a vehicle anymore?
21  A.  Yes.
22  Q.  If you don't have a company vehicle, would
23  you be entitled to some reimbursements that

71

1  you would not otherwise be entitled to, in
2  other words, your car expenses, your mileage
3  expenses, those types of things?
4  A.  In a roundabout way.
5  Q.  You are going to have to explain that to me.
6  A.  Mileage was figured on the vehicle, and it
7  was deducted from your next paycheck, the
8  amount, the dollar percentage of your
9  mileage.  You would be reimbursed for the
10  mileage, that reimbursement would come out
11  of your next check, as I understood it.
12  I called Mike and had him explain
13  it to me, and that's the way I understood
14  it.
15  Q.  Your understanding is you could turn in
16  mileage reimbursement for use of your own
17  vehicle, but that would correspondingly
18  reduce your commission check?
19  A.  That's the way I understood it.
20  Q.  I think you've kind of indicated to me
21  already you weren't crazy about the switch
22  from salary to commission.
23  A.  No, I wasn't.

72

1  Q.  Did you view it that it was going to affect
2  your compensation negatively?
3  A.  Not if I was able to close on the accounts
4  that I -- the prospects I was working on, it
5  would have been fine.
6  Q.  Did you object to the switch at the time
7  they decided to make it?
8  A.  I went along with it.
9  Q.  Do you recall what your commission was
10  immediately prior to the planned switch to
11  straight commission?  What percentage were
12  you getting?
13  A.  10.
14  Q.  Salary plus 10 percent?
15  A.  Yes.
16  Q.  And when you were going to go to straight
17  commission, what was your percentage going
18  to be?
19  A.  31 percent, I believe.
20  Q.  Okay.  Now, as I indicated to you before,
21  the records show that was originally
22  scheduled to take place on January 1, 2004.
23  That ultimately ended up being delayed, did

73

1      it not?
2  A.  Yes.
3  Q.  And that was due to an illness you were
4      having; is that right?
5  A.  Yes.
6  Q.  Okay. Tell me what illness you were
7      fighting with at that time.
8  A.  Would you repeat the question again?
9  Q.  Yes. What illness prompted them to delay
10     switching you from salary plus commission to
11     straight commission?
12 A.  I have a genetic disease called Fabry's
13     Disease.
14 Q.  Can you spell that for me?
15 A.  F-a-b-r-y, Fabry's Disease. It's an
16     inherited genetic disease.
17 Q.  And what is it? How does it affect you?
18 A.  It causes basically waste products to build
19     up in your system. I lack an enzyme. It's
20     an enzyme deficiency disease. I'm required
21     to have infusions once every two weeks for
22     the rest of my life.
23 Q.  When was that diagnosed?

74

1  A.  When I was thirteen years old.
2  Q.  Has it -- is it a degenerative condition?
3  A.  Yes.
4  Q.  Okay. So its effect on you physically and
5      the treatment necessary for it has increased
6      over the recent years; is that a fair
7      statement?
8  A.  Treatment was just started or just developed
9      a few years ago, yes.
10 Q.  How during late 2003, early 2004 was it
11     affecting your ability to perform your job
12     duties with ChemTreat?
13 A.  Well, at that point, besides shutting down
14     all of my organs, it makes me extremely
15     tired. I will suffer from intestinal
16     problems, and it slows down my thought
17     process.
18         The other thing that was flaring
19     up at that time is that I do have chronic
20     osteomyelitis, which is a bone infection, in
21     my foot.
22 Q.  When did that -- or when was that diagnosed?
23 A.  1995, '94.

75

1  Q.  Is it also degenerative?
2  A.  I've had seven surgeries, and they have
3      removed portions of my foot to try to stop
4      bone infection from spreading.
5  Q.  And I use the term "degenerative" which is
6      not actually what I meant. Is it
7      progressive?
8  A.  Yes.
9  Q.  And has it gotten worse in recent years?
10 A.  Yes.
11 Q.  Okay.
12 A.  I just had surgery two weeks ago.
13 Q.  Prior to 2003 were you able -- did either or
14     both of these conditions affect your ability
15     to perform your job duties with ChemTreat?
16 A.  I've been suffering with these since '95.
17 Q.  Okay. Well, what I'm trying to figure
18     out -- I'm really not trying to be sneaky
19     about this. I'm trying to figure out what
20     was going on in the latter part of 2003 into
21     2004 that it became an issue?
22 A.  I was having to spend time at the University
23     of Iowa in the hospital.

76

1  Q.  Okay. Due to worsening symptoms --
2  A.  Yes.
3  Q.  -- of either/or condition, correct?
4  A.  Right.
5  Q.  And was that a company decision or your
6      request that they delay going to straight
7      compensation because of your needing to take
8      care of these other issues?
9  A.  Company decision.
10 Q.  Okay. Would you agree with me that keeping
11     you on salary plus commission rather than
12     moving you to straight commission at a time
13     when you were addressing these medical
14     issues was financially beneficial to you?
15 A.  At that time.
16 Q.  And have the health issues, either/or of
17     them, been covered by the health benefit
18     package you have with the company?
19 A.  Up until the time I started receiving the
20     infusions everything was fine.
21 Q.  When did you start receiving the infusions,
22     just ballpark?
23 A.  I'd had three infusions before that meeting

E-FILED
Friday, 21 July, 2006  12:07:33 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 8 - DEPOSITION OF GREGORY KINSMAN (2 OF 8)

77

1  with Dan O'Brien where we discussed the
2  salary changes.
3  Q.  Okay.  So if that was in 2003, you would
4      have had three infusions --
5  A.  Yes.
6  Q.  -- that year?
7  A.  Yes.
8  Q.  How frequent are they again?
9  A.  Every two weeks.
10 Q.  So what changed about the health benefits
11     when you began having the infusions?
12 A.  We've had problems, payment problems --
13 Q.  Okay.
14 A.  -- that have escalated significantly.
15 Q.  Who administers the health plan for
16     ChemTreat?  Do you know?
17 A.  At the beginning it was -- I'm sorry.  My
18     memory is -- United Healthcare, and it has
19     since changed to Aetna.
20 Q.  When did it change?  Do you know?
21 A.  First of the year.
22 Q.  Of 2005?
23 A.  2006.

78

1  Q.  So back in '93 when these treatments began
2      and you began having problem with payments
3      it was still United Healthcare, correct?
4          MR. WOLFE:  2003?
5          MR. CASSIDY:  What did I say?
6          MR. WOLFE:  You said '93.  I know,
7      we're all stuck in the '90s.
8  Q.  (BY MR. CASSIDY)  Okay.  It was still United
9      Health then, correct?
10 A.  Yes.
11 Q.  So any problems you had with payments didn't
12     have to do with a switch of health carriers
13     by the company; is that correct?
14 A.  Not that I'm aware of.
15 Q.  Okay.  What types of problems were you
16     having with payment once the infusion
17     treatments began?
18 A.  The infusions are $10,000 per treatment
19     every two weeks.  They escalated to 13,000.
20     The cost went up, and my wife was able to
21     get it reduced back down to $10,000 --
22 Q.  Okay.
23 A.  -- every two weeks, plus the treatments for

79

1  the osteo.
2  Q.  What were the problems with getting
3      payments?  United Health was not --
4  A.  We have been fighting with them since the
5      beginning.
6  Q.  When you submit a health claim, do you
7      submit it to ChemTreat, or do you submit it
8      directly to United Health?
9  A.  We don't submit it.
10 Q.  How does it get submitted?
11 A.  By the people that do the work.
12 Q.  Okay.  So you go to your medical treater,
13     you give them your insurance information and
14     they make the claim directly for you?
15 A.  Yes.
16 Q.  Do you have any understanding as to whether
17     or not the claim is made to ChemTreat or
18     whether it is made directly to United Health
19     without any involvement by ChemTreat at all?
20 A.  It is made to United Health.  They
21     administer the -- they go to ChemTreat for
22     the money.
23 Q.  This is a self-insured health plan --

80

1  A.  Yes.
2  Q.  -- your understanding?
3  A.  Yes.
4  Q.  And United Health is simply the
5      administrator of the self-insured plan?
6  A.  Yes.
7  Q.  What reasons have you been given for
8      nonpayment or the payment problems, whatever
9      they may be?
10 A.  They have several excuses.  They will try
11     everything from out of network, which you
12     can't do business with an out-of-network
13     company when your claims are $20,000 a month
14     just for infusions.  So we have to go to the
15     University of Iowa in order to get this done
16     because they are an in-network provider.
17         I have to have blood tests, the
18     osteomyelitis.  When I have treatments, I go
19     on IVs for 14 weeks at a time.  I have to
20     have my blood levels monitored.  We'll go to
21     the lab.  They won't pay the doctor's fees
22     for reading the lab results.
23 Q.  Other than out of network, what other basis

81

1    for denial or reduction of benefits have you
2    been given?
3 A.  Michelle takes care of all of the insurance.
4    I don't.
5 Q.  Okay.
6 A.  She maintains a list of the EOBs, she could
7    give you a list as long as your arm.
8 Q.  I'll have my chance to talk to your wife.
9 A.  That's all I can tell you.
10 Q.  That's all you know right now?
11 A.  I don't take care of the paperwork.
12 Q.  Do you know when the EOBs come in whether or
13    not they are coming from ChemTreat or
14    directly from United Health?
15 A.  They come from United Health.
16 Q.  Do you have any personal knowledge as to
17    what direct involvement ChemTreat has in
18    making the coverage determinations that are
19    eventually relayed to you by United Health?
20 A.  I have no understanding.
21 Q.  Have you ever spoken with any individual at
22    ChemTreat to discuss your problems with
23    payments?

82

1 A.  I have made calls, but I don't follow up;
2    Michelle does that.
3 Q.  All right.  I'm only interested in you
4    personally.  Have you spoken with any
5    particular individual at ChemTreat
6    concerning your health benefits?
7 A.  I have called Nancy Berryman at ChemTreat,
8    said that we were having problems with our
9    claims.
10 Q.  And was there any discussion about the
11    specifics of the problem?
12 A.  Not with me.
13 Q.  Did anybody from ChemTreat ever tell you
14    that they could not afford to pay benefits
15    to you under your plan?
16 A.  Not directly.
17 Q.  How has it been done indirectly?
18 A.  Through the discussion with Dan O'Brien, his
19    concern over my health, would I be able to
20    work, should we do -- you know, delaying the
21    change to full commission.
22 Q.  Okay.  Was there any conversation during
23    this discussion with Dan O'Brien concerning

83

1    the cost of your health treatments or was it
2    only limited to your making sales and
3    keeping the customers happy?
4 A.  He was concerned if the medical situation I
5    was going through would prevent me from
6    calling on my customers and doing a good job
7    for ChemTreat.
8 Q.  Do you recall him making any reference to
9    the cost to ChemTreat of your health issues?
10 A.  I can't remember.
11 Q.  Okay.  Do you have any recollection of any
12    individual at ChemTreat ever making a
13    reference to you as to the cost to them of
14    your health treatments?
15 A.  I can't remember.
16      MR. CASSIDY:  Okay.  I'm going to
17 completely switch gears here.  It might be a
18 good time to stretch our legs.
19      MR. WOLFE:  That's fine.  How
20 long?
21      MR. CASSIDY:  Couple minutes;
22 five, ten minutes, whatever.
23      (Recess taken.)

84

1 Q.  (BY MR. CASSIDY)  Mr. Kinsman, I want to --
2    there are a couple follow-up before I move
3    on to a new issue.
4      At or about the time that your
5    physical condition started affecting your
6    work and you were talking about meeting with
7    somebody from ChemTreat -- who was it you
8    were meeting with?
9      MR. WOLFE:  Dan.
10      MR. CASSIDY:  Dan.
11 Q.  (BY MR. CASSIDY) -- Dan O'Brien, were you
12    ever offered by the company to go on
13    disability?
14 A.  No, I was not.
15 Q.  To your knowledge, there was no opportunity
16    for you to quit working and receive a
17    percentage of your pay due to your health
18    issues?
19 A.  I said I was never -- it was never brought
20    up by anybody.
21 Q.  Okay.  And the follow-up question is, did
22    you have any knowledge that that opportunity
23    was there, whether or not somebody mentioned

85

1    it to you?
2  A.  Not at that time. I have since found out
3      that they did have a disability option.
4  Q.  Okay. When did you find that out?
5  A.  Probably prior to October 11 I had called
6      Nancy Berryman and asked her if we had a
7      disability program and if she could send me
8      the paperwork.
9  Q.  And did she send you the paperwork?
10 A.  Yes, she did.
11 Q.  Did that disclose to you that there was a
12     disability program for you?
13 A.  Yes.
14 Q.  Did you attempt to utilize that?
15 A.  I did not fill them out.
16 Q.  Okay. Why not?
17 A.  I just never got around to it. It was
18     probably in August or September of 2005.
19 Q.  Did you make a conscious decision that you
20     would be better off continuing to work
21     financially?
22 A.  I wanted to work both for the financial, to
23     keep my job, and second to service my

86

1      accounts.
2  Q.  Okay. Now, I guess my question is, is that
3      why you didn't fill out the paperwork,
4      because you made that decision, or was it
5      simply that you never got around to doing
6      the paperwork?
7  A.  I'm not very good at paperwork. I just
8      didn't get it done.
9  Q.  When you started at ChemTreat, I assume
10     there was some discussion about your
11     compensation package and your career path
12     with the company, correct?
13 A.  Yes.
14 Q.  Was there ever any discussion with you that
15     it was the goal of every salesman to go to
16     full commission?
17 A.  Yes.
18 Q.  Okay. So you understood that from the time
19     you started with ChemTreat and throughout
20     that the goal was always to put in enough
21     years to go to straight commission, correct?
22 A.  To build your territory, and there would be a
23     point where straight commission would

87

1      exceed your salary.
2  Q.  Okay. And what was your understanding as to
3      who made the determination as to when your
4      sales territory was such that straight
5      commission was going to be the compensation
6      package?
7  A.  I don't remember.
8  Q.  Well, would it be fair to say that being
9      notified in 2003 that you had gotten to a
10     point where they wanted you to go to
11     straight commission really didn't come out
12     of the blue; it was something you understood
13     from the time you started with ChemTreat may
14     happen, right?
15 A.  That some day it might, yes.
16 Q.  Okay.
17 A.  I know people that have been with ChemTreat
18     twelve, fifteen years that are still on
19     salary.
20 Q.  And were their sales territories as
21     successful as yours?
22 A.  Much more so.
23 Q.  Let's talk about Rhema here. First of all,

88

1      what is Rhema Elpis Enterprises, LLC?
2  A.  It's a business that my wife owns.
3  Q.  What kind of business?
4  A.  She's a middle -- it's a distributorship.
5  Q.  Distributorship of what?
6  A.  Chemicals.
7  Q.  Okay. Water treatment chemicals?
8  A.  Yes.
9  Q.  Okay. Would you consider Rhema -- I'm going
10     to refer to it as Rhema even though the name
11     is Rhema Elpis Enterprises, LLC.
12         Would you consider Rhema to be a
13     competitor of ChemTreat and/or Nalco?
14 A.  In some circumstances, yes.
15 Q.  Well, if a company is purchasing their water
16     treatment chemicals from Rhema, they don't
17     need the services of ChemTreat and/or Nalco;
18     would that be correct?
19 A.  Yes.
20 Q.  Okay. So in that sense, if they take the
21     business, they are taking it away from
22     ChemTreat and, therefore, would be a
23     competitor at least in that sense, correct?

89

1   A.  Yes.
2   Q.  Okay.  Does the name mean anything?  I mean,
3      what is Rhema, R-h-e-m-a?
4   A.  Does it mean anything?  It's a Greek word
5      that means God's word.
6   Q.  And Elpis?
7   A.  Elpis is also a Greek word that means -- I'm
8      not sure.  I'm not sure.  I didn't come up
9      with the name.  I don't know anything about
10     it.
11  Q.  When was Rhema established?
12  A.  I think sometime in 2004.  I'm not -- I
13     didn't have anything to do with it.
14  Q.  Did you know it was being established?
15  A.  Yes.
16  Q.  Did you know that your wife was going into
17     the chemical business?
18  A.  I knew that she was going to be a
19     distributor, yes.
20            (Exhibit No. 4 marked.)
21  Q.  (BY MR. CASSIDY)  I'm going to show you what
22     I've marked as 4 --
23          (Discussion off the record.)

90

1   Q.  All right.  Mr. Kinsman, I'm showing you
2     what I have marked as Deposition Exhibit No.
3     4.  Do you recognize that document?
4   A.  I have never seen it before.
5   Q.  You've never seen this before?
6   A.  No.
7   Q.  Are you familiar with your wife's signature?
8   A.  Yes.
9   Q.  Does that appear to be her signature on Page
10     2?
11  A.  I believe so.
12  Q.  And, according to this document, her
13     signature was placed on this document on
14     May 27, 2004.  Would you agree with my
15     interpretation of the document?
16  A.  Yes.
17  Q.  Okay.  And according to the front of this
18     document, this limited liability company was
19     filed of record on August 11, 2004, with the
20     Secretary of State, correct?
21  A.  Yes.
22  Q.  All right.  Do you know when Rhema first
23     began business, in other words, made any

91

1     sale, made any customer contact, did
2     anything like that?
3   A.  I can't remember.
4   Q.  Do you have any understanding as to why
5     approximately three months would pass from
6     the preparation of these Articles of
7     Organization to time that they were
8     eventually filed with the Secretary of
9     State?
10  A.  I have no idea.
11  Q.  Do you know whether or not Rhema was
12     operating as a going concern during that
13     interim three-month period?
14  A.  What is a going concern?
15  Q.  Was it operating business?
16  A.  I have no idea.
17  Q.  What is your personal involvement with
18     Rhema?
19  A.  I have none.
20  Q.  Okay.  Have you ever had any involvement
21     with Rhema?
22  A.  I have, yes.
23  Q.  Okay.

92

1   A.  I have placed -- I have relayed a message
2     for my wife to Ulrich Chemical, and I have
3     returned some drums of chemical, empty
4     drums, to Ulrich Chemical when I was coming
5     to Peoria.
6   Q.  Is that it?
7   A.  That's all I can remember.
8   Q.  Did you ever -- have you ever made a contact
9     with a prospective customer in an attempt to
10     make a sale on behalf of Rhema?
11  A.  No, I have not.
12  Q.  Have you ever inspected equipment for any
13     company in your region or customer in your
14     region on behalf of Rhema?
15  A.  Not on behalf of Rhema.  I have inspected
16     the equipment at a facility where ChemTreat
17     still had serviceable chemical there while I
18     was at that facility that was purchasing
19     chemical from Rhema.
20  Q.  And what is the name of that company?
21  A.  Monmouth College.
22  Q.  Have you ever prepared any reports
23     concerning inspections of equipment, of

93

1       customer equipment, on behalf of Rhema?
2  A.  Not that I can remember.
3  Q.  Did you ever provide your wife with
4       ChemTreat pricing information?
5  A.  No, I did not.
6  Q.  Was your wife ever employed by ChemTreat?
7  A.  No, she was not.
8  Q.  Okay. Now, we talked earlier about for you
9       to be able to get a cost per unit price from
10      ChemTreat you would have to be a sales rep,
11      correct?
12  A.  Right.
13  Q.  So your wife would not have the ability to
14      call into ChemTreat and get their cost
15      information; would that be correct?
16  A.  Correct.
17  Q.  And it's your testimony that you never
18      relayed such information to your wife; is
19      that correct?
20  A.  No, I didn't.
21  Q.  Did you ever relay to your wife pricing
22      information as opposed to cost information,
23      price information as to what certain

94

1       customers were paying for certain chemicals?
2  A.  No, I did not.
3  Q.  Did you maintain documentation as to such
4      information at your home?
5  A.  Such information as?
6  Q.  What customers were paying for chemicals and
7      what chemicals they were using?
8  A.  I would get my monthly reports from
9      ChemTreat.
10  Q.  And where did you keep that information when
11      you would get it?
12  A.  I would usually throw it away.
13  Q.  Okay. Did you maintain any records as to
14      what customers were purchasing and what they
15      were paying for it?
16  A.  Thirty days at a time.
17  Q.  Did your wife have access to that
18      information while you had it?
19  A.  Not that I'm aware of.
20        (Exhibit No. 5 marked.)
21  Q.  (BY MR. CASSIDY) I'll show a document that
22      was produced by you in discovery, you or
23      your wife, that I've now marked as Exhibit 5

95

1       which purports to be a March 12, 2004,
2      letter on Rhema Enterprises, LLC, letterhead
3      to Carus Chemical Company. Have you ever
4      seen that document before?
5  A.  Yes.
6  Q.  When did you first see that document?
7  A.  The first time I saw it was when it was
8      given to Kevin in the office.
9  Q.  You mean in connection with this litigation?
10        MR. WOLFE:  In connection with the
11      lawsuit?
12        THE WITNESS:  When it was provided
13      to you in the office.
14        MR. WOLFE:  Okay.
15  Q.  (BY MR. CASSIDY) I assume you mean in
16      answering my written discovery in this case?
17  A.  Yes.
18  Q.  Okay. Is it your testimony that you never
19      saw this letter or knew of its existence
20      prior to this lawsuit being filed?
21  A.  Right.
22  Q.  Do you have any knowledge as to whether or
23      not this letter has been redacted at all

96

1       from its original version?
2  A.  What does redacted mean?
3  Q.  Changed, altered.
4        MR. WOLFE:  I think for the record
5      the response to the discovery indicated that
6      the prices were removed based upon certain
7      concerns.
8        MR. CASSIDY:  So for the record,
9      and I don't care if the witness confirms
10      this or you do --
11        MR. WOLFE:  Right.
12        MR. CASSIDY:  -- the original of
13      this letter would have included actual
14      prices on it, correct?
15        MR. WOLFE:  Correct.
16        MR. CASSIDY:  Instead of the Xs
17      that appear on this document?
18        MR. WOLFE:  Correct.
19  Q.  (BY MR. CASSIDY) Okay. First of all, how
20      do you pronounce this gentleman's name, Tom?
21  A.  Tom Moshage.
22  Q.  Moshage. In March of 2004 was Carus
23      Chemical Company one of your customers?

**97**

1  A.  Yes.
2  Q.  And was Tom Moshage one of your contact
3      people?
4  A.  Yes.
5  Q.  Did you ever have your wife accompany you on
6      a sales call to Carus Chemical Company?
7  A.  No.
8  Q.  Did you ever introduce your wife to Tom
9      Moshage?
10 A.  Tom is a personal friend of ours.
11 Q.  Okay.  Please look at the letter here --
12      Oh, first of all, let me ask you:
13      The letterhead says Rhema Enterprises, LLC.
14      This letter is dated about five months prior to
15      the filing of Articles of Organization for
16      Rhema Elpis Enterprises.  Do you know
17      whether or not these are one and the same,
18      Rhema Enterprises, LLC, or Rhema Elpis
19      Enterprises, LLC?
20 A.  You would have to ask Michelle.
21 Q.  Okay.  Do you have any knowledge as to
22      whether or not Articles of Organization were
23      ever filed for a company called Rhema

**98**

1      Enterprises, LLC?
2  A.  I don't know.
3          MR. CASSIDY:  Before we go through
4      the letter, let me mark this.
5          (Exhibit No. 6 marked.)
6  Q.  (BY MR. CASSIDY) I'll show you Exhibit No.
7      6, which is a printout from the Illinois
8      Secretary of State Business Services web
9      site, showing an organization by the name of
10      Rhema Enterprises, LLC, which was organized
11      in May of 2003.
12          Do you have any knowledge or know
13      anybody connected with the company listed
14      there on that Exhibit 6?  Let me ask you
15      this: Do you know Jerome Robinson, the
16      agent listed in this document?
17 A.  No.
18 Q.  Do you have any knowledge as to whether or
19      not this Rhema Enterprises, LLC, has any
20      relationship or connection with the company
21      that is Rhema Enterprises, LLC, on the top
22      of the letter marked Exhibit 5?
23          MR. WOLFE:  Answer the question.

**99**

1      Do you know if there is any relationship
2      between 5 and 6?
3  A.  No.
4  Q.  (BY MR. CASSIDY)  I'm trying to find out if
5      you and your wife have anything to do with
6      this company that was created in May of 2003
7      called Rhema Enterprises, LLC?
8          MR. WOLFE:  In Exhibit 6?
9          MR. CASSIDY:  Yes.
10          MR. WOLFE:  Based on my knowledge,
11      based on what I know, no.
12          MR. CASSIDY:  Okay.
13 Q.  (BY MR. CASSIDY) Okay.  Back to Exhibit 5.
14      Starting with the sentence that begins on
15      Line 3 of that letter, it states, As you
16      know, your current supplier just passed a
17      6 percent increase for this year and has
18      followed the industry with one every year,
19      period.  Do you see that sentence?
20 A.  Uh-huh.
21 Q.  To your knowledge, who was the current
22      supplier of Carus Chemical Company in March
23      of 2004?

**100**

1  A.  ChemTreat.
2  Q.  Did ChemTreat on or about March of 2004 pass
3      a 6 percent increase?
4  A.  I can't remember.  They did have a price
5      increase, yes.
6  Q.  If you did not relay this information to
7      your wife, how would she have gotten that?
8  A.  She knew that ChemTreat had a price
9      increase.  I talked -- I complained about
10      price increases every time we got one.
11 Q.  Okay.  When you would have mentioned to your
12      wife that -- or complained about there being
13      a price increase from ChemTreat, would you
14      specifically have told her the amount of the
15      increase?
16 A.  Yes.
17 Q.  When you did that were you aware that she
18      would attempt to use that information in
19      competition with ChemTreat?
20 A.  No.
21 Q.  Okay.
22 A.  That was -- that's over-the-table talk.
23 Q.  Okay.  The second to the last sentence

| | |
|---|---|
| 1 | reads, We will also be providing the test |
| 2 | reagent and equipment ordering service |
| 3 | through Hach and the various equipment |
| 4 | companies as part of our regular service, |
| 5 | period. |
| 6 | Do you see that sentence? |
| 7 | A.  Right. |
| 8 | Q.  What is test reagent? |
| 9 | A.  A test reagent is a chemical that's used for |
| 10 | testing chemicals in the boilers. |
| 11 | Q.  And do all companies who require water |
| 12 | treatment chemicals use test reagents? |
| 13 | A.  Yes. |
| 14 | Q.  Okay.  Do you know if your wife ever met |
| 15 | with Mr. Moshage prior to preparing this |
| 16 | letter to discuss his chemical needs? |
| 17 | A.  No. |
| 18 | Q.  Do you have any information as to how your |
| 19 | wife would have obtained the information as |
| 20 | to the test reagent being used by Carus |
| 21 | Chemical in order to be representing that |
| 22 | she would be providing that test reagent? |
| 23 | A.  They ordered test reagents through ChemTreat |

*(page 101)*

| | |
|---|---|
| 1 | sent out, do you have any information as to |
| 2 | how your wife would have gained the |
| 3 | information as to the old price of ChemTreat |
| 4 | and the new price of ChemTreat in order to |
| 5 | be able to show this comparison table here? |
| 6 | A.  My guess is that Tom told her. |
| 7 | Q.  Do you know whether or not the dollar signs |
| 8 | that were used in here -- let me go back. |
| 9 | First of all, you are guessing |
| 10 | whether Tom told her?  You don't know that |
| 11 | for a fact? |
| 12 | A.  I would suspect that Tom told her. |
| 13 | Q.  That is simply your suspicion?  You have no |
| 14 | personal knowledge of that; is that correct? |
| 15 | A.  No. |
| 16 | Q.  Okay.  No, it's not correct, or, no, you |
| 17 | don't have personal knowledge? |
| 18 | MR. WOLFE:  Try again. |
| 19 | Q.  (BY MR. CASSIDY)  Do you have any personal |
| 20 | knowledge that Tom Moshage gave your wife |
| 21 | pricing information to be able to prepare |
| 22 | this letter? |
| 23 | A.  He didn't tell me that, but that would be my |

*(page 103)*

| | |
|---|---|
| 1 | all the time. |
| 2 | Q.  My question is, do you know how your wife |
| 3 | would have known what test reagent was being |
| 4 | ordered through ChemTreat? |
| 5 | A.  Oh, absolutely not.  They would have to |
| 6 | order. |
| 7 | Q.  Now, at the conclusion of the letter there |
| 8 | is a three-column comparison of prices.  The |
| 9 | three columns are headed, Old, New and |
| 10 | Rhema. |
| 11 | Now, as I understand this, the Old |
| 12 | would be -- and it indicates current |
| 13 | supplier, by the way -- that the Old would |
| 14 | be ChemTreat's price prior to the increase, |
| 15 | New would be ChemTreat's price after the |
| 16 | increase, and the Rhema would be the price |
| 17 | that she was quoting them.  Do you interpret |
| 18 | that the same way? |
| 19 | A.  That's the way that I would interpret this |
| 20 | letter, yes. |
| 21 | Q.  Assuming based upon the representation of |
| 22 | your counsel that these Xs were replaced |
| 23 | with numbers at the time this letter was |

*(page 102)*

| | |
|---|---|
| 1 | guess. |
| 2 | Q.  And I'm just trying to clarify that it is |
| 3 | simply a guess and you have no personal |
| 4 | information. |
| 5 | A.  Right. |
| 6 | Q.  Do you know whether or not the dollar |
| 7 | figures that were plugged into this letter |
| 8 | when it was sent were the cost or the price |
| 9 | to Carus? |
| 10 | A.  No, but if Tom told her what he was paying, |
| 11 | that would have been the cost to Carus. |
| 12 | Q.  Well, my question isn't asking you to put a |
| 13 | supposition on top of a supposition.  I |
| 14 | simply want to know if you know. |
| 15 | A.  I don't know. |
| 16 | Q.  Okay.  Have you ever seen this letter in its |
| 17 | complete form? |
| 18 | A.  When it was -- |
| 19 | Q.  -- not redacted? |
| 20 | A.  Yes. |
| 21 | Q.  You have seen that? |
| 22 | A.  In his office, like I said, the first time. |
| 23 | Q.  So before the dollar amounts were crossed |

*(page 104)*

**105**

1  out by the Xs you saw it?
2  A.  Yes.
3  Q.  Based upon that review of it, were the
4      prices being quoted the price to Carus or
5      the cost from the supplier?
6  A.  Price to Carus.
7  Q.  Okay.  Do you know a gentleman by the name
8      of Paul Panzica?
9  A.  Yes.
10 Q.  Who is Paul Panzica to you?
11 A.  Paul Panzica was an accountant that my wife
12     went to see to set up the -- set up her
13     business.
14 Q.  Was he an accountant in which you had a
15     business relationship prior to your wife
16     setting up the business of Rhema?
17 A.  No.
18 Q.  Is he an accountant that you have ever
19     personally used --
20 A.  No.
21 Q.  -- even for joint returns with your wife?
22 A.  No.
23 Q.  Do you know him personally?

**106**

1  A.  No.
2          MR. WOLFE:  Off the record a
3      minute.
4          MR. CASSIDY:  Sure.
5          (Discussion off the record.)
6  Q.  (BY MR. CASSIDY)  In March of 2004 did you
7      know that your wife had started Rhema?
8  A.  When it was started, yes.
9  Q.  Well, we haven't quite confirmed when it's
10     been started yet.  We only know the articles
11     were signed in May, filed with the Secretary
12     of State in August of 2004.  Now we have a
13     letter which predated both of those being
14     March 12, 2004.  So this is the earliest
15     date we have, so that's what I'm going to
16     use right now.
17         As of March 12, 2004, did you know
18     that your wife had a chemical business by
19     the name of Rhema?
20 A.  Yes.
21 Q.  Okay.  Do you know how long prior to that
22     you were aware that this company existed?
23 A.  No.

**107**

1  Q.  Did you have any knowledge that she was
2      quoting your customers?
3  A.  Yes.
4  Q.  Okay.  How did you become aware that she was
5      quoting your customers?
6  A.  Because they told me that they were going to
7      ask her for a quote.
8  Q.  Do you know how they became aware of the
9      existence of Rhema?
10 A.  I told them.
11 Q.  Why would you do that?
12 A.  Because they had already informed me that
13     they were leaving ChemTreat and were taking
14     bids.
15 Q.  So during -- I don't want to put words in
16     your mouth, but just to try to short circuit
17     this, during a regular service call or some
18     other communication with one of your
19     customers, they would indicate that they
20     were going to leave ChemTreat and so you --
21 A.  Or that they had already quit.
22 Q.  -- okay, and so you indicated to them, "My
23     wife has a chemical business, can she give

**108**

1      you a quote"?
2  A.  That's not what I said.
3  Q.  Okay.
4  A.  When they said they were seeking bids from
5      other companies, I said, "You may want to
6      call Michelle."
7  Q.  Okay.  Did you ever tell Tom Moshage that?
8  A.  Yes.
9  Q.  What other customers would you have told
10     that to?
11 A.  All of the customers that told me they were
12     leaving or quitting.
13 Q.  Okay.  Let's put names to those.  What
14     customers in the spring of 2004 told you
15     they were leaving or considering leaving
16     ChemTreat that you told them to contact your
17     wife?
18 A.  National Manufacturing, they had quit prior
19     to that --
20 Q.  Okay.
21 A.  -- Monmouth College, Carus Chemical, Bob
22     Evans Farms.  I can't think of any more
23     right now.

109

1  Q.  Let's take them one at a time.  Who is your
2      contact person at National Manufacturing?
3  A.  The contact was Dick Bogott.
4  Q.  To the best of your recollection, when did
5      he tell you he was leaving or considering
6      leaving ChemTreat?
7  A.  Dick didn't tell me that.
8  Q.  Who told you that?
9  A.  Jackie Molina.  Dick --
10 Q.  Who is Jackie Molina?
11 A.  She's an engineer.
12 Q.  Do you know who made the decision -- who
13     would make the ultimate decision at National
14     Manufacturing as to whether or not to leave?
15 A.  Mike King, owner.
16 Q.  Did you ever have direct dealings with him?
17 A.  No.  He got copies of reports.
18 Q.  Whom did you tell at National Manufacturing
19     that if they were considering leaving
20     ChemTreat they should contact your wife?
21 A.  National Manufacturing had already quit
22     ChemTreat.  They had moved to a new company
23     under the directive of Mike King.

110

1  Q.  What new company had they gone to?
2  A.  ECOLAB.
3  Q.  Spell that, please.
4  A.  E-C-O-L-A-B, I believe that's the...
5          Dick retired.  One week later I
6      was informed that they were dropping
7      ChemTreat because of --
8  Q.  And you were informed that by Jackie Molina?
9  A.  I was informed that by Bill Buckingham who I
10     called on at the plant.
11 Q.  And is that the point that you told them
12     that they should consider contacting your
13     wife?
14 A.  No.
15 Q.  Okay.  Did you make any attempt with Bill
16     Buckingham to preserve the ChemTreat
17     business?
18 A.  It was beyond Bill's control.  I tried.
19     Mike King, the owner, compared the pricing
20     of 30- to $40,000 with ChemTreat versus
21     $9,000 with ECOLAB.  They were informed that
22     they were not to do or have any association
23     with ChemTreat after that point in time.

111

1  Q.  Before they made the switch were you ever
2      contacted and shown the price comparison and
3      given an opportunity to rebid?
4  A.  No.  I had the business for fourteen years.
5  Q.  I understand that.
6  A.  Dick retired.  Mike King said, "ChemTreat is
7      out of here."  He was very upset, $40,000
8      versus $9,000.  He didn't know anything
9      about chemicals.  He just looked at the
10     price.
11         He said, "ChemTreat has been
12     screwing me, they are out of here," not
13     understanding what ECOLAB was doing.
14 Q.  Okay.  Couple questions:  No. 1, my question
15     to you is, were you ever given an
16     opportunity to see if you could lower your
17     cost or did Mike King have a knee-jerk
18     reaction to seeing the comparison?
19 A.  He said, "They are out of here."
20 Q.  And you said "not understanding what ECOLAB
21     was doing."  What was ECOLAB doing to be
22     able to undercut you so much?
23 A.  They were selling basically Stone Age

112

1      products.
2  Q.  How long did they stay with ECOLAB before
3      they figured out that --
4  A.  They are still with ECOLAB.  All of the
5      chemicals from the Rock Falls facility,
6      ChemTreat chemicals, were moved to the
7      Sterling facility.  Not only did they quit
8      ChemTreat; they hauled the chemicals on site
9      out.
10 Q.  At what point did you tell somebody to
11     contact your wife?
12 A.  When they -- I can't tell you the exact date
13     that it was at, but I had a meeting with
14     Jackie.  She said she had to cut her costs
15     by 15 percent over ECOLAB.  I said, "That is
16     not possible."  Our costs were higher than
17     $9,000 a year.
18 Q.  And how did you get from that to telling
19     them about Rhema?
20 A.  I said, "You may want to contact Michelle."
21     They stayed with ECOLAB at the Rock Falls
22     facility.
23 Q.  How about the Sterling facility?

113

1    A.    The Sterling facility continued to feed
2          ChemTreat chemicals which were brought over
3          from the Rock Falls facility. When the
4          chemicals -- they still have serviceable
5          materials today at that facility. Well,
6          it's been bought out. It's not National
7          anymore. It's been bought out by Stanley.
8    Q.    Did they contact your wife? Do you know?
9    A.    Jackie wanted to know where she could
10         purchase chemicals that were not provided by
11         ECOLAB, but were comparative and competitive
12         in price. She had a directive not to do
13         business with ChemTreat.
14   Q.    Why were you still calling on the company
15         if --
16   A.    Because I was servicing out the chemicals
17         that were left.
18   Q.    So when Mike King says no more contact with
19         ChemTreat, it's your understanding that was
20         only with respect to additional sales, but
21         not carrying out the service that had
22         already been sold?
23   A.    I was helping Jackie. She had just been

114

1          forced into that position when Dick retired.
2    Q.    Did you make regular calls on National
3          Manufacturing or did Jackie call you and ask
4          for your help?
5    A.    Both.
6    Q.    Did you make any attempt when she requested
7          a source for chemicals that ECOLAB didn't
8          sell to get ChemTreat back in the door?
9    A.    Yes.
10   Q.    Did you prepare a quote?
11   A.    She asked me for a quote.
12   Q.    Did you prepare one?
13   A.    No. Everything was done verbally.
14   Q.    And what was the result of you quoting for
15         ChemTreat?
16   A.    My cost was too high.
17   Q.    Okay. So they -- you mentioned your wife.
18         They contacted her, and your wife eventually
19         made some sales to National Manufacturing,
20         correct?
21   A.    Correct.
22   Q.    And is it your testimony that you could not
23         sell chemicals through ChemTreat at the same

115

1          or better price than your wife sold?
2    A.    Yes.
3    Q.    The discretion to set the price on any
4          chemicals is essentially yours as a sales
5          rep, is it not, other than going below cost?
6    A.    Right.
7    Q.    Okay. The chemicals sold by Rhema, were
8          they sold at below your cost?
9    A.    Yes.
10   Q.    And what chemicals, if you know, were sold
11         from Rhema to National Manufacturing?
12   A.    I don't know.
13   Q.    Okay. Who is your contact person at
14         Monmouth College?
15   A.    At what period of time?
16   Q.    2004.
17   A.    I'm not sure when Earl took over, but I did
18         business with Pete Loomis for 14 years. He
19         retired.
20   Q.    Whom did you tell about your wife's
21         business?
22   A.    Pete Loomis.
23   Q.    Do you remember when that was?

116

1    A.    No, I don't.
2    Q.    Do you remember the context of the
3          conversation?
4    A.    The context?
5    Q.    Yeah. Were they still a customer of yours
6          at that time?
7    A.    Of?
8    Q.    ChemTreat.
9    A.    No. They had made their last purchase,
10         their contract was up, and he said that they
11         were searching out for bids.
12   Q.    Okay. And did you attempt to rebid it on
13         behalf of ChemTreat?
14   A.    I asked to rebid it.
15   Q.    And how did he respond?
16   A.    He said I could rebid.
17   Q.    Is that when you told him about Rhema and
18         that he could contact your wife to also bid
19         it?
20   A.    He said he was putting the business out for
21         bid, and I told him that he could contact
22         Michelle.
23   Q.    Okay.

117

1   A.   He had told me that I was welcome to rebid
2        because we had done business for so long,
3        but that we were too high-priced.
4   Q.   Was it your habit in your ten years with
5        ChemTreat that when you had an opportunity
6        to bid on a job that you would also tell
7        your customers of the existence of your
8        competitors so you would have to bid against
9        them?
10  A.   They would tell me which competitors they
11       had asked for bid.
12  Q.   But in this particular case you brought to
13       their attention Rhema as a competitor?
14  A.   Because he told me that we would be
15       essentially out of there.
16  Q.   And did you rebid it?
17  A.   Did I rebid it?
18  Q.   Yes.
19  A.   No.
20  Q.   Why not?
21  A.   He told me that as a courtesy he would let
22       me rebid, but he said, "We're going to
23       switch suppliers."

119

1        quote, correct?  Is that right?
2   A.   (The witness nodded.)
3   Q.   I need a yes or a no.
4   A.   Yes.
5   Q.   Did Tom Moshage tell you that Carus was
6        going to dump ChemTreat?
7   A.   Yes.
8   Q.   When did he tell you that?
9   A.   I'm not sure what month it was --
10  Q.   Okay.
11  A.   -- but it was back in 2004.
12  Q.   Okay.  Sometime, I assume, prior to March 12
13       of 2004 when your wife sent him a letter?
14  A.   Yes.
15  Q.   Did Tom Moshage tell you why he was
16       considering jumping from ChemTreat?
17  A.   Prices were too high.
18  Q.   And did you ask him for an opportunity to
19       rebid it to bring his costs down?
20  A.   I didn't have an opportunity.
21  Q.   Why not?
22  A.   He said that he was changing companies, he
23       was getting bids from other companies.

118

1   Q.   Do you know what your markup was to Monmouth
2        College before this conversation with Pete
3        Loomis?
4   A.   Probably about 70 -- well, my profit was
5        probably 72 percent.
6   Q.   And the extent of the profit margin, again,
7        that's your discretion as a sales rep,
8        correct?
9   A.   Correct.
10  Q.   So in order to rebid this you could have
11       theoretically dropped your profit margin to
12       40, 45 percent?  You could have cut the
13       profit margin in half to give a lower price,
14       correct?
15  A.   Could have.
16  Q.   But instead of doing that you directed them
17       to your wife's competing business; is that
18       correct?
19  A.   Correct.
20  Q.   Okay.  Now, we already talked about Carus
21       Chemical and in discussions with Tom Moshage
22       you told him that this mutual friend
23       Michelle had a business and he should get a

120

1   Q.   As a sales rep when a customer tells you
2        they are getting bids, that you are too
3        high-priced, you don't make any attempt to
4        say, "Give me a chance to bring the price
5        down"?
6   A.   I had already passed up three price
7        increases at Carus Chemical, and I was -- I
8        could not go with four, bypass the fourth
9        price increase.
10  Q.   Do you know what your profit margin was with
11       Carus Chemical in early 2004?
12  A.   Not right offhand.
13  Q.   Okay.  Would it have been in excess of
14       60 percent?
15  A.   It was probably one of my lowest ones.
16  Q.   Okay.  Would it have been in excess of
17       60 percent?
18  A.   Could be.
19  Q.   Okay.  Was Carus Chemical your biggest
20       customer at that period of time?
21  A.   Caterpillar was my biggest customer through
22       the -- yeah.
23  Q.   Who was your contact person at Bob Evans?

**Page 121**

1   A.  Dave Swanson.
2   Q.  Is that who you told at Bob Evans of your
3       wife's competing business and they should
4       contact her?
5   A.  Yes.
6   Q.  Tell me how that conversation came about.
7   A.  Dave said he was going to be seeking out
8       other chemical companies because the cost
9       was too high.
10   Q.  Did you ask for an opportunity to keep the
11       business?
12   A.  I'm trying to think. I'm sure I did.
13   Q.  Do you remember what his response to that
14       was?
15   A.  He was still going to get outside bids.
16   Q.  And was it during this conversation that you
17       said, "Well, if you are going to get outside
18       bids, you should contact my wife"?
19   A.  Yes.
20   Q.  Do you ever remember in your career at
21       ChemTreat where your customer told you they
22       wanted to get new bids where you said to
23       them, "You know what, I think Nalco can

**Page 122**

1       undercut me; you should call them"?
2   A.  In most cases I told them to go ahead and
3       get outside bids, that would be good.
4   Q.  Did you ever directly tell them that I know
5       Nalco can undercut my price, why don't you
6       get a bid from them?
7   A.  No.
8   Q.  But isn't that essentially what you were
9       doing with your wife's business?
10   A.  When they had told me that they were seeking
11       outside bids because we were too high, I
12       told them to contact her.
13   Q.  And were you aware at that time that your
14       wife could undercut your price?
15   A.  That she could undercut my price?
16   Q.  Yes.
17   A.  Yes.
18   Q.  Okay. So in telling your ChemTreat
19       customers that they should contact your
20       wife, you knew that you were steering them
21       to somebody who would undercut you and
22       probably take the business?
23           MR. WOLFE: Objection. Assumes a

**Page 123**

1       legal conclusion.
2   Q.  (BY MR. CASSIDY) You can answer, unless he
3       instructs you not to.
4           MR. WOLFE: I didn't instruct him
5       not to answer.
6   A.  Would you repeat that again?
7           MR. CASSIDY: Can you read it
8       back.
9           (Record read.)
10   A.  I assume that all of the competitors they'd
11       contact could undercut me and try to take
12       the business.
13   Q.  You already testified that you didn't direct
14       them to call other customers; you only
15       directed them to call your wife.
16   A.  They informed me that they were contacting
17       others.
18   Q.  When you told these customers that they
19       should contact your wife in order to put in
20       a competing bid you were aware that you were
21       going to financially benefit if your wife
22       made the sale; isn't that correct?
23   A.  I have no part of the business.

**Page 124**

1   Q.  You and your wife live together, correct?
2   A.  Correct.
3   Q.  You file joint tax returns, correct?
4   A.  Correct.
5   Q.  The moneys you make is for the family,
6       correct?
7   A.  Correct.
8   Q.  Money she makes is for the family, correct?
9   A.  However she wants to use the money.
10   Q.  Money that she makes is for the benefit of
11       the family, correct?
12   A.  However she decides to use the money.
13   Q.  Does she keep separate bank accounts from
14       you?
15   A.  Yes.
16   Q.  She doesn't commingle any of the money made
17       from Rhema with your joint accounts?
18   A.  I can't answer that. I don't know. I don't
19       do any finances.
20   Q.  You are not telling me that you are under an
21       arrangement where what is yours is hers, but
22       what is hers is hers?
23           Let me re-ask it. You've heard

125
1       the old smart-aleck statement, "What is
2       yours is ours, what is mine is mine."  Is
3       that the living arrangement you and your
4       wife had?
5   A.  No.  She has her own accounts, though.
6   Q.  With Bob Evans Farm, did you ever make an
7       attempt to lower your price?
8   A.  No.
9   Q.  Okay.  Do you know what your profit margin
10      was with Bob Evans Farms at that time?
11  A.  No.
12  Q.  Do you know if it was over 60 percent?
13  A.  After fourteen years, you can't go back on
14      your prices.  Any customer you've had for
15      that period of time, you can't roll back
16      prices when you've told them there is a
17      price increase.
18  Q.  Do you know if your profit margin was over
19      60 percent?
20  A.  Probably.
21  Q.  And ChemTreat would not have stopped you
22      from dropping a profit margin as low down
23      as 25 percent, would they?

126
1   A.  I was trying to sell business and survive in
2       the company.  You have to have total sales
3       to do that.  I could not drop the prices.
4   Q.  You would rather lose the business than have
5       a lesser profit?
6   A.  I would rather pick up new business, spend
7       my time picking up new business.
8   Q.  From the time that Rhema was established on
9       or before March 12, 2004, how many new
10      companies did you bring into ChemTreat?
11  A.  One that I know of.
12  Q.  What is the name of the company?
13  A.  RSC Refrigeration.  It was an outsourcer for
14      Wal-Mart in Sterling, Illinois.
15  Q.  Any others?
16  A.  I put in a bid at Ameren-Cilco in Mossville,
17      and I worked on that with an individual from
18      ChemTreat.
19  Q.  During any of this time that you were
20      dealing with National Manufacturing,
21      Monmouth College, Carus Chemical, or Bob
22      Evans Farms concerning the possible loss of
23      business, did you ever relay to ChemTreat

127
1       that your wife had a competing business and
2       was talking to the businesses to give her
3       pricing?
4   A.  No.
5   Q.  Did you ever contact ChemTreat and say, "I'm
6       getting killed out here pricewise.  What can
7       you do to help me?"
8   A.  I contacted them regarding the price
9       increases and said that it was extremely
10      difficult as did hundreds of other sales
11      reps.
12  Q.  Well, I'm only asking what you did.  Now,
13      when you would lose a job to Nalco, would
14      you report that to ChemTreat?
15  A.  Yes.
16  Q.  Okay.  But when you lost these customers to
17      Rhema, did you report that to ChemTreat?
18  A.  No, I did not.
19  Q.  Why not?
20  A.  They were small accounts.  I was trying to
21      maintain my total sales, and I felt that
22      they were -- it was -- that they were
23      watching me close and looking for a reason

128
1       to terminate my business.
2   Q.  You just considered Carus Chemical Company a
3       small account that was not significant
4       enough to report to corporate?
5   A.  They still buy chemicals from ChemTreat.
6       They are still a ChemTreat customer.
7   Q.  It's your testimony here today that you were
8       unable to undercut the price your wife could
9       offer to Carus Chemical in order to keep
10      that business; is that right?
11          MR. WOLFE:  Objection.  I think it
12      misstates and is incomplete.  But you can go
13      ahead and answer if you are able to.
14  A.  The price that Carus Chemical was paying for
15      their chemical had been bypassed three times
16      for price increases.
17  Q.  Okay.  My question to you is --
18  A.  We got a letter from the company that said
19      anybody that did not take the last price
20      increase was obligated to take the next
21      price increase.
22  Q.  So in this particular case ChemTreat is
23      telling you that we have raised the price

129

1    and we're giving you no discretion to lower
2    your profit margin, you must pass it on?
3  A.  Once -- yes. That's the way I interpreted
4    the letter from them.
5  Q.  I'll show you a copy of this same letter, a
6    March 12, 2004 letter, that was produced to
7    us with a different date, I'm not sure why,
8    but we'll ask Mr. Moshage that. It was
9    produced to us by Carus Chemical Company and
10    has the dollar figures in there.
11        My question to you is, is it your
12    testimony here today that ChemTreat would
13    not have allowed you to drop your price by
14    2 cents per pound -- I'm sorry -- 8 cents
15    per pound in order to match the price that
16    Rhema was offering on product 1240?
17  A.  They might have.
18  Q.  They would have allowed you to do that?
19  A.  They might have.
20  Q.  Okay. Would they have allowed you to on
21    Product 100 -- well, on any of those items,
22    if you can look at the new increased column,
23    my question to you is, is there any of those

130

1    that ChemTreat would have told you we're not
2    going to let you drop your price down to
3    what your wife listed as Rhema being able to
4    charge to them in order to be able to keep
5    that business?
6  A.  Well, being that I hadn't seen this bid, I'm
7    sure that Tom made the decision. That
8    wasn't up to me to make who he was going to
9    go with.
10  Q.  My question is simply, generally you had the
11    discretion to set the price where you
12    wanted, and ChemTreat would not have
13    prevented you from going this low had you
14    chosen to do so?
15  A.  They might have. I did not make the
16    decision. I was not offered a chance to
17    drop the price.
18  Q.  Well, you set the price as a sales rep, do
19    you not?
20  A.  I set these prices. I bypassed three sales
21    increases to maintain these prices.
22        MR. WOLFE: Wait a minute. He's
23    referring to old.

131

1        MR. CASSIDY: I see that.
2  Q.  (BY MR. CASSIDY) What is Product 1544?
3  A.  It's an amine.
4  Q.  A what?
5  A.  An amine.
6  Q.  You are going to have to spell it. None of
7    us know what you are talking about.
8  A.  A-m-i-n-e.
9  Q.  The price prior to the 6 percent increase
10    referenced in this letter that you were
11    charging Carus was $2.50 per pound, correct?
12  A.  Correct.
13  Q.  Based upon their price increase, you would
14    go to $2.62 per pound, right?
15  A.  Right. There was a huge increase in the
16    price of amines.
17  Q.  What was your cost in March of 2004 for
18    amine per pound?
19  A.  I don't know.
20  Q.  Was it over 50 cents?
21  A.  I'm sure it was.
22  Q.  The 2.48 price if you had offered it to
23    Carus still would have been a profit margin

132

1    in excess of 60 percent on that item, would
2    it not?
3  A.  I don't know what the cost was, so I can't
4    confirm that.
5  Q.  Okay.
6        MR. WOLFE: Drew, we don't have a
7    question pending, is there a point you want
8    to break for some lunch?
9        MR. CASSIDY: Sure. If that's
10    what you want to do, that's fine.
11        MR. WOLFE: How long do you want
12    to take? Half hour?
13        MR. CASSIDY: Yeah. I don't eat
14    much for lunch. However much time your
15    clients want, that's fine. 45 or an hour?
16    I'll be ready in a half hour. I'll be ready
17    at 1:30.
18        MR. WOLFE: How much longer do you
19    anticipate? I won't hold you to it,
20    obviously.
21        MR. CASSIDY: I've got a couple
22    more hours.
23        MR. WOLFE: Okay.

133

1  (Discussion off the record.)
2  MR. CASSIDY:  I'll be back at
3  1:30.
4  MR. WOLFE:  Okay.  That's fine.
5  (Recess taken.)
6  (Discussion off the record.)
7  Q.  (BY MR. CASSIDY) Let's go back on.  Now
8  we're ready.  Mr. Kinsman, when we broke for
9  lunch, we had been talking a little bit
10  about the various customers with whom
11  ChemTreat either had lost business or was
12  about to and that you had spoken to them
13  about that.
14  I want to go back for a minute to
15  Carus Chemical, and tell me specifically
16  what your regular service of Carus would be
17  besides ordering chemical.
18  A.  At Carus I would go in on a weekly basis,
19  run a couple of water tests that their
20  operators didn't run at that time, and then
21  I would confer with Tom the results that I
22  had found, and then we would go to lunch.
23  Q.  Okay.  Would that -- would those water tests

134

1  and the results ever result in an adjustment
2  of the chemical composition being used?
3  A.  Tom took care of that himself.
4  Q.  But your understanding is he used your water
5  test to do that, correct?
6  A.  Yes.
7  Q.  I'm going to hand you back what was
8  previously marked as Exhibit 5 being the
9  March 12, 2004, letter to Tom Moshage.  And
10  I understand that you've testified you did
11  not take part in the preparation of this
12  letter nor even see it until just recently,
13  correct?
14  A.  Right.
15  Q.  Okay.  In the second to last sentence here
16  it indicates, We, meaning Rhema I assume,
17  will also be providing the test reagent and
18  equipment ordering service through Hach,
19  H-a-c-h, and the various equipment companies
20  as part of our regular service.
21  Do you know whether or not the
22  regular service that Rhema was intending to
23  provide to Carus includes the types of

135

1  service you just described?
2  A.  No, I don't.
3  Q.  To your knowledge, did your wife have
4  anybody as part of her company who had the
5  technical expertise to conduct water tests
6  or inspect the equipment?
7  A.  No.
8  Q.  Did you ever call on Tom Moshage and
9  represent to him that you were there on
10  behalf of Rhema?
11  MR. WOLFE:  Did you hear the
12  question?
13  THE WITNESS:  I don't understand
14  what he asked.
15  Q.  (BY MR. CASSIDY)  Did you ever make a
16  service call or a visit with Tom Moshage at
17  Carus Chemical and represent to him that you
18  were there on behalf of Rhema as opposed to
19  ChemTreat?
20  A.  I went to lunch with Tom as friends.
21  Q.  Okay.  After sales began from Rhema to Carus
22  Chemical did you continue to call on Tom
23  Moshage on a weekly basis?

136

1  A.  I called on Carus Chemical to maintain -- to
2  do maintenance service on the chemicals that
3  they had remaining from ChemTreat.
4  Q.  Okay.  And did you continue those regular
5  calls to Carus Chemical up until the time of
6  your termination from ChemTreat?
7  A.  I think that they stopped prior to that,
8  because they had used up the chemical that
9  they had remaining.
10  Q.  To the best of your recollection, do you
11  remember when that was?
12  A.  No, I don't.
13  Q.  After the last of the chemicals from
14  ChemTreat would have been used up, then
15  Carus was no longer a customer of ChemTreat
16  and you would have no reason to call on them
17  other than your friendship with Thomas
18  Moshage; is that correct?
19  A.  Correct.
20  Q.  Okay.  I'm going to -- I know you are not
21  feeling well, and I'm going to try to get
22  through this very quickly here, okay.
23  We've already talked about

1  National Manufacturing, Monmouth College,  137
2  Carus Chemical and Bob Evans Farms as
3  customers that you brought the existence of
4  Rhema to their attention.
5      I want to ask you about the
6  remaining customers that Rhema has disclosed
7  having made sales to which would include
8  Illinois Cement, the Kensington, Duke Energy
9  and Washington Group or Caterpillar AC
10  Building. Do you recognize each of those
11  customers?
12  A.  There was never a Caterpillar.
13  Q.  Do you recognize the customer that I'm
14  referring to as Washington Group?
15  A.  Yes.
16  Q.  What is the Washington Group?
17  A.  It is a service contractor for Caterpillar.
18  Q.  Okay. And that was a customer of yours, a
19  customer of ChemTreat that you called upon,
20  correct?
21  A.  Right.
22  Q.  Now, again, rather than taking you through
23  each of these individually, so I can

1  expedite this I'm going to ask about  138
2  Illinois Cement, Bob Evans -- I'm sorry.
3      MR. WOLFE:  Kensington.
4  Q.  (BY MR. CASSIDY) Illinois Cement,
5  Kensington, Duke Energy and Washington
6  Group. Did you ever call upon any of those
7  customers while employed at ChemTreat and
8  indicate that you were a representative of
9  Rhema Enterprises?
10  A.  No, not that I remember.
11  Q.  Did you ever direct any of the people at any
12  of those four companies to contact your wife
13  if they wanted to get a rebid on chemicals?
14  A.  What ones were they?
15      MR. WOLFE:  Illinois Cement,
16  Kensington, Duke, Washington Group.
17      THE WITNESS:  I don't know what
18  the Washington Group is.
19      (Discussion off the record.)
20  A.  The Kensington wasn't doing business with
21  ChemTreat. Illinois Cement -- when these
22  companies received the price increase letter
23  from ChemTreat they asked me -- or informed

1  me that they could not afford to take a  139
2  price increase.
3  Q.  So each of these four companies would be the
4  same as the four we've previously discussed?
5  A.  They all received a price increase letter
6  from ChemTreat.
7  Q.  And they indicated to you that they weren't
8  happy with it?
9  A.  Right.
10  Q.  And as with the four companies we talked
11  about before lunch, did you advise your
12  contact person at these companies that they
13  could contact your wife if they wanted to
14  try to get new bids?
15      MR. WOLFE:  Do you remember?
16      THE WITNESS:  What's that?
17      MR. WOLFE:  Did you hear his
18  question?
19  A.  I have no idea what the Washington Group is
20  there.
21  Q.  (BY MR. CASSIDY)  I thought that was a
22  service contractor that you recognized as a
23  customer of yours.

1  A.  They are -- or, I mean, they were when I was  140
2  with ChemTreat.
3  Q.  All right. So what don't you understand
4  about that?
5  A.  Would you ask the original question again?
6  Q.  Yeah. I'm just simply trying to figure
7  out -- as I said, before lunch we talked
8  about National Manufacturing, Monmouth
9  College, Carus Chemical and Bob Evans Farms,
10  and in each of those -- with respect to each
11  of those customers, you indicated that when
12  they complained about the price increase --
13  A.  When they said that they would no longer do
14  business with ChemTreat.
15  Q.  -- okay, you advised them of the existence
16  of Rhema and told them they should contact
17  your wife in rebidding. My question to you
18  is --
19  A.  They would contact my wife for a bid.
20  Q.  Right.
21  A.  They had informed me that they were no
22  longer going to do business with ChemTreat.
23  Q.  My question is, did you do the same thing

**E-FILED**
Friday, 21 July, 2006  12:08:58 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 8 - DEPOSITION OF GREGORY KINSMAN (3 OF 8)

141

1      with Illinois Cement?
2 A.  Yes.
3 Q.  And did you do the same thing with the
4      Kensington?
5 A.  They had not purchased chemical from
6      ChemTreat for a long time, and when I
7      stopped as I recall to try to resell the
8      business, they said that they would -- that
9      they had received their price increase
10     letter and they weren't interested in doing
11     business with ChemTreat.
12 Q.  And at that point did you tell them of the
13     existence of Rhema?
14 A.  Yes.
15 Q.  How about Duke Energy?
16 A.  I can't remember. I believe so. I can't
17     remember for sure.
18 Q.  Do you recall whether or not you ever
19     discussed moving the business to Rhema with
20     your contact at the Washington Group?
21 A.  I had several contacts at the Washington
22     Group.
23 Q.  Do you recall whether or not you had

142

1      mentioned to any of them that there was a
2      business out there known as Rhema with which
3      they could get a bid that perhaps would be
4      lower than yours?
5 A.  I don't remember. I don't think so.
6 Q.  Do you know a gentleman by the name of Jeff
7     Bastian?
8 A.  Yes, I do.
9 Q.  Did you ever discuss Rhema with Jeff
10     Bastian?
11 A.  Not that I remember.
12 Q.  With respect to any of the eight companies
13     we've discussed, did you ever actually
14     attempt to encourage any of them to switch
15     their business over to Rhema?
16 A.  No, I didn't.
17 Q.  All right. And with respect to any of your
18     calls to any of these companies, did you
19     ever represent yourself as a representative
20     of Rhema when you called upon them?
21 A.  The only one would be -- I did not represent
22     myself as a -- excuse me.
23           I used the Rhema name when working

143

1      with Jackie Molina at National Manufacturing
2      because her boss told her she could have
3      nothing to do with ChemTreat, and I said,
4      How do you want to -- How should I handle
5      the reports? And she said, Just use the --
6      since she was doing business, she said, Just
7      use the Rhema name.
8 Q.  So to be able to get in the door there you
9     said --
10 A.  I did not represent myself. I strictly told
11     her I was working for ChemTreat.
12 Q.  Okay. You did business with Duke Energy,
13     correct?
14 A.  Yes.
15 Q.  They were a customer of ChemTreat?
16           MR. WOLFE: Did you hear his
17     question?
18           THE WITNESS: What?
19 Q.  (BY MR. CASSIDY) Were they a customer of
20     yours with ChemTreat?
21 A.  Duke Energy?
22 Q.  Yes. I'm almost finished.
23 A.  Duke Energy bought one drum of bleach

144

1      through Ulrich Chemical through ChemTreat.
2 Q.  How often did you call on Duke Energy as a
3     sales representative for ChemTreat?
4 A.  Once per year, twice -- maybe twice per
5     year, but usually only once a year.
6 Q.  And do you recall that when you would appear
7     at Duke Energy that there was a sign-in log
8     that was to be signed?
9 A.  Yes.
10 Q.  Okay. I'll show you a page from their
11     document production here, dated
12     September 16, without a year on it. Does
13     that appear to be your handwriting, your
14     name on their sign-in sheet?
15 A.  It does.
16 Q.  What do the initials REI, which you put
17     after your name, represent?
18 A.  I'm not sure that I filled that in. I
19     usually left them -- I mean sometimes I
20     would -- because I didn't want the other
21     competitors to know who was in the facility.
22 Q.  Do you know whether or not REI after your
23     name is intended to be Rhema Enterprises,

145

```
 1        Inc.?
 2   A.   I don't know.  I don't know.  Do you have
 3        other ones here?
 4   Q.   This is the one I'm asking you about right
 5        here.  I can show you the prior year wherein
 6        you filled your name on September 3, '04 --
 7   A.   Right.
 8   Q.   -- and it showed ChemTreat Inc.
 9   A.   I wrote CTI.
10   Q.   Okay.  And here you wrote REI.  What does
11        REI stand for?
12   A.   I'm not sure I wrote that, because I usually
13        left those blank.
14             MR. WOLFE:   And you are indicating
15        10/28, G. Kinsman, blank.
16   Q.   (BY MR. CASSIDY)  You are familiar with your
17        own handwriting and printing, are you not?
18   A.   Yes.
19   Q.   In looking at the REI after your name, does
20        that appear to be your printing?
21   A.   It appears to be.
22   Q.   Okay.  And if you wrote REI in there, were
23        you intending to indicate Rhema Enterprises,
```

146

```
 1        Inc.?
 2   A.   I don't know.
 3             MR. CASSIDY:  All right.  Well, at
 4        this point -- I guess if you want to,
 5        correct me -- at the request of the
 6        defendants we're going to suspend Mr.
 7        Kinsman's deposition in that he is not
 8        feeling well and there is some time left to
 9        go with the deposition.  For the same reason
10        Mrs. Kinsman needs to take him home and will
11        not be able to give her deposition today
12        which we have an agreement we will
13        reschedule as quickly as possible, hopefully
14        next week sometime.  Correct?
15             MR. WOLFE:  Correct.
16             MICHELLE KINSMAN:  We have
17        doctors' appointments next week, so we have
18        to work around those.
19             MR. WOLFE:  I indicated my
20        calendar was open on Monday and on Tuesday.
21             MR. CASSIDY:  I guess I'm just
22        asking on the record that I'm accommodating
23        and certainly I don't want to risk anybody's
```

147

```
 1        health, but I hope we get 100 percent effort
 2        to get this in around doctors' appointments
 3        and other things as quickly as we can.
 4             I also understand that we have a
 5        deposition of another witness in this case,
 6        Tom Moshage, tomorrow afternoon.  It was
 7        scheduled this way because we wanted the
 8        Kinsmans' depositions done first.  And in
 9        exchange for this accommodation it is my
10        understanding that, Kevin, you are agreeing
11        and your clients are agreeing that they will
12        not speak with Tom Moshage prior to the
13        recommencement of the deposition and
14        completion of the depositions; is that
15        correct?
16             MR. WOLFE:  That is correct.
17             MR. CASSIDY:  Okay.  And without
18        running to court to get some order, we are
19        agreeing this is a stipulation of the
20        parties, subject to petitioning the Court
21        for contempt and/or sanctions for violation
22        of the agreement.  Fair enough?
23             MR. WOLFE:  Fair enough.
```

148

```
 1             MR. CASSIDY:  With that we will
 2        suspend it.
 3             MR. WOLFE:  It's suspended.
 4        (Discussion off the record.)
 5             MR. CASSIDY:  You can put on the
 6        record that defendants have complied with
 7        the document production request that was
 8        made part of their deposition notices by
 9        providing tax returns.
10             MR. WOLFE:  Correct.  Right.
11             MR. CASSIDY:  Thank you.
12        (The deposition was adjourned at 2:15
13        p.m., May 3, 2006.)
```

149

```
                    May 11, 2006
                     9:45 a.m.
                   Harvey & Stuckel
```

1    MR. CASSIDY:  Let the record show
2  this is the continuation of the deposition
3  of Greg Kinsman.

```
             GREGORY P. KINSMAN,
having been previously sworn, was examined and
certified as follows:
```

CONTINUED EXAMINATION BY MR. CASSIDY:

Q.  Mr. Kinsman, you understand you are still
under oath, correct?

A.  Yes.

    MR. WOLFE:  Just for the record,
we continued this.  At the time, I think it
was last week, he was on the Zyvox
antibiotic; he's still taking that, so if we
need to take a break, it's because of that,
but hopefully we can get through it this
morning.

---

150

    MR. CASSIDY:  And I will try to
get through it quickly, and please let me
know if you do need a break, and we'll be
happy to do that.

    MR. WOLFE:  Thank you, Drew.

Q.  (BY MR. CASSIDY)  Okay.  Mr. Kinsman, when
we broke last week we were talking about
various customers of both ChemTreat and
Rhema you may have called upon.

    I want to kind of switch gears now
and talk about the supply side of it a
little bit.  The chemical supplier for Rhema
was Ulrich Chemical Company; is that
correct?

A.  Yes.

Q.  Okay.  Did chemicals, any chemicals that
were procured by Rhema for its customers,
originate from any other supplier other than
Ulrich Chemical Company?

A.  Not that I'm aware of.

Q.  Okay.  Did you personally ever deal directly
with Ulrich Chemical Company on behalf of
Rhema, make orders, check shipments, any of

---

151

Q.  that type of stuff?

A.  I placed a phone order, yes.

Q.  A phone order.  Just one time?

A.  It may have been one or two.

Q.  Okay.  Do you know what customer you may
have been placing that order for?

A.  I don't remember.

Q.  Okay.  Do you know whether or not that was
done prior to October of 2005 while you were
still employed by ChemTreat?

A.  Yes, it was.

Q.  And in what capacity, just in whatever
terminology you want to use, were you acting
on behalf of Rhema when you placed an order
with Ulrich Chemical Company while still
working for ChemTreat?

A.  My wife had left me a note to call an order
in.

Q.  And, I'm sorry, I know I asked you this:  Do
you remember what customer that was for?

A.  I don't remember right offhand, no.

Q.  Okay.  Do you know a Dennis Hunter?

A.  Yes.

---

152

Q.  Who is Dennis Hunter?

A.  He's an operator at Monmouth College.

Q.  Is that somebody that you dealt with while
you were working for ChemTreat?

A.  Yes.

Q.  Okay.  What is an empty container receipt?
Do you know?

A.  Yes.

Q.  What is that?

A.  When a returnable drum is returned, a
receipt is issued for that empty drum.

Q.  Okay.  That's issued by in this case Ulrich
Chemical to show they have got the drum
back?

A.  Yes.

Q.  I want to show you -- I don't have this in a
separate exhibit, we can pull it and copy it
if you want.

    MR. WOLFE:  Which one is that?

    MR. CASSIDY:  This is from Ulrich
Chemical's records.

    MR. WOLFE:  Let's go off of this.
I'll get mine.

---

MERIT REPORTERS        309/266-7700

153

```
(Discussion off the record.)
```
Q. (BY MR. CASSIDY) Mr. Kinsman, in front of
   you is what's entitled a straight bill of
   lading from Ulrich Chemical Company, dated
   April 25, 2005.
         It appears to be a shipment order
   for a 50-pound container of calcium
   hypochlorite mixtures. Would you agree with
   that, first of all?
A. Yes.
Q. Okay. Now, on their form it indicates a
   space to list the purchase order number for
   the order that came in.
A. Right.
Q. In this case they indicate that it was a
   verbal order from Greg. Do you see that?
A. Yes.
Q. Do you know where this chemical was going,
   first of all?
A. I can't tell from this, no.
Q. Do you know whether or not this was the --
   would have been the order that you were
   telling me you made at your wife's request

155

dated April 19, 2005, and this appears to be
an order for 300 pounds of some chemicals
containing sodium sulfite, I guess. You
would agree this is a different order,
correct?
A. Yes.
Q. Okay. This also shows that it was a verbal
   order called in by you, does it not?
A. Yes, it does.
Q. So at least, according to Ulrich's records,
   you called in orders for Rhema more than
   once?
A. Yes.
Q. Now, this one is an order apparently for
   Carus Chemical Company, and they are showing
   that it was shipped directly to them. Do
   you see that?
A. Yes.
Q. Now, if we look at the documents, as I said,
   this one is signed by M -- I can't read
   it -- Schur or Shier. Do you recognize that
   name at all?
A. No, I don't.

154

on behalf of Rhema? Does this help refresh
your recollection?
A. If it was a verbal, and it has my name, I
   called the order in.
Q. Okay. Now, your signature appears on this
   document. How did that come about?
A. I'm not sure. On a verbal it's a telephone
   call.
Q. Well, this particular product shows that
   it's being shipped to Rhema Enterprises at
   754 First Street, LaSalle, Illinois. Is
   that your address?
A. That's not my address.
Q. Okay. Do you recognize that address?
A. No, I don't.
Q. Okay. Do you have any recollection as to
   whether or not you would have signed off as
   receiving the shipment?
A. No, I don't.
Q. Okay. Let's look at the next document in
   Ulrich's production or subpoena response to
   us, and this one has a handwritten No.
   191134 at the top, also a Bill of Lading,

156

Q. You don't know if that's an individual at
   Carus that might have signed this?
A. I have no idea.
Q. Did you ever -- strike that.
         Did Rhema, to your knowledge,
   issue written purchase orders to Ulrich
   Chemical, or were they always called in?
A. I don't know.
         MR. CASSIDY: Okay. Kevin, down
   about ten documents. It's preprinted 77176
   in the upper left-hand corner.
         There it is. You just passed it.
Q. (BY MR. CASSIDY) I want to show you another
   document here. It's an Ulrich Chemical,
   Inc., document entitled Empty Container
   Receipt, Ulrich Document No. 77176.
         Now, you indicated before, an
   empty container receipt is something that's
   given when an empty barrel or whatever the
   chemicals came in is returned to them,
   correct?
A. Yes.
Q. On this particular document it shows that

157

1     the empty container was received from Rhema
2     Enterprises, and you have signed as the
3     customer returning that, correct?
4  A.  Yes.
5  Q.  Okay. Also, on this document it indicates
6     LCN, which I assume is referring to LCN
7     Closers; is that correct?
8  A.  It could be.
9  Q.  Did you return containers to Ulrich Chemical
10    Company on behalf of Rhema for the customer
11    LCN, to your recollection?
12 A.  I might have.
13 Q.  Are there any other customers of Rhema that
14    you collected empty containers and returned
15    them to Ulrich?
16 A.  Yes.
17 Q.  Okay. How often would you do that?
18 A.  When I was asked to pick them up.
19 Q.  By the customer or by your wife?
20 A.  By Michelle.
21 Q.  Okay. Now, if you had no involvement with
22    Rhema Enterprises and you were actually
23    working for its competitor ChemTreat, why

158

1     would you be picking up empty containers for
2     Rhema customers and returning them to
3     Ulrich?
4  A.  Because my wife asked me to.
5  Q.  And that occurred on more than one occasion,
6     did it not?
7  A.  Yes.
8  Q.  Okay. And is it your testimony that with
9     respect to the customers from whom you would
10    have picked up empty containers in order to
11    return to Ulrich, you were not making any
12    sales to those customers on behalf of Rhema?
13 A.  Yes.
14 Q.  Okay. Where is Ulrich Chemical Company
15    located?
16 A.  Bartonville, Illinois; Indianapolis,
17    Indiana.
18 Q.  With respect to the empty container receipts
19    and where you would be returning empty
20    containers, where would you be taking them?
21 A.  Bartonville, Illinois.
22 Q.  Okay. Did you have any other business in
23    Bartonville, Illinois, on behalf of

159

1     ChemTreat during 2004 and 2005?
2  A.  I went past Bartonville every Monday.
3  Q.  Okay. On your way to where?
4  A.  Ameren-Cilco, Air Liquide.
5  Q.  Were you returning these containers to
6     Ulrich as you were driving by on Mondays
7     while calling on other customers for
8     ChemTreat?
9  A.  I dropped them off early morning before I
10    started.
11 Q.  Did you have any dealings with Ulrich
12    Chemical as a supplier while you were
13    working for ChemTreat?
14 A.  Yes.
15 Q.  Okay. So as I understand it, ChemTreat was
16    a supplier of chemicals so you could order
17    from them for your customers, but sometimes
18    you went out to third-party suppliers?
19 A.  Ulrich Chemical supplied local --
20    distributed local chemicals for ChemTreat.
21 Q.  Does Ulrich Chemical -- forgive me to the
22    extent that some of this we talked about
23    last week, but this is the problem with

160

1     breaking depositions up, you forget what
2     you've asked about. I think you and I
3     talked about the term "commodity chemical"
4     and what that references.
5  A.  Yes.
6  Q.  And you understand that the opposite of that
7     would be a special formulation or a blend of
8     chemicals. Does that make any sense?
9  A.  That's possible.
10 Q.  And when you worked for ChemTreat there were
11    specific formulations or blends used by
12    ChemTreat for certain applications, correct?
13 A.  Yes.
14 Q.  Okay. Were any of those -- well, strike
15    that.
16         Just so I don't have to keep
17    repeating myself here, what should I refer
18    to that as, a blend or special formulation
19    or some other term?
20 A.  All chemical companies have blends that they
21    use for certain applications.
22 Q.  Okay.
23 A.  Many of them are exactly the same, many are

161

1      different.
2 Q. Did Ulrich Chemical Company provide blends
3      for ChemTreat?
4 A. I'm not sure. Not that I used.
5 Q. Okay. So with respect to the -- to the
6      extent you were using Ulrich Chemical
7      Company with ChemTreat they were commodity
8      chemicals?
9 A. Yes.
10 Q. Now, the blends that are used, and let's
11      talk about ChemTreat, some of those are
12      blends that ChemTreat has come up with over
13      the years and may be used by a number of
14      customers, correct?
15 A. Could you restate that?
16 Q. Well, does ChemTreat have a list of blends,
17      for instance, over the years, with
18      ChemTreat, this blend works pretty good for
19      this application?
20 A. Yes.
21 Q. And are there also certain blends that are
22      created specifically for a single customer
23      application?

162

1 A. Sometimes.
2 Q. Okay. When that is done, is it the sales
3      rep who formulates that blend or determines
4      what amounts of different chemicals to put
5      together?
6 A. It's the chemists that work for the
7      companies that put them together.
8 Q. Would that be based upon some water analysis
9      testing they did, and then after that is
10      done you get together with them and say what
11      should we put together for this particular
12      customer?
13 A. It can be in certain applications.
14 Q. Now, with respect to the blends that
15      ChemTreat has come up with over the years
16      and uses for a number of different customer
17      applications, is there a list of those
18      provided to its sales reps?
19 A. There is a list of all chemical names.
20 Q. Okay. And when you say chemical names, are
21      we talking about a name given to a blend?
22 A. A number.
23 Q. Okay. And is that contained in your

163

1      employee handbook, or how do you get that as
2      a sales rep?
3 A. It comes out with the pricing book.
4 Q. Do you know whether or not Ulrich Chemical
5      Company ever blended chemicals to come up
6      with what we've been referring to as a blend
7      for use by Rhema in a customer application?
8 A. Yes.
9 Q. When a number of chemicals are blended
10      together to create -- or combined together
11      to create a blend, is it mandated that a
12      MSDS be prepared for this new end product?
13 A. Yes.
14 Q. In this scenario where a sales rep for a
15      chemical supplier, such as yourself, would
16      determine a blend that they want to use in a
17      certain application and they contact the
18      chemical company to create that blend, who
19      prepares the MSDS?
20      MR. WOLFE: Let me object. I
21      think your hypothetical misstates some of
22      the earlier testimony. I believe you said
23      the chemist of the company put together the

164

1      formulation, and maybe it's just a
2      misinterpretation here.
3      MR. CASSIDY: Well, let me go back
4      then. Fair enough.
5 Q. (BY MR. CASSIDY) When Ulrich would create a
6      blend for Rhema who determined what
7      chemicals to use to create this blend?
8      MR. WOLFE: Objection.
9      Speculation. You can answer, if you know.
10 A. Ulrich's chemists.
11 Q. Similar to what you said with ChemTreat,
12      that some water analysis would be done and
13      Ulrich would tell your wife what blend
14      should be put together for that application?
15 A. No. Ulrich blends chemicals for several
16      companies out there.
17 Q. Okay. They did not do that for ChemTreat,
18      though, correct?
19 A. ChemTreat blends their own chemicals.
20 Q. Okay. When Rhema -- strike that.
21      Do you know how Rhema became
22      aware of what blends Ulrich had in order to
23      be able to utilize them for their customers?

165

1  A.  When?
2  Q.  How that information became known to your
3      wife?
4  A.  I asked them.
5  Q.  Were there, to your knowledge, any blended
6      products prepared by Ulrich for Rhema that
7      were specific to Rhema, in other words they
8      didn't already have this blend, they were
9      asked by you or your wife to prepare a
10     certain blend?
11 A.  Would you repeat that again?
12 Q.  Sure.  As you indicated Ulrich Chemical
13     Company, as I think you indicated most
14     chemical companies, have certain blends that
15     they have used similar to what you said
16     ChemTreat has, correct?
17 A.  Right.
18 Q.  But there are instances where an individual
19     company needs a specific blend that might be
20     prepared by a sales rep and/or chemists for
21     that particular application, correct?
22 A.  Sometimes.
23 Q.  Okay.  Do you know whether or not there was

166

1      any such specific blended formulation
2      prepared by Ulrich for a Rhema customer?
3  A.  Not for a specific customer that I'm aware
4      of.
5  Q.  Would any blended formulation provided by
6      Ulrich for Rhema customers have been blended
7      formulations that they use -- that they
8      already had, in other words?
9  A.  Some.
10 Q.  Some or all?  Do you understand what I'm
11     asking you?
12 A.  Not really.
13 Q.  All right.  Let me --
14 A.  I'm trying to understand.
15 Q.  Okay.  Let me see if I can clear it up,
16     because formulation, blends, I'm getting
17     confused myself.
18         Did Rhema, to your knowledge, ever
19     contact Ulrich Chemical Company and say,
20     "Look, I need you to put together this blend
21     for me; I have a customer that uses this
22     combination of chemicals, you don't normally
23     provide it, but here is the blend I would

167

1      like you to mix up for me"?
2  A.  Yes.
3  Q.  Okay.  And was that done by you or your
4      wife?
5  A.  By myself.
6  Q.  And for what customer?
7  A.  No specific customer.
8  Q.  When that is done, Ulrich is basically
9      coming up with a new product based upon your
10     specifications?  Go ahead, correct me if
11     what I'm saying is wrong.  I don't want to
12     misstate anything.
13 A.  They have several mixtures, and there may be
14     a modification to an existing mixture.
15 Q.  Okay.  Based upon your request?
16 A.  Right.
17 Q.  When that is done, does there need to be an
18     MSDS prepared for this new mixture?
19 A.  That depends on the hazardous chemicals
20     involved in the mixture.
21 Q.  Do you know whether or not any MSDSs were
22     created, irrespective of who created them,
23     due to a modification of a chemical that was

168

1      requested by Rhema?
2  A.  I don't know for sure.
3  Q.  Okay.  Which would answer my next question.
4      You didn't prepare any MSDS sheets, correct?
5  A.  No.
6  Q.  When you purchased from -- I know you are
7      not a lawyer, but the law requires when
8      chemicals are delivered to a distributor or
9      an end customer that an MSDS accompany those
10     chemicals, correct?
11 A.  Correct.
12 Q.  In Ulrich's case do the MSDS sheets come to
13     you for delivery to the customer -- I should
14     say to Rhema, or do they get shipped
15     directly to the customer?
16 A.  I don't know.
17 Q.  Okay.  Do you or does Rhema, to your
18     knowledge, ever receive copies of material
19     safety data sheets for chemicals sold to any
20     of its customers?
21 A.  I think I saw one upstairs, yes.
22 Q.  Okay.  Well, let me go back to your years
23     with ChemTreat.  As you sold to ChemTreat I

169

```
 1   assume, similar to what Ulrich does,
 2   ChemTreat would direct ship to your
 3   customers?
 4 A. Correct.
 5 Q. It wouldn't come to you and you have to
 6   deliver all over, right?
 7 A. No.
 8 Q. Did ChemTreat provide MSDS sheets to you as
 9   a sales rep when you made sales to your
10   customers?
11 A. The MSDS sheets went directly with the
12   first-time order to the customers.
13 Q. Okay. And were copies provided to you as a
14   sales rep or no?
15 A. We could get the MSDS if we needed it.
16 Q. But not as a matter of course? I mean,
17   routinely whenever a new one was issued to a
18   customer, they wouldn't automatically copy
19   you on it; is that right?
20 A. No.
21 Q. Is that the same situation with Ulrich, you
22   could get one if you needed it, but they
23   didn't routinely provide the MSDS to the
```

170

```
 1   sales rep?
 2 A. I don't know.
 3 Q. Okay --
 4           MR. WOLFE:  Are we getting into
 5   another area, and did you want to mark these
 6   sheets?
 7           MR. CASSIDY:  If you want me to
 8   mark them, I will.
 9           MR. WOLFE:  I think, to keep the
10   record clear, we should mark those and make
11   them part of the record.
12           MR. CASSIDY:  I don't want to take
13   your copies.
14           MR. WOLFE:  I'll make quick
15   copies.
16        (Recess taken.)
17    (Exhibit Nos. 7 through 9 marked.)
18 Q. (BY MR. CASSIDY)  Okay. Mr. Kinsman, you
19   had mentioned before that a company assigns
20   a number to a specific chemical that they
21   refer to it as, correct?
22 A. Yes.
23 Q. Okay. Does Ulrich have a price list or
```

171

```
 1   available chemical list that lists the name
 2   of the chemical and a corresponding number
 3   so you would know how to order it?
 4 A. No. I would call -- when I worked -- when I
 5   was still employed by ChemTreat, I would
 6   call in and order the chemical by name.
 7 Q. Okay. All right. Let me show you this.
 8   This is Ulrich Chemical Company Invoice No.
 9   165918. This is a -- an order from Rhema
10   for Duke Energy from November 30, 2004, and
11   it shows here what is being sold as sodium
12   hypochlorite. Do you see that?
13 A. Yes.
14 Q. Okay. Sodium hypochlorite would be a basic
15   chemical, correct? It's generic or
16   commodity chemical?
17 A. It's a bleach.
18 Q. Now, the reason I showed you that was to
19   differentiate it from, for instance, Invoice
20   No. 161703, which is an order from Rhema for
21   National Manufacturing, dated November 4th,
22   2004, and in here it refers to what is being
23   sold as the blend RE 660. Do you see that?
```

172

```
 1 A. Yes.
 2 Q. And we can go through these chemicals -- or
 3   through these invoices, but I'm going to try
 4   to cut it short here. RE 820, RE 730, a
 5   whole series of RE numbers that we're going
 6   to see. Are you familiar with those RE
 7   numbers?
 8 A. I didn't place this -- I mean I have no idea
 9   what this order is.
10 Q. Do you know what RE -- blend RE 660 is?
11 A. I can't tell you.
12 Q. Okay. Do you know whether or not the blend
13   numbers that begin RE and then some
14   three-digit number are the numbers assigned
15   to chemicals by Ulrich for all of their
16   blended products?
17 A. No.
18 Q. Okay. Is that specific to Rhema?
19 A. I don't know. You would have to ask Ulrich.
20 Q. Okay. Do you know whether or not Rhema as a
21   company assigned numbers to certain
22   chemicals for ordering inventory purposes?
23 A. I don't know.
```

173

1 Q. Okay. Do you personally have any paperwork
2   from Ulrich Chemical that identifies the
3   chemicals that make up any of its blends?
4 A. Do I personally have a list? No, I do not.
5 Q. Okay. Do you know whether or not such a
6   list exists that Ulrich Chemical would give
7   to its distributors?
8 A. I do not.
9 Q. Okay. Let's just check on a couple others
10   here without referring to the invoice. Do
11   you know what blend RE 720 is?
12 A. It's been so long since I've done anything
13   with chemicals, I can't keep track.
14 Q. Assuming that ChemTreat is selling the same
15   blend of chemicals as Ulrich, it would have
16   a different number, correct? ChemTreat has
17   its numbers, Ulrich would have its numbers,
18   right?
19 A. Every company has different numbers.
20 Q. Okay. If I take you through the dozen or so
21   RE numbers that appear on these invoices,
22   are you going to know what any of them are?
23   Again, I'm just trying to short circuit

174

1   this.
2 A. I can't remember.
3 Q. Okay. Do you know whether or not any of the
4   blended products, such as blended RE 720, or
5   820 or 660, are blends that were modified by
6   Ulrich at the request of Rhema?
7         MR. WOLFE: I'll just object based
8   on speculation since he doesn't know what
9   they are.
10         You can go ahead, if you are able.
11 A. What do you mean "modified"?
12 Q. (BY MR. CASSIDY) Well, before when we were
13   talking about blends and you indicated that
14   if a sales rep needed a certain product for
15   a certain customer they might ask them to
16   modify their blend in a certain way to have
17   different chemicals in it. I was trying to
18   refer to it as modified instead of blend,
19   because that term is getting overused here
20   this morning.
21         MR. WOLFE: Could you read back
22   the original question now that we have that.
23         (Record read.)

175

1 A. Modified would mean that they were already
2   existing. I don't know.
3 Q. (BY MR. CASSIDY) Well, correct me if I'm
4   wrong, I believe about ten, fifteen minutes
5   ago you testified to me that there were
6   occasions with respect to Rhema orders that
7   you had requested a modification of some
8   existing product they have in order to meet
9   a customer's need. That's what I'm
10   referring to.
11 A. Right.
12 Q. Do you know -- would you know what the
13   identifying number from Ulrich is, the
14   blend's RE number, which would refer to any
15   product that you requested be prepared in a
16   certain fashion?
17 A. It's possible. I don't remember.
18 Q. When you did that, when you would contact
19   Ulrich and ask them to prepare a certain
20   product according to your specs, do you just
21   do that orally, or do you have to submit
22   some sort of paperwork to show how much of
23   each chemical you want in the blend?

176

1 A. I checked to see what existing blends they
2   had available to see if there was an
3   application. That was it.
4 Q. Okay. And if they didn't, you requested
5   that they modify what they had to meet your
6   needs, correct?
7 A. Right.
8 Q. When you did that, did you simply ask them
9   orally to reconfigure their blend this way
10   or did you have to submit it in writing
11   somehow?
12 A. I believe I was asked what was to be in it,
13   I told them orally.
14 Q. Okay. When you asked Ulrich to modify some
15   existing blend they had to meet your needs,
16   were you -- was your intent to obtain a
17   product that matched the product that you
18   were already selling to those customers
19   through ChemTreat?
20         MR. WOLFE: Maybe you just
21   clarified my question. Could you define
22   what you mean by your needs.
23 Q. (BY MR. CASSIDY) Well, I'll just re-ask the

177

1  question.  In these instances when you asked
2  Ulrich for a specialized blend was the new
3  blend you were asking them to create
4  identical to a blend that you had been
5  providing to the customers through
6  ChemTreat?
7  A.  No.
8  Q.  How did you determine what modification to
9  the Ulrich blends you wanted if you didn't
10  have the chemists from ChemTreat to help you
11  formulate that?
12  A.  I've been in this business for 16 years, I
13  know what the basic ingredients are.
14  Q.  In order to make the determination as
15  to what blend is needed, would you require a
16  water analysis?
17  A.  No.
18  Q.  When you requested Ulrich to modify its
19  existing products to come up with a new
20  blend for Rhema's use, would any type of
21  formulation documentation be produced, in
22  other words, something that will come out
23  and say here is product RE 720, here is what

178

1  is in it, so that you would keep track of
2  what blends and what number had been
3  assigned to them?
4  A.  No.  An MSDS sheet was created when it was
5  blended, and that's all there is.
6  Q.  Okay.  Well, I was more interested in so
7  that you could know what number Ulrich may
8  have assigned to this new product, for lack
9  of a better term, that it was creating for
10  Rhema's use.
11  A.  Was that a question?
12  Q.  Yeah.  Well, I'm trying to clarify my
13  question so you understand it.  Does that
14  help at all?
15     MR. WOLFE:  I don't think it did.
16  Q.  (BY MR. CASSIDY)  Okay.  Let's assume that
17  for a particular customer, and just because
18  we've been throwing Carus out, I'm not
19  saying it was done for Carus, but let's say
20  for Carus you've called Ulrich and asked
21  them to modify some existing product
22  slightly, or whatever amount, for Carus'
23  use.  They do that, you send the order --

179

1  A.  I didn't send any orders.
2  Q.  Okay.  Rhema provides the product to Carus.
3  When it comes time for Rhema to reorder --
4  or for Carus to reorder that specific
5  product, how is it known what number has
6  been assigned to it?
7  A.  Michelle would know.
8  Q.  Okay.  Now, you testified that you didn't
9  need the chemists at ChemTreat to know how
10  you might need to modify a particular
11  product because you've been in this business
12  for so long and you simply know what
13  chemicals should go in there, correct?
14  A.  Correct.
15  Q.  Your wife has not been in the chemical
16  business for the past ten or twelve years,
17  correct?
18  A.  Correct.
19  Q.  In your opinion does she have the expertise
20  to determine what modifications might need
21  to be made to an existing blend or chemical
22  for a particular customer's needs?
23  A.  I would believe that that would be left up

180

1  to Ulrich.
2  Q.  Well, I'm following up on your testimony
3  that you would determine what a particular
4  customer needs and how to tell Ulrich to
5  modify it without any --
6  A.  If a product did not already exist.
7  Q.  Right.  That's right.  And you would know if
8  what product is needed existed and what
9  modifications needed to be made to create
10  this product based upon your experience and
11  expertise in the field, correct?
12  A.  Correct.
13  Q.  And it would be based on that expertise you
14  would call Ulrich and tell them or request
15  them to modify a particular product to now
16  meet this need, right?
17     MR. WOLFE:  And I guess that's
18  where I'm getting -- having a little trouble
19  when you say "this need."  Maybe we need to
20  be clear.  Are you talking about the needs
21  for or on behalf of which vendor?
22     MR. CASSIDY:  Well, it doesn't
23  matter whether it's for ChemTreat or for

181

1　Rhema.
2　　　　MR. WOLFE: So your question is
3　just generically if he's calling Ulrich,
4　right?
5　Q.　(BY MR. CASSIDY) Well, let's stick with
6　　　Rhema. I believe there has been testimony
7　　　that you did this on behalf of Rhema and
8　　　asked that a certain product be modified for
9　　　a particular use and that you knew how to do
10　　that based upon your expertise in the field.
11　A.　Yes.
12　Q.　My question to you is, do you believe that
13　　　your wife has the same expertise to know
14　　　what modifications should be made to an
15　　　existing product for a particular use?
16　A.　Probably not.
17　Q.　Okay. Would it be fair to say then that
18　　　your wife would not -- or Rhema absent your
19　　　expertise would not have been in a position
20　　　to have chemicals modified for particular
21　　　customer uses?
22　A.　I guess she would have had to have used a
23　　　blend that was already existing.

182

1　Q.　So in these instances where a blend that
2　　　wasn't already in existence needed to be
3　　　used by Rhema for one of its customers, that
4　　　required your expertise to get done,
5　　　correct?
6　A.　Not necessarily. Ulrich has their own
7　　　chemists and they blend their own products.
8　Q.　Okay. But I'm talking about the instance
9　　　where you have now described to me that a
10　　sales rep would call in and make a specific
11　　modification request as opposed to asking
12　　Ulrich what modification should be made.
13　　　　My point is, based upon that
14　　scenario that we've been talking about for
15　　the past twenty minutes, Rhema absent your
16　　expertise would not be able to do that;
17　　isn't that correct?
18　A.　I called ChemTreat several times when a
19　　product didn't work and asked them what
20　　needed to be changed.
21　Q.　Okay. That's not -- with all due respect,
22　　Mr. Kinsman, I'm not talking about asking
23　　the chemical company what needs to be

183

1　changed.
2　　　　I'm talking about the scenario
3　that you've testified to me where you are
4　telling them what modification to make, and
5　I'm asking you, isn't it true that Rhema had
6　nobody other than yourself who would have
7　the expertise or qualifications to be able
8　to make such a chemical composition
9　determination and instruct the chemical
10　company what to do?
11　　　　MR. WOLFE: I would object based
12　upon foundation.
13　　　　You can go ahead if you're able
14　to answer.
15　A.　I don't believe that's true.
16　Q.　(BY MR. CASSIDY) Okay. Well, you've
17　　already told me you don't believe your wife
18　　has that technical expertise, correct?
19　A.　Ulrich is a very successful chemical company
20　　that's been in business for years. They
21　　have blends for other companies. They have
22　　chemists that blend. I believe that they
23　　would have been able to put a chemical

184

1　together for her had she requested it. It
2　may not have worked --
3　Q.　Okay.
4　A.　-- but they would have provided her with a
5　　chemical.
6　Q.　But I'm not asking again what Ulrich is
7　　recommending. I'm talking about the
8　　scenario that you've testified to where the
9　　call comes in and tells Ulrich what they
10　　want made, and my question to you is, does
11　　your wife with no input from you have the
12　　qualifications or technical expertise to
13　　make that determination of what
14　　modifications should be made to an existing
15　　product?
16　　　　MR. WOLFE: I believe that
17　　particular question has been answered.
18　Q.　(BY MR. CASSIDY) Okay. And I believe the
19　　answer to that was, no, you don't believe
20　　she does have that expertise?
21　　　　MR. WOLFE: Right, and you were
22　　moving to the next scenario.
23　Q.　And are there any other employees of Rhema

185

1  Elpis Enterprises other than your wife?
2  A. Not that I'm aware of.
3  Q. Okay. So any expertise that Rhema Elpis
4     Enterprises would have would necessarily
5     have to come from your wife as the sole
6     employee, owner, officer, director,
7     whatever, correct?
8  A. I guess so.
9  Q. Have you ever had an Ulrich product list?
10 A. Ulrich product list, could you explain what
11    you mean by an Ulrich product list?
12 Q. A list of the products that Ulrich sells
13    whether it be a commodity chemical or its
14    blends that it routinely uses?
15 A. If I needed a product for a specific
16    application with ChemTreat, I would just
17    call and ask.
18 Q. Okay. You indicated that when you were --
19    that over the years with ChemTreat that
20    sometimes products would be ordered from
21    Ulrich, though, right?
22 A. All the time.
23 Q. Okay. And was that done by somebody at

186

1  ChemTreat after you submit an order or would
2  that come directly from you as a sales rep?
3  A. Both.
4  Q. And for you to be able to make such an
5     order, refer to it by proper number, et
6     cetera, would you have had a product list
7     from Ulrich?
8  A. No.
9  (Exhibit No. 10 marked.)
10 Q. Okay. I'll show you what I've marked as
11    Kinsman Exhibit 10. I'll state for the
12    record that this was an affidavit entitled
13    Affidavit of Gregory P. Kinsman that was
14    filed in this lawsuit. Do you recognize
15    that document?
16 A. Would you repeat the question again?
17 Q. Do you recognize it? Have you ever seen it
18    before?
19 A. Yes.
20 Q. Who prepared it?
21 A. I answered the questions for this.
22 Q. You mean you provided the information that
23    has been incorporated into this affidavit,

187

1  correct?
2  A. Yes.
3  Q. Okay. And then it was prepared by somebody
4     else and presented back to you to sign?
5  A. Yes.
6  Q. And that is your signature on it, correct?
7  A. Yes.
8  Q. And you read it before you signed it to make
9     sure it was accurate, correct?
10 A. Yes.
11 Q. All right. I want to go through it here.
12    Paragraph No. 1 indicates, quote, I was
13    formally employed by ChemTreat, Inc., as a
14    salesman. When did you cease being a
15    salesman for ChemTreat?
16 A. I believe October 11.
17 Q. Of?
18 A. 2005.
19 Q. All right. And we've already talked about
20    when you started with ChemTreat. Were you
21    consistently employed by ChemTreat from your
22    start back in '94, '95 until the time in
23    October of 2005?

188

1  A. Yes.
2  Q. And did you consider yourself a full-time
3     employee of ChemTreat?
4  A. Yes.
5  Q. What did you understand your obligations to
6     ChemTreat as a full-time salesman were?
7  A. To sell and service accounts for ChemTreat.
8  Q. Okay. Did you have any understanding as to
9     whether or not as a full-time sales rep for
10    ChemTreat you were obligated to represent
11    them exclusively in the chemical business?
12 A. Yes.
13 Q. No. 2, quote, I am not currently employed in
14    any form or fashion either by myself, by
15    Michelle M. Kinsman individually or by Rhema
16    Elpis Enterprises, LLC, end quote.
17    I want to clarify what is meant by
18    this paragraph and I note it uses the term
19    "currently." Have you at any time been
20    employed in any form or fashion by Rhema
21    Elpis Enterprises?
22 A. No.
23 Q. So your intention here in Paragraph 2 was

189

1  not to limit it to the date of execution of
2  this document, but you were referencing at
3  any time in the past; is that correct?
4  A.  Correct.
5  Q.  Okay. And I also want to clarify what you
6  intended to mean by use of the word
7  "employed." In swearing to this Paragraph 2
8  were you limiting yourself to the formal
9  term of employee, or were you intending to
10  state that you never acted or represented
11  Rhema irrespective of the definition of
12  employee? Does that make any sense at all?
13        MR. WOLFE:  Do you understand?
14  A.  I don't understand the question, no.
15  Q.  (BY MR. CASSIDY) An employee can have a
16  specific legal meaning. What I'm trying to
17  figure out is whether you intended to
18  incorporate that specific legal meaning of
19  employee or whether or not you are swearing
20  to the fact that you have never acted in any
21  capacity for Rhema Elpis Enterprises?
22        MR. WOLFE:  I guess I would just
23  object. If you want to give him the legal

190

1  definition of employee and see if that's
2  what he meant, what you mean by that term.
3        MR. CASSIDY:  I understand
4  employee is someone who is on the payroll of
5  a particular company.
6        MR. WOLFE:  That's how I
7  understand it, too.
8  Q.  (BY MR. CASSIDY) Are you limiting your
9  sworn statement; in Paragraph 2 are you
10  limiting it to that capacity at the present
11  time?
12  A.  Yes.
13  Q.  Have you acted or represented Rhema Elpis
14  Enterprises in any capacity other than as an
15  employee?
16  A.  I called in a couple of orders for Michelle
17  when she was out of town.
18  Q.  Okay.
19  A.  I dropped off some drums on my way through
20  Peoria.
21  Q.  Okay. Other than those instances you did
22  not act as a representative of Rhema Elpis
23  Enterprises?

191

1  A.  Not that I can remember.
2  Q.  Paragraph 3 reads, quote, Rhema Enterprises,
3  LLC, is a single-member limited liability
4  company owned by Michelle Kinsman with
5  Illinois Limited Liability Act Business Code
6  No. 454390. I own no portion of that
7  business, period, end quote.
8        Other than having an ownership
9  interest in the business, do you -- have you
10  profited in any manner as a result of the
11  existence of Rhema Elpis Enterprises?
12        MR. WOLFE:  I object to vagueness
13  of the phrase "have you profited." Are you
14  asking him if he's received distributions,
15  payments or just in the family relationship?
16  Q.  (BY MR. CASSIDY) Well, let me ask you this:
17  Do you recognize that if your wife earns
18  income that as your wife's husband living in
19  a marital relationship that you equally
20  benefit from that income, correct?
21  A.  I guess that would be true.
22  Q.  So irrespective of whether or not you have
23  any ownership interest in Rhema Elpis

192

1  Enterprises, its existence and its success
2  would benefit you, correct?
3  A.  Yes.
4  Q.  Paragraph 4 reads, quote, Michelle Kinsman,
5  my wife, is not a 'strawman'; she has a
6  business degree from the University of
7  Wisconsin and runs the day-to-day operations
8  of Rhema. I am not working and have applied
9  for disability benefits from the Social
10  Security Administration due to my illness,
11  end quote.
12        First of all, let me ask you what
13  your understanding of the term "strawman"
14  is, that you would be able to make a sworn
15  statement that your wife is not a strawman.
16  A.  I'm not real sure what that term means.
17  Q.  Okay. It indicates your wife has a business
18  degree from the University of Wisconsin.
19  What is the degree, specifically? Is it a
20  BS in business administration?
21  A.  Business administration.
22  Q.  Okay. Do you know whether or not there are
23  any subdegrees or subspecialties of the

193

1   degree?
2   A.  I'm not aware.
3   Q.  When did she receive her bachelor of science
4       in business administration?
5   A.  I don't know the date.
6   Q.  Okay.  Prior to the creation of Rhema Elpis
7       Enterprises, Inc., in 2004, did your wife
8       ever work in the chemical field to your
9       knowledge?
10  A.  No.
11  Q.  Does she have any other degrees other than
12      the business administration degree?
13  A.  I don't know.
14  Q.  To your knowledge, does she have any
15      chemistry training?
16  A.  Not that I'm aware of.
17  Q.  Or any training in the field of chemical
18      sales or water treatment chemical sales?
19              MR. WOLFE:  Did you hear him?
20              THE WITNESS:  Was that a question?
21      No, I didn't hear him.
22  Q.  (BY MR. CASSIDY)  Other than any degrees or
23      ever working in the chemical field, to your

194

1       knowledge, has she ever undergone any
2       training in the field of chemical sales or
3       specifically water treatment chemical sales?
4   A.  She was married to me for 15 years while I
5       did it.
6   Q.  Okay.  Other than the marriage, is there any
7       formal training that you are aware of?
8   A.  Not that I'm aware of.
9   Q.  Have you received disability or is the
10      application pending?
11  A.  I've received disability.
12  Q.  Okay.  When was disability approved?
13  A.  December sometime.
14  Q.  Of '05?
15  A.  Yes.
16  Q.  Did you apply for the disability yourself or
17      did you obtain representation for that?
18  A.  I applied for it myself.
19  Q.  I assume the illness that we're referencing
20      is what we talked about last week?
21  A.  Yes.
22  Q.  The issues with your foot, correct?
23      Specifically what illness were you granted

195

1   disability for?
2   A.  Fabry's and osteomyelitis.
3   Q.  Okay.  Subsequent to the granting of
4       disability in December of 2005 have you
5       continued to call on any of your former
6       customers for any reason?
7   A.  No.
8   Q.  Okay.  Would that include Tom Moshage at
9       Carus Chemical?
10  A.  We went to lunch.
11  Q.  Okay.
12  A.  We are friends.
13  Q.  Okay.  It would be --
14  A.  That's not a sales call.  It's a luncheon --
15  Q.  You are saying a nonprofessional capacity;
16      you just met with him?
17  A.  Yes.  Right.
18  Q.  Are you aware that Carus Chemical continues
19      to buy product from ChemTreat?
20  A.  Yes.
21  Q.  Do you know who is calling upon them as a
22      sales rep?
23  A.  No one that I know of.

196

1   Q.  Paragraph 5 of the affidavit, quote, I have
2       never diverted customers from ChemTreat to
3       Rhema and I have never 'admitted' to anyone
4       that I diverted customer accounts from
5       ChemTreat to Rhema, end quote.
6               How do you define the term
7       "divert" as you've used it in this
8       affidavit?
9   A.  Divert would mean to tell them not to do
10      business with ChemTreat, to do business with
11      Rhema when they were actively purchasing
12      chemical from ChemTreat.
13  Q.  Okay.  Would you consider a diversion only
14      if the customer stopped purchasing from
15      ChemTreat and started purchasing from Rhema?
16  A.  Would you say that again.
17  Q.  Well, you defined it as telling a customer
18      not to buy from ChemTreat and start buying
19      from Rhema, and my question to you is, let's
20      assume that a customer, based upon
21      information received from you as to the
22      existence of Rhema, began purchasing
23      chemicals from Rhema but continued to

197

```
1   purchase from ChemTreat. Would you consider
2   that a diversion?
3           MR. WOLFE:  He also defined it as
4   if actively purchasing from ChemTreat. You
5   left that out of your question, but go
6   ahead.
7  A.  Now, I forgot what the question was.
8           MR. WOLFE:  I'm sorry.
9  Q.  (BY MR. CASSIDY)  Do you want me to re-ask
10   it?
11 A.  Yes.
12 Q.  Okay.
13          MR. WOLFE:  You are asking him
14   about additional definitions, whether he
15   would agree or disagree.
16          MR. CASSIDY:  I'm really trying to
17   see how narrow he makes it. His definition
18   is a customer that's actively purchasing
19   from ChemTreat and it would be a diversion
20   if you told them to stop buying from
21   ChemTreat and start buying from Rhema.
22 Q.  (BY MR. CASSIDY)  My question to you is, if
23   we expand that and suggest that they have
```

198

```
1   not been told to stop buying from ChemTreat,
2   but were asked to start purchasing some of
3   their product from Rhema, would you consider
4   that a diversion of that customer as you've
5   used the term in your affidavit?
6           MR. WOLFE:  Asked by him?
7           MR. CASSIDY:  Excuse me?
8           MR. WOLFE:  Asked by him to
9   purchase?
10          MR. CASSIDY:  Yeah.
11 Q.  (BY MR. CASSIDY)  I guess my question is,
12   would you limit it only to a customer that
13   completely stopped doing business with
14   ChemTreat?
15 A.  I guess I missed that one, too.
16 Q.  Okay.
17 A.  I don't know what the difference is.
18 Q.  All right. Let me retry.
19 A.  Okay.
20 Q.  Would you consider it a diversion if you
21   while still employed with ChemTreat made a
22   sale to a ChemTreat customer on behalf of
23   Rhema?
```

199

```
1  A.  I didn't make any sales on behalf of Rhema.
2  Q.  I'm asking you hypothetically if you would
3   consider it a diversion of a customer if a
4   ChemTreat sales representative made a sale
5   on behalf of another chemical company while
6   still employed by ChemTreat; would that be a
7   diversion of that customer in your opinion?
8           MR. WOLFE:  Objection.  Calls for
9   a legal conclusion and lacks factual
10   foundation in a hypothetical.  You can
11   answer.
12 A.  If a customer was no longer doing business
13   with ChemTreat and had informed me that
14   they were no longer doing business with
15   ChemTreat -- I lost my train of thought
16   again.
17          MR. WOLFE:  Can you read back his
18   hypothetical, and I won't interrupt.  We'll
19   understand the same objection.  She's going
20   to read back his hypothetical.
21          THE WITNESS:  Okay.
22          [Record read.]
23 A.  The rep is not the one that made the sale or
```

200

```
1   don't I understand it or still not
2   understand it?
3  Q.  I'm not asking you what factually happened.
4   I'm asking a hypothetical situation.  Let's
5   put a name to it, to see if we can help
6   here, okay.
7           Let's assume that Mike Klausegger
8   while working for ChemTreat went to one of
9   his customers, Commerce Bank Building, an
10   existing customer of ChemTreat, he's selling
11   chemicals to them; while still employed by
12   ChemTreat being paid by ChemTreat he goes in
13   and makes a sale on behalf of a competitor
14   of ChemTreat.  Would you consider that a
15   diversion of Commerce Bank from ChemTreat to
16   the competitor?
17 A.  Mike himself makes the sale?
18 Q.  Yes.
19 A.  No bid process, nothing involved?
20 Q.  Nothing involved.
21 A.  I guess if he was selling pricing for
22   another company, that might be a diversion.
23 Q.  As a sales rep of ChemTreat, do you
```

201
1   understand that your exclusive loyalty
2   should be to ChemTreat?
3   A.   Yes.
4   Q.   And in that regard a sales rep who owes a
5        exclusive loyalty to ChemTreat irrespective
6        of whether or not the customer has said they
7        may stop using ChemTreat --
8   A.   Or have stopped.
9   Q.   -- or have stopped, do you consider it to be
10       exercising exclusive loyalty to try to get
11       them to buy from another chemical company?
12  A.   I guess I don't understand getting them to
13       buy.  How?
14  Q.   Well, you're a sales rep.  Isn't it your job
15       to get people to buy?
16  A.   For the company you are employed by.
17  Q.   Okay.  It would not be your job to get them
18       to buy from another company, correct?
19  A.   Not to sell pricing.
20  Q.   So if a sales rep did sell product for
21       another company while employed by ChemTreat,
22       would you consider that to be a diversion of
23       a customer as you've used in -- as you've

202
1   referenced that term in Paragraph 5 of your
2   affidavit?
3            MR. WOLFE:   I have to interpose an
4        objection, because we're talking in terms
5        of -- what do you mean, sell?  Maybe you
6        need to narrow that down.
7   Q.   (BY MR. CASSIDY)  Whatever activity you may
8        do as a sales rep for any company over the
9        past twelve years to make a sale; whether or
10       not the sale is called in by you or directly
11       by the customer, it's your job to convince
12       that customer that they should buy product
13       from ChemTreat, correct?
14  A.   Right.
15  Q.   Sometimes they call in the order directly,
16       sometimes they make it through you, correct?
17  A.   Yes.
18  Q.   Either way it's considered a sale made by
19       you, correct?
20  A.   Yes.
21  Q.   Okay.  So if the activities of yourself as a
22       salesman result in the sale to another
23       company while you are still employed by

203
1   ChemTreat, would you consider that a
2   diversion of that customer?
3            MR. WOLFE:   Assuming he did the
4        exact same sales activity for the other
5        customer?
6            MR. CASSIDY:   Any activity that
7        resulted in a sale to the competing company.
8   A.   Several times in the field we tell our
9        customers, current customers, to go out and
10       get bids to see how we are competitively
11       priced.  I've done that on several
12       occasions; I said, "Go get a bid from Betz,
13       go get a bid from Crown Engineering."
14  Q.   (BY MR. CASSIDY)  What was the purpose of
15       that?
16  A.   What is the purpose to do that?
17  Q.   To show that you are competitive, correct?
18  A.   Right.
19  Q.   When you told various customers to give your
20       wife a call, was it your intention to prove
21       that ChemTreat was competitively priced so
22       you could keep the business or was it your
23       intention that if ChemTreat did lose the

204
1   business you wanted your wife to get it?
2   A.   When I was informed that ChemTreat no longer
3        had the business or had, in fact, lost the
4        business, it was another option for them,
5        compared to the -- in comparison to the
6        competitors I had fought against all my
7        life.
8   Q.   It was your intention to have your wife get
9        the business as opposed to Nalco or Betz or
10       somebody else, correct?
11  A.   It was to give the customer another option.
12  Q.   You didn't give them the option of Nalco or
13       Betz, did you?
14  A.   Nalco and Betz were already mentioned as
15       being considered.
16  Q.   Okay.  Now, let me go back to where we were,
17       because I'm trying to understand what you
18       have sworn to the Court in Paragraph 5 here.
19       So I'm going to go back to my question.
20            If through your sales efforts
21       while calling on a ChemTreat customer as a
22       ChemTreat sales rep you have achieved a sale
23       for a competing company, would you consider

**205**

1    that a diversion of that customer?
2 A.   It's up to the other companies to get the
3     business once I've lost it.
4          MR. WOLFE: So is that a no or a
5    yes?
6          THE WITNESS: What was the
7    question again? I'm sorry, I'm having a
8    terrible time focusing on this.
9 Q.   (BY MR. CASSIDY) That's why I want you to
10    view it as a hypothetical and view it in the
11    context of what you are saying in
12    Paragraph 5 as opposed to what you may have
13    done or what the evidence may show later in
14    this case.
15         I'm asking you to assume that a
16    sales representative employed by ChemTreat
17    calling on a ChemTreat customer takes steps
18    by bringing up the name of the company,
19    asking to get bids from that other company,
20    results in a sale to that competing company,
21    would you consider that a diversion of a
22    customer?
23 A.   No.

**206**

1 Q.   In your mind would it only be a diversion if
2    you or a sales rep for ChemTreat convinced
3    that customer to stop buying from ChemTreat?
4 A.   I must be missing something. I just
5    don't --
6 Q.   Let me ask a new hypothetical.
7          MR. WOLFE: Before we get into it,
8    is this a new line?
9          MR. CASSIDY: No, no. Same line.
10    I'm trying to get him to understand the
11    question.
12          MR. WOLFE: I think we might want
13    to take a break unless you object to that.
14          MR. CASSIDY: I don't object. As
15    I said, anytime you need a break, we'll take
16    a break.
17          MR. WOLFE: All right. Let's take
18    five.
19           (Recess taken.)
20 Q.   (BY MR. CASSIDY) Okay. When we broke, Mr.
21    Kinsman, we were talking about Paragraph 5
22    of your affidavit trying to clarify the
23    extent of what you considered a diversion.

**207**

1         Let me just try to get us past
2    this point here. To paraphrase your earlier
3    testimony as to what you mean by diversion
4    you indicated that if a sales rep would come
5    in to an existing customer and attempt to
6    get them to stop buying from ChemTreat and
7    to buy from another company, that would be a
8    diversion, correct?
9 A.   Correct.
10 Q.   Okay. So it's your sworn statement in this
11    affidavit that you have never done that with
12    any of your ChemTreat customers, correct?
13 A.   Correct.
14 Q.   And if we go and talk to your contact person
15    at each of these companies, none of them are
16    going to tell us that you personally tried
17    to get them to switch companies; is that
18    correct?
19 A.   Correct.
20 Q.   Okay. Paragraph 6, the affidavit is
21    self-explanatory, and I'm going to skip past
22    that.
23         Paragraph 7 reads, and I quote,

**208**

1    Rhema manufactures no products and there is
2    no disclosure of information relative to
3    proprietary information of ChemTreat to
4    Rhema, end quote.
5         Mr. Kinsman, with respect to that
6    we've discussed at some length today the
7    issue of blends and modifying blends for
8    particular customer uses.
9          MR. WOLFE: Drew, can you speak up
10    a little bit.
11 Q.   (BY MR. CASSIDY) So this will just follow
12    up on that a little bit. If, as you
13    testified earlier, for a customer of
14    ChemTreat you utilized the ChemTreat
15    chemistry department to assist you in
16    formulating a special blend for a customer,
17    would you consider that a proprietary
18    formulation of ChemTreat?
19 A.   That would happen on very limited occasions.
20 Q.   But if it happened, would you consider that
21    formulation the proprietary property of
22    ChemTreat?
23 A.   It could be, yes.

**E-FILED**
Friday, 21 July, 2006  12:10:18 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 8 - DEPOSITION OF GREGORY KINSMAN (4 OF 8)

209

1   Q.  Okay. And so if hypothetically that
2      proprietary formulation that was put
3      together with the chemists of ChemTreat was
4      taken and produced through another
5      manufacturer for sales by Rhema, would you
6      consider that the use of ChemTreat's
7      proprietary information by Rhema?
8            MR. WOLFE: The exact same
9      formula?
10          MR. CASSIDY: Yes.
11  Q.  (BY MR. CASSIDY) If you took the formula
12      ChemTreat created with your assistance and
13      provided it to a new manufacturer, asked
14      them to start producing that so that you
15      could sell it on behalf of Rhema, would you
16      recognize that as an improper use of
17      ChemTreat's proprietary property?
18  A.  If it was an exact copy?
19  Q.  Yes.
20  A.  It could be, yes.
21  Q.  Okay. And is it your testimony that that
22      has not occurred with respect to you,
23      ChemTreat and Rhema?

210

1  A.  Yes.
2  Q.  Okay. Paragraph 8 is a little longer, but
3      I'm still going to read it verbatim. On or
4      about September 5th, 2003, I was advised by
5      Daniel J. O'Brien, manager of Sales
6      Development, Midwest, that as a result of
7      plant closures at LTV, ChemTreat had lost a
8      little over $200,000 in business which would
9      be difficult to recover. I was further
10      advised that due to my illness, it had been
11      difficult to maintain a satisfied customer
12      base and they were determined to have a
13      backup representative for me. All of this
14      information was provided to Randy Azzarelo,
15      end quote.
16            I want you to explain to me what
17      the significance of this information is.
18      What is it you are trying to tell the Court
19      and me by putting this in the affidavit?
20            MR. WOLFE: To the extent you are
21      requesting his opinion on relevance, I would
22      object.
23  Q.  (BY MR. CASSIDY) Okay. I mean I guess if I

211

1      looked at you and very simply said what's
2      your point, how would you respond to that?
3  A.  I believe that was in response to a
4      question.
5  Q.  Okay. This affidavit is different from the
6      Answers to Interrogatories. This is not
7      answers to questions. So I guess my
8      question to you is, with that clarification,
9      how is this information -- what is the point
10      of giving us this information in response to
11      allegations that you improperly created a
12      competing business?
13            MR. WOLFE: Well, in addition,
14      Drew, I think this is also in response to
15      some affidavits and petitions for the
16      temporary restraining order that would have
17      been filed in this case, and so I think it's
18      a little unfair to ask him the relevance of
19      it. Maybe the Court should ask me.
20            MR. CASSIDY: Well, again --
21            MR. WOLFE: I think they are
22      setting forth facts, and to the extent you
23      want to dissect those, perhaps that would be

212

1      a better --
2  Q.  Well, I don't know how to address each of
3      the points made in this paragraph without
4      understanding what it is you are trying to
5      tell me, and there have been some
6      allegations in this lawsuit, although not
7      formally filed, that there was an improper
8      firing of you, and I don't know how to
9      address that without understanding the
10      specifics of such an allegation.
11            Are you suggesting here that you
12      were being moved out because you were ill?
13  A.  That's my belief.
14  Q.  Okay. And what is it about a communication
15      from Daniel O'Brien that the plant closure
16      at LTV had cost ChemTreat a little over
17      $200,000 that leads you to believe that you
18      were intentionally moved out of ChemTreat?
19            MR. WOLFE: He's just asking you
20      with regard to that phrase.
21  A.  Dan was sent here, I was notified by Randy
22      Azzarelo that Dan O'Brien was coming to talk
23      to me about my performance and evaluation.

213

1  Q.  Okay. And are you suggesting that the
2      combination of losing $200,000 in business
3      due to the LTV plant closure and what they
4      referenced as an unsatisfied customer base
5      were excuses to take away your territory?
6  A.  That was part of it, yes.
7  Q.  And I guess I'm just trying to make sure, is
8      that the suggestion you are making here in
9      this affidavit, that, yeah, they came to me,
10     they gave me these excuses and that was the
11     start of them running me out? Is that what
12     you are trying to say?
13  A.  Yes, sir.
14  Q.  Is it your opinion that your firing from
15     ChemTreat had nothing to do with the fact
16     that your wife had created a competing
17     business and taken some of the ChemTreat
18     customers?
19  A.  Several ChemTreat employees' wives have
20     businesses.
21  Q.  That directly compete with ChemTreat?
22  A.  According to the contract they are supposed
23     to devote 100 percent of their time just as

214

1     I am to ChemTreat. That's not being done.
2  Q.  Are you telling me that other ChemTreat
3     employees' spouses have businesses that
4     compete directly with ChemTreat?
5  A.  No, I'm not.
6  Q.  Okay. They have other businesses, but those
7     businesses are not in competition with
8     ChemTreat, correct?
9  A.  I'm not sure.
10  Q.  Okay. So I go back to my question. Is it
11     your opinion that your firing from ChemTreat
12     was, for lack of a better term, preordained
13     and that the existence of Rhema and the loss
14     of customers through Rhema was not actually
15     the basis of your termination?
16  A.  I believe that.
17     (Exhibit No. 11 marked.)
18  Q.  (BY MR. CASSIDY) Okay. I'll ask you to
19     take a moment and review what I've marked as
20     Exhibit 11. It purports to be a September
21     3, 2003, letter from Daniel O'Brien.
22            MR. WOLFE: I'm sorry, Drew, was
23     there a 12?

215

1           MR. CASSIDY: We're not to 12 yet.
2  Q.  (BY MR. CASSIDY) First of all, do you
3     recognize this document? Do you recall ever
4     receiving this letter from Daniel J.
5     O'Brien?
6  A.  I think so.
7  Q.  Okay. The second paragraph talks about the
8     LTV plant closure and the $200,000 in lost
9     business, correct?
10  A.  Correct.
11  Q.  Okay. And the first paragraph on Page 2
12     talks about your customer base and
13     satisfaction, correct?
14  A.  Yes.
15  Q.  And the second paragraph on Page 2 discusses
16     getting you backup to support your business,
17     correct?
18  A.  Correct.
19  Q.  Okay. Each of the three issues raised in
20     Paragraph 8 of your affidavit are in this
21     letter. Is this the correspondence that you
22     are referring to in Paragraph 8 when you say
23     on September 5th, 2003?

216

1           MR. WOLFE: Is this letter what
2     you were referring to?
3           THE WITNESS: Yes.
4  Q.  (BY MR. CASSIDY) Okay. Now, in the first
5     paragraph on Page 2, I'll read verbatim,
6     quote, I know you recently began struggling
7     with a tough illness. To your credit, you
8     have been able to maintain a satisfied
9     customer base, which was demonstrated when
10     we visited MG Industries and two of your
11     Caterpillar facilities. We will support
12     your efforts and want you to contact us if
13     you need any help during this difficult
14     time, end quote.
15          First of all, for the record, did
16     I read that accurately?
17  A.  Yes.
18  Q.  And contrary to what your affidavit says,
19     that it had been difficult to maintain a
20     satisfied customer base, this letter from
21     Daniel J. O'Brien is actually giving you
22     credit for maintaining a satisfied customer
23     base, is it not?

217

1 A.  Yes.
2 Q.  Okay.  So what is contained in the affidavit
3      is inaccurate, would you agree with me, with
4      respect to the satisfied customer base?
5 A.  I guess it may have been worded incorrectly.
6 Q.  Okay.  Now, the letter specifically, the
7      second to last paragraph, talks about the
8      plan to convert you on January 1st, 2004, to
9      full commission, and it goes on to state,
10     quote, "Considering your situation, we will
11     pay you a salary of $69,000 and continue to
12     pay your expenses for your leased
13     automobile.  We will pay you this through
14     June 31st of 2004 and reevaluate your
15     situation at that time.  If you are unable
16     to work for health reasons, this would not
17     apply, end quote.
18           We discussed this a little bit
19     last week during the deposition that --
20     well, strike that.
21           Do you understand Dan O'Brien in
22     this letter to you where he says considering
23     your situation we will withhold the switch

218

1      to straight commission as referring to your
2      health situation?
3 A.  I'm really not sure what situation he's
4      talking about.
5 Q.  Okay.  As we discussed last week, if you
6      were at all limited due to health issues in
7      calling upon your customers, it is a benefit
8      to you to have remained on part salary plus
9      commission as opposed to going straight
10     commission, correct?
11 A.  There was no -- this salary of 69 did not
12     include any commission.
13 Q.  All right.  It's your testimony that from
14     January 1st of 2004 to the time you went to
15     straight commission you received a salary
16     with no commission?
17 A.  See, I think up here they were talking about
18     at 31 percent commission, that it would be
19     approximately 69,000, and I think what they
20     did -- I can't remember for sure -- I think
21     they just put me on a salary of 69 to make
22     sure that I made that much.
23 Q.  If the records showed you were paid $69,000

219

1      plus 10 percent commission and that that was
2      the same financial arrangement you had prior
3      to January 1st of 2004, are you suggesting
4      those records are inaccurately stating the
5      facts?
6 A.  I'm not sure, no.
7 Q.  Okay.  Now, back to my question.  If due to
8      your health situation you were at all
9      limited in calling on customers, procuring
10     sales, remaining on a salary was of benefit
11     to you as opposed to going to straight
12     commission; would you agree?
13 A.  I continued to call on my customers all the
14     way through.  I didn't not call on my
15     customers.
16 Q.  Did you understand the question?
17 A.  I think they were trying to say -- you were
18     trying to say even if I didn't call on my
19     customers that I would still be paid the
20     69,000.  I never stopped calling on my
21     customers.
22 Q.  What I'm saying is, remaining on a salary,
23     your prior financial arrangement before any

220

1      discussion of going to straight commission,
2      was of financial benefit to you, correct?
3 A.  Unless I had some big sales, yes.
4 Q.  And is that how you understood this letter
5      is that we are going to do this for you to
6      allow you to try to resolve these health
7      issues?
8 A.  I think at the time I did.
9 Q.  The letter concludes by stating, "Please
10     stay in touch over the next few months as
11     you work with Mike to keep us all up to date
12     on the progress with your health and
13     business activity," and it also states
14     earlier in the letter, "We will support your
15     efforts and want you to contact us if you
16     need any help during this difficult time."
17     Did you request any help from ChemTreat to
18     maintain a satisfied customer base when you
19     were dealing with these health issues?
20 A.  I continued to work.  My customers were
21     happy.
22 Q.  So would it be true that you were never in a
23     situation where you requested some

| | 221 |
|---|---|
| 1 | assistance from them which they declined? |
| 2 | Would that be fair? |
| 3 | A. I made telephone calls asking questions, |
| 4 | they supplied me with their best advice. |
| 5 | That's all I needed. |
| 6 | Q. Were there any occasions where due to your |
| 7 | health issues you requested assistance or |
| 8 | backup from ChemTreat and that was denied |
| 9 | you? |
| 10 | A. No. |
| 11 | Q. Okay. However, here in Paragraph 9 of your |
| 12 | affidavit you state, quote, Since |
| 13 | September 5th, 2003, ChemTreat, Inc. has |
| 14 | been and has continued to provide little or |
| 15 | no support to my efforts at selling their |
| 16 | product." Isn't that contrary to what you |
| 17 | just testified to, that they never refused |
| 18 | to give you support? |
| 19 | A. No, that's not true. |
| 20 | Q. Okay. How is it different? |
| 21 | A. I called concerning a major sale that I had |
| 22 | already done a proposal for, and they told |
| 23 | me -- I was told by the director of the |

| | 222 |
|---|---|
| 1 | technology division at ChemTreat that they |
| 2 | did not want the business. |
| 3 | Q. Who was the potential customer? Do you |
| 4 | remember? |
| 5 | A. It was the Wal-Mart facility in Sterling, |
| 6 | Illinois. |
| 7 | Q. Do you know when that was? |
| 8 | A. 2004. |
| 9 | Q. Okay. And you were told -- what type of |
| 10 | assistance did you request from them? |
| 11 | A. Technical assistance. |
| 12 | Q. Okay. To prepare a bid or what? |
| 13 | A. Yes, check my numbers on a bid. |
| 14 | Q. And they refused to do that stating that |
| 15 | they didn't want the business? |
| 16 | A. The individual I talked to said that they |
| 17 | did not want Wal-Mart business. In his |
| 18 | opinion Wal-Mart was not a company to do |
| 19 | business with. |
| 20 | Q. Did they refuse to give you the technical |
| 21 | assistance that you were requesting? |
| 22 | A. They told me they did not want the business. |
| 23 | Q. That's not my question. My question is, |

| | 223 |
|---|---|
| 1 | irrespective of what this individual said as |
| 2 | to whether or not they wanted the business, |
| 3 | did they refuse to provide with you the |
| 4 | technical assistance you were requesting? |
| 5 | A. When I was told that they did not want the |
| 6 | business, I did not pursue it any further. |
| 7 | The proposal had already been submitted. |
| 8 | Q. Who told you that? |
| 9 | A. Norm Fahrer. |
| 10 | Q. What's his position with ChemTreat? |
| 11 | A. He's the head of the technical division. |
| 12 | Q. Was it your understanding that as head of |
| 13 | technical division Norm Fahrer made the |
| 14 | ultimate decision as to which customers |
| 15 | ChemTreat did or didn't want? |
| 16 | A. Would you repeat that again. |
| 17 | Q. Is it your understanding that as head of the |
| 18 | technical department that Norm Fahrer was |
| 19 | the final say within ChemTreat as to which |
| 20 | customers they wanted or did not want? |
| 21 | MR. WOLFE: Objection. Vague. |
| 22 | Final say for him or for ChemTreat? |
| 23 | MR. CASSIDY: For ChemTreat. |

| | 224 |
|---|---|
| 1 | MR. WOLFE: Go ahead. |
| 2 | A. I had already submitted the bid. |
| 3 | Q. Without the technical assistance? I thought |
| 4 | you needed the technical assistance to |
| 5 | prepare the bid? |
| 6 | A. I wanted my numbers checked. |
| 7 | Q. Okay. |
| 8 | A. It was gone. |
| 9 | Q. Okay. Now, do you understand my question as |
| 10 | to whether or not Norm Fahrer had the |
| 11 | authority to tell you what customers |
| 12 | ChemTreat wanted or did not want? |
| 13 | A. Does he have final authority? |
| 14 | Q. Yes. |
| 15 | A. No. |
| 16 | Q. Did you go over his head? Did you talk to |
| 17 | Dan O'Brien, manager of the sales |
| 18 | development for Midwest, to ask him why you |
| 19 | could not get assistance? |
| 20 | A. No. |
| 21 | Q. Okay. Would you agree with me that Dan |
| 22 | O'Brien would more likely be an individual |
| 23 | at ChemTreat that would tell you what |

225

1  customers they wanted and did not want?
2  A.  I can't answer that with any certainty.
3  Q.  Okay.  Is there any other instances you can
4      tell me about where you requested any
5      assistance or support from ChemTreat
6      subsequent to September 5th, 2003, where it
7      was refused to you?
8  A.  I think that was the main one.
9  Q.  Were there more minor ones?
10 A.  I can't remember.
11 Q.  You testified last week in the first part of
12     your deposition that the customers who told
13     you they were considering leaving ChemTreat
14     or had already decided to leave ChemTreat
15     was over pricing issues?
16 A.  Correct.
17 Q.  Were there any service issues that caused
18     ChemTreat to lose or caused you to lose any
19     business that were a direct result of the
20     failure of ChemTreat to support you in your
21     job?
22 A.  Could you repeat that again?
23         MR. CASSIDY:  Can you read it

226

1  back.
2           (Record read.)
3  A.  Not that I can remember.
4  Q.  (BY MR. CASSIDY)  Okay.  In fact, was there
5      anything other than price increasing that,
6      to your knowledge, cost ChemTreat any
7      business in your market?
8  A.  I think that was the main one.
9  Q.  Okay.  Paragraph 10, we talked about this a
10     little bit last week, and without reading it
11     verbatim, in Paragraph 10 you are opining
12     that you were dismissed from ChemTreat
13     because of your health issues which are
14     costing them money through their insurance,
15     correct?
16 A.  Correct.
17 Q.  And other than anything we discussed last
18     week, what have you ever been told by
19     anybody connected with ChemTreat that leads
20     you to believe that your health insurance
21     costs were the basis of your termination?
22 A.  Can you repeat that..
23           (Record read.)

227

1  A.  I guess just the discussions we had with Dan
2      that indicated to me that he was concerned
3      about my health.
4  Q.  The discussions in September of 2003?
5  A.  I had -- I've talked to him on other
6      occasions by phone where he's asked me how
7      I'm doing.
8  Q.  Okay.
9  A.  Am I -- okay.
10 Q.  And is it your opinion that these were not
11     actual concerns for your health, but,
12     rather, some indication of concern of what
13     you were costing the company?
14 A.  That's my belief.
15 Q.  Did Dan O'Brien ever say anything
16     specifically that would point you to that
17     conclusion?
18 A.  No, but we got several letters from -- or we
19     got notifications from ChemTreat regarding
20     chemical -- or not chemical costs -- health
21     insurance costs.
22 Q.  All right.  Did you save those?
23 A.  No, but I'm sure I can get them.

228

1  Q.  Did any of them indicate in the letter that
2      if you did not get the medical costs under
3      control that it could be a reason for your
4      dismissal?
5  A.  No.  It said it was jeopardizing our
6      company's profit as a whole.
7  Q.  And you did not save those?
8  A.  No.
9  Q.  Who sent those?  Do you know who signed off
10     on them?
11 A.  They went to all the salespeople.  It was
12     not just a letter to me.  It was a generic
13     letter.
14 Q.  Referring to overall health costs?
15 A.  Right.
16 Q.  Was there any reference in that letter
17     specifically to the costs of your treatment
18     and what effect it was having on ChemTreat?
19 A.  No.
20 Q.  Other than these general letters that went
21     out to all the ChemTreat employees, what
22     other evidence of any kind, oral statements
23     by a person, documentation, anything, that

229

1  forms the basis of your opinion that this
2  was due to your health issues and health
3  costs as opposed to any other issue?
4  A.  Not that I can remember right now.
5  Q.  Paragraph 11 of the affidavit indicates --
6  well, I'll read it, quote, While plaintiff
7  has characterized these various accounts as
8  their customers, in reality they have had
9  little contact with ChemTreat over the past
10  two years.  Ingersoll Rand last did business
11  with ChemTreat on January 26, 2004, and it's
12  first sale date was in November of 2002.
13  Monmouth College last did business with
14  ChemTreat on October 18, 2004, and first did
15  business with ChemTreat in August of 2002.
16  Bob Evans Farms last did business with
17  ChemTreat in February of 2004.  Illinois
18  Cement last did business with ChemTreat in
19  August of 2004.
20          First of all, with respect to
21  Ingersoll Rand and Monmouth College, from
22  your perspective why is it relevant as to
23  when these companies first began purchasing

230

1  from ChemTreat?  Are you just trying to
2  indicate they were short-term customers?
3          MR. WOLFE:  To the extent you are
4  requesting him to answer on the legal
5  significance, I'll object.
6  A.  I can't remember what that was in response
7  to.
8  Q.  (BY MR. CASSIDY)  Okay.  Specifically
9  Monmouth College here, it says last did
10  business with ChemTreat on October 18, 2004.
11  Was that before or after the first purchases
12  by Monmouth College from Rhema, if you know?
13  A.  I don't know.
14  Q.  Okay.  Do you know whether or not Monmouth
15  College bought any chemicals from any
16  company between the time it stopped doing
17  business with ChemTreat and the time it made
18  its first purchase from Rhema?
19  A.  I don't know.
20  Q.  Okay.  It indicates Bob Evans Farms last did
21  business with ChemTreat in February of 2004.
22  Was that before or after its first purchase
23  from Rhema?

231

1  A.  I don't know.
2  Q.  Was that before or after the creation of
3  Rhema?
4  A.  I don't know.
5  Q.  Do you know whether or not they bought any
6  product from any company between the time
7  they stopped purchasing from ChemTreat and
8  the time they began purchasing from Rhema?
9  A.  I don't know.
10  Q.  It indicates that Illinois Cement last did
11  business with ChemTreat in August of 2004.
12  Do you know whether or not that was before
13  or after their first purchase from Rhema?
14  A.  I don't know.
15  Q.  Do you know whether or not between the time
16  they stopped doing business with ChemTreat
17  in August of 2004 and their first purchase
18  with Rhema whether they bought any product
19  from any other company?
20  A.  They bought chemicals from other companies.
21  Q.  As a substitute for what ChemTreat was
22  selling them?
23  A.  I don't know.  I don't think so.

232

1  Q.  Do you know whether or not -- well, strike
2  that.
3          August of 2004 was certainly after
4  Rhema was in business and selling, correct?
5  A.  I don't know what the actual date of startup
6  was.
7  Q.  Paragraph 12 references your efforts to
8  maintain service and represent ChemTreat,
9  but despite that -- I'm paraphrasing -- that
10  you were told by these customers that the
11  ChemTreat product was overpriced and, quote,
12  that they did not wish to discuss -- or did
13  not wish to do business with ChemTreat as
14  they were currently offering their services,
15  end quote.
16          What services are you referring to
17  that ChemTreat was offering other than
18  price?
19  A.  I guess the service of providing chemical.
20  Q.  Okay.  Well, as we've already established,
21  the primary reason that any company gave you
22  for wanting to leave ChemTreat was their
23  price, correct?

233

1  A.  Correct.
2  Q.  As opposed to any poor service, correct?
3  A.  Correct.
4  Q.  And any service that was given on behalf of
5      ChemTreat to any particular customer,
6      whether it be water analysis, boiler
7      inspection, whatever it may be, you were the
8      individual for ChemTreat providing that
9      service, correct?
10 A.  Correct.
11 Q.  Okay.  So to the extent any customer may
12     have left due to poor service, that would --
13     they would be referring to the service you
14     were providing them?
15 A.  Not necessarily.  I had several complaints
16     -- I had customers with several complaints
17     on delivery, service delivery.
18 Q.  Being late or what?
19 A.  The truck would show up without a drop gate,
20     the drums were dropped out of the back of
21     semis onto tire piles, poor delivery
22     service.
23 Q.  Did any company give you that as the reason

234

1      why they were considering or had already
2      made a decision to switch from ChemTreat?
3  A.  That was one of the reasons.
4  Q.  What company specifically gave you that
5      reason?
6  A.  Kensington, St. Mary's Square.
7  Q.  Were these chemicals that were shipped
8      directly from ChemTreat?
9  A.  Yes.
10 Q.  Did ChemTreat use a common carrier?  Did
11     they have their own carriers?
12 A.  Common carriers.
13 Q.  Okay.  So the delivery issues that were
14     taking place were the result of some company
15     that ChemTreat had contracted with to ship
16     the stuff, correct?
17 A.  Correct.
18            (Exhibit No. 12 marked.)
19 Q.  (BY MR. CASSIDY)  I'll show you what I have
20     marked as Exhibit 12.  Do you recognize that
21     document?
22 A.  Yes, I do.
23 Q.  What is it?

235

1  A.  It is a business proposal, put together by
2      ChemTreat's group.
3  Q.  For the Wal-Mart Distribution Center in
4      Sterling, Illinois?
5  A.  Yes.
6  Q.  Is this the bid you were talking about
7      previously when you indicated that
8      Mr. Fahrer would not check your numbers
9      because he didn't think they wanted the
10     business?
11 A.  He told me that he didn't think Wal-Mart was
12     a company to do business with.
13 Q.  My only question to you is, is this the bid
14     that you were referring to before?
15 A.  It appears to be.
16 Q.  Okay.  And last week when we talked about
17     whether after the creation of Rhema you ever
18     procured any new business for ChemTreat and
19     you indicated Wal-Mart, would this also be
20     what you were referencing in that testimony?
21 A.  Yes.
22 Q.  Who -- I realize this shows it as a
23     ChemTreat document.  Who prepared this

236

1      proposal?
2  A.  It was prepared in the documents department.
3  Q.  Of ChemTreat?
4  A.  Yes.
5  Q.  Okay.  What was your role in preparing this
6      document?
7  A.  I put the bid specs together.
8  Q.  Tell me how this comes about.  You are told
9      that this distribution center is being built
10     in Sterling, they are going to need a
11     chemical supplier.  What's your next step?
12     Tell me how you first became aware of it.
13 A.  They had contacted ChemTreat saying that
14     they wanted a bid on this facility.  They
15     sent me --
16 Q.  I don't mean to interrupt you, but so I
17     don't have to go back, was that a request to
18     you as the sales rep or ChemTreat's
19     corporate office?
20 A.  Corporate office.
21 Q.  It was your area so they directed it to you?
22 A.  Right, I got it.  They mailed it to me.  I
23     received it three weeks -- or they did not

237

1  mail it until three weeks after they
2  received it at corporate. I received it the
3  day before the bid was due.
4  Q. Okay.
5  A. So it was quickly put together. That's why
6  I wanted verification on my numbers.
7  Q. How did you put it together? Was there an
8  existing facility that you had to go
9  inspect, that you did a water analysis, or
10 were you going based upon plans and
11 specifications?
12 A. Based on specifications.
13 Q. So you put together this proposal -- I'm
14 sorry. The technical specifications you
15 said?
16 A. They sent technical specifications with
17 their RFB.
18 Q. Then do you provide -- did you then provide
19 that information back to ChemTreat's
20 document department to put this together?
21 A. Yes.
22 Q. And is that also at their corporate in
23 Virginia?

238

1  A. Yes.
2  Q. Okay. So based upon your specifications for
3  what you wanted to bid, corporate put this
4  document together and got back to you, is
5  that right, or did they submit it?
6  A. They submitted it directly because it was so
7  late.
8  Q. At what point in this process did you talk
9  with Mr. Fahrer to ask him to check your
10 numbers?
11 A. The day that I was preparing, the day of or
12 the day after. While this was being
13 prepared at ChemTreat I called and asked to
14 double check my numbers.
15 Q. So you've put together the technical
16 numbers. You got it to the ChemTreat's
17 document department. While it's being
18 prepared in the department, you called the
19 technical division to double check your
20 numbers?
21 A. Yes.
22 Q. That wasn't done, so basically your numbers
23 were produced by ChemTreat and submitted for

239

1  approval to Refrigeration Systems Company,
2  correct?
3  A. Correct.
4  Q. After the initial submission there were some
5  minor revisions to the proposal?
6  A. Several, in fact.
7  Q. And were those done by yourself or done by
8  corporate?
9  A. By myself.
10 Q. Did you return your revisions back to the
11 ChemTreat document department to prepare or
12 did you do all of the document preparation
13 for those?
14 A. They were sent to Mr. Gary Mills at RSC.
15 Q. The revision documents?
16 A. Right.
17 Q. Who prepared the revision documents?
18 A. Well, some -- let's see.
19 Q. Was it similar to this where it was your
20 technical expertise, but it was actually
21 ChemTreat preparing the hard documents?
22 A. Some of the parameters were not met because
23 this was such a short-term project, it was a

240

1  two-day turn around, so there were things
2  that were left out. They needed updated
3  information and revisions on things that
4  were not included in the proposal.
5  Q. And those were provided?
6  A. Right.
7  Q. My question is, I have the document, I just
8  didn't want to mark them, but, for instance,
9  here is a letter -- we can mark these if you
10 want -- a February 4th letter from yourself
11 to Gary Mills just indicating that you are
12 including the updated information, and then
13 there is an addendum.
14 A. I think there were several of these letters
15 that were sent out.
16 Q. This was all prepared by you and directed to
17 Gary Mills yourself?
18 A. Right.
19 Q. That's really all I was trying to figure
20 out.
21    So corporate's involvement in the
22 preparation of the documents was the initial
23 bid process, any changes or addendums, and

241

```
1    things, that was done by you with Gary
2    Mills, correct?
3  A. Correct.
4  Q. Was this an open bid, a competitive bid, or
5    was ChemTreat exclusively requested to give
6    the proposal?
7  A. I don't know.
8  Q. In any event, the proposal was approved and
9    accepted by Refrigeration Systems Company on
10    behalf of Wal-Mart, correct?
11  A. Right.
12           (Exhibit No. 13 marked.)
13  Q. I'll show you what is marked as Exhibit 13.
14    Do you recognize that as the purchase order
15    that was issued by Refrigeration Systems
16    Company?
17  A. Yes, I do.
18  Q. Reflecting acceptance of this proposal,
19    correct?
20  A. Yes.
21  Q. And the prices contained in this purchase
22    order are the prices that were proposed
23    after all of the revisions, and everything,
```

242

```
1    correct?
2  A. They were in this proposal here.
3  Q. My question is, this purchase order is for
4    the entire proposal; they accepted this
5    thing 100 percent, and this purchase order
6    reflects the entire order, correct?
7  A. Yes.
8  Q. How is it that on a ChemTreat proposal
9    submitted by you as senior area manager of
10    ChemTreat, Inc., that the purchase order was
11    issued to ChemTreat in care of Rhema Elpis
12    Enterprises?
13  A. I met with Mr. Gary Mills in Sterling,
14    Illinois, at his trailer. Gary wanted an
15    address where he could fax information and
16    diagrams. I gave him the telephone number.
17    I faxed that number. I faxed him back the
18    information that he required and that
19    letterhead showed up from the fax machine.
20  Q. You mean the automatic printing that you
21    might get from a fax machine, or did you
22    actually fax over a document that had a
23    letterhead on it?
```

243

```
1  A. No. I faxed him a diagram and other
2    information to RSC.
3  Q. So when you say -- when you said the
4    letterhead of Rhema appeared on the fax, you
5    are meaning like the time and date and
6    number of pages type of information that fax
7    machines print out on documents?
8  A. He asked me for an address, and that's the
9    address that I provided him with, and that's
10    what showed up on the -- that's on our fax.
11        MR. WOLFE:  I think you two are
12    missing each other. You see this line when
13    you fax something, and it will say -- it
14    will have a company and a number. Is that
15    where he got the information or was it on a
16    printed letterhead that was faxed? I think
17    that is what he is trying to find out.
18        THE WITNESS:  No, it was not on a
19    printed letterhead. He asked me what
20    address he could fax things to, and that is
21    where the fax machine is at, and that's how
22    he got that address.
23  Q. (BY MR. CASSIDY)  So when it came out on his
```

244

```
1    end, your fax machine, as almost all fax
2    machines do, printed some information across
3    the top as to the sender, the date it was
4    sent, number of pages, as we see on these
5    exhibits, correct?
6  A. I provided him with this number, with this
7    address, because that is the address for my
8    wife's office, and that is where he
9    corresponded -- he faxed me diagrams. He
10    wanted to bypass the two to three weeks that
11    it was taking to send stuff through
12    ChemTreat.
13  Q. I'm not interested in the address. I'm
14    interested in the care of Rhema Elpis
15    Enterprises and what gave him the idea that
16    he was dealing with a company by the name of
17    Rhema Elpis Enterprises.
18  A. I gave him that address for our fax and for
19    the E-mail. He wanted to be in contact with
20    me without having to spend two to three
21    weeks with ChemTreat.
22  Q. When you gave him that fax information did
23    you tell him to fax it to Rhema Elpis
```

245

1  Enterprises?
2  A.  Our fax machine has and our answering
3     machine has one number.
4  Q.  Okay.  Let me show you your affidavit again,
5     not for any of the content of the affidavit.
6     Do you see across the top here, among a
7     number of other numbers -- some of this is
8     from the court and everything else -- that
9     printed across the top of this document it
10    shows a date, it says Harvey & Stuckel;
11    that's your attorney's firm, correct?
12 A.  Correct.
13 Q.  Showing the number of pages, the date they
14    went out.  That's what I refer to as the
15    information that the fax machines
16    automatically place on documents when they
17    are sent.  Do you understand that?
18 A.  Yes.
19 Q.  Is that what you are telling me was the
20    information that Mr. Mills received showing
21    Rhema Elpis Enterprises?  It was just
22    automatically printed on his documentation
23    when you used that fax machine; is that what

246

1  you are telling me?
2  A.  I told Mr. Mills that this was the address
3     of my wife's office and this was the fastest
4     way to get information to me.
5  Q.  I understand where he got the number.  I'm
6     trying to figure out why he prepared a
7     document that shows Rhema Elpis Enterprises,
8     LLC.
9  A.  Why would --
10       MR. WOLFE:  Don't speak.  I
11    believe he's answered that question.  I
12    believe he's telling you that he gave him
13    this information because that's where he
14    was.  And what you are asking him is why.
15       MR. CASSIDY:  His testimony was
16    that he gave that address.  I want to know
17    whether he also gave him the company name or
18    whether that is something that Gary Mills
19    picked up on his own based upon faxed
20    documents.
21       MR. WOLFE:  I think he did say he
22    gave him the company name.  I think you are
23    focusing on why did he use in care of.

247

1        MR. CASSIDY:  Well, that's not
2     where I was, so I wasn't making that clear.
3  Q.  (BY MR. CASSIDY)  When you gave him the
4     address was part of the address you gave him
5     Rhema Elpis Enterprises as the addressee?
6  A.  Yes.  I gave him that address.
7  Q.  Including the name of that company?
8  A.  Yes.  I told him --
9  Q.  I apologize.  I did not understand that.
10 A.  I told him that was my wife's address and
11    that would be the fastest way for
12    correspondence.
13 Q.  Did he ask you what Rhema Elpis Enterprises
14    was?
15 A.  No.  I told him.
16      [Exhibit No. 14 marked.]
17 Q.  After the purchase order you then sent out
18    an invoice for the first four items on the
19    purchase order which are reflected in
20    Exhibit 14; is that correct?
21 A.  That's correct -- I didn't send this out.
22 Q.  Who sent this out?
23 A.  Rhema Elpis Enterprises.

248

1  Q.  So on a purchase order issued to ChemTreat,
2     based upon a ChemTreat proposal, your wife
3     issued an invoice in the name of her own
4     company?
5  A.  Yes, she did.
6  Q.  At your request?
7  A.  Yes.
8  Q.  Why did you request your wife to invoice the
9     ChemTreat purchase order in the name of
10    Rhema Elpis Enterprises?
11 A.  Because of the time from this first proposal
12    to the time that RSC requested their
13    equipment, the equipment costs had gone up
14    significantly.  I called ChemTreat and got a
15    cost on equipment.
16 Q.  Okay.
17 A.  Okay.  I desperately needed to sell this
18    piece of business for ChemTreat.  Because of
19    the cost difference I could not go back to
20    RSC because it was in here at what their
21    equipment was going to cost.
22 Q.  Okay.
23 A.  It stated in here exactly what each piece of

249

1  equipment was going to cost.
2  Q.  I understand what a bid is, yes.
3  A.  I desperately needed to sell this piece of
4      business for ChemTreat. Their equipment
5      costs had gone up significantly. Rather
6      than pass -- because we had this purchase
7      order for this amount, rather than pass the
8      increase in expense of equipment costs on to
9      RSC, I checked with Michelle to see if she
10     was able to provide the equipment at the
11     costs that were in the bid specs without
12     losing money.
13 Q.  I thought Rhema was a chemical supplier.
14     When did Rhema get in the business of
15     supplying equipment?
16 A.  I asked her to check on it.
17 Q.  Okay. So your explanation is you came in as
18     though you are dealing with some unrelated
19     entity and asked Michelle Kinsman, here is a
20     purchase order, can you get me this
21     equipment at this price, and then she looked
22     into it and told you she could; is that your
23     testimony?

250

1  A.  Yes.
2  Q.  And is that the first time, to your
3      knowledge, that Rhema had ever engaged in
4      the business of equipment sales?
5  A.  No, I'm not aware.
6  Q.  Well, your affidavit says they are a
7      chemical supplier. Now you are telling me
8      they are an equipment supplier as well. I'm
9      just wondering when did they switch from
10     purely a chemical supplier to an equipment
11     supplier?
12 A.  I'm not sure.
13 Q.  How did you become aware that your wife's
14     business had expanded from simply chemical
15     supplies to equipment supplies that would
16     make you think to even go ask her?
17 A.  I don't know.
18 Q.  What documentation do you have currently in
19     your possession from ChemTreat showing that
20     their equipment costs had gone up from the
21     time of the bid?
22 A.  I called.
23 Q.  Okay. Do you have any documentation?

251

1  A.  No.
2  Q.  Who told you that the equipment -- that they
3      would not honor the equipment prices that
4      were included in the bid?
5  A.  I called and got pricing on the equipment
6      that had been bid out back when this form
7      was done. There was a significant time
8      lapse.
9  Q.  Who at the company told you that the prices
10     were up and they would not honor their prior
11     quote?
12 A.  No one said they would not honor their
13     quote. The prices were up.
14 Q.  Did you ask anybody at the company, "I have
15     quoted certain prices on this job, and I now
16     have a purchase order accepting that
17     proposal. Are you going to honor the
18     price?" Did you ask anybody that?
19 A.  No.
20 Q.  Do you know what date this proposal was
21     submitted to Wal-Mart -- or to RSC I should
22     say? Is that January 11, '05?
23 A.  I'm not sure.

252

1  Q.  While you are looking for that, would you
2      please look in here and tell me whether or
3      not there is any provision anywhere in this
4      proposal that tells the prospective customer
5      how long the bid is good for.
6  A.  I don't think that's in there.
7  Q.  Okay. So they accept the bid. They issue a
8      purchase order to ChemTreat. Please correct
9      me if I'm misstating your testimony. You
10     contact ChemTreat. Somebody at ChemTreat
11     tells you their prices have gone up. You
12     make no attempt to ask anybody at the
13     company whether or not they will meet the
14     prices included in the bid and instead hand
15     the business over to your wife who then
16     invoices it as a Rhema project, correct?
17 A.  Correct.
18 Q.  Now, you indicated before that Mr. Mills
19     asked you who Rhema was or that you told him
20     who Rhema was. What did you tell him?
21 A.  I told him this was an address that he could
22     fax information to, and that's all that I
23     told him.

253

1  Q.  Okay. When he received an invoice from
2      Rhema for the first portions of the project,
3      was there any question or inquiry from him
4      or anybody at RSC as to why they were being
5      invoiced by Rhema?
6  A.  No. He said nothing to me at all.
7  Q.  And RSC paid this invoice in the amount
8      submitted, correct?
9  A.  No.
10 Q.  They did not?
11 A.  No. It has never been paid to my knowledge.
12          (Exhibit No. 15 marked.)
13 Q.  I'll show you what I have marked as Kinsman
14     Exhibit 15. I will represent to you on the
15     record that RSC has advised us that that is
16     a check stub evidencing a check issued to
17     Rhema Elpis Enterprises for this invoice,
18     which is marked as Exhibit 14, and that
19     check was negotiated and cashed by Rhema.
20     Is it your testimony that that is an
21     inaccurate statement by RSC?
22 A.  Yes.
23 Q.  Was the equipment that was invoiced for by

254

1      Rhema pursuant to the ChemTreat proposal to
2      RSC ever provided to RSC?
3  A.  Yes.
4  Q.  By whom?
5  A.  By me.
6  Q.  By Rhema?
7  A.  I dropped it off for Michelle at their
8      facility in Sterling.
9  Q.  Who ordered the equipment? I don't mean who
10     ordered it from Rhema or ChemTreat. I mean
11     who on behalf of Rhema actually ordered the
12     equipment from its manufacturer or supplier?
13 A.  It would be Michelle.
14 Q.  Where was it shipped to?
15 A.  I don't know.
16 Q.  What is the name of the manufacturer whom
17     the materials were ordered from?
18 A.  I don't know.
19 Q.  Well, you say you don't know where it was
20     shipped to, but you've told me that you
21     delivered it to the project. Where did you
22     get it from?
23 A.  The box showed up at home, I believe. I'm

255

1      not sure. I can't remember.
2  Q.  Was the manufacturer of this equipment paid
3      for it?
4  A.  Pardon?
5  Q.  Was it paid for? Was the equipment paid for
6      by Rhema?
7  A.  I don't know. I would assume so.
8  Q.  Okay. So is it your understanding that
9      Rhema ordered and supplied equipment for
10     this project and has been paid nothing for
11     it?
12 A.  Yes.
13 Q.  Did you have any conversation with any
14     individual at ChemTreat, other than the
15     person who told you the price had gone up,
16     to advise them that an accepted ChemTreat
17     bid was being handed over to another
18     company?
19 A.  No.
20 Q.  As a sales rep for ChemTreat who owed
21     exclusive loyalty to that company, did you
22     have any discomfort whatsoever in handing an
23     accepted ChemTreat proposal and purchase

256

1      order over to another company?
2  A.  Absolutely not. I truly believed that I was
3      unable to provide the equipment at the
4      stated costs and I was going to sell this
5      business for ChemTreat, the chemical
6      business at all costs.
7  Q.  But you never checked with ChemTreat, Dan
8      O'Brien, your sales area manager, or anybody
9      else to see whether or not they would honor
10     the quote, correct?
11         MR. WOLFE: Objection. Asked and
12     answered, all of those.
13 Q.  Is that correct?
14         MR. WOLFE: And argumentative. Go
15     ahead.
16         THE WITNESS: Go ahead?
17         MR. WOLFE: Go ahead.
18 Q.  (BY MR. CASSIDY) That is a correct
19     statement, is it not, that you never
20     inquired as to whether or not ChemTreat
21     would meet their quoted price?
22 A.  No.
23 Q.  No, you did not do it?

257

1  A.  I was desperate to sell this business for
2      ChemTreat.
3  Q.  But you didn't sell it for ChemTreat.  You
4      sold it for Rhema.
5  A.  I did not want to jeopardize the chemical
6      business which will last for years by
7      pissing these people off on the equipment.
8  Q.  And you did not ever tell Mr. Mills or
9      anybody else at Refrigeration Systems
10     Company that the bid was out of date and
11     they needed to rebid the project; would you
12     agree?
13 A.  No, I did not.
14 Q.  And you never told them that when it was
15     being invoiced by Rhema that Rhema was not
16     connected in any way with ChemTreat; is that
17     correct?
18 A.  No, I did not.
19 Q.  Was this job completed, the mechanized
20     distribution center?
21 A.  I don't know.  ChemTreat has the chemical
22     business.
23 Q.  Did you make any sales of chemicals to

258

1      Wal-Mart after the distribution center was
2      built?
3  A.  No.
4  Q.  But that was your goal in giving this
5      business to Rhema was to save the future
6      chemical business for ChemTreat, correct?
7  A.  Correct.
8  Q.  And were you guaranteed anywhere in that
9      proposal -- is that proposal for the future
10     chemical supplies or were you simply
11     assuming that since you put in the equipment
12     that you would get the chemical business in
13     the future?
14 A.  I don't understand that question.
15 Q.  Okay.  What was involved in this proposal?
16     Obviously providing equipment.
17 A.  Just to feed the chemicals that were in the
18     proposal.  The equipment was necessary to
19     feed the chemicals in the proposal.
20 Q.  And for how long a period of time did the
21     proposal cover the supply of chemicals?
22 A.  One year.
23 Q.  Okay.  One year from the date of acceptance

259

1      of the proposal or one year from completion
2      of installation of all the equipment?
3  A.  Startup of the facility.
4  Q.  Okay.  And do you know when it was started
5      up?
6  A.  No, I don't.
7  Q.  Now, we talked earlier about how you define
8      the term "diversion."  Do you or under your
9      definition of diversion would you believe
10     taking an accepted proposal from ChemTreat
11     and handing it to your wife to make the sale
12     is a diversion of that customer?
13 A.  I believe that I saved this customer because
14     of what was done.
15 Q.  By diverting it to Rhema?
16         MR. WOLFE:  Objection.  Don't
17     answer.  That calls for a legal conclusion.
18     Ask it again, please.
19 Q.  (BY MR. CASSIDY)  Do you consider taking an
20     accepted ChemTreat proposal and handing it
21     to a competing company to fill the order as
22     a diversion of a ChemTreat customer?
23         MR. WOLFE:  Objection.  Asked and

260

1      answered.  He said he did not.
2          MR. CASSIDY:  I don't think he
3      said that.  I think all he said was he
4      thought it saved the business.
5          MR. WOLFE:  My position is that
6      you can ask another question.
7          MR. CASSIDY:  Are you telling him
8      not to answer?
9          MR. WOLFE:  Yeah, because I
10     believe he has answered it.
11         MR. CASSIDY:  Okay.  At the point
12     he said he saved the business?
13         MR. WOLFE:  Right.
14         MR. CASSIDY:  Can you read back
15     that answer, please.
16            (Record read.)
17         MR. CASSIDY:  I'll re-ask the
18     question.
19         MR. WOLFE:  I'll withdraw the
20     objection.
21 Q.  (BY MR. CASSIDY)  Subject to the objection,
22     we'll say as you understand the term
23     "diversion" that we've already talked about,

**261**

```
1    do you feel that taking an accepted
2    ChemTreat proposal and handing it to another
3    company to fill the order is a diversion of
4    that company?  Do you need the question read
5    back?
6              MR. WOLFE:   Read the question
7    back.  It's yes, you believe it's a
8    diversion or no, you don't believe it's a
9    diversion.  That's all he's asking.
10             (Record read.)
11   A.  No.
12   Q.  (BY MR. CASSIDY)  You were an employee of
13   ChemTreat at the time that this business was
14   given to Rhema, correct?
15             MR. WOLFE:   Objection to the use
16   of the term "this business" as being vague.
17   Q.  (BY MR. CASSIDY)  I'll re-ask it.  You were
18   still an employee of ChemTreat at the time
19   that you had Rhema fill the equipment order
20   to RSC pursuant to the ChemTreat proposal;
21   is that correct?
22   A.  Correct.
23             (Exhibit No. 16 marked.)
```

**262**

```
1    Q.  Do you recognize the documents that make up
2    16?  Do you recognize it?
3    A.  It was a form I signed when I got a laptop
4    early on.
5    Q.  Okay.  Essentially the company loaned you
6    money to get a laptop, and these are the
7    documents saying you would repay them for
8    it, correct?
9    A.  I think so.
10   Q.  I assume that that was a laptop that was for
11   use as a sales rep.  That's why they would
12   loan you the money for it?
13   A.  Right.
14   Q.  What type of things did you use your laptop
15   for in connection with your sales business?
16   A.  This laptop was returned years ago.
17   Q.  Okay.  It didn't work?  Did you get a
18   replacement laptop?
19   A.  From the company?
20   Q.  No.  Anywhere.  Really I just want to know
21   what you use a laptop for in connection with
22   you being a sales rep.
23   A.  I would use it to generate some reports.
```

**263**

```
1    Q.  Keep track of customer names, contact
2    information, those type of things?
3    A.  That usually was in printed form.
4    Q.  Okay.  Did you use it to log dates of
5    visits, times of visits, activities done on
6    any particular call to a customer, anything
7    like that?
8    A.  Not really.  I'm not very good on paperwork.
9    Q.  I thought that might be why you had the
10   laptop so you wouldn't have all the paper.
11   A.  I'm not very proficient.
12             (Exhibit No. 17 marked.)
13   Q.  I'll show you what I've marked as Exhibit
14   17.  It's a October 20th, 2005, letter from
15   ChemTreat to yourself.  Do you recognize
16   that as the termination letter you received
17   from the company?
18   A.  I think so.
19   Q.  In relation to that October 20, 2005, date,
20   when did you first become aware that there
21   was any issue at ChemTreat concerning
22   improper competition?
23   A.  I was contacted by Randy on a phone call.
```

**264**

```
1    Q.  Do you remember the date?
2    A.  No.
3    Q.  Do you remember, again in relation to
4    October 20th, how long prior to that it
5    might have been?
6    A.  Sometime early October, I guess.
7    Q.  What did he say to you?
8    A.  Man, I can't remember much of the
9    conversation at all.
10   Q.  Was there some discussion as to the company
11   known as Rhema?
12   A.  He asked me -- yeah.  Yes.
13   Q.  Okay.  Do you remember how that came up?
14   A.  He called, he said, "This is Randy."  He
15   said something about that, was all excited.
16   He said, "Pay me some money, this thing will
17   go away.  Let me know tomorrow."  That was
18   basically all I remember.
19   Q.  That was the first indication you had from
20   anybody at ChemTreat corporate headquarters
21   that they felt you were engaged in improper
22   competition?
23   A.  Yes.
```

**265**

1  Q.  And you were asked for money on that
2      occasion?
3  A.  Yes.
4  Q.  Were you ever asked whether or not it was
5      true?
6  A.  I was on my way out the door. I answered
7      the phone. It was quick. I left. I don't
8      remember much at all.
9  Q.  Did you have any follow-up conversation with
10     Randy Azzarelo concerning the issue of
11     improper competition and your ultimate
12     termination?
13 A.  He called me and said that my termination
14     date would be October 11.
15 Q.  Did you talk to anybody else other than
16     Randy Azzarelo concerning that issue?
17 A.  No.
18 Q.  Did you ever tell Randy Azzarelo or anybody
19     at the company that, yes, you were acting on
20     behalf of Rhema selling in competition to
21     ChemTreat?
22 A.  No.
23 Q.  Were you ever told by Randy Azzarelo or

**266**

1      anybody at ChemTreat during a telephone
2      conversation that in that telephone
3      conversation it was being tape-recorded?
4  A.  No.
5  Q.  Do you have any knowledge of being tape-
6      recorded during any telephone conversations?
7  A.  No.
8                 (Exhibit No. 18 marked.)
9  Q.  I'll hand you a copy of the temporary
10     restraining order entered by the U.S.
11     District Court for the Central District of
12     Illinois on November 9, 2005, that I have
13     marked as Exhibit 18. I assume you've seen
14     that document before.
15 A.  I don't remember.
16 Q.  All right. Were you aware that a
17     restraining order was entered against you in
18     this case?
19 A.  Yes.
20 Q.  What was your understanding as to what you
21     were restrained from doing?
22 A.  Contacting customers for the purpose of
23     doing business or discussing business.

**267**

1  Q.  And in addition to contacting customers, is
2      it your understanding that the restraining
3      order would have encompassed selling any
4      product to your former ChemTreat customers
5      in competition with ChemTreat?
6  A.  I didn't do anything.
7  Q.  I didn't ask you if you did. I asked you,
8      did you understand that the restraining
9      order would have precluded continuing to
10     sell product in competition with ChemTreat
11     to your prior ChemTreat customers?
12 A.  I think so, yes.
13 Q.  And do you have any knowledge as to whether
14     or not subsequent to November 9th, 2005,
15     Rhema has continued to sell chemicals to any
16     of your former customers?
17 A.  Would you repeat that again.
18 Q.  Do you have any knowledge as to whether or
19     not Rhema after November 9th, 2005, has
20     continued to sell product to your former
21     ChemTreat customers?
22 A.  Yes.
23 Q.  Okay. Carus Chemical is one of those,

**268**

1      correct?
2  A.  Yes.
3  Q.  Any others?
4  A.  I don't know.
5  Q.  But as you've testified before, you
6      understood that continuing to sell to your
7      former customers would be contrary to the
8      Court's order; is that right?
9          MR. WOLFE:  Objection. His
10     response to your question was to those
11     customers in competition with ChemTreat, and
12     the way you've phrased this is merely
13     selling, and I think that is the gist of the
14     controversy regarding the TRO.
15 Q.  (BY MR. CASSIDY) Do you recognize that this
16     TRO would preclude you from selling chemical
17     products to your former ChemTreat customers?
18 A.  I haven't done anything.
19 Q.  I didn't ask if you did anything.
20 A.  I haven't participated in anything since
21     October 11.
22 Q.  I haven't asked if you did it. I'm only
23     asking you if you understood that this

269

1  temporary restraining order would preclude
2  you from doing that?
3  A.  From me going out and selling chemicals?
4  Q.  Not necessarily going out.  From you selling
5  chemicals to any of your former customers,
6  whether they called you, called in the
7  orders, however it came about?
8  A.  I guess I'm stuck.  I don't know.
9  Q.  Let me come at it a different way:  Rhema as
10  a chemical supplier is in competition with
11  ChemTreat, correct?  They are both selling
12  the same products to the same customers or
13  attempting to, correct?
14  A.  I wouldn't say the same.  I don't know how
15  to answer that.
16  Q.  I don't want to go back a week, but I think
17  we have an acknowledgment in this deposition
18  that Rhema is a business that is in
19  competition with ChemTreat.  Do you agree
20  with that or disagree with that?
21  A.  In some aspects I agree.
22  Q.  To the extent that Rhema would be selling
23  chemicals to Carus Chemical or any of your

271

1  which could take us the rest of the
2  afternoon.  I'm trying to cut through it
3  here.
4  A.  Right.  Yes.
5  Q.  Okay.  And to the extent that Rhema sells
6  chemicals to Carus Chemical Company that
7  previously were provided by ChemTreat would
8  you agree that that would constitute
9  competition with ChemTreat?
10  A.  On strictly the chemicals, yes.
11  Q.  Okay.  And is it your understanding that the
12  temporary restraining order entered by the
13  Court on November 9th, 2005, precluded you,
14  your wife or Rhema from continuing to
15  compete with ChemTreat at least as it
16  pertains to former ChemTreat customers?
17  A.  That's not what I understood.
18  Q.  Okay.  It is your understanding that Rhema
19  is continuing to sell product to former
20  customers of yours with ChemTreat?
21  A.  Yes.
22  Q.  Okay.  Have you since November 9, 2005,
23  submitted any orders for any of your former

270

1  other former ChemTreat customers, would you
2  agree that that would be engaging in
3  competition with ChemTreat?
4        MR. WOLFE:  I'll object to the
5  vagueness of the term "competition" without
6  a definition and parameters.  You can
7  answer if you can answer.
8  A.  I believe they are a different type of
9  business.
10  Q.  (BY MR. CASSIDY)  Okay.  Are you familiar
11  with the chemicals that have been sold by
12  Rhema to Carus Chemical Company?
13  A.  I know the basics -- the basis for the basic
14  chemicals, yes.
15  Q.  Are the chemicals that are being sold by
16  Rhema at any time in the last two years
17  chemicals that were previously being
18  purchased by Carus from ChemTreat?
19        MR. WOLFE:  It calls for
20  speculation.  You can answer.
21  Q.  (BY MR. CASSIDY)  I'll simply say that I'm
22  going to get through this information if I
23  have to pull out every invoice from Carus

272

1  customers?
2  A.  No.
3  Q.  Do you know of any customers other than
4  Carus Chemical that Rhema is presently
5  continuing to sell product to that
6  previously was being purchased by those
7  customers from ChemTreat?
8  A.  No.
9  Q.  Is it your understanding that under the
10  order selling to these former customers
11  wasn't prohibited, it was only direct
12  contact or making sales calls?
13  A.  That's what I understood.
14  Q.  And you don't remember ever reviewing the
15  document, correct, the restraining order?
16  A.  I didn't read it.
17  Q.  Let me read subparagraph D on Page 2 of the
18  temporary restraining order.  It simply
19  provides, quote, you are enjoined from
20  engaging in any business or other endeavor
21  in competition with ChemTreat, end quote.
22        Had you read that would you have
23  understood that that was a preclusion from

273

1 selling any chemical products to your former
2 ChemTreat customers?
3         MR. WOLFE:  Let me just object to
4 this line, because we've had a discussion
5 before the judge about the bases for this
6 TRO and the agreement for it and the
7 foundations for it.
8         I can state for the record that
9 this has been provided.  It's going to be up
10 to the Court, apparently at some point, to
11 determine whether or not there has been a
12 violation.  So with that understanding, I
13 believe that the line of questioning is
14 improper.
15         MR. CASSIDY:  I would only respond
16 that I think I'm entitled to explore whether
17 or not any violation was willful, and to the
18 extent that it may be willful is going to
19 turn on what his understanding of what he
20 should or should not have been doing since
21 November 9, 2005.
22         MR. WOLFE:  And I believe that
23 he's answered what his understanding of what

274

1 he should or should not be doing has been.
2         MR. CASSIDY:  I understand that.
3 He also said he didn't read it.  So now I
4 think I'm entitled to explore as if he had
5 read it how he would have understood the
6 language which plainly appears on the
7 document.
8         I really don't want to get in a
9 fight with you about it.  Are you
10 instructing him not to answer?
11         MR. WOLFE:  Well, I guess I'm
12 having a problem understanding how if you
13 had done X, that would go to his intent.  I
14 also believe that he did not recall reading
15 it and did not believe he read it.
16         MR. CASSIDY:  We can get into the
17 argument of constructive notice, whether he
18 had an obligation to read it.
19         MR. WOLFE:  The answer to your
20 first question is, no, I don't want to get
21 in a fight with you, but, two, yes, I am
22 arguing with you over the purposes of this.
23         MR. CASSIDY:  I want to put the

275

1 issue to bed.  Can I follow up on the
2 question, or are you instructing him not to
3 answer?
4         MR. WOLFE:  Read it back.  If you
5 can answer it, please go ahead.
6         MR. CASSIDY:  I can re-ask it
7 quicker.
8 Q.  (BY MR. CASSIDY)  If the document provides
9 expressly that you are enjoined from, quote,
10 engaging in any business or other endeavor
11 in competition with ChemTreat, end quote,
12 had you read that language, would you have
13 understood that to preclude you from
14 continuing to sell chemical products to
15 former ChemTreat customers.
16 A.  I'm not part of Rhema.  I don't sell
17 chemicals through Rhema.  I am not involved
18 in the sale of chemicals for Rhema.
19 Q.  I understand that.  That wasn't my question.
20 A.  ChemTreat fired me.  I have no chemicals to
21 sell.
22 Q.  Whether you do or don't, would you
23 understand the language which states that

276

1 you are enjoined from, quote, engaging in
2 any business or other endeavor in
3 competition with ChemTreat, end quote, to
4 preclude you from continuing to sell
5 chemicals to former ChemTreat customers?
6 A.  I haven't sold any chemicals to former
7 ChemTreat customers.
8 Q.  Do you understand that you are enjoined from
9 doing so based upon the language I just read
10 irrespective of whether or not you've done
11 it?
12         MR. WOLFE:  Do you understand that
13 phrase or not?
14 A.  I had a discussion with my attorney, and my
15 attorney --
16         MR. WOLFE:  No, no, no.  He
17 doesn't want to know that.
18         MR. CASSIDY:  I don't want to know
19 the attorney-client communication.
20         MR. WOLFE:  If you don't
21 understand the phrase, tell him you don't
22 understand the phrase.
23 A.  I don't understand.

277

1  Q.  (BY MR. CASSIDY)  Here is the language of
2      the letter.  You are enjoined from, and
3      there are four things, and D is -- I will
4      let you read it yourself, and then I'll
5      re-ask the question.  Had you read that,
6      would you understand that to preclude you
7      from continuing to sell chemical products to
8      former ChemTreat customers?
9  A.  I guess I just don't understand.
10 Q.  Okay.  Lastly, at the first part of your
11     deposition, in response to my demand for it,
12     you produced yours and your wife's joint
13     individual income tax returns for 2004, 2005
14     as well as the tax returns for Rhema Elpis
15     Enterprises for 2004 and 2005.
16         The 2005 return for Rhema Elpis
17     Enterprises is simply a portion of your
18     joint tax return showing a profit or loss
19     for business as Schedule C.  Included in
20     this -- first all, do you and your wife do
21     your own returns, or do you have an
22     accountant?
23 A.  I don't have anything to do with any of the

278

1      returns.
2          MR. WOLFE:  Do you do them
3      yourself, or do you have an accountant that
4      does them?
5          THE WITNESS:  We have an
6      accountant.
7          MR. WOLFE:  Thank you.
8  Q.  (BY MR. CASSIDY)  Do you know what property
9      of Rhema Elpis Enterprises was depreciated
10     to the extent of $6,786 for 2005?
11 A.  No, I don't.
12 Q.  Okay.  If I asked you the same question as
13     to depreciation expense for Rhema Elpis
14     Enterprises for 2004, do you have any
15     knowledge what property is being
16     depreciated?
17 A.  No, I don't.
18 Q.  What is the name of the accountant who does
19     your joint tax returns?
20 A.  I don't know.
21 Q.  You don't know your accountant's name?
22 A.  I do not know my accountant's name.
23 Q.  When you switched from salary plus

279

1      commission to commission with ChemTreat
2      included in that is that you would start
3      obtaining mileage reimbursement, correct?
4  A.  Correct.
5  Q.  Prior to that the company paid all of your
6      vehicle expenses, so you didn't get your
7      mileage reimbursed; is that right?
8  A.  Correct.
9  Q.  When you switched in 2004 to straight
10     commission and began turning in miles driven
11     for business, what type of records were you
12     obligated to provide to ChemTreat to support
13     the mileage reimbursement?
14 A.  Total miles driven for the month.
15 Q.  Okay.  Were you required to keep track of
16     any type of daily or weekly log showing
17     where you drove, for what purpose and the
18     number of miles on that individual trip?
19 A.  No.
20 Q.  Did you obtain or retain any such
21     information?
22 A.  No.
23 Q.  Okay.  How did you keep track of your miles

280

1      that were for business purposes?
2  A.  On my company car or on business?
3  Q.  After you went to straight commission you
4      got mileage reimbursement for using your own
5      vehicle, correct?
6  A.  Yeah.
7  Q.  Some of those, that vehicle would be used
8      for both business purposes and personal
9      purposes?
10 A.  Just for business.
11 Q.  Okay.  You only used that vehicle for
12     business?
13 A.  Yes.
14 Q.  So would it be true that your -- every mile
15     driven on that vehicle was being submitted
16     to ChemTreat for mileage reimbursement?
17 A.  Yes.
18 Q.  So you have no logs or records which would
19     show how many personal miles versus business
20     miles; is that correct?
21 A.  No.  I have so many junk vehicles.
22 Q.  Did you ever over the years keep any type of
23     log or diary showing your daily calls to

**281**

```
 1    customers, purpose of the calls, time, any
 2    of that?
 3   A.   While I was with ChemTreat?
 4   Q.   Yes.
 5   A.   No.
 6             MR. CASSIDY:  I'm done.  Okay.  I
 7    assume we want to break.
 8             Signature?
 9             MR. WOLFE:  We'll review.
10             MR. CASSIDY:  We're treating these
11    as discovery under the Illinois rules.
12             MR. WOLFE:  Yes.  We'll put that
13    on the record.  We're treating these as
14    discovery.  If you want to put that upfront,
15    that's fine.  We'll reserve, and we'll
16    review.
17        FURTHER DEPONENT SAITH NOT.
18
19
20
21
22
23
```

**282**

```
 1   STATE OF ILLINOIS  )
                         )
 2   COUNTY OF TAZEWELL )
 3
 4            C E R T I F I C A T E
 5      I, Gina Fick, CSR, RMR, a Notary Public duly
 6   commissioned and qualified in and for the County
 7   of Tazewell and State of Illinois, DO HEREBY
 8   CERTIFY that, pursuant to notice, there came
 9   before me on the 3rd day of May, 2006, at 331
10   Fulton Street, Suite 650, in the City of Peoria,
11   County of Peoria, and State of Illinois, the
12   following named person, to wit:
13
14        GREGORY P. KINSMAN,
15
16   who was by me first duly sworn to testify to the
17   truth and nothing but the truth of his knowledge
18   touching and concerning the matters in
19   controversy in this cause and that he was
20   thereupon carefully examined upon his oath and
21   his examination immediately reduced to shorthand
22   by means of stenotype by me.
23      I ALSO CERTIFY that the deposition is a true
```

**283**

```
 1   record of the testimony given by the witness and
 2   that the necessity of calling the court reporter
 3   at time of trial for the purpose of
 4   authenticating said transcript was also waived.
 5      I FURTHER CERTIFY THAT I am neither attorney
 6   or counsel for, nor related to or employed by,
 7   any of the parties to the action in which this
 8   deposition is taken, and further, that I am not a
 9   relative or employee of any attorney or counsel
10   employed by the parties hereto, or financially
11   interested in the action.
12      IN WITNESS WHEREOF, I have hereunto set my
13   hand and affixed my notarial seal this 24th day
14   of May, 2006.
15
16
17        GINA FICK, CSR, RMR
18
19
20        "OFFICIAL SEAL"
21        Gina Fick
22        Notary Public, State of Illinois
         My Commission Exp. 02/03/2008
23
```

**284**

```
 1   STATE OF ILLINOIS  )
                         )
 2   COUNTY OF TAZEWELL )
 3      IN THE UNITED STATES DISTRICT COURT
 4        FOR CENTRAL DISTRICT OF ILLINOIS
 5
 6   CHEMTREAT, INC.,  v. GREGORY P. KINSMAN, et al.
 7      ILLINOIS RULE 207 (a) STATEMENT BY WITNESS:
 8            SIGNATURE PAGE
 9      I hereby state that I have read the foregoing
10   transcript of my deposition given at the time and
11   place aforesaid and I do again subscribe and make
12   oath that the same is a true, correct, and
     complete transcript of my deposition given as
13   aforesaid, with corrections based on the
     reporter's errors in reporting or transcribing
14   the answer or answers involved, if any, as they
     appear on the attached, signed correction sheet.
15      _____ Correction sheet(s) attached.
16      Dated this _____ day of _____,
17   A.D., 2006.
     SIGNED _____
18             GREGORY P. KINSMAN
19   Subscribed and sworn to before me this
20   _____ day of _____, 2006.
21   Notary Public
22   My commission expires
23   _____
```

CORRECTION SHEET

RE: CHEMTREAT, INC. v. GREGORY KINSMAN, et al.

PAGE        LINE

........    ........    CHANGE_____
                        _____
                        REASON_____
                        _____

........    ........    CHANGE_____
                        _____
                        REASON_____
                        _____

........    ........    CHANGE_____
                        _____
                        REASON_____
                        _____

........    ........    CHANGE_____
                        _____
                        REASON_____
                        _____

........    ........    CHANGE_____
                        _____
                        REASON_____
                        _____

# ChemTreat, Inc.

(An Equal Opportunity Employer)

## APPLICATION FOR EMPLOYMENT
(Pre-Employment Questionnaire)

## PERSONAL INFORMATION

NAME **KINSMAN GREGORY PAUL**    DATE 6/11/95
　　　LAST　　　FIRST　　　MIDDLE　　SS#

PRESENT ADDRESS **P.O. Box 312    PRINCETON IL. 61356**
　　　　　　　STREET　　　　CITY　　STATE　ZIP

PERMANENT ADDRESS **SAME**
　　　　　　　STREET　　　　CITY　　STATE　ZIP

PHONE NO. **8 5 - 1 7 3 - 2316**    ARE YOU 18 YEARS OR OLDER    Yes ☒    No ☐

ARE YOU PREVE    **UPS**

HAVE YOU BEEN    　　　　　　    ...U.S.?    Yes ☐    No ☒

HAVE YOU BEE    **Rt. 3, Box 159**    ...ANORS OR TRAFFIC VIOLATIONS?  Yes ☐  No ☒

IF YES, GIVE D    **Princeton, IL 61356**    ...ANORS OR TRAFFIC VIOLATIONS?  Yes ☐  No ☒

* The Age Disc...
  who are at l...
** You will not...
   which you h...

...ation on the basis of age with respect to individuals

...record, unless the offense is related to the job for

## EMPLOYMEI

POSITION    ...OU    ...ART **NEGOTIATE**    SALARY DESIRED **NEGOTIATE**

ARE YOU EMPLOYED NOW...    MAY WE INQUIRE ...UR PRESENT EMPLOYER?    **NO**

EVER APPLIED TO THIS COMPANY BEFORE?  Yes ☐  No ☒  WHERE?    WHEN?

## EDUCATION

| | NAME AND LOCATION OF SCHOOL | *NO. OF YEARS ATTENDED | *DID YOU GRADUATE? | SUBJECT STUDIED |
|---|---|---|---|---|
| GRAMMAR SCHOOL | RICE LAKE, WI. | 8 | YES | |
| HIGH SCHOOL | RICE LAKE HIGH SCHOOL RICE LAKE, WI. | 4 | YES | |
| COLLEGE | U.W. RIVER FALLS RIVER FALLS, WI. | 4 | YES | CHEMISTRY MATHEMATICS BIOLOGY |
| TRADE, BUSINESS OR CORRESPONDENCE SCHOOL | | | | |

*The Age Discrimination in Employment Act of 1967 prohibits discrimination on the basis of age with respect to individuals who are at least 40.

## GENERAL

SUBJECTS OF SPECIAL STUDY OR RESEARCH WORK

U.S. MILITARY OR NAVAL SERVICE    RANK    PRESENT MEMBERSHIP IN NATIONAL GUARD OR RESERVES

FOREIGN LANGUAGE

OTHER SKILLS:  TYPING **Yes**    SHORTHAND    OTHER **Computer**

(Continued on Other Side)

KF420

EXHIBIT
5-3-CC

PENGAD 800-631-6989

**E-FILED**
Friday, 21 July, 2006  12:11:03 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 8 - DEPOSITION OF GREGORY KINSMAN (5 OF 8)



## ACKNOWLEDGMENT AND RELEASE

I, *Gregory P. Kinsman*, acknowledge that I have applied for employment with ChemTreat, Inc. (the Company). By signing below I understand and agree that:

1... In order to be considered for employment by the Company, I will participate in certain tests, including but not limited to ability and aptitude tests, to be administered at Company expense.

2... I authorize the release of all tests results to the Company.

3... The test results are the property of the Company.

I further acknowledge that, in the event that the Company extends an offer of employment to me, the offer will be contingent. By signing below, I further understand and agree that:

1... Any employment offer I receive will be contingent on:

a.. my completing certain tests, including but not limited to a drug screen and a medical examination, to be administered at Company expense and;

b.. my achieving test results satisfactory to the Company.

2... I authorize the release of all test results, including but not limited to drug and medical test results, to the Company.

3... The test results are the property of the Company.

Applicant's Signature: *Gregory P. Kinsman*       Date: *6/11/95*

*Corporate Offices*

## EMPLOYMENT AGREEMENT

THIS AGREEMENT by and between CHEMTREAT, INC., a Virginia corporation ("CHEMTREAT") and Gregory P. Kinsman ("Employee") recites and provides as follows:

WHEREAS, CHEMTREAT is engaged in the business of selling and distributing chemicals, chemical products and other miscellaneous products at retail or wholesale and servicing equipment which uses or consumes products sold by CHEMTREAT; and

WHEREAS, Employee is desirous of working for CHEMTREAT in whatever capacity as may be determined by the Board of Directors of CHEMTREAT;

NOW, THEREFORE, in consideration of the employment relationship created hereby, the remuneration paid hereunder, and the mutual covenants and conditions hereinafter set forth, CHEMTREAT and Employee agree as follows:

1.    Employment

CHEMTREAT hereby employs Employee to conduct the business of CHEMTREAT with those customers and prospective customers of CHEMTREAT as designated by CHEMTREAT and/or developed by Employee. Employee covenants and agrees that he will devote his entire time and energy exclusively to the business of CHEMTREAT and that during the period of his employment, he will not engage in any other business, either for himself or for the account of any other person, firm or corporation without the prior consent of the Board of Directors of CHEMTREAT.

2.    Compensation

For all services to be rendered by Employee in any capacity hereunder, CHEMTREAT agrees to pay Employee such compensation as may be mutually agreed upon between Employee and CHEMTREAT from time to time.

1



EXHIBIT
5-2-06
PENGAD 800-631-6989

3. <u>Termination of Previous Employment Agreements</u>

Employee does hereby represent and warrant that he has the right to enter into this contract and that he has terminated all previous employment agreements and is free from any previous employment contracts, except for post-termination covenants not to compete, if any, and restrictions on disclosure of confidential information.

4. <u>Termination</u>

Employee may resign and CHEMTREAT may terminate Employee at any time with or without cause by giving the other party written notice of termination. Termination is effective upon receipt by the non-terminating party of the written notice of termination. No commissions or compensation shall be payable to Employee by CHEMTREAT for sales or services (or any portion thereof) which are not delivered or performed as of the effective date of Employee's termination of employment with CHEMTREAT.

If Employee dies while this Agreement is in effect, the Agreement shall automatically terminate on the date of Employee's death, and CHEMTREAT shall be obligated to pay to Employee's estate Employee's monthly compensation or commissions computed as though Employee died on the last day of the month in which his death occurs.

The provisions of this Agreement contained in Paragraphs 6 through 11 hereof, as applicable, shall survive any termination of employment described herein.

5. <u>Disability</u>

In the event the Employee suffers a permanent, total disability as determined by a physician selected by the Company, this Agreement shall automatically terminate ninety (90) days after the date said physician determines that the employee became disabled. In such event, CHEMTREAT shall be obligated

2

to pay Employee his monthly compensation or accrued commissions up to the date of termination.

6. <u>Non-Compete Agreement</u>

The parties hereto acknowledge that CHEMTREAT is engaged in the business of the sale of equipment and chemical formulations for treatment of boilers, cooling towers, heating and cooling systems, raw water and waste water systems and the sale of fuel oil treatments and providing servicing activities incidental to the sale of the above products. Employee hereby acknowledges that during the course of his employment he has or will receive or have access to certain confidential and proprietary information which is essential to the sales and service activities of CHEMTREAT including, but not limited to, selling methods, price sheets and product manuals. Employee hereby further acknowledges that the customers of CHEMTREAT constitute a valuable asset to CHEMTREAT and that CHEMTREAT has legitimate business interests to protect by the restrictions contained herein.

During the eighteen (18) month period following the effective date of termination by either party of the employment relationship created hereunder, Employee shall not in his own name, or as a consultant, or in any other capacity on behalf of any other person or entity solicit, call upon, communicate with, enter into any sales or servicing agreements with, or attempt to communicate with any CHEMTREAT customer or prospective customer, as defined herein, for the purpose of selling, offering for sale, influencing the purchase of, or otherwise providing any product, service or equipment competitive with any product, service or equipment then sold, offered for sale, provided, or under development by CHEMTREAT.

For the purposes of this Agreement, "customer" shall mean any person or entity that is a customer of CHEMTREAT (or any representative of such person or entity) with whom Employee had any contact, communication, or for which Employee had supervisory, sales or service responsibility during any of the eighteen

3

(18) consecutive calendar months preceding the effective date of termination of his CHEMTREAT employment. For the purposes of this Agreement, "prospective customer" shall mean any person or entity (or representative or such person or entity) for which Employee performed or participated in a survey or written proposal during the twelve (12) consecutive calendar months preceding termination of Employee's employment with CHEMTREAT.

Employee further agrees that the above restrictions upon him are reasonable in all respects including the description of CHEMTREAT's business and the time, customer, and prospective customer restrictions. Employee further expressly acknowledges that such restrictions will not unreasonably restrict him in earning a livelihood.

7. **Interference With Contractual Relations**

For the eighteen (18) consecutive calendar months immediately following the effective date of termination of Employee's CHEMTREAT employment, Employee agrees that he shall not induce, encourage, or solicit any other employee of CHEMTREAT to terminate his employment with CHEMTREAT.

8. **Injunctive Relief**

Employee acknowledges and agrees that it would be difficult to quantify or to fully compensate CHEMTREAT in damages for the breach of Employee's obligations hereunder. Accordingly, Employee specifically agrees that CHEMTREAT shall be entitled to temporary and permanent injunctive relief to enforce the provisions of this Agreement and that such relief may be granted without the necessity of proving actual damages or irreparable injury or harm. Nothing contained herein, however, shall diminish the right of CHEMTREAT to claim and recover damages as appropriate.

4

9.  Attorneys' Fees

In the event CHEMTREAT files suit against Employee to enforce any provision of this Agreement and a court of competent jurisdiction finds in favor of CHEMTREAT, Employee shall reimburse CHEMTREAT its reasonable costs and attorneys' fees incurred in maintaining such suit.

10.  Miscellaneous

This Agreement shall not be binding until signed by an officer of CHEMTREAT at its corporate offices in Richmond, Virginia.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legatees, devisees, administrators, executors, successors and assigns, and its terms shall not be amended except by a writing signed by both parties.

If any portion of this contract shall be determined unenforceable by a court of competent jurisdiction, the remaining provisions of this Agreement shall remain in full force and effect. If any of the covenants or restraints provided in this Agreement are adjudicated to be excessively broad or otherwise unenforceable, said covenant or restraint shall be reduced to and enforced to whatever extent deemed reasonable by said court.

Employee acknowledges that he was provided an unsigned copy of this Agreement in advance of accepting initial employment or continued employment and was accorded ample opportunity to read and seek whatever counsel relative to the Agreement he deemed necessary.

11.  Governing Law

This Agreement is made in, and shall be construed under and governed by the laws of, the Commonwealth of Virginia exclusive of its choice of law provisions.

IN WITNESS WHEREOF, Employee has read, understood and duly executed this Agreement, and CHEMTREAT, INC., has caused this Agreement to be executed in its name and on its behalf by its duly authorized officers.

CHEMTREAT, INC.

Date: <u>August 17, 1995</u>          By: _Harrison R. Tyler_____

Harrison R. Tyler, President

Date: <u>August 17, 1995</u>          EMPLOYEE:

_Gregory P. Kinsman_____

Signature

_GREGORY P. KINSMAN_____

Print Name

6

## TRADE SECRETS AND CONFIDENTIALITY AGREEMENT

In consideration of my employment by ChemTreat, Inc. (Corporation) and of the salary and wages paid to me in connection with such employment, and other good and valuable consideration, I agree as follows:

1.    I recognize that the Corporation has a substantial investment in its development and use of commercially valuable technical and nontechnical information which the Corporation desires to protect by patents or by holding such information secret or confidential. Such proprietary information is vital to the success of the Corporation's business. I also recognize that during my employment, I will receive, develop or otherwise acquire such secret or confidential technical and nontechnical information. Except as authorized in writing by the Corporation, I will not disclose to persons not employed by the Corporation or to those persons employed by the Corporation to whom disclosure has not been previously approved by the president or any vice president of the Corporation, or use directly or indirectly, during or after my employment with the Corporation, any information of the Corporation I obtain during the course of my employment relating to inventions, products, product specifications, processes, procedures, prices, discounts, manufacturing costs, business affairs, future plans, technical data, customer lists (customer lists to include among other things customer requirements, products purchased by customers, and customer contacts and other business information pertaining to such customer), product formulations, marketing techniques and cost data. The foregoing sentence shall not be construed to apply to the direct or indirect use of information by employees of the Corporation in the performance of their duties and responsibilities during the course of their employment by the Corporation. This agreement also covers other information which is of a secret or confidential nature (whether or not acquired or developed by me) designated from time to time by the Corporation as being proprietary, trade secret or confidential information.

2.    Upon termination of my employment, for any reason, I shall not remove or retain without the Corporation's prior written consent any figures, calculations, letters, papers, drawings, reports, financial statements, product specifications, customer lists, product formulations, cost data or other confidential information of any type or description, or copies, summaries or extracts thereof, and I shall promptly return to the Corporation all such items which may be in my possession or control at the time of termination of my employment, other than information and documents belonging to me that were prepared or created prior to my employment by the Corporation which I shall be entitled to retain after termination of my employment.

3.    I will communicate to the Corporation promptly and fully all discoveries, improvements, processes, devices and inventions (hereinafter collectively called "inventions") made, discovered, conceived or developed by me

7

(either solely or jointly with others) during my employment and for six months thereafter which may be useful in or relate to the lines of the actual or anticipated business, work or investigations of the Corporation or which result from or are suggested by any work I may do for the Corporation; and such inventions, whether patented or not, shall be and remain the sole and exclusive property of the Corporation or its nominees or assigns.

4.    I will keep and maintain adequate and current written records of all such inventions, in the form of notes, sketches, drawings and reports relating thereto, which records shall be and remain the property of and available to the Corporation at all times. All such records shall remain on the premises of the Corporation at all times. Further, during and after my employment, without charge to the Corporation but at its request and expense, I will assist the Corporation and its nominees in every proper way to obtain and vest in it or them title to patents or such inventions in all countries by executing all necessary or desirable documents, including applications for patents and assignments thereof. I understand that as consideration for my assignment of any patent to the Corporation I will receive a cash bonus within the then current fiscal year of the Corporation.

5.    I understand and agree that in the event of any breach, violation or evasion of the terms of this agreement, any such breach, violation or evasion will result in immediate and irrevocable injury or harm to the Corporation and the Corporation shall be entitled to equitable and legal relief to protect its interest, including the recovery of its costs, expenses and attorney's fees in pursuing any such remedies.

6.    This agreement shall be construed according to the laws of the State of Virginia, and shall be binding upon my heirs, legal representatives and assigns and shall inure to the benefit of any successors and assigns of the Corporation.

7.    It is our intention that the provision of this agreement be enforceable to the fullest extent permissible under applicable law, and that unenforceability (or modification to conform to applicable law) of any provision, in whole or in part, shall not render unenforceable, or impair, the remainder of this agreement which shall be deemed to be amended to delete or modify, as necessary, the offending provision and to alter the balance of this agreement in order to render it valid and enforceable.

CHEMTREAT, INC.

BY: _Hanson Wyl_

Date: _August 17, 1995_

_Gregory P. Kinsman_
Employee's Signature

8



CORPORATE OFFICES: P. O. BOX 27207
RICHMOND, VA 23261 · (804) 965-0505

# *Memorandum*

TO:   Harrison Tyler        Gary Wein           T. J. O'Connor
      Ruth Hill             Dave Johnson        Jeff Norton
      Bill Simmons          Dave Beck           Jim Hastings
      John Nygren           Jack Bland          Rick Ashcraft
      Norm Fahrer           Mike Trulear        Jim Newlin
      Randy Azzarello       Scott Switzer       Phyllis Bargo
      Lynn Long             Fred Roensch        Cindy Jansen
      Mike Fitzpatrick      Lawasa Pitts        Daryl McMath
      Steve Leavell         Steve Hemmis        Terri Circeo
      Dennis Martin         Phyllis Bagent      Dave Cook
      Rick Hildebrant       Deanna Chavez       Dave Nuttall
      Tom Soukup            Cecily Whiteside    Cindy Lowe
      Doug Brown            Jo Wright           Julie Semp
      Vance Agee            Jeff Dowd
      Tim Reid              Nancy Berryman

FROM:     Kelly Ober

DATE:     August 15, 1995

SUBJECT:  New Salesman Orientation

                 Dean DiLonardo, Pennsylvania
                 Greg Kinsman, Illinois

Both men will be arriving for orientation the week of August 21.  They will train at Innsbrook on Monday, at Ashland on Tuesday, and complete their training at Innsbrook on Wednesday, August 23.

The schedule is attached. If you cannot be available during the time you are scheduled, please let me know as soon as possible.

Thank you for your cooperation and we look forward to a successful three days.

/kro
Enclosure



EXHIBIT
3

# ORIENTATION AND TECHNICAL TRAINING SCHEDULE

For: Dean DiLonardo, Greg Kinsman

**MONDAY (INNSBROOK)**
August 21, 1995

**STAFF MEMBER**

| | | | |
|---|---|---|---|
| 8:30 | - | 11:00 | Water Treatment/Orientation |
| 11:00 | - | 12:00 | Documents/Word Proc & Graphics |
| 12:00 | - | 1:00 | Lunch |
| 1:15 | - | 1:30 | Marketing Support |
| 1:30 | - | 1:45 | Quarterly Reports |
| 1:45 | - | 2:00 | Voice Mail Review/Business Cards |
| 2:00 | - | 4:45 | Water Treatment/ISO and Quality Policy Orientation |

Dave Johnson
Deanna Chavez
Staff
Cecily Whiteside
Lawasa Pitts
Jo Wright
Dave Johnson

**TUESDAY (ASHLAND & INNSBROOK)**
August 22, 1995

**STAFF MEMBER**

| | | | |
|---|---|---|---|
| 8:15 | - | 8:30 | Arrive at Ashland |
| 8:30 | - | 9:00 | Plant Tour |
| | | | Totes/Bulk Installation |
| 9:00 | - | 9:30 | Research & Development |
| 9:30 | - | 10:00 | Field/Test Kits/Lab Familiarization |
| 10:00 | - | 10:30 | Pricing/Packaging |
| 10:30 | - | 11:00 | Customer Service |
| 11:00 | - | 11:30 | Transportation/ISO/Quality Program |
| 11:30 | - | 12:00 | Equipment Purchases/ Rotation Equipment |
| 12:00 | - | 1:00 | Lunch |
| 1:15 | - | 1:45 | Depart/Travel to Innsbrook |
| 1:45 | - | 2:15 | Credit, Invoices, Collections |
| 2:15 | - | 3:00 | Expense Report Policy/Telephone LD |
| 3:00 | - | 3:45 | Payroll/Benefits |
| 3:45 | - | 4:30 | Company Policy and Benefits |

Jeff Norton
Dave Nuttall
Rick Ashcraft
T. J. O'Connor
Jim Hastings
Phyllis Bargo
Dave Cook
Daryl McMath

Staff

Terri Circeo
Cindy Jansen
Nancy Berryman
Jeff Dowd

**WEDNESDAY (INNSBROOK)**
August 23, 1995

**STAFF MEMBER**

| | | | |
|---|---|---|---|
| 8:00 | - | 10:30 | Physical |
| 10:45 | - | 11:00 | Environmental Concerns |
| 11:00 | - | 11:15 | Purchasing |
| 11:15 | - | 11:30 | Purchasing |
| 11:30 | - | 12:00 | Picture for Exchanger |
| 12:00 | - | 1:00 | Lunch |
| 1:15 | - | 1:45 | Meet Principal/Sign Contract |
| 1:45 | - | 2:15 | Technical Staff Role |
| 2:15 | - | 4:45 | Water Treatment/Orientation |

Tim Reid
Phyllis Bagent
Steve Hemmis
Julie Semp
Staff
Mr. Tyler
Norm Fahrer
Dave Johnson

TO: Kelly Ober
    Nancy Berryman
    Ruth Hill

CC:
SUBJECT: new salesmen
PRIORITY:
ATTACHMENTS:
-----------------------------------------------------------------------------

Dean DiLonardo    Title:  Area Manager        Vmx: 396
Gregory Kinsman   Title:  Senior Area Manager   Vmx:  560

Form **LLC-5.5**
December 2003

Jesse White
Secretary of State
Department of Business Services
Limited Liability Company Division
Room 351, Howlett Building
Springfield, IL 62756
http://www.cyberdriveillinois.com

Payment must be made by certified check, cashier's check, Illinois attorney's check, Illinois C.P.A.'s check or money order, payable to "Secretary of State."

**Illinois**
**Limited Liability Company Act**
**Articles of Organization**

*SUBMIT IN DUPLICATE*
Must be typewritten

This space for use by Secretary of State

Date 08-11-2004
Assigned File # 0126 3862
Filing Fee        $500.00
Approved: _TB_

This space for use by Secretary of State

# FILED

AUG 1 1 2004

JESSE WHITE
SECRETARY OF STATE

1. Limited Liability Company Name: Rhema Elpis Enterprises, LLC

   (The LLC name must contain the words limited liability company, L.L.C. or LLC and cannot contain the terms corporation, corp., incorporated, inc., ltd., co., limited partnership, or L.P.)

2. The address of its principal place of business: (Post office box alone and c/o are unacceptable.)
   754 First St.   LaSalle, IL  61301

3. The Articles of Organization are effective on: (Check one)

   a) __X__ the filing date, or b) _____ another date later than but not more than 60 days subsequent to the filing date: _____
   (month, day, year)

4. The registered agent's name and registered office address is:

   Registered agent: | Paul | G | Panzica
   | *First Name* | *Middle Initial* | *Last Name*

   Registered Office: | 754 | First Street |
   (P.O. Box and | *Number* | *Street* | *Suite #*
   c/o are unacceptable) | LaSalle | 61301 | LaSalle
   | *City* | *ZIP Code* | *County*

5. Purpose or purposes for which the LLC is organized: Include the business code # (IRS Form 1065).
   (If not sufficient space to cover this point, add one or more sheets of this size.)

   "The transaction of any or all lawful business for which limited liability companies may be organized under this Act."

   Business Code  #454390

6. The latest date, if any, upon which the company is to dissolve ____N/A____.
   (month, day, year)

   Any other events of dissolution enumerated on an attachment. (Optional)


EXHIBIT
4
5-3-06

**LLC-5.5**

7. Other provisions for the regulation of the internal affairs of the LLC per Section 5-5 (a) (8) included as attachment:
   *If yes, state the provisions(s) from the ILLCA.*     ☐ Yes     ☒ No

8. a) Management is by manager(s):     ☐ Yes     ☒ No
   *If yes, list names and business addresses.*

   b) Management is vested in the member(s):     ☒ Yes     ☐ No
   *If yes, list names and addresses.*

   Michelle Kinsman
   754 First Street
   LaSalle, IL  61301

9. I affirm, under penalties of perjury, having authority to sign hereto, that these articles of organization are to the best of my knowledge and belief, true, correct and complete.

   Dated _____ May 27 _____ , ___ 2004 ___
                  (Month/Day)              (Year)

| Signature(s) and Name(s) of Organizer(s) | Address(es) |
|---|---|
| 1. *Michelle Kinsman* | 1. 754 First Street |
| Signature | Number                    Street |
| Michelle Kinsman, Organizer  ᴍᴋ | LaSalle |
| (Type or print name and title) | City/Town |
| | Illinois                           61301 |
| (Name if a corporation or other entity) | State                          ZIP Code |
| 2. _____ | 2. _____ |
| Signature | Number                    Street |
| (Type or print name and title) | City/Town |
| (Name if a corporation or other entity) | State                          ZIP Code |
| 3. _____ | 3. _____ |
| Signature | Number                    Street |
| (Type or print name and title) | City/Town |
| (Name if a corporation or other entity) | State                          ZIP Code |

(Signatures must be in ink on an original document. Carbon copy, photocopy or rubber stamp signatures may only be used on conformed copies.)

LLC-4.8

**E-FILED**
Friday, 21 July, 2006  12:12:16 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 8 - DEPOSITION OF GREGORY KINSMAN (6 OF 8)

# RHEMA Enterprises, LLC

P. O. Box 127

Tiskilwa, IL 61368

Phone 815-872-1590

Fax 815-872-1590

March 12, 2004

Mr. Tom Moshage
Carus Chemical Company
1500 Eight Street
LaSalle, IL 61301

Dear Tom:

I have put together the pricing you requested regarding the boiler treatment chemicals. I think you will be pleased with the pricing being it is fixed for a minimum of 2 years and hopefully 3. This will be the equivalent of a 12-15% savings over the next 3 years. As you know your current supplier just passed a 6% increase for this year and has followed the industry with one every year. Performance is, of course, the key to maintaining high efficiencies and an economical program. We will complete this task in addition to saving Carus Chemical money over the next several years. Our products will perform exactly the same as your current products and we will have very little overhead to maintain. The manufacturer of these specialty chemicals is one of the best known commodity chemical suppliers in the country and is one of your very own customers. Ulrich Chemical Company will make all of the deliveries with their trained personnel. The way we are expecting to be able to maintain these fixed costs is by working with our customers and providing "just in time" deliveries. Large inventories are not required to be kept or stored so as to only benefit from volume orders. We will be able to deliver in 330 gallon quantities, or multiples, with only a few days notice once all our inventories are in place. We can even transfer 55 gallon drums into your holding tanks should the need arise. In return we are asking that our customers help us in keeping the payment cycle on track as close as possible to the 60 day net goal. We will also be providing the test reagent and equipment ordering service through Hach and the various equipment companies as part of our regular service. Please find listed below the comparison pricing for this quote.

| Current Supplier | | Old | New | Rhema |
|---|---|---|---|---|
| Current Supplier | xxxx | x.xx/lb | x.xx/lb | x.xx/lb |
| | xxx | x.xx | x.xx | x.xx |
| | xxxx | x.xx | x.xx | x.xx |
| | xxxx | x.xx | x.xx | x.xx |

Sincerely,

Michelle Kinsman
President



CORPORATION/LLC SEARCH RESULTS...                                Page 1 of 1



### SERVICES    PROGRAMS    PRESS    PUBLICATIONS    DEPARTMENTS    CONTACT

## LLC FILE DETAIL REPORT

| | | | |
|---|---|---|---|
| Entity Name | RHEMA ENTERPRISES LLC | File Number | 00909203 |
| Status | NGS | On | 05/01/2006 |
| Entity Type | LLC | Type of LLC | Domestic |
| File Date | 05/01/2003 | Jurisdiction | IL |
| Agent Name | JEROME E ROBINSON | Agent Change Date | 05/01/2003 |
| Agent Street Address | 1821 N MOBILE | Record Office | 1821 N MOBILE CHICAGO  60639 |
| Agent City | CHICAGO | Management Type | MGR |
| Agent Zip | 60639 | Dissolution Date | |
| Annual Report Filing Date | 00/00/0000 | For Year | 2006 |
| Assumed Name | ACTIVE - RHEMA PRODUCTIONS AND MANAGEMENT COMPANY ACTIVE - RHEMA RECORD COMPANY | | |

**Return to the Search Screen**

BACK TO CYBERDRIVEILLINOIS.COM



# Ulrich Chemical, Inc.

(309) 697-8400  **PHONE**

(309) 697-9644  **FAX**

Straight Bill of Lading  - Short Form - Original - Not Negotiable

# 191927

| B/L DATE |
|---|
| 04/25/2005 |

| B/L NO. |
|---|
| 157005 |
| Page 1 of 2 |

FROM:   Ulrich Chemical (06)
AT:     Bartonville, IL  USA

CARRIER  Will Call

S   Rhema Enterprises LLC
H   754 1st Street
I   LaSalle , IL 61301-
P   USA

S   Rhema Enterprises LLC
O   P O Box 127
L   Tiskilwa , IL 61368-
D   USA
TO

| CUST. NO. | SALES AGENT | OPERATOR | REQ. NO. | SHIP VIA | PO NUMBER | CUST ORDER NUMBER |
|---|---|---|---|---|---|---|
| 1005855 | 06074 | dmorris | | Other | Verbal - Greg | 157005 |

| SHIP DATE | WAREHOUSE | FREIGHT | FOB REMARK | DELIVERY DATE | DELIVERY TIME | DELIVERY TYPE |
|---|---|---|---|---|---|---|
| 04/26/2005 | 06 | Will Call | Ulrich-Bartonville | 04/26/2005 | 00:00:00 | Regular |

| QUANTITY ORDERED | QUANTITY OPEN | PACKAGING | HM | DESCRIPTION | NET WEIGHT LBS | GROSS WEIGHT LBS | FRT CLASS |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 50.00 lb PIP VNew OH | RQ | CALCIUM HYPOCHLORITE MIXTURES, DRY,5.1,UN1748,PGII | 50.00 | 52.00 | |
| | | Qty Shipped: | | ERG# 140 CCH 3" Cal Hypo Tablets 2002140-VOP050 | | | |
| | | | | Lot #: 4CH128D     Qty   1 | | | |
| | | | | Lot #: | | | |
| | | | | Total Weight (lbs): | 50.00 | 52.00 | |

*Gregory P. Kinsman*

EXHIBIT
7

# Ulrich Chemical, Inc.

(309) 697-8400   PHONE

(309) 697-9644   FAX

**Straight Bill of Lading** – Short Form – Original – Not Negotiable

| B/L DATE |
|---|
| 04/25/2005 |

| B/L NO. |
|---|
| 157005 |

Page 2 of 2

FROM: Ulrich Chemical (06)
AT:     Bartonville, IL   USA

CARRIER  Will Call

---

Pallets Left:   Wood: _____   Plastic: _____

| Driver: | Loader: | FOR CHEMICAL EMERGENCY - Spill, Leak, or Accident<br>CALL CHEMTREC - 800 - 424 - 9300 |
|---|---|---|

Note — Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.
The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding:

$_____ per _____

–This is to certify that the above named materials are property classified, described, packaged, marked and labeled and are in proper condition for transportation according to the applicable regulation of the Department of Transportation.

_____ Signature

Subject to Section 7 of the conditions, if the shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:
The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

_____ (Signature of Consignor)

If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is "carrier's or shipper's weight".

"The fiber boxes used for this shipment conform to the specifications set forth in the box maker's certificate thereon, and all other requirements of Uniform Freight Classification." Shipper's imprint in lieu of stamp, not a part of bill of lading approved by the Interstate Commerce Commission.

RECEIVED, subject to the classifications and lawfully filed tariffs in effect on the date of the issue of this Bill of Lading, the property described above in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as indicated above which said carrier (the word carrier being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its route, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed as to each carrier of all or property over all or any portion of said route to destination and as to each party at any time interested in all or any said property, that every service to be performed hereunder shall be subject to all the bill of lading terms and conditions in the governing classification on the date of shipment.
Shipper hereby certifies that he is familiar with all the bill of lading terms and conditions in the governing classification and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

| SHIPPER | CARRIER / 3rd PARTY | | COD | Amt: $ |
|---|---|---|---|---|
| Shipper | PLACARDS OFFERED<br>DRIVER PLEASE INITIAL. | PLACARDED<br>NAME OF PLACARD ☐ | | |
| PER Permanent Post Office Of Shipper | AGENT | | FREIGHT CHARGES<br>If charges are to be prepaid, write or stamp here.<br>"TO BE PREPAID." | **1** |
| | PER | | | |
| | TOTAL NO. OF PACKAGES REC'D. | | | |

# Jlrich Chemical, Inc.

309) 697-8400 PHONE

309) 697-9644 FAX

TRUCK RUN #: 34330

STOP #: 4

FROM: Ulrich Chemical (06)
AT: Bartonville, IL USA

# 191134

| B/L DATE |
|---|
| 04/19/2005 |

| B/L NO. |
|---|
| 155667 |

Page 1 of 2

**Straight Bill of Lading** - Short Form - Original - Not Negotiable

CARRIER Ulrich

S Carus Chemical Company
H 1500 Eighth Street
I LaSalle , IL 61301-
P USA

S Rhema Enterprises LLC
O P O Box 127
L Tiskilwa , IL 61368-
D USA

T
O

| CUST. NO. | SALES AGENT | OPERATOR | REQ. NO. | SHIP VIA | PO NUMBER | CUST ORDER NUMBER |
|---|---|---|---|---|---|---|
| 1005855 | 06074 | dbrooks | | Truck | Verbal - Greg | 155667 |

| SHIP DATE | WAREHOUSE | FREIGHT | | FOB REMARK | DELIVERY DATE | DELIVERY TIME | DELIVERY TYPE |
|---|---|---|---|---|---|---|---|
| 04/22/2005 | 06 | Prepaid | | Delivered | 04/22/2005 | 00:00:00 | Regular |

| QUANTITY ORDERED | QUANTITY OPEN | PACKAGING | HM | DESCRIPTION | NET WEIGHT LBS | GROSS WEIGHT LBS | FRT CLASS |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 300.00 lb DrF VenOHNew | | NON DOT REGULATED CHEMICALS, N.O.S. | 300.00 | 314.00 | |
| | | Qty Shipped: 1 | | Contains: SODIUM SULFITE | | | |
| | | | | Sodium Sulfite Catalyzed 2000705-VOF300 | | | |
| | | | | Lot #: 5012800158 Qty 1 | | | |
| | | | | Lot #: | | | |
| | | | | Total Weight (lbs): | 300.00 | 314.00 | |

Deliv chg
$30.96

FSC

M Schu

EXHIBIT
E
Bushman
PENGAD 800-631-6989

# lrich Chemical, Inc.

9) 697-8400  **PHONE**

9) 697-9644  **FAX**

JCK RUN #: 34330

OP #: 4

OM:  Ulrich Chemical (06)
AT:  Bartonville, IL  USA

Straight Bill of Lading  - Short Form - Original - Not Negotiable

| B/L DATE |
|---|
| 04/19/2005 |

| B/L NO. |
|---|
| 155667 |

Page 2 of 2

| CARRIER  Ulrich |
|---|

**Pallets Left:**  Wood: _0_  Plastic: ___

Driver: ___

Loader: ___

FOR CHEMICAL EMERGENCY - Spill, Leak, or Accident
CALL CHEMTREC - 800 - 424 - 9300

— Where the rate is dependent on value, shippers are
required to state specifically in writing the agreed or declared
value of the property.
— agreed or declared value of the property is hereby
specifically stated by the shipper to be not exceeding:

_____ per _____

This is to certify that the above-named materials are properly classified,
described, packaged, marked and labeled and are in proper condition for
transportation according to the applicable regulation of the Department of
Transportation.

_____
Signature

Subject to Section 7 of the conditions, if the shipment is to be
delivered to the consignee without recourse on the consignor,
the consignor shall sign the following statement:
The carrier shall not make delivery of this shipment without
payment of freight and all other lawful charges.

_____
(Signature of Consignor)

If the shipment moves between two ports by a carrier by water, the
law requires that the bill of lading shall state whether it is "carrier's
or shipper's weight".

"The fiber boxes used for this shipment conforms to the
specifications set forth in the box maker's certificate thereon, and
all other requirements of Uniform Freight Classification." Shipper's
imprint in lieu of stamp; not a part of bill of lading approved by the
Interstate Commerce Commission

CEIVED, subject to the classifications and lawfully filed tariffs in effect on the date of the issue of this Bill of Lading, the property described above in apparent good order, except as noted (contents and
dition of contents of packages unknown), marked, consigned, and destined as indicated above which said carrier (the word carrier being understood throughout this contract as meaning any person or
poration in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its route, otherwise to deliver to another carrier on the route to said destination.
mutually agreed as to each carrier of all or property over all or any portion of said route to destination and as to each party at any time interested in all or any said property, that every service to be performed
eunder shall be subject to all the bill of lading terms and conditions in the governing classification on the date of shipment.
hipper hereby certifies that he is familiar with all the bill of lading terms and conditions in the governing classification and the said terms and conditions are hereby agreed to by the shipper and accepted for
self and his assigns.

| SHIPPER | CARRIER / 3rd PARTY | | COD  Amt: $ |
|---|---|---|---|
| | PLACARDS OFFERED  DRIVER PLEASE INITIAL. | PLACARDED ☐  NAME OF PLACARD | FREIGHT CHARGES  If charges are to be  prepaid, write or  stamp here,  "TO BE PREPAID." |
| hipper | | | |
| R Permanent Post Office Of Shipper | AGENT | | 1 |
| | PER | | |
| | TOTAL NO. OF PACKAGES REC'D. _____ | | |

# ULRICH CHEMICAL, INC.

111 North Post Road    Indianapolis, IN  622

FOR HELP IN CHEMICAL SPILL, LEAK,
FIRE EXPOSURE OR ACCIDENT
DIAL TOLL FREE 1-800-424-9300

CM 77176
18067

lease make "X" in correct address below.

| INDIANAPOLIS, IN | TERRE HAUTE, IN | EVANSVILLE, IN | FT. WAYNE, IN | LOUISVILLE, KY | BARTONVILLE, IL | GEORGETOWN, KY |
|---|---|---|---|---|---|---|
| 3111 N. Post Road | 1400 Lockport Rd. | 4219 Garrison Rd. | 1615 Estella Avenue | 3900 Tucker Ave. | 4516 South Enterprise Dr. | 324 E. Yusen Dr. |
| PHONE: (317) 898-8632 | PHONE: (812) 234-7757 | PHONE: (812) 424-2966 | PHONE: (260) 749-9950 | PHONE: (502) 448-6200 | PHONE: (309) 697-8400 | PHONE: (502) 863-0084 |
| FAX: (317) 895-0614 | FAX: (812) 234-3349 | FAX: (812) 421-2077 | FAX: (260) 749-9650 | FAX: (502) 448-6204 | FAX: (309) 697-9644 | FAX: (502) 863-2523 |

(_____)
Customer No.

RECEIVED FROM _Thena Enterprises_
Customer Name

CITY _Tiskilwa_    STATE _IL_

## EMPTY CONTAINER RECEIPT

| TY | HM | UM | HAZARDOUS MATERIAL DESCRIPTION | HAZARD CLASS | ID NO. | PG | PLACARDS REQUIRED |
|---|---|---|---|---|---|---|---|
| | RQ 100# | EA | POUND CYLINDER RESIDUE: LAST CONTAINED AMMONIA ANHYDROUS, LIQUEFIED INHALATION HAZARD | 2.2 | UN 1005 | — | NON-FLAMMABLE GAS 2 |
| | RQ 10# | EA | POUND CYLINDER RESIDUE: LAST CONTAINED CHLORINE POISON INHALATION HAZARD / ZONE B / MARINE POLLUTANT | 2.3 | UN 1017 | — | POISON GAS 2 |
| | RQ 10# | EA | POUND CYLINDER RESIDUE: LAST CONTAINED CHLORINE POISON INHALATION HAZARD / ZONE B / MARINE POLLUTANT | 2.3 | UN 1017 | — | POISON GAS 2 |
| | X | EA | POUND CYLINDER RESIDUE: LAST CONTAINED HYDROGEN CHLORIDE ANHYDROUS POISON INHALATION HAZARD / ZONE C | 2.3 | UN 1050 | — | POISON GAS 2 |
| | X | EA | POUND CYLINDER RESIDUE: LAST CONTAINED SULFUR DIOXIDE, LIQUEFIED POISON INHALATION HAZARD / ZONE C | 2.3 | UN 1079 | — | POISON GAS 2 |
| | | EA | GALLON DRUM RESIDUE: LAST CONTAINED | | | | |

OTE: 1. Use RQ in HM column if material shipped is in quantities greater than RQ in one package.
2. ID# must be used on placard for containers with over 119 gallons capacity (i.e. totes, bulk, ton cylinders, etc.)

REV. 4/03

## MISCELLANEOUS RECEIPT

| Y | HM | UM | HAZARDOUS MATERIAL DESCRIPTION | HAZARD CLASS | ID NO. | PG | GROSS WT. |
|---|---|---|---|---|---|---|---|

| CHLORINE TON CYLS. (C20000) | | CHLORINE 150# CYLS. (C01500) | | CHLORINE 100# CYLS. (C01000) | AMMONIA 150# CYLS. (AA0150) | SULPHUR DIOXIDE TON CYLS. (So2000) | 150# CYLS. (So0150) |
|---|---|---|---|---|---|---|---|
| QTY. | QTY. | | | QTY. | QTY. | QTY. | QTY. |
| 1 | 1 | 13 | 25 | 1 | 1 | 1 | 1 |
| 2 | 2 | 14 | 26 | 2 | 2 | 2 | 2 |
| 3 | 3 | 15 | 27 | 3 | 3 | 3 | 3 |
| 4 | 4 | 16 | 28 | 4 | 4 | 4 | 4 |
| 5 | 5 | 17 | 29 | 5 | 5 | 5 | 5 |
| 6 | 6 | 18 | 30 | 6 | 6 | 6 | 6 |
| 7 | 7 | 19 | 31 | 7 | 7 | 7 | 7 |
| 8 | 8 | 20 | 32 | 8 | 8 | 8 | 8 |
| 9 | 9 | 21 | 33 | 9 | 9 | 9 | 9 |
| 10 | 10 | 22 | 34 | 10 | 10 | 10 | 10 |
| 11 | 11 | 23 | 35 | 11 | 11 | 11 | 11 |
| 12 | 12 | 24 | 36 | 12 | 12 | 12 | 12 |

| NTITY | DESCRIPTION | QUANTITY | DESCRIPTION | QUANTITY | DESCRIPTION |
|---|---|---|---|---|---|
| | 5 GAL. POLY CARBOYS (Pr0050) | | NO DEPOSIT: | | FOR DISPOSAL: |
| | 15 GAL. DELDRUMS (Pr0150) | | 55 GAL. DELDRUMS - NO DEPOSIT | | 55 GAL. DELDRUMS |
| | 15 GAL. STAINLESS STEEL DRUMS (SS150) | | 55 GAL. STEEL DRUMS - NO DEPOSIT | | 55 GAL. STEEL DRUMS |
| | 30 GAL. DELDRUMS (Pr0300) | | | | 55 GAL. POLY LINED STEEL DRUMS |
| | 55 GAL. DELDRUMS (Pr0550) | | CUSTOMER DRUMS: | | 55 GAL. PHENOLIC LINED STEEL DRUM |
| | 55 GAL. STAINLESS STEEL DRUMS (SS550) | | 55 GAL. DELDRUMS - CUSTOMER | | JUNK PALLETS |
| | 55 GAL. STEEL DRUMS (Sr0550) | | 55 GAL. STEEL DRUMS CUSTOMER | | TOTE TANKS |
| | PALLETS | | | | |
| | PLASTIC PALLETS | | | | |

| | CHECKED BY | RECEIVED BY | VIA | CUSTOMER SIGNATURE |
|---|---|---|---|---|
| 21-05 | | | | _Gregory P. Kusman_ |

EXHIBIT
9
FRESNO 800-631-6989

TURNABLE CONTAINERS REMAIN THE PROPERTY OF THE SELLER AND MAY BE RETURNED FOR FULL CREDIT WITHIN 120 DAYS OF SHIPMENT
IF IN GOOD CONDITION. PALLETS AND EMPTY CONTAINERS ARE PICKED UP FOR CREDIT SUBJECT TO FINAL INSPECTION IN OUR PLANT.

_____, a representative of the above listed company, hereby authorize that the empty _____ (Quantity/Drum Type/Tote Type)
roperty of Ulrich Chemical for inspection and reconditioning.

# U.S. DISTRICT COURT
## FOR CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

CHEMTREAT, INC., a Virginia ) 
corporation, )
)
       Plaintiff, )
)
     v. )    Case No.: 05-CV-1336
)
GREGORY P. KINSMAN, and )
MICHELLE M. KINSMAN, individually )
and d/b/a RHEMA ELPIS )
ENTERPRISES, LLC, )
)
       Defendant. )

## AFFIDAVIT OF GREGORY P. KINSMAN

Gregory P. Kinsman, being first duly sworn, states as follows:

1.    I was formerly employed by Chemtreat, Inc., as a salesman.

2.    I am not currently employed in any form or fashion either by myself, by Michelle M. Kinsman, individually, or by Rhema Elpis Enterprises, LLC.

3.    Rhema Enterprises, LLC is a single-member limited liability company owned by Michelle Kinsman with Illinois Limited Liability Act Business Code No. 454390. I own no portion of that business.

4.    Michelle Kinsman, my wife, is not a "strawman"; she has a business degree from the University of Wisconsin and runs the day-to-day operations of Rhema. I am not working, and have applied for disability benefits from the Social Security Administration due to my illness.

5.    I have never diverted customers from Chemtreat to Rhema and I have never "admitted" to anyone that I diverted customer accounts from Chemtreat to Rhema.

6.    I have provided Chemtreat with all of the formulas, books, brochures, and any and all other information and material which I had previously used as a salesperson for Chemtreat. I have retained none of the formulas, trade secrets, lists or any other information which Chemtreat alleges is or are trade secrets.



1:05-cv-01336-JBM-JAG # 44 Page 4 of 4

7. Rhema manufactures no products and there is no disclosure of information relative to proprietary information of Chemtreat to Rhema.

8. On or about September 5, 2003, I was advised by Daniel J. O'Brien, manager of Sales Development, Midwest, that as a result of plant closures at LTV, Chemtreat had lost a little over $200,000.00 in business which would be difficult to recover. I was further advised that due to my illness, it had been difficult to maintain a satisfied customer base and they were determined to have a backup representative for me. All of this information was provided to Randy Azzarelo.

9. Since September 5, 2003, Chemtreat, Inc. has been and has continued to provide little or no support to my efforts at selling their product.

10. The reason for my dismissal is because I suffer from Fabrys Disease, a condition which causes organ system failure. The healthcare costs to Chemtreat exceeds $20,000.00 per month. Since 2003, and my diagnosis with this condition, Chemtreat has taken the position that I have not been able to maintain the accounts in my sales area. Cronic Osteomylitis is costing $20,000.00 per month for IV therapy.

11. While Plaintiff has characterized these various "accounts" as their customers, in reality they have had little contact with Chemtreat over the past two years. Ingersoll Rand last did business with Chemtreat on January 26, 2004 and its first sale date was in November of 2002. Monmouth College last did business with Chemtreat on October 18, 2004 and first did business with Chemtreat in August of 2002. Bob Evans Farm last did business with Chemtreat in February 2004. Illinois Cement last did business with Chemtreat in August of 2004.

12. Despite my efforts to maintain service and to represent their product in the best light, the information I received from these and other customers was that the Chemtreat product was overpriced and that they did not wish to do business with Chemtreat as they were currently offering their services.

Further Affiant sayeth not.

*Gregory P. Kinsman*
Gregory P. Kinsman

Subscribed and Sworn to before me this

9th day of November, 2005.

*Alan M. Davis*
Notary Public

OFFICIAL SEAL
ALAN M. DAVIS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES August 04, 2009

2

U.S. DISTRICT COURT
FOR CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

CHEMTREAT, INC., a Virginia )
corporation, )
         )
         Plaintiff, )
         )
         )
         v. )         Case No.: 05-CV-1336
         )
GREGORY P. KINSMAN, and )
MICHELLE M. KINSMAN, individually )
and d/b/a RHEMA ELPIS )
ENTERPRISES, LLC, )
         )
         )
         Defendant. )

## AFFIDAVIT OF GREGORY P. KINSMAN

Gregory P. Kinsman, being first duly sworn, states as follows:

1.     I was formerly employed by Chemtreat, Inc., as a salesman.

2.     I am not currently employed in any form or fashion either by myself, by Michelle M. Kinsman, individually, or by Rhema Elpis Enterprises, LLC.

3.     Rhema Enterprises, LLC is a single-member limited liability company owned by Michelle Kinsman with Illinois Limited Liability Act Business Code No. 454890. I own no portion of that business.

4.     Michelle Kinsman, my wife, is not a "strawman"; she has a business degree from the University of Wisconsin and runs the day-to-day operations of Rhema. I am not working, and have applied for disability benefits from the Social Security Administration due to my illness.

5.     I have never diverted customers from Chemtreat to Rhema and I have never "admitted" to anyone that I diverted customer accounts from Chemtreat to Rhema.

6.     I have provided Chemtreat with all of the formulas, books, brochures, and any and all other information and material which I had previously used as a salesperson for Chemtreat. I have retained none of the formulas, trade secrets, lists or any other information which Chemtreat alleges is or are trade secrets.

7.      Rhema manufactures no products and there is no disclosure of information relative to proprietary information of Chemtreat to Rhema.

8.      On or about September 5, 2003, I was advised by Daniel J. O'Brien, manager of Sales Development, Midwest, that as a result of plant closures at LTV, Chemtreat had lost a little over $200,000.00 in business which would be difficult to recover. I was further advised that due to my illness, it had been difficult to maintain a satisfied customer base and they were determined to have a backup representative for me. All of this information was provided to Randy Azzarelo.

9.      Since September 5, 2003, Chemtreat, Inc. has been and has continued to provide little or no support to my efforts at selling their product.

10.     The reason for my dismissal is because I suffer from Fabrys Disease, a condition which causes organ system failure. The healthcare costs to Chemtreat exceeds $20,000.00 per month. Since 2003, and my diagnosis with this condition, Chemtreat has taken the position that I have not been able to maintain the accounts in my sales area. Cronic Osteomylitis is costing $20,000.00 per month for IV therapy.

11.     While Plaintiff has characterized these various "accounts" as their customers, in reality they have had little contact with Chemtreat over the past two years. Ingersoll Rand last did business with Chemtreat on January 26, 2004 and its first sale date was in November of 2002. Monmouth College last did business with Chemtreat on October 18, 2004 and first did business with Chemtreat in August of 2002. Bob Evans Farm last did business with Chemtreat in February 2004. Illinois Cement last did business with Chemtreat in August of 2004.

12.     Despite my efforts to maintain service and to represent their product in the best light, the information I received from these and other customers was that the Chemtreat product was overpriced and that they did not wish to do business with Chemtreat as they were currently offering their services.

Further Affiant sayeth not.

*Gregory P. Kinsman*
Gregory P. Kinsman

Subscribed and Sworn to before me this

9th day of November, 2005.

Notary Public

OFFICIAL SEAL
ALAN M. DAVIS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES August 04, 2009

2

September 3, 2003


Greg Kinsman
Post Office Box 312
Princeton, Illinois 61356

Dear Greg:

Thank you for taking the time to visit with me in Bettendorf, Iowa on July 2 and while traveling to some of your key accounts in and around Peoria, Illinois on August 26.

During our first visit, we discussed current business opportunities and the overall challenges you face, in particular the LTV plant closure that resulted in $200,000 in lost business, from which it has been difficult to recover. During this visit we agreed that as of January 1, 2004, you would move to a full commission pay plan. As a fully commissioned employee, you will earn 31 percent of all profit. In addition, ChemTreat will stop paying for your automobile and will begin paying 50 percent of your business expenses.

On our most recent visit, you discussed the potential for new business at the Mossville Caterpillar plant if Johnson Controls is awarded the management contract. We also discussed the potential for growth with J&B Construction and PQ Industries. Please contact me or anyone else in Corporate Support who could assist you in closing this business.



Greg Kinsman
Page 2
September 3, 2003

I know you recently began struggling with a tough illness. To your credit, you have been able to maintain a satisfied customer base, which was demonstrated when we visited MG Industries and two of your Caterpillar facilities. We will support your efforts and want you to contact us if you need any help during this difficult time.

After considering how to best support your business, we need to begin providing you with a backup representative for all of your facilities. Please begin working with Mike Klausegger on this as soon as possible.

Based on current invoicing through August, you will be on pace to $225,000 in annual profit. At 31%, this would pay approximately $69,000 in income. We had originally planned on converting your pay 1-1-04 to full commission which would mean that you would pay for ½ of your expenses and for 100% of your automobile expenses. Considering your situation, we will pay you a salary of $69,000 and continue to pay your expenses and for your lease automobile. We will pay you this through June 31st of 2004 and re-evaluate your situation at that time. If you are unable to work for health reasons, this would not apply.

Please stay in touch over the next few months as you work with Mike to keep us all up-to-date on the progress with your health and business activity.

Sincerely,

Daniel J. O'Brien

ejn



ChemTreat, Inc.

CORPORATE OFFICE: 4461 COX ROAD
GLEN ALLEN, VIRGINIA 23060 • (804) 935-2000

# Wal-Mart
# Mechanized Distribution Center No. 7024
# Sterling, Illinois

## Water Treatment
## Recommendations

THIS DRAWING IS SUBMITTED FOR:

☒ APPROVAL

☐ REFERENCE

REFRIGERATION SYSTEMS CO.

JOB NO. A-3560 DATE 1-11-05

RSC INTERNAL REVIEW

☒ Complies with project drawings,
   specifications and P.O.

☐ Revise and resubmit as noted

☐ Does not comply as noted

SALES _____ PM _____

ENGINEERING

Signed: _____

Date: 01/08/05

Prepared By

Gregory P. Kinsman

Senior Area Manager

ChemTreat, Inc.







EXHIBIT

12

KINSMAN



CORPORATE OFFICE: 4461 COX ROAD
GLEN ALLEN, VIRGINIA 23060 • (804) 935-2000

January 3, 2005

Mr. Gary Mills
Refrigeration Systems Company
1770 Genessee Avenue
Columbus, Ohio 44211

Dear Gary:

We at ChemTreat would like to thank you for allowing us to present water treatment recommendations for the Wal-Mart Mechanized Distribution Center located in Sterling, Illinois.

The operating data and water analyses obtained helped design an effective, economical treatment program tailored to your plant needs. The additional information requested has been added to this proposal.

We invite your careful study of our recommendations and appreciate your interest in ChemTreat.

Sincerely,

CHEMTREAT, INC.

*Gregory P. Kinsman*

Gregory P. Kinsman
Senior Area Manager

jif
Enclosure

E-FILED
Friday, 21 July, 2006  12:12:53 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 8 - DEPOSITION OF GREGORY KINSMAN (7 OF 8)

# Table of Contents

I.   Open Recirculating Cooling Water Systems

II.   Technical Service Program

III.   Chemical Feed and Control Equipment

IV.   Appendices

# Section I. Open Recirculating Cooling Water Systems

## Operational Data

| | |
|---|---|
| Location: | Sterling, Illinois |
| Recirculation Rate: | 4,200 gpm |
| Average: | |
| Temperature Difference: | 17°F |
| Evaporation Rate: | 47 gpm |
| Cycles of Concentration: | 4 |
| Bleedoff Rate and Windage Loss: | 16 gpm |
| Makeup: | 63 gpm |
| Daily Makeup: | 90,720 gallons |
| Estimated System Volume: | 7,500 gallons |

Our chemical treatment program is calculated on the following operational parameters:

| | |
|---|---|
| Days/Week: | 7 |
| Weeks/Year: | 52 |
| Days/Year: | 365 |

4

## Plant Operation Recommendations

Based on an extensive plant survey and the technical information provided, the following recommendations are offered for improvement of your plant operation:

- Based on the water chemistries provided by the City of Sterling, along with the recommendations made by the various manufacturers, operating the system at four cycles is possible, but not recommended. This bid is based on four cycles of operation and any questions can be addressed at a later date.

- Manufacturers specifications for their towers are listed in the accompanying document, Galvanized Tower Technical Bulletin.

- City of Sterling monthly mineralogical samples for the west water plant also accompany this bid.

- Bid specifications dictate the system will be operating at 75 percent total capacity.

## Treatment Recommendations

Our plant survey and detailed water analyses allow us to offer the following chemical treatment program specifically designed for the needs of your cooling system.

### Corrosion/Scale Inhibition

The success of any cooling water treatment program depends on several factors. The most important of these are the selection of tower cycles, system pH, and the correct choice and control of chemical inhibitors.

Treatment application begins with establishing correct cycles and pH control. With your makeup water, a treatment program cannot operate successfully in an environment above 1~2 cycles without acid feed. The use of sulfuric acid with the recommended treatment program will increase allowable limits to a more reasonable four cycles. This will reduce bleedoff and chemical requirements. The tower water pH will be controlled between 7.0 and 8.0, which is ideally suited for the treatment program selected.

Proper feed and control of the recommended product, ChemTreat CL-1432, will prevent scale and corrosion on heat transfer surfaces and in water distribution systems throughout the cooling water system. The product will be fed to the recirculating line by means of an automated chemical pump system.

5

P/Wal-Mart Sterling_Kinsman/01-05

Initial system passivation will be conducted immediately after the contractor completes system flushing. Cooling tower passivation will be completed by operating the tower at a pH of 7.0 and maintaining two times the normal level of CL-1432 in the system. This will be done for a minimum of two days, possibly more if time permits. Passivation will be completed with no load applied to the tower. The first two months of operation will be conducted under somewhat reduced cycles to ensure passivation is complete. The process is described in the cooling tower guide provided.

A coupon rack will be provided, at no cost, along with the necessary coupons. The system controller also has a full time corrosion monitor to track daily and hourly corrosion rates.

## Microbiological Control

The alternating use of NaOCl and ChemTreat CL-2150 will prevent fouling caused by bacteria, fungi, or algae growth in your cooling water system. This dual approach ensures system cleanliness and eliminates the possibility of developing resistant strains of microorganisms.

The City of Sterling was proud to report that their microbio counts were consistently below a count of 10 colonies/ml for all months listed on the report.

NaOCl will be considered the primary biocide. The product contains 12.5 percent sodium hypochlorite, which has proven through toxicology studies to be extremely effective in controlling the growth of most microbiological forms typically found in cooling water systems. The frequency of addition will depend on the degree of fouling present, as well as the critical need for control.

As an alternate toxicant, CL-2150 will be used. This product contains isothiazolin, a second, highly efficient microbiocide. When this biocide is alternated with the primary biocide, an extremely effective control program exists.

6

## Cost Summary

Based on the cooling system information found in the operational data, estimated daily use rates and costs are summarized below.

| Product | Pounds/Day | Price/Pound | Cost/Day |
|---|---|---|---|
| CL-1432 | 48 | $ 3.33 | $ 159.84 |
| NaOCl | 12 | 0.55 | 6.60 |
| CL-2150 | 1 | 4.90 | 4.90 |
| Total Cost/Day | | | $ 171.34 |

7

## Section II. Technical Service Program

### Representative Experience

The services of a qualified chemist or engineer are essential to ensure that all the benefits of our chemical treatment program are achieved. This service is key to the success of any chemical treatment program. Your ChemTreat representative has the following qualifications:

| | |
|---|---|
| **Representative:** | **Gregory P. Kinsman** |
| College and Major: | University of Wisconsin |
| | River Falls |
| | Chemistry Major |
| Water Treatment Experience: | 15 years |
| Residence: | Princeton, Illinois |
| Territory Serviced: | Peoria Area |

Education, training, and experience are needed to make sound technical recommendations in all phases of industrial water treatment.

### Service Schedule

In addition to routine evaluation of chemical applications and feed equipment, our program will include, at no additional charge, specific services designed to improve the applications. Routine service will occur on a repeating two-week interval between visits. The following is an initial commitment based on present needs. Expansion of these services is available as future directions are discussed.

8

## *Cooling Water System*

| Service | As Needed | Twice/ Month | Monthly | Quarterly | Semi-Annually | Annually |
|---|---|---|---|---|---|---|
| Microbiological Studies | ✓ | | | | | |
| Makeup Analyses | | ✓ | | | | |
| Corrosion Coupon Studies | | | ✓ | | | |
| System Pretreatment | ✓ | | | | | |
| System Sampling and Laboratory Analyses | | ✓ | | | | |
| Iron and Copper Profiles | ✓ | | | | | |
| Toxicant Evaluations for Biocide Selection | ✓ | | | | | |
| Deposit Analyses | ✓ | | | | | |
| Metallurgical Analyses | ✓ | | | | | |
| Equipment Inspections | | ✓ | | | | |
| Heat Exchange Coefficient Determinations | ✓ | | | | | |
| Biofilm Monitoring | | ✓ | | | | |

P/Wal-Mart Sterling_Kinsman/01-05

## *General Services*

| Service | As Needed | Twice/ Month | Monthly | Quarterly | Semi- Annually | Annually |
|---------|-----------|--------------|---------|-----------|----------------|----------|
| Reviews of Plant Testing | | ✓ | | | | |
| Check Plant Testing Equipment Against Standards | | ✓ | | | | |
| Operator Training | ✓ | | | | | |
| Chemical Cost Summaries | | | | ✓ | | |
| Formal Management Reviews | ✓ | | | | | |
| Chemical Inventory Reviews | | ✓ | | | | |

10

# ChemTrack® Computerized Data Management Software

ChemTrack® is a comprehensive, computerized data management system. Any measurement that an operator now observes and records can be tracked with the program. Data that is typically recorded includes boiler and cooling water system test results, water, steam or process flow rates, product usage rates, etc. With ChemTrack®, the user can define any system measurement, record and retrieve data as often as desired, alert operators when entered readings are outside a designated range, provide comments or instructions to direct "out-of-limit" actions, provide summary reports covering any time frame, generate graphs of the data in any time interval selected, draw a trend line (regression analysis), provide exception reports and data distribution graphs (histograms). Graphs may be presented in line, area, point, 3-D and other formats.

ChemTrack® incorporates statistical process control (SPC) functions. SPC helps identify the data variables within a control range and helps clarify trends and upset conditions in a system. The program generates x-bar and range charts covering the data points in a selected interval, using any subgroup size. Output may go to the screen or printer or may be exported to other programs.

ChemTrack® enables multiple databases to be set up for a plant site. ChemTrack® will handle up to 15 different measurements to be tracked on one data entry screen and will handle multiple data screens, up to 25 per system. Such an example is a site having several different boilers, cooling systems, air washers, etc., each of which requires data tracking of many different measurements.

ChemTrack® allows the user to create customized calculations to compute and track, for example, percent blowdown, tower cycles, retention time, stability index, Na:PO4 ratio, etc. Calculations use any standard math function, variable, or constant. Special summation and averaging functions are also included.

Using product consumption data, the program will produce a report of product usage, as well as days of product remaining and recommended ordering points (set by representative or plant). This function is useful in plants that tend to maintain low levels of inventory or is operating in a "just-in-time" mode.

# *ChemTrack® Highlights*

- Easy to set up and use.
  - ➢ Menu driven; no computer experience necessary.
  - ➢ Help screens readily available.
  - ➢ Comprehensive, easy-to-understand operating manual.

- Extremely flexible—makes the program fit your data management needs.
  - ➢ Self-define your own data points and data entry scheme.
  - ➢ Self-define your own calculations.
  - ➢ Unlimited number of measurements, systems, and data entry screens.
  - ➢ Unlimited ability to add, modify, or delete measurements and screens.

- Extremely powerful—turns data into usable information.
  - ➢ Easily create graphs and charts:
    - Create line, bar, point, or area graphs for any measurement.
    - Regression analysis generates a trend line on any graph.
    - Produce SPC charts in x-bar and range format for any measurement or time period.
    - Superimpose up to four graphs on one chart, or up to four charts on one page.

  - ➢ Easily create reports:
    - Produce exception reports from self-set measurement limits.
    - Produce customized reports from a built-in query system.
    - Produce a summary of system status reports between any two dates.
    - Edit any report easily.
    - Add comments to any report as needed.
    - All reports, graphs, and charts are compiled and viewed on screen or printed in presentation quality.
    - The data for all reports, graphs, and charts can be sent to a file or disk or exported to a word processing or spreadsheet program.
    - The program contains built in email capability from which to send reports and graphs.

12

## *ChemTrack® Hardware Requirements*

ChemTrack® programs run on IBM or IBM-compatible personal computers. The following description is for a typical Windows system. The following is the minimum configuration required for a user-friendly system with the features needed for present as well as future expansion.

- Computer System Components
  - ➢ 133-Mhz, or faster, CPU
  - ➢ 32 Meg RAM, minimum.
  - ➢ 1.44-megabyte, 3.5" floppy drive
  - ➢ Standard CD-ROM disk drive
  - ➢ 540-megabyte hard drive, or larger (15 megabytes of free disk space)
  - ➢ 101-key IBM AT-style keyboard
  - ➢ Mouse

- Monitor
  - ➢ VGA color monitor, 15", 800 x 600 screen resolution

- Printer
  - ➢ Any Windows ink jet or laser printer. A color printer is preferred for high-quality graphics

- Software and Miscellaneous
  - ➢ Compatible operating systems: Windows 98, 2000, NT, Me, XP. LAN and WAN capable.
  - ➢ ChemTrack® for Windows supplied on CD. Comprehensive setup and operating manual included.
  - ➢ Optional hand held data logger available.

ChemTrack® for Windows is supported by ChemTreat specialists, as well as a free telephone Help Line. Technical support and periodic software upgrades are included at no additional charge.

F/Wal-Mart Sterling_Kinsman/01-05

## Section III. Chemical Feed and Control Equipment

Proper chemical additions, tests, and control are essential to the success of the ChemTreat treatment program. The following feed and control equipment needs to be added to ensure proper treatment and control:

- One Aquatrac Smart Flex controller, model SFT-CF-T1-OR-RM-CR/CS, priced at $4,560.00

- Four Pulsatrol chemical feed pumps, model LPB3-SA-PTC1-XXX, priced at $1,992.00

- Four chemical injectors, model J41758, priced at $192.00

- One motorized blowdown valve, ASCO 2#, priced at $1,029.00

14

# SMART Flex          SFT Series          Cooling Towers

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **CD** | Conductivity Control & Selectable Inhibitor Feed, Sensor Included | | | | | | | | | | $ 1445.00 |
| **PH** | pH Controller, Acid and Caustic Feed, Sensor Included | | | | | | | | | | $ 1470.00 |
| **CP** | Conductivity & pH Control, Selectable Inhibitor Feed, Sensors Included | | | | | | | | | | $ 2300.00 |
| **CD2** | Dual Conductivity Control & Selectable Inhibitor Feed, Sensors Included | | | | | | | | | | $ 1918.00 |
| **PH2** | Dual pH Controller, Acid and Caustic Feed, Sensors Included | | | | | | | | | | $ 2218.00 |
| **CP2** | Dual Conductivity & pH Control, Dual Selectable Inhibitor Feed, Sensors Included | | | | | | | | | | $ 3360.00 |

| | **T1** | Single Biocide Timer with Lockout & Pre-bleed | | | | | | | | | $ 155.00 |
| | **T2** | Dual Biocide Timer with Lockouts & Pre-bleeds | | | | | | | | | $ 375.00 |
| | **T12** | Dual Tower, Single Biocide Timer with Lockouts & Pre-bleeds | | | | | | | | | $ 360.00 |
| | **T22** | Dual Tower, Dual Biocide Timer with Lockouts & Pre-bleeds | | | | | | | | | $ 675.00 |

| | | **P** | Flow Lockout Switch, use F2, F3, F4 for Towers 2, 3 & 4 | | | | | | | | $ 175.00 ea |
| | | | **OR** | ORP Control with time window selection, use OR2, OR3, for multiple ORP's | | | | | | | $ 635.00 ea |
| | | | | **L1** | One liquid level sensor for a drum or tank, Specify length when ordering. Use L2, L3 & L4 for up to four liquid levels | | | | | | $ 475.00 ea |
| | | | | | **R2** | RS232 Serial Communications & data logging. | | | | | $ 335.00 |
| | | | | | **R22** | Modem & Auto switched RS232 with data logging, remote command & control, alarm dial out. | | | | | $ 760.00 |
| | | | | | | **NT** | Controller Networking – Modem Sharing (Requires R2 or R22) | | | | $ 300.00 |
| | | | | | | | **LN** | Ethernet Networking (Requires R2 or R22) | | | $ 665.00 |
| | | | | | | | | **IC, IP, IO, IR** | 4-20mA Output on Conductivity, pH, ORP, Corrosion Rate, 4 MAX. | | | $ 175.00 ea. |
| | | | | | | | | | **FFP** | pH Sensor upgrade to Flat Faced, Double Junction. Specify In-Line or Immersion | | $ 200.00 ea |
| | | | | | | | | | **FFO** | ORP Sensor upgrade to Flat Faced, Double Junction. Specify In-line or Immersion | | $ 200.00 ea |
| | | | | | | | | | | **CRCU** | Corrosion Rate, Copper Tip | $ 775.00 ea |
| | | | | | | | | | | **CRCS** | Corrosion Rate, Carbon Steel Tip | |
| | | | | | | | | | | **CRAM** | Corrosion Rate, Admiralty Tip | |
| | | | | | | | | | | **CRCN** | Corrosion Rate, Cupro-Nickel Tip | |
| | | | | | | | | | | **CK** | Make-up Water Conductivity | $ 575.00 |
| | | | | | | | | | | | **AR** | Alarm Contacts 115VAC | $ 55.00 |
| | | | | | | | | | | | **AD** | Alarm Dry Contacts | $ 55.00 |

SFT  CD  T1  P  CK2  L1  R2  NT  LN  IC  FFP FFO  CR  CK  AR  AD
   CP2  T3            L3

**NOTES**
1. ORP Controllers with T22 Biocide system limit biocide feed timing to a set of pumps.
2. Configuration is limited by available inputs and outputs.
3. Use conductivity upgrade CK for Hi-con cooling over 5450.
4. Up to four 4-20mA outputs per controller.
5. SMART FLEX has 8 relays available, controls limited to a maximum of 8 on-off pumps and solenoids.
6. FIELD VERIFICATION – see Built-In Upgrades, page 40

| Sample System #1 | |
|---|---|
| **SFT-CD-T2-P** | $ 1955.00 |

| Sample System #2 | |
|---|---|
| **SFT-PH-F-L3-R2-AD** | $ 2215.00 |

| Sample System #3 | |
|---|---|
| **SFT-CP2-T12-F3-L1-R22** | $ 5203.00 |

# Section IV. Appendices

FOB Delivered
(Ashland, Virginia)
Terms: Net 30 Days

### Ordering Information

ChemTreat, Inc.
4461 Cox Road
Glen Allen, Virginia 23060
Telephone 1-804-935-2200
Toll-free direct to Customer Service 1-800-648-4579
(for order placement only)

### Payment Address

ChemTreat, Inc.
Post Office Box 60473
Charlotte, North Carolina 28260-0473

16

## Terms and Conditions of Sale

Acceptance of this order is expressly conditioned upon the terms and conditions contained herein. Any additional or different terms or conditions set forth in Buyer's purchase order or similar communication are objected to and will not be binding upon ChemTreat, Inc. ("ChemTreat") unless specifically assented to, in writing, by an authorized representative of ChemTreat management.

- *Terms.* Any order or statement of intent by Buyer to purchase any goods or any direction to proceed with shipment shall constitute assent to the Terms and Conditions set forth herein and in any attachments hereto. This sale is not valid unless accepted by an authorized representative of ChemTreat in its offices in Richmond, Virginia.

- *Delivery and Risk of Loss.* Factory shipping dates given in advance of actual shipment are estimates and shall not be deemed to represent fixed or guaranteed shipping dates. ChemTreat shall not be liable for any loss or damages as a result of any delay and delivery due to any cause beyond ChemTreat's reasonable control, including, without limitation, an act of God, act or omission of Buyer, act of civil or military authority, governmental priority or other allocation of control, fire, strike or other labor difficulty, riot or other civil disturbance, inability to obtain materials, or delay in transportation or any other commercial impracticability. In the event of any such delay, the date of delivery or performance shall be extended for a period equal to the time lost by reason of delay. Unless otherwise agreed on Buyer's purchase order or in a service agreement (i), all sales are made FOB point of shipment, and (ii) title and risk of loss or damage shall pass to Buyer upon shipment.

- *Price and Terms of Payment.* Price shall be as agreed to on Buyer's purchase order or in an applicable service agreement. Unless otherwise agreed on Buyer's purchase order, terms shall be net 30 with a finance charge of 1½% per month after 30 days (Annual Percent Rate of 18%). Buyer shall pay the purchase price quoted herein plus any applicable taxes. Buyer shall provide to ChemTreat any applicable tax exemption certificates.

- If, in ChemTreat's judgment, the financial condition of Buyer at the time of shipment does not justify the terms of payments specified, ChemTreat reserves the right to acquire from Buyer full or partial payment or adequate assurance of performance prior to shipment. ChemTreat also reserves the right to suspend shipment until such payment or assurances from Buyer are received.

- *Warranties.* All products are inspected before shipment. ChemTreat warrants to Buyer that the products manufactured by ChemTreat will conform to ChemTreat's specifications, if any. ChemTreat makes no other warranties of any kind, whether statutory, written, oral, expressed or implied as to the goods or their condition, quality or characteristics, or as to any other matter. The foregoing warranties are in lieu of all other express and implied warranties, including, without limitation, any warranty of merchantability or fitness for a particular purpose, whether known or not known to ChemTreat.

- *Limitation of Liability.* The Buyer's sole and exclusive remedy shall be limited to replacements of products that do not substantially conform to the specifications under which the products were manufactured, provided that prompt, written notice of such failure is given to ChemTreat. ChemTreat will either replace the affected goods with conforming goods or refund the purchase price paid by Buyer to ChemTreat for the affected goods at ChemTreat's option. In no event shall ChemTreat be liable for special, direct, indirect, incidental or consequential damages, whether in contract, tort, negligence or otherwise. Use of the goods by Buyer shall be deemed an acceptance of the goods.

- Buyer shall assume all responsibility for injury or damage to Buyer or others based on or arising out of possession, handling or use by Buyer or by others of any materials purchased from ChemTreat for any purpose whatsoever, including, but not limited to, any injuries or damages arising from spillage or other occurrences during the unloading of the product at its destination and shall hold and save ChemTreat harmless of and from any and all claims, demands, damages, actions and causes of action whatsoever arising from or growing out of such injury or damage.

- *Return of Materials.* Materials may not be returned without the prior, written consent of ChemTreat.

- *Termination.* Unless otherwise provided in an applicable service agreement, either party may terminate an order within 30 day's notice to the other. Upon expiration of 30-day period of notice of termination, inventory (chemicals and equipment) will be bought by customer at list price. Standard terms and conditions will apply.

- *Assignment.* The delegation or assignment of Buyer of any or all of its duties or rights hereunder, without the prior, written consent of ChemTreat, shall be void.

- *Acceptance.* This document is not an Expression of Acceptance or a Confirmation document as contemplated in Section 2-207 of the Uniform Commercial Code. The acceptance of any order entered by Buyer is expressly conditioned on Buyer's assent to any additional or conflicting terms contained herein.

- *Governing Law.* This agreement shall be governed and construed according to the laws of the Commonwealth of Virginia.

17

P/Wal-Mart Sterling_Kinsman/01-05



| | **Technical Bulletin #82**<br>Pretreatment, "Passivation," and<br>Maintenance Recommendations for<br>Galvanized Cooling Towers or Evaporative<br>Condensers |
|---|---|

## Introduction

Galvanized metal was first used in the 1930s and 1940s and is, unfortunately, perceived by many as the answer to long-term corrosion of mild steel. In fact, galvanizing can contribute to corrosion, depending on water characteristics and operating conditions.

It is extremely important that the function and limitation of zinc galvanizing be clearly understood. Galvanization is designed to be "sacrificed" (i.e., lost) in place of the base iron metal. It will be lost eventually regardless of the water treatment "passivation" or maintenance program followed.

There are many who suggest that galvanized tubes and other system parts exposed to **constantly wetted** surfaces are an unnecessary added expense that often leads to excessive deposits, including aesthetically unacceptable white deposits, and unreasonable operating and treatment costs. Furthermore, in many cases, the makeup water characteristics do not allow operating the system within manufacturer's warranty guidelines and/or will cause excessive water and chemicals to be used if the manufacturer's guidelines are not violated.

Until approximately 1985, the majority of white rust problems were confined to the southeast and northwest areas of the United States, where water is very low in hardness. In these areas, total hardness in the makeup may be less than 2 ppm as calcium carbonate. In these areas, reports of white rust have existed for many years.

It is generally believed that the two most important factors contributing to wider reports of white rust in galvanized cooling towers and evaporative condensers in other areas of the United States are the newer process, which creates a thinner galvanizing, and the removal of chromate from the galvanizing process. There has also been an increased use of nonchromate alkaline treatments in cooling systems.

Because of the increase in white rust, a Cooling Tower Institute task force committee was formed several years ago. A summary of their recommendations is included in the enclosed table.

T/Roensch/3-03

Another factor that may contribute to loss of galvanizing is the greater potential for reduced "aging" of galvanized cooling towers and evaporative condensers because of better inventory control. In the past, a larger inventory was likely maintained, and equipment was exposed to the elements for months rather than weeks. As a result, the galvanizing in new towers may be much newer and less aged when they are placed in service, compared to those built years ago.

There have also been reports that the amount of aluminum in the galvanizing has increased since the process has changed. Aluminum can be lost quickly, possibly resulting in an increased level of initial pitting, causing a greater susceptibility to white rust.

Cooling towers fabricated of galvanized steel are susceptible to corrosion attack of the zinc coating. Generally, the hot water return pans on the tower deck will corrode most readily, followed by the cooling tower sump. Corrosion of galvanized towers usually occurs within the first year of service. When conditions are conducive, tower corrosion will continue unabated until corrective measures are taken or until metal failures occur. It is important to note that white rust is the result of corrosion of the galvanized coating and not of the base metal. If the galvanized coating is completely removed, the unprotected steel may corrode rapidly, and serious damage to the basic structure and integrity of the tower will occur over time.

In a cooling water system, corrosion of the galvanized coating results in the solubilizing of zinc ions into solution at the anodic site. The corresponding cathodic reaction forms hydroxyl ions and a localized high pH. Depending on water chemistry, the reaction between the zinc ions and the hydroxyl ions will form one of several possible compounds. The protective compound that can form is a hydrated basic zinc carbonate compound, $3Zn(OH)_2 \cdot ZnCO_3 \cdot H_2O$. This material provides protection because its strongly adherent, nonporous nature forms a physical barrier that prevents the dissolution of zinc into the bulk cooling water. However, the nonprotective compound that also can form is a simple zinc carbonate, $ZnCO_3$. This material is highly porous, loosely adherent, and prone to sloughing off. These traits allow the cooling water to continuously contact the galvanized layer, perpetuating the corrosion cycle.

White rust formation and deposition in cooling water systems can be attributed to any variety of physicochemical conditions. These include the following:

≈ Bulk cooling water pH values above 8.0

T/Roenech/3-03

- Low pH
- Low level of calcium in the water
- Total alkalinity above 300 ppm as CaCO3
- High conductivity

When a new tower is brought on line, these conditions should be avoided or minimized until the galvanized coating is thoroughly passivated or "aged." This may take two to three months of continuous operation using a program designed to passivate the zinc coating.

## New System Startup (First Two Months)

To help form a stable, aged, basic zinc carbonate coating on a new galvanized tower, the following procedure is recommended.

1. If possible, the time used for hydrotesting should be minimized. Galvanized metal exposed to untreated stagnant water, particularly if the water has low hardness, can quickly initiate loss of galvanizing and increase susceptibility to white rust when the tower is placed on line.

2. Thoroughly flush the tower, deck, sides, and lines with filtered water treated with 50–500 ppm of CL-450. This treatment contains a surfactant and is not alkaline. Because of the potential for foam, it is prudent to have an antifoam on hand during this process.

3. If the lines can be isolated from the tower, a conventional alkaline/polyphosphate treatment such as CT-23 can be used separately on the mild steel lines and associated equipment. For example, CT-23 is added at 4 gallons/2,000 gallons and then flushed from the system thoroughly after treatment and tested to insure the pH is below 8.0.

4. If passivation is requested, we recommend treatment under "no-load" conditions, with two to three times the normal dosage of the recommended maintenance scale/corrosion treatment for 24–48 hours maximum. At no time, however, should the specific manufacturer's water treatment guidelines shown on the next page be exceeded. For at least two months, strictly adhere to the guidelines given in the table for specific **manufacturers.**

T/Roesch/3-03

5. As quickly as possible, develop at least 100 ppm of total hardness as $CaCO_3$ in the tower. This is critical to prevent initial loss of zinc. Note the recommended minimum of 30 ppm total hardness by BAC, 100 ppm by Marley, and 50 ppm by CTI. If the minimum level of hardness cannot be achieved because of very low hardness in the makeup, this needs to be discussed. ChemTreat recommends that a minimum LSI of +1.0 be quickly developed.

6. At least once per year, or when white rust appears, thoroughly clean the sump and the distribution deck and paint them with heavy, zinc-based paint. We do not recommend other coatings such as epoxy. To the best of our knowledge, high levels of orthophosphate, polyphosphate of any kind, tolyltriazole (TT), zinc, molybdate (Mo), or a combination of these will not have any significant impact on the initial or subsequent loss of zinc galvanizing and may make conditions worse.

## Operation Guidelines (After the First Two Months)

ChemTreat recommends the following guidelines for extending the useful life of galvanized tubes and other elements in the system.

1. Maintain pH control as tightly as possible (ideally within 0.1 unit) and do not exceed pH 8.0. If pH control is not available and the pH rises above 8.0, pH control should be discussed. These operating conditions may violate manufacturer's guidelines and can invalidate the warranty. With a pH above 8.0, an increased rate of galvanizing loss is expected.

2. To maintain the warranty, do not violate the following applicable guidelines.

T/Roensch/3-03

## Manufacturers' Guidelines

| Parameter | BAC | | Marley** | Evapco | CTI |
| --- | --- | --- | --- | --- | --- |
| | Baltibond®* | Galvanized | | | |
| PH | 6.5–9.0 | 7.0–9.0 | 6.5–8.0 | 6.5–8.0 | 7.0–8.0 |
| Hardness (as CaCO₃) | 30–500 ppm | 30–500 ppm | 100–300 ppm (note higher minimum) | 50–300 ppm | 50 ppm min |
| Alkalinity | 500 ppm max | 500 ppm max | 100–300 ppm | 50–300 ppm | 300 ppm |
| Total dissolved solids | 1,200 ppm max | 1,000 ppm | None given | None given | None given |
| Chlorides | 250 ppm max | 125 ppm max (very low) | None given | <125 ppm | 450 ppm max |
| Sulfates | 250 ppm max | 125 ppm max | None given | None given | 1,200 ppm max |

*Galvanized metal coated with polyurethane

**See the following page for revised Marley, North Carolina cooling tower specifications.

If any applicable guidelines are exceeded because of makeup water quality and/or operating conditions, those water conditions violating recommended guidelines should be discussed with the customer and placed in writing.

3.  Staying within the specific manufacturer's guidelines, ChemTreat recommends the following treatments and operating conditions:

    a.  Operate at a minimum LSI of +1.0 and minimum pH of 7.0.

    b.  Do not operate the system above pH 8.0 (unless documented).

    c.  Control pH (ideally) at ±0.1 unit by controlling blowdown.

    d.  Feed at least 2–3 ppm copper corrosion inhibitor (TT) to the system to minimize the potential for accelerated loss of zinc from the galvanic impact of trace copper creating zinc loss.

T/Roensch/3-03



e. Maintain at least 5–10 ppm active polymer in the system. This level of dispersant will help reduce the buildup of white zinc carbonate and/or zinc hydroxide on the tubes and other galvanized parts of the system. **Do not exceed 20 ppm of active polymer.** There have been reports of dezincification under these conditions with polymers.

4. *As needed*, coat the basin or sump with a heavy, zinc-based paint. The surface must be cleaned and prepared properly for a lasting treatment. Epoxy-based coatings are not recommended.

5. Institute routine system cleaning (or at least thorough cleaning after shutdown and before startup) to reduce the potential for underdeposit corrosion and premature loss of galvanizing.

Marley recently issued revised specifications for the North Carolina galvanized cooling towers. They are as follows:

| | |
|---|---|
| pH | 6.5–8.0 |
| Chloride as NaCl | 750 ppm maximum |
| Sulfate as SO₄ | 1,200 ppm maximum |
| Calcium as CaCO₃ | 800 ppm maximum |
| Silica as SiO₂ | 150 ppm maximum |

T/Roensch/3-03

E-FILED
Friday, 21 July, 2006  12:13:26 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 8 - DEPOSITION OF GREGORY KINSMAN (8 OF 8)



| | Product Data |
|---|---|
| ChemTreat, Inc. | COOLING WATER TREATMENT |

### CHEMTREAT CL-1432

**GENERAL DESCRIPTION**

CHEMTREAT CL-1432 is an advanced formulation of orthophosphate and polyphosphate sequestrants, polymeric dispersants and organic corrosion inhibitors. Application of CHEMTREAT CL-1432 will prevent corrosion of those metals common to re-circulating cooling water systems. In addition, CHEMTREAT CL-1432 exhibits excellent dispersing properties which will prevent the formation of mineral scale and metal oxide deposits on heat transfer surfaces. CHEMTREAT CL-1432 provides maximum heat transfer and equipment life without pH control of heavy metals.

**TYPICAL PHYSICAL PROPERTIES**

| | |
|---|---|
| Form | Straw-colored liquid |
| Odor | Mild |
| pH | ~14 |
| Density | ~11.18 lbs./gal. |
| Freeze Point | ~3°F |

**DOSAGE**

The dosage of CHEMTREAT CL-1432 will vary depending upon the system being treated and chemical analysis of water supply. Optimum levels are determined by a ChemTreat Technical Representative.

**FEEDING**

CHEMTREAT CL-1432 may be fed directly from the drum for best results.

**SAFETY PRECAUTIONS**

For specific information on handling, safety and first aid, please review the product's Material Safety Data Sheet.

**SHIPPING**

CHEMTREAT CL-1432 is available in 55-gallon drums and in 300-gallon returnable totes.

Rev. 07/03



## Product Data
### COOLING WATER MICROBIOCIDE

## CHEMICAL TREATMENT CL-2150
### EPA Reg. No. 15300-24

### GENERAL DESCRIPTION

CHEMICAL TREATMENT CL-2150 is a formulation of two organo-sulfur antimicrobials designed to control algae, bacteria, and fungi in recirculating cooling water systems. CHEMICAL TREATMENT CL-2150 is particularly effective against those slime-forming organisms common to condenser water and air washer systems. CHEMICAL TREATMENT CL-2150 is effective at low concentrations and is highly resistant to the inhibitory effects of most organic and inorganic compounds.

### TYPICAL PHYSICAL PROPERTIES

| | |
|---|---|
| Form | Yellow to green liquid |
| Odor | None |
| pH | 3 -5 |
| Density | 8.61 lbs./gal. |
| Freeze Point | ~32°F |

### DOSAGE

Dosage levels of CHEMICAL TREATMENT CL-2150 and frequency of addition will depend on nature and severity of contamination. Typical requirements fall within the range of 50 and 150 ppm.

### FEEDING

CHEMICAL TREATMENT CL-2150 may be pumped continuously to the recirculating water or added intermittently by slug dosage. CHEMICAL TREATMENT CL-2150 is extremely corrosive to metals. Use either 316 L or 316 ELC. Do not feed or store this product in 304, 305 or 316 stainless steel tanks, lines or pumps. Please consult ChemTreat technical staff personnel for all feed system recommendations.

### SAFETY PRECAUTIONS

For specific information on handling, safety and first aid, please review the product's Material Safety Data Sheet.

### SHIPPING

CHEMICAL TREATMENT CL-2150 is available in 30 and 55-gallon drums, as well as in bulk quantities.

Rev. 07/03



## RSC
### PURCHASE ORDER
1770 Genessee Avenue Columbus, Ohio 43211
Phone: 614-263-0913 FAX: 614-263-5580

These numbers must appear on all packages and invoices.

| DATE: | ACCOUNT NAME | ACCOUNT NUMBER | ORDER NUMBER |
|---|---|---|---|
| 06/24/05 | WAL-MART MDC #7024 | A3560 | 3580331 |

TO:

CHEMTREAT, INC.
c/o RHEMA Elple Enterprises LLC
P.O. BOX 127
TISKILWA, IL 61368
Attn: GREGORY P. KINGMAN
TEL: (815) 872-1590
FAX: (815) 872-1590

SHIP TO/SERVICES PERFORMED at RSC address above unless otherwise noted.
RSC c/o:
WAL-MART MDC #7024
23789 MATHEW RD.
STERLING, IL 61081

Attn: ROBERT NEWTON 614-262-0093

Goods to be delivered and/or services to be performed on or before:

SHIP VIA    PP & ADD     F.O.B.

THIS ORDER IS:
☐ TAXABLE
☑ TAX EXEMPT

| ITEM | QUANTITY | DESCRIPTION OF GOODS AND/OR SERVICES | CATEGORY | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|---|
| 1 | 1 | AQUATRAC SMART FLEX MODEL #SFT-CP-T1OR-RM-CR/C8 CON-TROLLER | 15616.018 | 4080.0000 | $ | 4,680.00 |
| 2 | 4 | PULSATROL MODEL #LPB5-SA-PTC1-XXX CHEMICAL FEED PUMPS | 15616.018 | 498.0000 | $ | 1,992.00 |
| 3 | 4 | MODEL J41739 CHEMICAL INJECTORS | 15616.018 | 49.0000 | $ | 192.00 |
| 4 | 1 | ASCO 2" MOTORIZED BLOWDOWN VALVE | 15616.018 | 1029.0000 | $ | 1,029.00 |
| 5 | 355 | DAILY COSTS PER YOUR QUOTATION PAGE 7 | 15616.018 | 175.3400 | $ | 63,999.10 |
| 6 | | FREIGHT | 1110.COM | 1.0000 | $ | 1.00 |

***PLEASE SEND FOUR (4) COPIES OF PRODUCT LITERATURE & INSTALLATION, OPERATION, & MAINTENANCE MANUALS TO GARY MILLS AT RSC, 1770 GENESSEE AVE, COLUMBUS, OH 43211***

| | TOTAL | $ 71,773.10 |
|---|---|---|

Advise promptly if unable service immediate shipment. Please acknowledge this order promptly, also charges involved for boxing, crating or packaging. Goods subject to our inspection on arrival, notwithstanding prior payment to obtain cash discount. Goods received on account of prior order. Workmanship will be returned to you with charge for instrumentation from seller plus labor rehandling, trucking, etc. and are not to be replaced except upon receipt of written instructions from us. This purchase order is subject to RSC standard terms and conditions printed on the reverse side of this P.O.

TERMS 2% - 10 days - Net 30

ACCEPTANCE
Vendor hereby accepts this Purchase Order and agrees to all the terms and conditions of this Purchase Order INCLUDING THE TERMS AND CONDITIONS ON THE REVERSE SIDE.

Vendor _____ Date _____
Accepted by _____ Title _____

**Refrigeration Systems Company**

BY   J. G. Mills



EXHIBIT
13

309-274-9150

**RHEMA Elple Enterprises, LLC**

P. O. Box 127
Tiskilwa, IL 61368
Phone 815-872-1599
Fax 815-872-1599

# Invoice

| Date | Invoice # |
|------|-----------|
| 7/21/2005 | 1007 |

| | |
|---|---|
| **Bill To** | |
| Rathgeurber Systems Company | |
| 1770 Greeman Ave | |
| Columbia, OH 43211 | |

| Account # |
|-----------|
| 61360 |

| P O # | Terms |
|-------|-------|
| 1520031 | Net 30 |

| Quantity | Description | Price Each | Amount |
|----------|-------------|------------|--------|
| 1 | Aquatrac Nexus Flow Controller Model RT-1-CP-71-OX-MM-CTVOP | 4,905.00 | 4,905.00 |
| 4 | Pulsafed Chemtech Feed Pump Model LPB5-RA-PTC1-XXX | 308.00 | 1,040.00 |
| 1 | Chemical Injection Model 341798 | 192.00 | 192.00 |
| 1 | ABS 2" Motorized Drawdown Valve | 1,020.00 | 1,020.00 |

RECEIVED
AUG 0 4 2005

Thank you for the opportunity to be of service

| | **Total** | $7,172.00 |
|---|-----------|-----------|

EXHIBIT

W

Grossman

EXHIBIT
15
PENGAD 800-631-6989

REFINED METAL SYSTEMS COMPANY
DOCUMENTATION STMT

| DATE | INVOICE NO. | DESCRIPTION | INVOICE AMOUNT | DEDUCTION | BALANCE |
|------|-------------|-------------|----------------|-----------|---------|
| 7-22-05 | 1069 | 3560331 | 7773.00 | .00 | 7773.00 |

| CHECK DATE | CHECK NUMBER | TOTALS | | | |
|------------|--------------|--------|--------|--------|--------|
| 11-21-05 | 3958 | | 7773.00 | .00 | 7773.00 |

3958

## Laptop Computer Loan Disclosure Statement

Social Security Number: 387 - 50 - 9976

Date: March 18, 1997

Employee Name:

| Kinsman | Gregory | P |
|---------|---------|---|
| Last | First | Initial |

**Disclosure Information**

| Annual Percentage Rate The cost of my credit at a yearly rate | Finance Charge The dollar amount the credit will cost me. | Amount Financed The amount of credit provided to me or on my behalf. | Total of Payments The amount I will have paid after I have made all payments as scheduled. |
|---|---|---|---|
| 8.249 % | $390.97 | $2,956.31 | $3,347.28 |

Note: The amount shown above would change in the event that the participant pays all off the loan earlier than the scheduled maturity date.

My payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are Due |
|---|---|---|
| 36 | $92.98 | 18th of each month beginning 4/18/97 |

Prepayment: If I pay off early, I will not have to pay a penalty.
Late Charge: If a payment is late, I will be charged 5% of the payment, whichever is less
Security: I am giving a security interest in my Sharp PC-9300T Laptop PC.
Fee: Loan Application $-0-    Annual Loan Maintenance Fee $-0-

My promissory note contains additional information about prepayment refunds and penalties, nonpayment, default, and any required repayment in full before maturity date.

* This form is subject to Regulation Z, "Truth in Lending Act".

*Gregory P. Kinsman*
(Signature)

$2,956.31 Amount of Loan Proceeds Paid Directly to Attronica Computers, Inc.

EXHIBIT
16
Kinsman

## PROMISSORY NOTE

$2,956.31

Richmond, Virginia
March 18, 1997

FOR VALUE RECEIVED, the undersigned promises to pay to the order of ChemTreat, Inc. the principal sum of TWO THOUSAND NINE HUNDRED AND FIFTY-SIX AND 31/100 DOLLARS ($2,956.31), plus interest, in lawful money of the United States of America. Principal and interest shall be due and payable in thirty-six (36) equal monthly installments of NINETY-TWO DOLLARS AND NINETY-EIGHT ($92.98) on the eighteenth day of each calendar month beginning April 18, 1997, with the last payment due March 18, 2000 . Please see the accompanying loan disclosure statement, which is an integral part of this promissory note. Payment hereunder shall be made via payroll deduction each month, or at Post Office Box 27207, Richmond, Virginia 23261 or at such other place as the Noteholder may designate in writing. In the event any installment is not paid in full prior to the end of any calendar month, the Company reserves the right, and the Maker shall pay, a late fee of five percent (5%) of the then due installment.

If any installment of principal and interest is not paid before the eighteenth (18th) day of any month or if any default occurs in the performance of any of the provisions hereof or in the performance of any of the covenants or conditions of the Security Agreement which secures this Note, or upon application for the appointment of a Receiver for the Maker hereof, or upon the filing of a petition in bankruptcy by or against the Maker hereof, or upon the termination of employment for any reason, the entire unpaid principal amount hereof, together with all accrued interest thereon shall become due and payable forthwith at the election of the Noteholder without notice to the undersigned.

Maker reserves the right to prepay the principal of this Note in whole or in part at any time without premium or penalty.

The undersigned Maker does hereby waive presentment, demand, protest, and notice of dishonor and protest and hereby agrees to remain bound for the payment of this Note notwithstanding any extension or extensions of time of payment of this Note or any agreement with the Noteholder, and does likewise waive the benefit of any exemption under the Homestead Act and all other exemptions or insolvency laws as to this debt and any right which it may have to require the Noteholder to proceed against any persons. Maker further agrees that if this Note or any payment due hereunder is not paid according to its terms, it will pay all costs of collection, including reasonable attorneys' fees.

This Note and the interest are secured by a Security Agreement of even date herewith, executed and delivered by the Maker hereof to the Noteholder.

WITNESS the following signature as of the date first above written.

*Gregory P. Kinsman*
(Signed)

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT, made and entered into this 18 day of March, 1997 by and between Greg Kinsman ("Debtor"), and ChemTreat, Inc. ("Secured Party").

## RECITALS

WHEREAS, Debtor has acquired from Secured Party a loan in the amount of TWO THOUSAND NINE HUNDRED FIFTY-SIX AND 31/100 DOLLARS ($2,956.31) to purchase computer equipment; and

WHEREAS, concurrently with the execution hereof Debtor has executed a note in the amount of $2,956.31 in favor of Secured Party to evidence the loan (the "Note"), which Note is to be secured by this Security Agreement;

NOW, THEREFORE, in consideration of the covenants and conditions herein contained and for other good and valuable consideration, the receipt and adequacy whereof is hereby acknowledged, the parties hereto agree as follows:

1.     Security Interest In Equipment.

(a) To secure Debtor's obligations to Secured Party for the payment of the Note ("Indebtedness"), Debtor hereby assigns and grants to Secured Party and agrees that Secured Party will have a security interest in all equipment identified in Schedule A, which is attached hereto and made a part hereof together with all proceeds thereof. The equipment listed in Schedule A shall be referred to hereinafter as the "Collateral".

(b) Debtor does hereby represent and warrant that it is the owner of the Collateral and has the right to convey a security interest in the Collateral to Secured Party. Debtor does hereby further represent and warrant that the Collateral is and throughout the term of this Agreement will be free and clear of all liens, claims, charges, encumbrances, taxes and assessments.

(c) Debtor shall not, without the prior written consent of Secured Party, sell or otherwise transfer or encumber the Collateral or any interest therein. Debtor shall execute and deliver to Secured Party such papers and shall take all such action as Secured Party may at any time reasonably request or as may be necessary or appropriate for Secured Party to establish and maintain a perfected security interest in the Collateral.

(d) The Collateral shall be kept and maintained in good condition and repair, normal wear and tear excepted.

(e) Debtor shall keep the Collateral at all times insured against risk of loss or damage by fire, theft and such other casualties as Secured Party may reasonably require. All losses in all cases to be payable to Secured Party as its interest may appear.

2.  Default by Debtor.

If any one or more of the following events or conditions, each of which shall constitute an event of default on the part of Debtor hereunder, should occur and has not been cured within the time hereinafter provided, that is to say:

(a) Default shall be made by Debtor in the timely payment of any amount due under the Note; or

(b) Default shall be made by the Debtor in the performance of any other covenant, condition, or provision contained or referred to herein; or

(c) Where a receiver shall be appointed for the property of Debtor or a proceeding in bankruptcy shall be instituted by or against Debtor; or

(d) Where the Collateral shall be levied upon by virtue of an execution issued upon any judgment or any other proceedings and such levy shall not be stayed within thirty (30) days of the date of such levy; or

(e) Where a general assignment for the benefit of creditors shall be made by Debtor;

then, in any such event, Secured Party, at its option and without further notice or demand, may declare any or all of the Indebtedness of Debtor as may be secured hereunder to be immediately due and payable and the Collateral or its monetary equivalence returned to Secured Party.

In the event of an occurrence of an event of default on the part of Debtor hereunder, Secured Party shall have all the rights and remedies provided in Article 9 of the Uniform Commercial Code of the Commonwealth of Virginia, as amended, and, in addition those provided for in this Agreement.  Upon any Default by Debtor hereunder, Debtor shall upon request of Secured Party assemble the Collateral and make it available to Secured Party at such place designated by Secured Party, which shall be reasonably convenient to all parties.  Where any notification of intended disposition of any of the Collateral is required by law, such notification, if mailed, shall be deemed properly given if mailed at least ten (10) days before such disposition, postage prepaid, addressed to Debtor at its address as shown hereinafter. Any proceeds of any disposition of any of the Collateral may be applied by the Secured Party to the payment of expenses in connection with the disposition of the Collateral, including reasonable attorneys' fees and expenses, and the balance of such proceeds may be applied by Secured Party toward the payment of the indebtedness or any other obligation of Debtor as may be secured hereunder and in such order of application as Secured Party may from time to time elect.

3.  Secured Party's Option To Discharge Debtor's Obligations; Reimbursement

At its option, Secured Party may discharge any taxes, liens, security interests or other encumbrances at any time placed on the Collateral, may pay any premiums on any insurance

on the Collateral and may pay any other costs required to maintain and preserve the Collateral. Debtor agrees to reimburse Secured Party promptly on demand for any payment made or any expense incurred by Secured Party under the terms of this Paragraph 3..

4.    Disposition Of Excess Proceeds.

In the event of a sale or other disposition of the Collateral for the benefit of Secured Party hereunder, any proceeds, funds or assets as may remain after the full and complete satisfaction and payment of the Indebtedness and any other obligation of Debtor as may be secured hereunder, shall be paid over and delivered to Debtor.

5.    Termination Of Agreement And Release.

Upon the full and complete payment of the Indebtedness and any other obligation of Debtor as may be secured hereunder, the agreements and instruments entered into and made by Debtor hereunder shall be of no further force and effect, and Secured Party shall take such action as is reasonably necessary, including the execution of any documents or instruments, to terminate all such agreements and instruments and release and discharge Debtor from any further obligation hereunder.

6.    Notices.

All notices which may be required or given hereunder shall be in writing addressed to the respective addresses of the parties hereto as shown below, posted in the U.S. Mail by certified or registered mail, or hand delivered. Except for any notification occurring under Section 2(f) hereof, such notices shall be deemed given when received by the addressee thereof.

|  |  |
|---|---|
| To Secured Party: | Jeffrey M. Dowd<br>ChemTreat, Inc. |
| To Debtor: | At the address below Debtor's name<br>at the end of this Agreement. |

7.    Waiver.

Any delay or failure on the part of Secured Party to exercise any right hereunder shall not constitute a waiver thereof or of any other rights conferred upon Secured Party hereunder.

8.    Modification Or Amendment.

Neither this Agreement nor any term or provision hereof may be modified, altered or amended except by written agreement signed by the parties hereto.

9.    Binding Effect.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their respective heirs, personal representatives, successors and assigns.

10.    Counterparts.

This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which shall be deemed one and the same agreement.

11.    Severability.

Each paragraph, clause and provision of this Agreement is entirely independent and severable from every other paragraph, clause and provision hereof. The invalidation through court proceedings or waiver by either party or otherwise of any one paragraph, clause or provision will not result in the invalidation, unenforceability or waiver of any other paragraph, clause or provision of this Agreement, and if a provision hereof is held invalid or unenforceable in one or more of its applications, it is agreed that said provision shall remain in effect in all valid or enforceable applications that are severable from the invalid or unenforceable application or applications.

12.    Governing Law.

This Agreement shall be interpreted construed and enforced in accordance with the laws of the Commonwealth of Virginia.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

Secured Party:

CHEMTREAT, INC.

BY: _____
ITS: _____

Debtor:

_Gregory P. Kinsman_
                        (Signed)

_P.O. Box 312 Princeton, IL_
                        (Address)

SCHEDULE A



CORPORATE OFFICE: 4461 COX ROAD
GLEN ALLEN, VIRGINIA 23060 • (804) 935-2000

October 20, 2005

Mr. Gregory P. Kinsman
19493 1250 North Avenue
Princeton, Illinois 61356

Dear Mr. Kinsman:

This is to confirm that your employment with ChemTreat has been terminated effective October 11, 2005, as a result of your misconduct, which breached your Employment Agreement with the company dated August 17, 1995, and your Trade Secrets and Confidentiality Agreement, and also violated your common law duties to the company. As I explained during our telephone conversations on October 10 and October 11, 2005, ChemTreat is grievously disappointed in your actions to divert business from ChemTreat to your family business, REMA, a competitor of ChemTreat. This conduct is obviously not acceptable to ChemTreat and clearly violates Article 1 of your Employment Agreement and your duty of loyalty to the company. We also have reason to believe that in the course of diverting customers to REMA, you violated your Trade Secrets and Confidentiality Agreement and misappropriated ChemTreat's trade secrets. All of these violations are grounds for immediate termination and cause for immediate legal action.

In light of your rejection of our offers to settle your various breaches and violations, please be advised that ChemTreat intends to immediately pursue all available legal actions and remedies against you, including but not limited to an injunction enforcing the non-solicitation provisions of your Employment Agreement. We will also seek damages, including punitive damages to the extent they are available.



EXHIBIT
17
Kinsman

Mr. Gregory P. Kinsman
Page 2
October 20, 2005

You will also be receiving information from ChemTreat's Human Resources Department regarding your insurance options, 401(k), and ESOP.

If you have any questions, please do not hesitate to contact me.

Sincerely,

CHEMTREAT, INC.

Randy Azzarello
Executive Vice President & COO

lmh

cc:   John Nygren          } ChemTreat
      Jeff Dowd            }
      Sandra Walton        }
      Barbara Gary         }
      Nancy Berryman       }
      Dan O'Brien          }
      Terry Parsley        } Hirschler Fleischer
      Andrew Lohmann       }

E-FILED
Wednesday, 09 November, 2005  01:37:24 PM
Clerk, U.S. District Court, ILCD

U.S. DISTRICT COURT
FOR CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| CHEMTREAT, INC. a Virginia corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Case No. 05 CV 1336 |
| GREGORY P. KINSMAN, and MICHELLE M. KINSMAN, individually and d/b/a RHEMA ELPIS ENTERPRISE, LLC, | ) ) ) ) ) | |
| Defendants. | ) ) | |

### TEMPORARY RESTRAINING ORDER
### AGAINST GREGORY P. KINSMAN

This matter comes on for hearing on Plaintiff's Motion for Temporary Restraining Order, notice having been give, all parties present by counsel and the Court being fully advised, make the following findings:

1.  That is has jurisdiction over the subject matter and the parties;

2.  That the Plaintiff possesses a clear right or interest needing immediate protection;

3.  That absent immediate protection, Plaintiff will suffer immediate and irreparable harm including potentially substantial, but difficult to calculate financial losses, loss of proprietary product information and damage to its corporate reputation and good will; and

4.  There exists a likelihood of success on the merits of Plaintiff's cause of action against GREGORY P. KINSMAN.

IT IS THEREFORE ORDERED that GREGORY P. KINSMAN is hereby enjoined from:

   a.   Soliciting, calling upon, communicating with, entering into any sales or servicing agreements with, or attempting to communicate with any person or entity that is or was a customer of CHEMTREAT (or any representative of such person or entity) with whom Defendant, GREGORY P. KINSMAN, had any contact, communication, or for which he had supervisory, sales or service



responsibility during any of the eighteen (18) consecutive calendar months preceding his termination of employment with CHEMTREAT for the purpose of selling, offering for sale, influencing the purchase of, or otherwise providing any product, service or equipment competitive with any product, service or equipment sold, offered for sale, provided or under development by CHEMTREAT, either for his own benefit or on behalf of any other person or entity;

b.    Soliciting, calling upon, communicating with, entering into any sales or servicing agreements with, or attempting to communicate with any person or entity (a representative of such entity) for which Defendant, GREGORY P. KINSMAN, performed or participated in a survey or written proposal during the twelve (12) consecutive calendar months preceding his termination of employment with CHEMTREAT for the purpose of selling, offering for sale, influencing the purchase of, or otherwise providing any product, service or equipment competitive with any product, service or equipment sold, offered for sale, provided or under development by CHEMTREAT, either for his own benefit or on behalf of any other person or entity;

c.    Disclosing to any persons or entities any information relating to inventions, products, product specification, processes, procedures, prices, discounts, manufacturing costs, business affairs, future plans, technical data, customer lists, product formulations, marketing techniques and cost data received or learned by him during his course of GREGORY P. KINSMAN'S employment with CHEMTREAT;

d.    Engaging in any business or other endeavor in competition with CHEMTREAT.

This Temporary Restraining Order shall become effective immediately upon Plaintiffs posting of a security bond in the amount of $100.00 in accordance with FRCP 65.1 and shall remain in effect until December 15, 2005 at 1:00 p.m. unless otherwise modified by Order of this Court.

A hearing on Plaintiff's Petition for Preliminary Injunction is set for 1:00 p.m. on the 15th day of December, 2005 before the Honorable Joe Billy McDade at the Federal Courthouse, located in Peoria, Illinois.

2

Approved as to form.

By: s/ Andrew D. Cassidy
CASSIDY & MUELLER
416 Main Street, Suite 323
Peoria, IL 61602
Telephone: 309/676-0591
Fax: 309/676-8036
E-mail: dcassidy@cassidymueller.com

By: s/ J. Kevin Wolfe, Esq.
Harvey & Stuckel, Chtd.
331 Fulton, Ste. 650
Peoria, IL 61602
Telephone: 309/671-4900
Fax: 309/671-5473
E-mail: jkwolfe@hslaw.us

Date: _____

_____
Judge

3

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Kevin Wolfe                    jkwolfe@hslaw.us


By: s/ANDREW D. CASSIDY
CASSIDY & MUELLER
416 Main Street, Suite 323
Peoria, IL 61602
Telephone: 309/676-0591
Fax: 309/676-8036
E-mail: dcassidy@cassidymueller.com

**E-FILED**
Friday, 21 July, 2006  12:14:57 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 9 - DEPOSITION OF MICHELLE KINSMAN (1 OF 2)

**Page 1**

```
                  IN THE UNITED STATES DISTRICT COURT
                   FOR CENTRAL DISTRICT OF ILLINOIS
                            PEORIA DIVISION

CHEMTREAT, INC., A            )
VIRGINIA CORPORATION,         )
                             )
              Plaintiff,      )
                             )
        -vs-                  )     No. 05 CV 1336
                             )
GREGORY P. KINSMAN, and       )
MICHELLE M. KINSMAN,          )
individually and d/b/a        )
RENA CHEMICALS,               )
                             )
              Defendants.     )
                             )

          THE DEPOSITION OF MICHELLE KINSMAN, a
   defendant, called by the Plaintiff, for
   examination pursuant to notice, taken before Gina
   Fick, Illinois CSR 084-003872, RMR, a Notary
   Public, on Wednesday, the 11th day of May, 2006,
   commencing at the hour of 1:60 p.m., at 331
   Fulton Street, Suite 650, in the City of Peoria,
   County of Peoria, and State of Illinois.
```

**RECEIVED**

**MAY 2 6 2006**

**CASSIDY & MUELLER**

**Page 2**

```
   PRESENT:

        CASSIDY & MUELLER
        323 Commerce Bank Building
        416 Main Street
        Peoria, Illinois 61602
        BY:  Andrew D. Cassidy, Esq.
                for the Plaintiff;

        HARVEY & STUCKEL, CHTD.
        331 Fulton Street
        Suite 650
        Peoria, Illinois 61602
        BY:  J. Kevin Wolfe, Esq.
                for the Defendant;

   ALSO PRESENT:

        Gregory Kinsman

                    I N D E X

   WITNESS                              PAGE

   MICHELLE KINSMAN,
     Examination by Mr. Cassidy            3
     Certificate of Reporter              73
                    I N D E X
   EXHIBITS                             PAGE
     Exhibit No. 1                        41
     Exhibit No. 2                        42
     Exhibit No. 3                        52
```

**Page 3**

MR. CASSIDY:  Let the record reflect this is the deposition of Michelle Kinsman which, by agreement of the parties, is being taken under the Illinois Supreme Court Rules as they relate to discovery depositions.

I would also add, for the record, that the Notice of Deposition requested that certain documents be produced at the time of the deposition, and that has been complied with by the deponent.

MICHELLE KINSMAN,

having been first duly sworn, was examined and testified as follows:

EXAMINATION BY MR. CASSIDY:

Q. Could you please state your full name, please.

A. Michelle Kinsman.

Q. And your date of birth?

A. 4/25/59.

Q. Where do you reside?

**Page 4**

A. 19493 1250 North Avenue, Princeton, Illinois.

Q. How long have you lived there?

A. Five and a half years.

Q. Do you recognize the address of P.O. Box 1207, Tiskilwa, Illinois, 61368?

A. Yes.

Q. Is that simply a post office box that your home mail goes to?

A. No.

Q. Is there a street address that corresponds to that address I just read?

A. That would be the address I just gave, 19493.

Q. Is this a P.O. box that is simply used for the business of Rhema?

A. Yes.

Q. There is no separate location for the business Rhema; is that correct?

A. No.

Q. Does anybody live with you in Princeton other than your husband?

A. We have two children that are coming and

5

1    going from college.
2  Q.  Okay. Where are you originally from?
3  A.  Minnesota.
4  Q.  What is the extent of your education?
5  A.  I have a bachelor's of science in business
6      administration from the University of
7      Wisconsin at River Falls.
8  Q.  Did you complete all four of your years at
9      U of W, River Falls?
10 A.  I did.
11 Q.  What year did you obtain your degree?
12 A.  1981.
13 Q.  Do you have any other degrees?
14 A.  No.
15 Q.  Any postgraduate work?
16 A.  No.
17 Q.  After your graduation at U of W, River
18     Falls, in 1981 did you become employed?
19 A.  I did.
20 Q.  Where?
21 A.  At a bank.
22 Q.  Where was the bank located?
23 A.  Downtown Minneapolis.

6

1  Q.  What did you do for the bank?
2  A.  I was an assistant in the personal banking
3      department.
4  Q.  How long did you do that?
5  A.  At that bank?
6  Q.  Yes.
7  A.  I'm not sure. I think about a year, year
8      and a half. I can't remember.
9  Q.  Okay. If you think that we can kind of
10     expedite this, because I am going to bring
11     you right up to the present day, maybe you
12     could just walk me through, the best you
13     can, from that job to where you went next
14     when you left it and try to bring me up
15     through the last 20 years.
16 A.  I switched banks in 1983 when we got
17     married. I worked at a bank in Hudson,
18     Wisconsin. And I had even worked at one
19     while I was in college, but I was in the
20     banking industry I suppose all told for
21     close to ten years.
22 Q.  Up until around 1990 maybe?
23 A.  Oh, maybe a couple years -- well, yeah,

7

1      close to that.
2  Q.  Then what did you do?
3  A.  Then I was -- we had our own business for
4      awhile. I ran the day-to-day operations of
5      that.
6  Q.  Okay. When you say "we," you mean you and
7      your husband Greg?
8  A.  Yes.
9  Q.  What kind of business was it?
10 A.  Financial services business.
11 Q.  Okay. How long did you run the day-to-day
12     operations of the financial services
13     business?
14 A.  Three years maybe. Then we moved to
15     Illinois in '90, and I had been a
16     stay-at-home mom with our children.
17 Q.  What was your next employment outside the
18     home?
19 A.  I worked for an upholstery shop. It's
20     located in Ladd, Illinois.
21 Q.  Retail sales? What was your position with
22     them?
23 A.  We reupholstered furniture, so everything,

8

1      tearing off the old covers, sewing the new
2      ones.
3  Q.  You were hands-on reupholstering?
4  A.  Yes.
5  Q.  When did you leave that?
6  A.  I don't remember.
7  Q.  Okay. What did you do after the upholstery
8      business?
9  A.  Nothing.
10 Q.  All right. When was the next time after the
11     upholstery business you became employed
12     outside the home?
13 A.  I wasn't.
14 Q.  From the time you left the upholstery
15     business to 2004 were you employed other
16     than as a mother and homemaker?
17 A.  No.
18 Q.  Your next business of any kind that you
19     engaged in would have been when Rhema Elpis
20     Enterprises was established?
21 A.  Yes.
22 Q.  When did Rhema Elpis Enterprises come into
23     existence? And I mean actually as opposed

**9**

```
1        to when it was recognized by the State of
2        Illinois.
3    A.  Either the very end of February or the
4        beginning of March of '04.  I can't give you
5        a specific date.  I can't remember.
6    Q.  Let me show you what was previously marked
7        as Exhibit 1 in your responses to our
8        discovery requests.  I'll ask you to take a
9        look at that.  Do you recognize that as the
10       Articles of Organization for Rhema Elpis
11       Enterprises?
12   A.  I do.
13   Q.  Did that company operate under any other
14       name prior to the filing of those documents?
15   A.  As Rhema Enterprises.  The Elpis had to be
16       added because someone else -- by the time I
17       filed it was actually going through the
18       process, someone else had already picked the
19       same name as I had, and so then I had to
20       refile, which is why there was such a lag,
21       and I have no idea who that is.
22   Q.  You don't know who that is?
23   A.  I have no idea.
```

**10**

```
1    Q.  But as you were trying to follow the
2        formalities with the State of Illinois
3        someone said that name is wrong?
4    A.  Right.  We checked -- when I first decided
5        the name, we checked.  It wasn't being used.
6        But between then and the time we actually
7        filed they must have filed first.
8    Q.  Do you recall when you first chose the name
9        and looked into it?
10   A.  No.
11   Q.  This, according to the Secretary of State
12       records, Rhema Enterprises, LLC, the other
13       one, came into existence on May 1st, 2003.
14       Would you have looked into the Rhema name
15       that far back?
16   A.  When?
17   Q.  May 1st of 2003.
18   A.  No, not that far back.  And I wasn't the one
19       who checked to see if this name was already
20       being used.
21   Q.  Okay.
22   A.  It was Paul Panzica.  So I'm just telling
23       you what he had told me, that he saw that
```

**11**

```
1        the name was still available.
2    Q.  So it would have been sometime around
3        February of 2004 that you elected the name?
4    A.  Uh-huh.
5    Q.  Yes?
6    A.  Yes.  I'm sorry.
7    Q.  That's okay.  How did you come up with the
8        name?
9    A.  It's just a Greek word.
10   Q.  Similar to what your husband had tried to
11       explain to me last week?
12   A.  Yes, exactly.
13   Q.  Elpis you added later, also a Greek word --
14   A.  Uh-huh.
15   Q.  -- that fit for you?
16   A.  Yes.
17   Q.  Tell me how the concept of you starting
18       Rhema first came on the radar screen.  What
19       made you think about it?
20   A.  Listening to Greg complain about losing
21       sales based on price increases that were
22       coming through that he didn't have an option
23       to bypass this time, and he had several
```

**12**

```
1        customers that were going to look elsewhere.
2    Q.  Prior to that time how involved were you
3        with your husband's chemical sales
4        profession?  Did you work with him?  Did you
5        ever travel with him?
6    A.  Sometimes I went with him.
7    Q.  Over the years did you engage yourself in
8        his profession to the extent where you kind
9        of learned the ins and outs of the chemical
10       business?
11   A.  I listened to some of the things he would
12       say from time to time.
13   Q.  Okay.  Nothing out of the ordinary than what
14       any husband and wife might talk about with
15       their respective careers; would that be
16       fair?
17   A.  Probably.
18   Q.  So at some point your husband is indicating
19       how the -- his employer's price increases
20       are affecting him and you decided to look
21       into starting a chemical supply business,
22       correct?
23   A.  Yes.
```

13

1  Q. Did you discuss that with your husband when
2     you first thought about it?
3  A. I may have. I don't remember.
4  Q. Okay. Just in an attempt to jar your
5     memory, was there any conversation like, you
6     know, couldn't you find another supplier and
7     provide these directly or isn't that
8     something we can do?
9  A. No.
10 Q. Was there any conversation like that at all?
11 A. No.
12 Q. What investigation or research did you do to
13    convince yourself that starting a chemical
14    supply business was doable?
15 A. I'm not sure I understand what you are
16    asking.
17 Q. Well, when the idea first came into your
18    head, did you do any research to see whether
19    or not you could be a distributor or where
20    you would find a manufacturer and how you
21    would become a recognized distributor for a
22    manufacturer, anything like that?
23 A. No. I didn't think it was going to be a big

14

1     deal.
2  Q. Had you ever assisted your husband in
3     submitting orders either to ChemTreat or
4     Ulrich Chemical or any other chemical
5     supplier while he was working for ChemTreat?
6  A. No.
7  Q. Do you have any knowledge of who was
8     supplying the chemicals for your husband
9     other than his employer at ChemTreat?
10 A. I knew that there were outside sources
11    sometimes.
12 Q. Had you ever had any dealings with Ulrich
13    Chemical Company prior to February of 2004?
14 A. No.
15 Q. Okay. When you decided that this was
16    something that was doable, what was the next
17    thing you did to get it started?
18 A. I visited with Paul Panzica.
19 Q. Who is Paul Panzica?
20 A. He was the accountant we were going to.
21 Q. Is he an accountant that you had previously
22    utilized for personal issues?
23 A. No.

15

1  Q. Is he a friend or acquaintance of you and
2     your husband?
3  A. No.
4  Q. How did you choose him?
5  A. He was referred to us by someone else.
6  Q. Who referred you to Paul Panzica?
7  A. His name is Terry Kelly.
8  Q. Okay. Was this an individual that you just
9     gave the idea, told him you had an idea of
10    starting a business, and he said, "You
11    should talk to this accountant, he can help
12    you out"?
13 A. No. I asked him if he knew of an
14    accountant, and he just gave me
15    Mr. Panzica's name.
16 Q. Okay. What did you discuss with Mr.
17    Panzica?
18 A. Just the ins and outs of having to file with
19    the State.
20 Q. Did you have an attorney involved at all?
21 A. No.
22 Q. Was there any discussion with Mr. Panzica
23    about the pros and cons of various types of

16

1     business ownership meaning partnership, sole
2     proprietorship, corporation, LLC?
3  A. No.
4  Q. How was it determined that you would go with
5     an LLC?
6  A. I guess I had done some reading on it and
7     had decided.
8  Q. Okay. Once you met with Mr. Panzica, you
9     decided on a name, and then sometime in late
10    February or early March you are up and
11    running, you have a business?
12 A. Uh-huh.
13 Q. Is that right? Yes?
14 A. Yes.
15 Q. Did you hire anybody, any employees?
16 A. No.
17 Q. How did you go about obtaining customers for
18    your business?
19 A. I received phone calls from prospective
20    customers.
21 Q. How did customers -- prospective customers
22    know about the existence of Rhema and the
23    contact information to make those phone

**17**

1    calls to you?
2  A.  To my knowledge, it was when -- to my
3      knowledge, it was when these -- they were
4      customers that had decided to quit their
5      relationship with ChemTreat and had decided
6      they were going to go with another supplier,
7      and once that decision was made then Greg
8      had given them my phone number to call me.
9  Q.  Was it a joint decision between your husband
10     and yourself to start this business, or did
11     you make the decision on your own?
12 A.  No.  I made it on my own.
13 Q.  Was there ever any discussion with your
14     husband that he was not thrilled with the
15     idea of his wife having a business that was
16     in competition with his business, at least
17     his employer's business?
18 A.  I don't believe we saw it as competitive by
19     nature, so, no, there wasn't any discussion
20     like that.
21 Q.  Did you have or did you advertise your
22     business anywhere?
23 A.  No.

**18**

1  Q.  Did you make cold calls to any businesses to
2      try to get sales?
3  A.  No.
4  Q.  How did you develop a relationship with
5      Ulrich Chemical after Rhema came into
6      existence?
7  A.  I had one meeting and then it was by phone
8      calls.
9  Q.  You had a meeting with a representative of
10     Ulrich Chemical?
11 A.  I believe so.
12 Q.  Okay.  Do you remember the name of who you
13     met with?
14 A.  No.
15 Q.  Do you remember how that meeting was set up?
16 A.  No.
17 Q.  Were you introduced to somebody at Ulrich
18     Chemical by your husband?
19 A.  No.
20 Q.  Were you introduced to somebody at Ulrich
21     Chemical by Mr. Panzica?
22 A.  No.  I don't remember.  I don't remember if
23     it was by phone call.  I don't recall.

**19**

1  Q.  Was it before or after Rhema was an existing
2      business?  In other words, was it part of
3      the investigation process to determine, yes,
4      this is something I could do, I better see
5      if there is a supplier out there?
6  A.  Yes.
7  Q.  So it was during that initial investigation
8      period?
9  A.  I think so, yes.
10 Q.  And you have no recollection as to how you
11     learned of the existence of Ulrich Chemical?
12 A.  Well, I knew of the existence of Ulrich
13     Chemical because it was one of the -- I had
14     heard Greg talk about it as being one of the
15     outside suppliers that ChemTreat used and I
16     knew they were local.  I knew they were
17     reputable.
18 Q.  Did you ask your husband to provide you with
19     the name of somebody that you could contact?
20 A.  I don't remember.
21 Q.  You have no recollection at all as to how
22     you were able to get a meeting with somebody
23     at Ulrich to see if they would supply for

**20**

1      your company; is that your testimony?
2  A.  Yeah, I don't remember.
3  Q.  Did the meeting take place at Ulrich
4      Chemical, at your home or some third
5      location?
6  A.  A third location, but I don't remember
7      where.
8  Q.  Has Rhema ever since its existence made a
9      sale to a customer who was not previously a
10     ChemTreat customer?
11 A.  I don't believe so.
12 Q.  Has Rhema since its existence ever received
13     a call for a price quote from anybody that
14     was not directed to you by your husband?
15 A.  Not that I can remember.
16 Q.  In 2004, in the spring of 2004, what was the
17     scope of the business of Rhema?
18 A.  I don't understand your question.
19 Q.  What did Rhema provide?  What products, what
20     services?
21 A.  They provided -- I provided chemicals.
22 Q.  You were --
23 A.  They can order them through me.  I ordered

**21**

1  them, and they were delivered.
2  Q.  In connection with getting an order, did
3      Rhema perform any type of investigation,
4      inspection, water analysis or anything to
5      help the customer decide what chemicals
6      needed to be ordered?
7  A.  No.  They already knew.
8  Q.  So it was always customers who were aware of
9      what their water treatment chemical needs
10     were, and they simply found you to supply
11     those chemicals to them; is that correct?
12 A.  Yes.
13 Q.  At any point did the business of Rhema
14     expand beyond being a chemical supplier?
15 A.  I did have to order some equipment.
16 Q.  Okay.  For any customer besides the Wal-Mart
17     distribution center?
18 A.  Not that I can recall.
19 Q.  I'll show you what was marked as Exhibit 13
20     during your husband's deposition and Exhibit
21     14 from his deposition.  To your knowledge
22     do the first four items on the purchase
23     order, Exhibit 13, and all of the items on

**22**

1      Exhibit 14 represent equipment that was
2      being provided by Rhema?
3  A.  You said the first four items on here?
4          MR. WOLFE:  Looking at Item No. 1,
5      2, 3, 4, correct?
6          MR. CASSIDY:  Yes.
7          THE WITNESS:  Do they, what, line
8      up with this; is that the question?
9  Q.  (BY MR. CASSIDY)  Are each of those line
10     items referencing equipment as opposed to
11     some chemicals?
12 A.  Yes.
13 Q.  Other than those four items of equipment
14     that Rhema ordered, did Rhema ever order
15     equipment for any other customer?
16 A.  I already told you I didn't recall.
17 Q.  I just want to narrow it down to these four
18     things, okay.  So you have no recollection
19     as to whether or not you ever ordered
20     equipment for anybody else?
21 A.  No.
22 Q.  Okay.  Do you recall whom Rhema purchased
23     that equipment from evidenced by those two

**23**

1      documents?
2  A.  No, I don't remember offhand.
3  Q.  Did you have -- prior to being asked by
4      your -- well, strike that.  I'm assuming too
5      much from the prior deposition.
6          How did you first become aware
7      that RSC was interested in obtaining
8      equipment?
9  A.  Through Greg.
10 Q.  Your husband?
11 A.  Yes.
12 Q.  Okay.  What did he tell you, the best you
13     can recall?
14 A.  The best that I can recall is that the
15     business, this, with RSC was in jeopardy of
16     being lost because the price on the
17     equipment had gone up substantially from the
18     time that RSC accepted the bid to when it
19     was originally submitted, I guess, and from
20     his previous experience he knew that
21     ChemTreat wouldn't honor it; they would want
22     to increase the price of the equipment.  So
23     he asked me if I would check on getting the

**24**

1      equipment to save the chemical business for
2      him.
3  Q.  Did he tell you whom to contact to get the
4      equipment?
5  A.  No.
6  Q.  Did Rhema have any prior business
7      relationship with any equipment
8      manufacturers or suppliers prior to this
9      conversation with your husband?
10 A.  No.
11 Q.  How did you know who to call?
12 A.  I started investigating on the Internet.
13 Q.  What did you find?
14 A.  I found some suppliers for these names of
15     feed pumps and injectors, and I can't
16     remember the companies that I did business
17     with.
18 Q.  Where was the -- did you as a representative
19     of Rhema order the equipment?
20 A.  Yes.
21 Q.  Did you have it direct shipped to RSC or to
22     the Wal-Mart distribution center or to
23     yourself or to where?

**25**

1    A. · To myself.
2    Q. How was it ordered?
3    A. How?
4    Q. By telephone?
5    A. Yes.
6    Q. Okay. Did you buy all of the equipment from
7       the same company?
8    A. No.
9    Q. Do you know how many different companies
10      supplied the equipment?
11   A. I don't remember offhand.
12   Q. How was it paid for?
13   A. I used my personal credit card.
14   Q. Okay. Is that a credit card you still have?
15   A. Uh-huh.
16   Q. Yes?
17   A. Yes.
18   Q. Okay. Do you save your credit card
19      statements?
20   A. Not after I've done my taxes.
21   Q. When you -- do you use an accountant for
22      yours and your husband' personal tax
23      returns?

**26**

1    A. Yes.
2    Q. I assume to use an accountant you provide
3       them with all your tax records?
4    A. No. Just -- he just wanted numbers.
5    Q. Your accountant doesn't ask for the
6       documents; he just asks for you to give him
7       numbers?
8    A. Uh-huh.
9    Q. Yes?
10   A. Yes.
11   Q. So you would not have provided him with your
12      credit card statement?
13   A. No.
14   Q. What is your accountant's name?
15   A. I believe it's on here. I think his name is
16      Jay Baxter.
17   Q. Is that the same accountant that was used
18      for -- and you referenced your 2005 tax
19      return that shows Jay Baxter, CPA, Oglesby,
20      Illinois?
21   A. Uh-huh.
22   Q. Did Mr. Baxter do your 2004 tax returns as
23      well?

**27**

1    A. No.
2    Q. You did those yourself?
3    A. I did.
4    Q. After the equipment came to you from being
5       ordered by phone, what did you do next?
6       What did you do with it?
7    A. I just sat on it.
8    Q. I don't know what that means.
9    A. I kept it until it was requested.
10   Q. Okay. Requested from Refrigeration Systems
11      Company?
12   A. Yes.
13   Q. Okay. That wasn't requested from you, was
14      it?
15   A. No.
16   Q. Requested to your husband?
17   A. Yes.
18   Q. Then what happened with the equipment?
19   A. I believe he took some of it there so they
20      could start hooking it up.
21   Q. Who prepared the invoice that's marked as
22      Exhibit 14 from your husband's deposition?
23   A. I did.

**28**

1    Q. Those are for the items that we've been
2       talking about, correct?
3    A. The equipment items, yes.
4    Q. Yes. Do you know how much of a markup
5       Rhema added to those items from what was
6       paid?
7    A. I do not.
8    Q. Okay. Did Rhema ever receive any payment on
9       the invoice marked as Exhibit 14?
10   A. No.
11   Q. Did you ever receive a call from either
12      Refrigeration Systems Company or Wal-Mart
13      explaining why they would not pay that
14      invoice?
15   A. I did not.
16   Q. Did you ever do a follow-up and say, "Hey,
17      I've invoiced you. It's outstanding. Why
18      haven't I been paid?"
19   A. I sent it twice, and, no, I haven't done any
20      more than that.
21   Q. Is it your testimony you had no
22      understanding as to why your invoice wasn't
23      being paid and you did nothing to follow up

**29**

1  to try to get it paid?
2  A.  No.
3              MR. WOLFE:  Without prolonging it,
4  your question was, is it your testimony
5  followed by a statement, and she said no.
6  No, that wasn't your testimony, or what he
7  said was correct?
8  Q.  (BY MR. CASSIDY)  Is what I said correct?
9  A.  And what did you say?
10             MR. WOLFE:  I hesitated.
11             MR. CASSIDY:  We ask questions in
12  negative form.
13  Q.  Is it your testimony today that you sent an
14  invoice to Refrigeration Systems Company
15  twice, you received no word from them as to
16  why it wasn't being paid, and, yet, you did
17  not follow up in an attempt to get payment;
18  is that your testimony?
19  A.  Yes.
20  Q.  Have you ever made a sales call upon any of
21  the customers to which Rhema sells
22  chemicals?
23  A.  No.

**30**

1  Q.  Do you have contact people at any of the
2  Rhema customers that you speak to on the
3  phone?
4  A.  Those that call me.
5  Q.  Do you keep track of those, the names of
6  those contact people?
7  A.  Some of them.
8  Q.  All right.  Do you know who your contact
9  person at Bob Evans Farms is?
10  A.  Dave Swanson calls me from there.
11  Q.  And have you ever personally met Dave
12  Swanson?
13  A.  No.
14  Q.  Have you ever been on the Bob Evans Farms
15  facility?
16  A.  Not that I recall.
17  Q.  Who is your contact person at Carus Chemical
18  company?
19  A.  A woman named Kris calls me from there to
20  place the orders.
21  Q.  Do you know Kris' last name?
22  A.  I can't recall it right now.
23  Q.  Do you know who the purchasing agent at

**31**

1  Carus Chemical Company is?
2  A.  No -- well, what do you mean?
3  Q.  Who would ultimately be responsible for
4  determining where the chemicals are going to
5  be purchased from?
6  A.  Oh.  No.
7  Q.  Have you ever made a sales call to Kris or
8  anybody else at Carus Chemical Company?
9  A.  No.
10  Q.  Have you ever been on the Carus Chemical
11  Company property?  When I say on the
12  property, I'm going to ask you for each of
13  these, I'm talking the facility where the
14  boiler, cooling tower, or whatever it is, is
15  located.
16  A.  I think I was there one time years ago when
17  I was just riding along with Greg.
18  Q.  Prior to the inception of Rhema?
19  A.  Yeah, but like maybe six or seven years ago.
20  I don't know.  I just was with him.
21  Q.  Do you know who the contact person at Duke
22  Energy is?
23  A.  Jim Cumbow.

**32**

1  Q.  Have you ever met Jim Cumbow?
2  A.  Yes.
3  Q.  How many times?
4  A.  Our children went to school together, so I
5  saw him at school functions.
6  Q.  Have you ever met him in a professional
7  capacity with Rhema and chemical purchases?
8  A.  No.
9  Q.  Have you ever been on the Duke Energy
10  facility?
11  A.  No.
12  Q.  Who is the contact person at Illinois Cement
13  Company?
14  A.  Gene Hodges.
15  Q.  Have you ever met Gene Hodges?
16  A.  I've only spoken to him on the phone.
17  Q.  Have you ever been on the Illinois Cement
18  Company property?
19  A.  Yes, to ride along, years ago with Greg.
20  Q.  Unless I say otherwise, if I ask you if you
21  have ever been on any of these company's
22  properties, meaning within your business
23  capacity with Rhema; fair enough?

33

1  A.  Okay.
2  Q.  And going backward, do you know Tom Moshage
3      at Carus Chemical Company?
4  A.  I do.
5  Q.  Have you ever met Tom Moshage?
6  A.  Yes.
7  Q.  How many times have you met Tom Moshage?
8  A.  I don't know.  Maybe -- I'm not even sure.
9      Half a dozen maybe.
10 Q.  Personal or business meetings or a
11     combination?
12 A.  Personal.
13 Q.  Have you ever met with Tom Moshage with the
14     business of Rhema for chemical supplies to
15     Carus?
16 A.  Only by phone.
17 Q.  So in addition to Kris you've received calls
18     from Tom Moshage?
19 A.  Yes.
20 Q.  Who is your contact person at Kensington in
21     Galesburg?
22 A.  I can't tell you.  I've only ever had
23     probably one call from them.  I don't recall

34

1      the person's name.
2  Q.  Have you ever been there in a business
3      capacity?
4  A.  No.
5  Q.  Who is your contact person at LCN Closers?
6  A.  I can't think of his name now who calls to
7      order.
8  Q.  Is it only calls to order?
9  A.  Uh-huh.
10 Q.  Have you ever met him?
11 A.  I have never met him.
12 Q.  Have you ever been at the LCN Closers
13     facility for a business purpose?
14 A.  No.
15 Q.  Who is the contact person at Monmouth
16     College?
17 A.  I don't speak to them very often.  Earl.
18 Q.  Do you know Earl's last name?
19 A.  It's something German.
20 Q.  Have you ever met Earl?
21 A.  No.  Only on the phone.
22 Q.  And have you ever been at Monmouth College
23     for a business reason?

35

1  A.  No.
2  Q.  The contact person at National Manufacturing
3      Company?
4  A.  I believe the only person I've ever spoken
5      to there is Jackie Molina.
6  Q.  Have you ever met Jackie Molina?
7  A.  No.
8  Q.  Have you ever been to National Manufacturing
9      for a business purpose?
10 A.  No.
11 Q.  Who is the contact person at St. Mary's
12     Square?
13 A.  I can't tell you.  I've maybe only spoken to
14     them once a long time ago, and I don't
15     remember the name.
16 Q.  Whoever placed the order you've never met
17     them personally?
18 A.  No.
19 Q.  And you've never been at the facility?
20 A.  No.
21 Q.  Has Rhema ever performed a water analysis
22     for any of the customers I've just named?
23 A.  No.

36

1  Q.  Have any of the customers I've just named
2      ever requested a water analysis from Rhema?
3  A.  No.
4  Q.  Has Rhema ever done a equipment inspection
5      for trouble-shooting purposes for any of the
6      customers we've just named?
7  A.  No.
8  Q.  Have any of the customers we've talked about
9      requested any type of service calls from
10     Rhema?
11 A.  No.
12 Q.  To your knowledge, has your husband ever
13     signed a document as a representative of
14     Rhema for purpose of providing it to a
15     customer?
16 A.  Not to my knowledge.
17 Q.  Have you ever seen a document -- any
18     document where your husband specifically
19     signed as a technical representative of
20     Rhema which was provided to a customer?
21 A.  No.
22 Q.  Rhema continues in the business of selling
23     chemicals, correct?

37

1  A.  Yes.
2  Q.  Do you continue to sell to Carus Chemical
3      Company?
4  A.  Yes.
5  Q.  You continue to sell to Carus Chemical
6      Company?
7  A.  Yes.
8  Q.  You understood that Carus Chemical Company
9      was formerly a customer of your husband's
10     while he was a customer of ChemTreat?
11 A.  Yes.
12 Q.  Is it your understanding that the chemicals
13     you're providing to Carus Chemical Company
14     are chemicals that were formerly provided by
15     ChemTreat?
16 A.  I don't know if they are exactly the same.
17 Q.  And any business relationship that you have
18     with Carus was the result of a referral by
19     your husband to you; would that be correct?
20 A.  He gave them my phone number to call me.
21 Q.  Within the context of purchasing chemicals?
22 A.  Correct.
23 Q.  Okay.  When was the last time, to your

38

1      knowledge, of any sales made by Rhema to Bob
2      Evans Farms?
3  A.  I don't know offhand.
4  Q.  Have there been any sales to Bob Evans Farms
5      subsequent to November 9th, 2005?
6  A.  I don't recall.
7  Q.  Does Rhema continue to sell to Duke Energy
8      Company?
9  A.  I don't know that I have since November.  I
10     don't know.
11 Q.  Unless I say otherwise, let's say subsequent
12     to November 9, 2005.
13 A.  Not that I recall.
14 Q.  How about Illinois Cement Company?
15 A.  I don't remember.
16 Q.  Kensington?
17 A.  I don't believe so.
18 Q.  LCN Closers?
19 A.  Yes.
20 Q.  And you understand that LCN Closers was
21     formerly a customer of ChemTreat that your
22     husband called upon, correct?
23 A.  Yes.

39

1  Q.  Again, that business relationship between
2      Rhema and LCN was the result of a referral
3      from your husband to yourself?
4  A.  He gave them my phone number when they no
5      longer wanted to do business with ChemTreat
6      because of price increases.
7  Q.  Within the context of using you to buy those
8      chemicals elsewhere?
9  A.  To check into prices, yes.
10 Q.  How about Monmouth College, continue to sell
11     after November of 2005?
12 A.  I don't recall.
13 Q.  National Manufacturing Company?
14 A.  I don't believe so.
15 Q.  St. Mary's Square?
16 A.  I don't think so.
17 Q.  You did know there was a temporary
18     restraining order entered against yourself
19     and Rhema Elpis Enterprises, LLC; is that
20     correct?
21 A.  Yes.
22 Q.  What was your understanding as to what that
23     Court's restraining order precluded you from

40

1      doing with respect to ChemTreat and its
2      customers?
3  A.  To sell to any of his previous customers
4      with ChemTreat.
5  Q.  You understood that there was a court order
6      precluding you from selling to any of his
7      previous customers?
8  A.  But as I was instructed, it was -- I
9      understood that to include if -- that I
10     could if I had received -- or I had been
11     doing them as a result of a bid process.
12     They had called me, they wanted a bid on a
13     price.
14 Q.  Let's go back to the initial question.
15     Maybe I misunderstood you.  The best you can
16     tell me and in as much detail as you can
17     tell me, what is your understanding as to
18     what the Court restrained you from doing,
19     you and the company Rhema, with respect to
20     former ChemTreat customers?
21 A.  Not to sell to them unless I had received --
22     unless I had been doing business with them
23     because of an open bid process or a bid

**41**

```
 1   process with them.
 2   Q.  Are you selling to Carus as a result of an
 3       open bid process?
 4   A.  They had called me, wanted prices.  I bid
 5       prices.  They chose to do business with me.
 6       It was my understanding if that's the way I
 7       obtained the business that I could continue.
 8   Q.  Did you read the restraining order?
 9   A.  I believe so, yes.
10   Q.  I'm going to re-mark the articles that were
11       marked as Exhibit 1 to the response to
12       written interrogatories, and I will also
13       make it Exhibit 1 to the deposition.
14                MR. WOLFE:  Put M. Kinsman.
15                MR. CASSIDY:  Yes.
16            (Exhibit No. 1 marked.)
17                MR. CASSIDY:  So I will make this
18       Exhibit 2, M. Kinsman.
19            (Exhibit No. 2 marked.)
20   Q.  (BY MR. CASSIDY)  Here is a copy of the
21       restraining order that's been entered in
22       this case.  I'll ask you to please review
23       it.
```

**42**

```
 1              Having reviewed it, does it
 2       refresh your recollection as to whether or
 3       not you have ever read it previously?
 4   A.  Uh-huh.
 5   Q.  Yes?
 6   A.  Yes.
 7   Q.  First of all, let me ask you, as a result of
 8       that restraining order being entered, is
 9       there any customer of Rhema which you have
10       stopped doing business with because of that
11       order?
12   A.  No.
13   Q.  Okay.  So it's a true statement that after
14       entry of this order you continued to sell to
15       any of the customers of Rhema who would call
16       in and make an order, right?
17   A.  Yes.
18   Q.  And you did not view that as a violation of
19       this because this business was gotten
20       through an open bid process?
21   A.  Well, it states here that whose customer
22       relations have resulted from the wrongful
23       conduct of Greg.
```

**43**

```
 1              I didn't believe that how I
 2       received the relation -- or I was doing --
 3       the fact that I was selling to these people
 4       was obtained wrongfully.
 5   Q.  Let me read to you a separate description of
 6       what you are enjoined from doing besides
 7       Subparagraph B that you point to.
 8       Subparagraph A reads, soliciting, calling
 9       upon, communicating with, entering into any
10       sales or servicing agreements with, or
11       attempting to communicate with any person or
12       entity that is currently a customer of
13       ChemTreat with whom defendant, Gregory B.
14       Kinsman, had any contact, communication or
15       for which he had supervisory, sales or
16       service responsibility during any of the 18
17       consecutive calendar months preceding his
18       termination of employment with ChemTreat for
19       the purpose of selling, offering for sale,
20       influencing the purchase of or otherwise
21       providing any product, service or equipment
22       competitive with any product, service or
23       equipment sold, offered for sale, provided
```

**44**

```
 1       or under development by ChemTreat.
 2              You may review it.  Take as much
 3       time as you want to review that.  I
 4       personally interpret it as you cannot sell
 5       to any customer of ChemTreat that was your
 6       husband's customer in the prior 18 months.
 7   A.  Well, it --
 8   Q.  Tell me how you read it differently.
 9   A.  They were not currently a customer of
10       ChemTreat's.
11   Q.  Is it your understanding that Carus does not
12       buy from ChemTreat right now?
13   A.  Correct.  They didn't want to buy -- those
14       chemicals that they are buying from me, they
15       didn't want to get them from ChemTreat
16       anymore.
17   Q.  Are they buying any other chemicals from
18       ChemTreat?
19   A.  I don't know.
20   Q.  Did you ask them that when they called in to
21       make orders after the entry of that order?
22   A.  No, I didn't.
23   Q.  And would you agree with me that under the
```

E-FILED
Friday, 21 July, 2006  12:16:10 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 9 - DEPOSITION OF MICHELLE KINSMAN (2 OF 2)

**Page 45**

1  reading of that order if Carus Chemical is,
2  in fact, still a customer of ChemTreat, that
3  that provision of the restraining order
4  would preclude you from selling any product
5  to them?
6      MR. WOLFE:   I'll object as calling
7  for a legal interpretation and a legal
8  ruling, and I'll instruct her not to answer
9  that.
10 Q.  (BY MR. CASSIDY)  Do you believe in reading
11     that paragraph that it is relevant for you
12     to determine whether or not you are in
13     compliance with that agreement to determine
14     whether or not Carus Chemical Company is
15     still a customer of ChemTreat?
16 A.  I'm not sure I understand the question.
17 Q.  Okay.  Well, you understood the restraining
18     order was entered, correct?
19 A.  Yes.
20 Q.  You understood it was a court order that you
21     were obliged to follow, correct?
22 A.  Yes.
23 Q.  And I assume you wanted to comply with any

**Page 46**

1  court orders, correct?
2  A.  Yes.
3  Q.  My question to you is, under the language of
4      that court order, do you recognize that it
5      would be relevant in attempting to comply
6      with that order to determine whether or not
7      any company that's ordering from you is
8      still a customer of ChemTreat?
9  A.  It never crossed my mind to ask them.
10 Q.  Did you ask that of any customer of Rhema
11     with whom you may have taken an order since
12     November of 2005?
13 A.  No.
14 Q.  When you set up or established some
15     relationship with Ulrich Chemical Company to
16     provide chemicals for Rhema were you
17     provided with any type of a price list?
18 A.  No.
19 Q.  Were you provided with any type of a product
20     list?
21 A.  No.
22 Q.  How did you know what to order?
23 A.  The customer told me what they needed.

**Page 47**

1  Q.  And would they order that from you by number
2      or would they do it by name of a chemical?
3  A.  Sometimes both, either/or.
4  Q.  So Carus Chemical, for instance, would call
5      you and say, "I need a drum of blend RE 730"
6      as opposed to calling it by name?
7  A.  Sometimes.
8  Q.  All right.  How did -- how would Carus
9      Chemical Company know what Ulrich Chemical's
10     numbering system is to know what number to
11     order?
12 A.  From me.
13 Q.  How did you give them that if Ulrich didn't
14     give it to you?
15 A.  They gave it to me.  I didn't say they
16     didn't.  You asked if it was a price list.
17     I said no, I didn't get a price list from
18     them.
19 Q.  Then I asked if they gave you a product list
20     of what products they sold.
21 A.  I didn't have a product list either.  I
22     would call them.
23 Q.  What kind of documentation did you have that

**Page 48**

1  would tell you what, for instance, the
2  product known as blend RE 770 was?
3  A.  Ask that question again, please.
4  Q.  What documentation did you have, either from
5      Ulrich Chemical or anybody else, that would
6      allow you to determine what the product
7      entitled blend RE 770 is?
8  A.  I'm sorry.  You'll have to repeat that one
9      more time.
10 Q.  What information did you have, whether it be
11     product lists, brochures, directory, any
12     documentation, that would advise you what
13     chemical Ulrich Chemical Company referred to
14     as blend RE 770?
15 A.  A price letter, when I called for a price, I
16     would either get a price over the phone or
17     they would send me a price letter.
18 Q.  Tell me how you would go about getting this
19     price letter.  A customer would call you,
20     tell you I need such-and-such chemical.
21 A.  Uh-huh.
22 Q.  Yes?
23 A.  Yes.

49

Q. You would call Ulrich and say, "I need a price." Is that right?
A. Yes.
Q. Okay. Tell me what you would ask them.
A. I would ask them for a price for that chemical.
Q. And how would you identify the chemical?
A. By name.
Q. Okay. You would not identify it by number; is that right?
A. Correct. They would give me the number.
Q. Who would?
A. Ulrich.
Q. You would call and say, for instance, I need a price on such-and-such polymer, and they would say, Oh, that's RE No. such-and-such, and this is the price; is that correct?
A. Yes.
Q. And as you were told this did you then keep track so that you would have reference as to their product numbers?
A. Yes.
Q. You did. Where is that kept track of?

50

A. Just on notes.
Q. Okay. Where do you keep those notes?
A. In my office.
Q. Okay. And you are still in possession of those notes?
A. I don't know if I still have them or not.
Q. You continue to order from Ulrich Chemical, correct?
A. Yes.
Q. Okay. Do you know whether or not the RE numbers that appear on Ulrich Chemical invoices are their own in-house numbers?
A. I have no idea.
Q. Okay. Now, you said that some of your customers -- for instance, maybe Carus would call in and order the product by number.
A. Yes.
Q. Okay. So have you ever received a call from, again, let's say Carus saying, I need a barrel of RE 770, and you call Ulrich and say, I need a price for RE 770?
A. No. The only way that Carus would know to reference it by number is because of a

51

previous sale, and they would now have the number because that's what we're using.
Q. And at no time have you requested from Ulrich to give you any type of a guide by which you can cross-reference chemical names to their product numbers; is that right?
A. No.
Q. Yes, that's right?
A. That's correct, I have not.
Q. To your knowledge, has any of Rhema's customers ever required a modification of an existing blend from Ulrich Chemical Company?
A. Not to my knowledge.
Q. You have no chemistry training; is that correct?
A. Correct.
Q. Okay. You have no training in the water treatment chemical business; is that correct?
A. Correct.
Q. You would have no expertise whatsoever to determine whether or not a specific formulation should be modified for a

52

particular application; is that correct?
A. I wouldn't know.
Q. Okay. Now, you were talking about getting the business of Carus Chemical Company and you called it an open bid. I'm going to mark this as Michelle Kinsman Exhibit No. 3, and I'll ask you to please take a look at that.
A. Okay.

(Exhibit No. 3 marked.)

Q. Do you recognize that?
A. I do.
Q. It's a letter from yourself to Tom Moshage at Carus Chemical Company, correct?
A. Yes.
Q. Would you consider this as part of your bid process with Carus Chemical?
A. Yes.
Q. Okay. Now, on the exhibit that you have in front of you, which was produced by yourself in discovery, the actual prices that appeared in the original letter have been redacted and replaced with just Xs correct?

53

1   A.   Yes.
2   Q.   Okay.  But the actual letter that went to
3        Carus Chemical Company, in fact, had prices
4        listed on there; is that right?
5   A.   Uh-huh.
6   Q.   Yes?
7   A.   Yes.
8   Q.   Okay.  And that would have included the
9        current supplier's old price, the current
10       supplier's new price and the price that you
11       were offering as Rhema, correct?
12  A.   Yes.
13  Q.   And when you refer in this letter to current
14       supplier to show the old and new price, you
15       are referring to ChemTreat, correct?
16  A.   Yes.
17  Q.   You also have on here -- prior to the three
18       columns you have product numbers 1240, 100,
19       1544 and 4355, which are X'd out on that
20       copy as well.  Let me show you Carus' copy
21       of that same letter.
22            MR. WOLFE:  Do you want me to give
23       my copy to her?

54

1            MR. CASSIDY:  That's okay, unless
2        you want this attached.
3   Q.   (BY MR. CASSIDY)  Am I correct this first
4        column of numbers, 4355, 1240, 100, and 1544
5        are chemical numbers?  They are product
6        numbers, correct?
7   A.   I believe so.
8   Q.   Whose product numbers are those?  Are they
9        Ulrich's, are they ChemTreat's, or are they
10       Carus' in-house numbers?
11  A.   Well, they are not Rhema's, but whether they
12       are Carus' in-house or ChemTreat's, I don't
13       know.
14  Q.   Okay.  Now, you just raised an interesting
15       point.  You say not Rhema's.  Does Rhema
16       have its own numbering system?
17  A.   Just whatever I have from Ulrich.
18  Q.   So when you say Rhema, you mean Ulrich?
19  A.   Yes.
20  Q.   Ulrich doesn't use a different numbering
21       system for you than they would anybody else?
22  A.   No.
23  Q.   To your knowledge?

55

1   A.   To my knowledge, no.
2   Q.   How did you determine -- okay.  Strike that.
3            With respect to Product 1240
4        listed in this letter, you've given a price,
5        a Rhema price, which would be Ulrich's price
6        plus whatever markup you gave for Rhema,
7        correct?
8   A.   Yes.
9   Q.   So it necessarily follows that you contacted
10       Ulrich to get a price on this particular
11       chemical that's denoted as No. 1240,
12       correct?
13  A.   Yes.
14  Q.   How did you know what 1240 was?
15  A.   I don't recall.  Probably from discussion
16       with Tom.  I don't remember.  It's been so
17       long ago.
18  Q.   You believe that Tom Moshage told you the
19       various chemicals that he might want new
20       prices on and also gave you the numbering
21       system to reference them to him?
22  A.   Possibly.  I don't remember.  I don't
23       recall.

56

1   Q.   How about the old ChemTreat column, where
2        did you get those prices?
3   A.   I don't remember.
4   Q.   Okay.  Did your husband give them to you?
5   A.   I don't remember.
6   Q.   Do you have any recollection of discussing
7        with your husband when you began the
8        business of Rhema what prices he was
9        charging for various chemicals?
10  A.   No.
11  Q.   Do you know where you got the new ChemTreat
12       price, which I assume is after a price
13       increase referenced earlier in the letter,
14       how you would have gotten that information?
15  A.   I don't recall.
16  Q.   Do you believe that that information was
17       given to you by your husband?
18  A.   I don't recall.
19  Q.   Okay.  Would you agree with me that a
20       company's pricing information is proprietary
21       information?
22  A.   I don't know.
23  Q.   Okay.  Do you know whether or not any other

**57**

1  companies submitted bids at or about the
2  time you submitted this letter to Tom
3  Moshage?
4  A.  I was told that they had.
5  Q.  And do you know whether or not Tom Moshage
6  gave them the benefit of knowing what he was
7  currently paying so they could put it in
8  their bids?
9  A.  I have no idea.
10 Q.  I'll ask the same question specifically
11 another way.  Do you specifically have any
12 recollection of having a conversation with
13 Tom Moshage where he told you what price he
14 was paying for any chemical he was asking
15 you to quote?
16 A.  I don't recollect.  I don't remember.
17 Q.  Okay.  Based upon any -- based upon your two
18 years' experience in this business and any
19 other quoted prices you've put together for
20 any other companies, would you agree with me
21 that it would be very unusual for a customer
22 to tell you what they were paying so that
23 you would have that information in preparing

**58**

1  a new bid?
2  A.  I have no idea.
3  Q.  Did your husband have employee manuals,
4  product information documents, other such
5  things from ChemTreat when he was working
6  for ChemTreat?
7  A.  I guess so.
8  Q.  Okay.  Did you ever see them?
9  A.  I saw them on a shelf.  I never looked at
10 them.
11 Q.  You've never reviewed them?
12 A.  No.
13 Q.  You would not have gotten these prices by
14 going through materials that he had left on
15 a desk or on a shelf or something?
16 A.  No.
17 Q.  That's correct?
18 A.  That is correct.
19 Q.  You were not able to call ChemTreat and get
20 their current prices; is that correct?
21 A.  That's correct.
22 Q.  Which would leave either Tom Moshage or your
23 husband who gave you the former prices; is

**59**

1  that a fair deduction?
2  A.  I guess so.
3  Q.  Do you have any idea right offhand what your
4  percentage markup is on the chemicals that
5  you sell to Carus Chemical Company?
6  A.  No.
7  Q.  Ulrich Chemical Company does not dictate to
8  you what you sell the chemical for; is that
9  correct?
10 A.  No.
11 Q.  No, they don't, or no, I'm not correct?
12 A.  They don't dictate to me.
13 Q.  So they sell to you at a price, and you
14 determine how much of a markup to establish
15 your profit, correct?
16 A.  Yes.
17 Q.  That would have been the situation back in
18 March of 2004 when you prepared this price
19 comparison for Tom Moshage?
20 A.  Probably.
21 Q.  Is that letterhead a letterhead that you
22 prepared just on your computer program?
23 A.  I believe so.

**60**

1  Q.  And that letter was prepared five months
2  prior to the time that you were an LLC?
3  There were no prior filings with the State
4  of Illinois, was there?
5  A.  Prior to what?
6  Q.  To the Articles of Organization marked as
7  Exhibit 1.
8  A.  Well, attempts.  I already told you that I
9  tried once and the name was used, so then I
10 had to refile.
11 Q.  I understand that, but you had decided on
12 the company name and began using it, but I
13 notice you are referencing it as an LLC
14 there even though you were not registered
15 with the State.  I just want to make sure
16 there was no other filing.  There was an
17 attempt, but it was rejected, correct?
18 A.  Yes.
19 Q.  Have you ever purchased chemicals from any
20 supplier other than Ulrich?
21 A.  No.
22 Q.  Did you ever ask your husband to make a
23 sales call to a customer on behalf of Rhema?

**61**

1  A.  I did not.
2  Q.  Do you know whether or not he ever did that?
3  A.  Not to my knowledge.
4  Q.  Did you ever request that your husband help
5      you out in the business by submitting
6      orders?
7  A.  I was out of town a few times, and I did
8      have to -- I did ask him to make a call for
9      me, yes.
10 Q.  Did he regularly make orders on behalf of
11     Rhema?
12 A.  No.
13 Q.  Did he regularly perform any activities on
14     behalf of Rhema?
15 A.  No.
16 Q.  What understanding did you have at the time
17     that this letter that's marked as Exhibit 3
18     was sent as to the status of Carus Chemical
19     Company and its continuing purchase of
20     ChemTreat chemicals?
21 A.  They had decided to cease to purchase their
22     chemicals from ChemTreat.
23 Q.  It was your understanding that was a

**62**

1      rock-solid firm decision that had been made;
2      they were going to switch, correct?
3  A.  Yes.
4  Q.  Who told you that?
5  A.  Greg did.
6  Q.  All right.  So is it your understanding that
7      if the Rhema price was not acceptable or Tom
8      Moshage, for whatever reason, didn't want to
9      do business with Rhema, he was still going
10     to discontinue his relationship with
11     ChemTreat irrespective?
12 A.  Yes.
13 Q.  If it was your understanding that Mr.
14     Moshage, just hypothetically, was
15     contemplating continuing with ChemTreat if
16     the Rhema price didn't beat it, would you
17     have still gone after the business?
18 A.  No.
19 Q.  You would agree with me that by going after
20     business that would otherwise stay with
21     ChemTreat you were actually taking your
22     husband's business, correct?
23 A.  Yes.

**63**

1  Q.  And your husband worked partly on commission
2      at that time, correct?
3  A.  I believe so.
4  Q.  So if, in fact, just hypothetically, you did
5      take business that otherwise would have
6      remained with your husband you were actually
7      affecting his income?
8  A.  But I didn't do that.
9  Q.  I know.  I asked you hypothetically.  I'm
10     saying you recognized that dynamic between
11     the two companies, correct?
12 A.  Yes.
13 Q.  Do you know how much commission your
14     husband would make on a sale to Carus
15     Chemical in March of 2004?
16 A.  Dollars?
17 Q.  Percentage, his percentage commission.
18 A.  I don't recall when the change happened from
19     salary and commission to commission, so I
20     don't remember.
21 Q.  Do you remember what --
22 A.  If it was salary and commission, I believe
23     it was 10.  If it was commission only, I

**64**

1      think it was 30.
2  Q.  Okay.  And with respect to Rhema, after
3      payment of the actual product costs, how
4      much did Rhema keep?  It was 100 percent,
5      wasn't it?  You didn't have to pay anybody
6      else?
7  A.  Correct.
8  Q.  Have you ever received an MSDS for any of
9      the products you sell to any of the
10     customers?
11 A.  Occasionally they send them to me to pass
12     them on.
13 Q.  Do you pass them on?
14 A.  I do.
15 Q.  Do you retain copies?
16 A.  Sometimes.  Sometimes I -- I don't know if I
17     have any now or not.  I usually just send
18     them on.
19 Q.  Let me go back a little bit here.  When you
20     agreed to fill the equipment order for
21     Refrigeration Systems Company you understand
22     that that purchase order that you were
23     filling was the result of a proposal

**Page 65**

1  prepared and submitted by ChemTreat?
2  A. I did.
3  Q. You understood that Refrigeration Systems
4  Company had accepted that proposal and
5  issued this purchase order to ChemTreat,
6  correct?
7  A. Yes.
8  Q. Okay. Did you have any communication with
9  anybody at Refrigeration Systems Company,
10  Inc., to indicate to them that you were not
11  ChemTreat?
12  A. No.
13  Q. Did you have any communication with anybody
14  at RSC?
15  A. No.
16  Q. Do you know whether or not any notification
17  was given to ChemTreat that a portion of its
18  accepted proposal was being farmed out to
19  another company?
20  A. Would you repeat that, please.
21  Q. Do you have any knowledge as to whether or
22  not any notification was given to ChemTreat,
23  Inc. --

**Page 66**

1  A. I don't know.
2  Q. Just so we finish the question, so we're
3  clear -- that a purchase order issued to
4  them was being filled by another company?
5  You understood that was my question when you
6  answered, right?
7  A. I wasn't aware there was any communication.
8  Q. Did it occur to you that that might be
9  something that should be done?
10  A. I don't remember.
11  Q. In your Rhema Elpis Enterprises 2004
12  partnership income tax return, it shows a
13  property depreciation line item of $22,266.
14  Do you know what property was being
15  depreciated?
16  A. A truck.
17  Q. Anything else?
18  A. Not that I remember.
19  Q. Okay. Well, it shows -- I don't want you to
20  have to go by memory. It's showing some
21  25-year property. $22,000 is a pretty high
22  depreciation for a truck.
23  A. Those numbers are automatically -- those

**Page 67**

1  numbers are on there. I mean I didn't put
2  those on there. Those came up on the thing.
3  Q. You use like a TurboTax or something?
4  A. Uh-huh.
5  Q. Yes?
6  A. Yes.
7  Q. Everybody does it.
8      Okay. It's your understanding
9  that the entire $22,000 deduction is from a
10  truck?
11  A. Yes.
12  Q. Was the truck completely depreciated in one
13  year?
14  A. No.
15  Q. What kind of truck was it?
16  A. It was a pickup truck.
17  Q. You also have -- I understand you don't have
18  your tax records in front of you, but the
19  best you can recall, you have cost of goods
20  sold of $29,097. Would that all represent
21  chemical costs paid to Ulrich Chemical?
22  A. I don't know without my records.
23  Q. And the 2005 return it's reported a little

**Page 68**

1  differently on a Schedule C, profit or loss
2  from business, and you have a $6,786
3  property depreciation. Do you know what
4  property was being depreciated there?
5  A. The same pickup truck.
6  Q. Just the truck, nothing else?
7  A. (The witness nodded.)
8  Q. Yes?
9  A. Yes.
10  Q. We are also showing here cost of goods sold
11  of $51,254. Do you know whether or not that
12  represents product costs to Ulrich, or were
13  there other items in there?
14  A. I wouldn't know without my records.
15  Q. Probably includes the cost of the equipment
16  that we've been talking about to RSC?
17  A. I wouldn't know without my records.
18  Q. Is that a number that you came up with to
19  give to the accountant, or did the
20  accountant come up with that number based
21  upon the records you gave him?
22  A. Which number are we talking about?
23  Q. The cost of goods sold for 2005.

69

1  A.  They would have come from my records.
2  Q.  Okay.  You simply would have told him what
3      to put on that line?
4  A.  That's all he asked for.
5  Q.  And the depreciation of the truck, did you
6      calculate and tell him --
7  A.  No.  He calculated that.
8          MR. CASSIDY:  Bear with me one
9      minute.
10         (Recess taken.)
11 Q.  (BY MR. CASSIDY)  Mrs. Kinsman, when you
12     spoke with Tom Moshage at Carus Chemical
13     before submitting a price quote to them, did
14     you have any discussion with them with
15     respect to their physical facilities?
16 A.  I don't recall.
17 Q.  Did you have any discussion with them as to
18     the quantities of any chemicals that were
19     previously being ordered?
20 A.  No.
21 Q.  Would you have had any knowledge -- let me
22     ask it this way:  Do you know whether or not
23     Carus Chemical Company has holding tanks for

71

1      would perform exactly the same as what your
2      husband had been providing through
3      ChemTreat?
4  A.  This was so -- this letter was so long ago,
5      I can only -- I can't fine the right word.
6      Having something to do with Ulrich.
7  Q.  You would have been relaying information
8      that Ulrich was telling you that their
9      products would perform exactly the same as
10     the products that ChemTreat was providing?
11 A.  I believe so.
12 Q.  And did you determine on your own that it
13     would be beneficial for them to order in
14     330-gallon quantities as opposed to some
15     other amount and also the benefits of them
16     transferring that into 55-gallon drums once
17     on site?
18 A.  I don't recall.  This probably had something
19     to do with the conversation I had, but it's
20     been so long ago I don't have a recollection
21     of it, I'm sorry.
22 Q.  It's your testimony under oath here today
23     that this document was prepared by you with

70

1      their chemicals?
2  A.  Yes.
3  Q.  How do you know that?
4  A.  I don't know.
5  Q.  You indicate in Exhibit 3 here -- let me
6      just ask you, Exhibit 3, did your husband
7      take any part in helping you prepare that to
8      submit to Tom Moshage?
9  A.  Not that I recall.
10 Q.  How would you have had knowledge as to the
11     amount of ChemTreat's most recent price
12     increase as represented in this letter?
13 A.  I don't recall.
14 Q.  Okay.  How would you have gained the
15     knowledge that they have followed the
16     industry with a price increase every year?
17 A.  I don't recall.
18 Q.  You indicate in this letter that, quote, Our
19     products will perform exactly the same as
20     your current products.
21         How do you know without any
22     chemical background as to how the products
23     you were going to provide through Ulrich

72

1      no chemical or water treatment chemical
2      experience without any assistance from your
3      husband; is that correct?
4  A.  I don't recall.  It's been so long ago since
5      I did it.
6  Q.  You don't recall if your husband took part
7      in bidding for the work with Carus Chemical?
8  A.  He didn't take part in bidding it.
9  Q.  Do you distinguish between preparation of
10     this letter and bidding for the work of
11     Carus Chemical?
12 A.  I don't know.
13         MR. CASSIDY:  I'm done.
14     Signature?
15         MR. WOLFE:  Yeah.  We'll reserve
16     it, too.
17         MR. CASSIDY:  Condensed, please.
18         MR. WOLFE:  Same.
19     FURTHER DEPONENT SAITH NOT.
20
21
22
23

73

```
 1   STATE OF ILLINOIS  )
                        )
 2   COUNTY OF TAZEWELL )

 3

 4           C E R T I F I C A T E

 5       I, Gina Fick, CSR, RMR, a Notary Public duly

 6   commissioned and qualified in and for the County

 7   of Tazewell and State of Illinois, DO HEREBY

 8   CERTIFY that, pursuant to notice, there came

 9   before me on the 3rd day of May, 2006, at 331

10   Fulton Street, Suite 650, in the City of Peoria,

11   County of Peoria, and State of Illinois, the

12   following named person, to wit:

13

14       MICHELLE KINSMAN,

15

16   who was by me first duly sworn to testify to the

17   truth and nothing but the truth of her knowledge

18   touching and concerning the matters in

19   controversy in this cause and that she was

20   thereupon carefully examined upon her oath and

21   her examination immediately reduced to shorthand

22   by means of stenotype by me.

23       I ALSO CERTIFY that the deposition is a true
```

74

```
 1   record of the testimony given by the witness and

 2   that the necessity of calling the court reporter

 3   at time of trial for the purpose of

 4   authenticating said transcript was also waived.

 5       I FURTHER CERTIFY THAT I am neither attorney

 6   or counsel for, nor related to or employed by,

 7   any of the parties to the action in which this

 8   deposition is taken, and further, that I am not a

 9   relative or employee of any attorney or counsel

10   employed by the parties hereto, or financially

11   interested in the action.

12       IN WITNESS WHREEOF, I have hereunto set my

13   hand and affixed my notarial seal this 24th day

14   of May, 2006.

15

16

17           GINA FICK, CSR, RMR

18

19

20   "OFFICIAL SEAL"
     Gina Fick
21   Notary Public, State of Illinois
     My Commission Exp. 02/03/2008
22

23
```

75

```
 1   STATE OF ILLINOIS  )
                        )
 2   COUNTY OF TAZEWELL )

 3       IN THE UNITED STATES DISTRICT COURT

 4       FOR CENTRAL DISTRICT OF ILLINOIS

 5

 6   CHEMTREAT, INC., v. GREGORY P. KINSMAN, et al.

 7       ILLINOIS RULE 207 (a) STATEMENT BY WITNESS:

 8           SIGNATURE PAGE

 9       I hereby state that I have read the foregoing

10   transcript of my deposition given at the time and

11   place aforesaid and I do again subscribe and make

12   oath that the same is a true, correct, and

13   complete transcript of my deposition given as

14   aforesaid, with corrections based on the

15   reporter's errors in reporting or transcribing

16   the answer or answers involved, if any, as they

17   appear on the attached, signed correction sheet.

18       _____ Correction sheet(s) attached.

     Dated this _____ day of _____,
     A.D., 2006.

     SIGNED _____
                    MICHELLE KINSMAN

     Subscribed and sworn to before me this
     _____ day of _____, 2006.

     Notary Public
     My commission expires
     _____
```

```
           CORRECTION SHEET

RE: CHEMTREAT, INC. v. GREGORY KINSMAN, et al.

PAGE      LINE

____      ____     CHANGE_____

                   REASON_____

____      ____     CHANGE_____

                   REASON_____

____      ____     CHANGE_____

                   REASON_____

____      ____     CHANGE_____

                   REASON_____

____      ____     CHANGE_____

                   REASON_____
```

MERIT REPORTERS                    309/266-7700

Form **LLC-5.5**
December 2003

Jesse White
Secretary of State
Department of Business Services
Limited Liability Company Division
Room 351, Howlett Building
Springfield, IL 62756
http://www.cyberdriveillinois.com

Payment must be made by certified check, cashier's check, Illinois attorney's check, Illinois C.P.A.'s check or money order, payable to "Secretary of State."

**Illinois
Limited Liability Company Act
Articles of Organization**

*SUBMIT IN DUPLICATE*
Must be typewritten

This space for use by Secretary of State

Date 0F-11-2004
Assigned File # 0126 3F62
Filing Fee     $500.00
Approved:

This space for use by Secretary of State

# FILED

AUG 1 1 2004

JESSE WHITE
SECRETARY OF STATE

1. Limited Liability Company Name: Rhema Elpis Enterprises, LLC

(The LLC name must contain the words limited liability company, L.L.C. or LLC and cannot contain the terms corporation, corp., incorporated, inc., ltd., co., limited partnership, or L.P.)

2. The address of its principal place of business: (Post office box alone and c/o are unacceptable.)
   754 First St.   LaSalle, IL 61301

3. The Articles of Organization are effective on: (Check one)
   a) ___**X**___ the filing date, or b) _____ another date later than but not more than 60 days subsequent
   to the filing date: _____
                        (month, day, year)

4. The registered agent's name and registered office address is:

   Registered agent:      Paul                    G              Panzica
                          *First Name*            *Middle Initial*    *Last Name*

   Registered Office:     754                     First Street
   (P.O. Box and          *Number*                *Street*           *Suite #*
   c/o are unacceptable)  LaSalle                 61301              LaSalle
                          *City*                  *ZIP Code*         *County*

5. Purpose or purposes for which the LLC is organized: Include the business code # (IRS Form 1065).
   (If not sufficient space to cover this point, add one or more sheets of this size.)
   "The transaction of any or all lawful business for which limited liability companies may be organized under this Act."

   Business Code #454390

6. The latest date, if any, upon which the company is to dissolve _____ N/A _____
                                                                    (month, day, year)

   Any other events of dissolution enumerated on an attachment. (Optional)

EXHIBIT

EXHIBIT

**LLC-5.5**

7. Other provisions for the regulation of the internal affairs of the LLC per Section 5-5 (a) (8) included as attachment:

    *If yes, state the provisions(s) from the ILLCA.*    ☐ Yes    ☒ No

8. a) Management is by manager(s):    ☐ Yes    ☒ No
    *If yes, list names and business addresses.*

    b) Management is vested in the member(s):    ☒ Yes    ☐ No
    *If yes, list names and addresses.*

    Michelle Kinsman
    754 First Street
    LaSalle, IL 61301

9. I affirm, under penalties of perjury, having authority to sign hereto, that these articles of organization are to the best of my knowledge and belief, true, correct and complete.

    Dated _____ May 27 _____ , ___ 2004 ___
            (Month/Day)              (Year)

| Signature(s) and Name(s) of Organizer(s) | Address(es) |
|---|---|
| 1. *Michelle Kinsman* | 1. 754 First Street |
| Signature | Number            Street |
| Michelle Kinsman, Organizer ~mk~ | LaSalle |
| (Type or print name and title) | City/Town |
| | Illinois            61301 |
| (Name if a corporation or other entity) | State            ZIP Code |
| 2. _____ | 2. _____ |
| Signature | Number            Street |
| (Type or print name and title) | City/Town |
| (Name if a corporation or other entity) | State            ZIP Code |
| 3. _____ | 3. _____ |
| Signature | Number            Street |
| (Type or print name and title) | City/Town |
| (Name if a corporation or other entity) | State            ZIP Code |

(Signatures must be in ink on an original document. Carbon copy, photocopy or rubber stamp signatures may only be used on conformed copies.)

LLC-4.8

E-FILED
Wednesday, 09 November, 2005  01:39:36 PM
Clerk, U.S. District Court, ILCD

U.S. DISTRICT COURT
FOR CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| CHEMTREAT, INC. a Virginia<br>corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  05 CV 1336 |
| | ) | |
| GREGORY P. KINSMAN, and | ) | |
| MICHELLE M. KINSMAN, individually | ) | |
| and d/b/a RHEMA ELPIS ENTERPRISE, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

### TEMPORARY RESTRAINING ORDER
### AGAINST MICHELLE M. KINSMAN, INDIVIDUALLY
### AND D/B/A RHEMA ELPIS ENTERPRISE, LLC,

This matter comes on for hearing on Plaintiff's Motion for Temporary Restraining Order,

notice having been give, all parties present by counsel and the Court being fully advised, make

the following findings:

1.   That is has jurisdiction over the subject matter and the parties;

2.   That the Plaintiff possesses a clear right or interest needing immediate protection;

3.   That absent immediate protection, Plaintiff will suffer immediate and irreparable
     harm including potentially substantial, but difficult to calculate financial losses,
     loss of proprietary product information and damage to its corporate reputation and
     good will; and

4.   There exists a likelihood of success on the merits of Plaintiff's cause of action
     against MICHELLE M. KINSMAN, individually and d/b/a RHEMA ELPIS
     ENTERPRISE, LLC.

IT IS THEREFORE ORDERED that MICHELLE M. KINSMAN, individually and d/b/a

RHEMA ELPIS ENTERPRISE, LLC, is hereby enjoined from:



EXHIBIT
2
M Kinsman

a.  Soliciting, calling upon, communicating with, entering into any sales or servicing agreements with, or attempting to communicate with any person or entity that is currently a customer of CHEMTREAT (or any representative of such person or entity) with whom Defendant, GREGORY P. KINSMAN, had any contact, communication, or for which he had supervisory, sales or service responsibility during any of the eighteen (18) consecutive calendar months preceding his termination of employment with CHEMTREAT for the purpose of selling, offering for sale, influencing the purchase of, or otherwise providing any product, service or equipment competitive with any product, service or equipment sold, offered for sale, provided or under development by CHEMTREAT;

b.  Servicing, selling to or calling upon any former CHEMTREAT customer with is a current customer of RHEMA ELPIS ENTERPRISES, LLC (or any representative of such person or entity) whose current customer relationship resulted from the wrongful conduct of GREGORY P. KINSMAN as alleged in Plaintiff's Complaint;

c.  Soliciting, calling upon, communicating with, entering into any sales or servicing agreements with, or attempting to communicate with any person or entity (a representative of such entity) for which Defendant, GREGORY P. KINSMAN, performed or participated in a survey or written proposal during the twelve (12) consecutive calendar months preceding his termination of employment with CHEMTREAT for the purpose of selling, offering for sale, influencing the purchase of, or otherwise providing any product, service or equipment competitive with any product, service or equipment sold, offered for sale, provided or under development by CHEMTREAT, either for his own benefit or on behalf of any other person or entity;

d.  Disclosing to any persons or entities any information relating to inventions, products, product specification, processes, procedures, prices, discounts, manufacturing costs, business affairs, future plans, technical data, customer lists, product formulations, marketing techniques and cost data received or learned by it as a result of GREGORY P. KINSMAN'S employment with CHEMTREAT;

This Temporary Restraining Order shall become effective immediately upon Plaintiffs posting of a security bond in the amount of $100.00 in accordance with FRCP 65.1 and shall remain in effect until December 15, 2005 at 1:00 p.m. unless otherwise modified by Order of this Court.

2

A hearing on Plaintiff's Petition for Preliminary Injunction is set for 1:00 p.m. on the 15th day of December, 2005 before the Honorable Joe Billy McDade at the Federal Courthouse, located in Peoria, Illinois.

Approved as to form.

By: s/ Andrew D. Cassidy
    CASSIDY & MUELLER
    416 Main Street, Suite 323
    Peoria, IL 61602
    Telephone: 309/676-0591
    Fax: 309/676-8036
    E-mail: dcassidy@cassidymueller.com

By: s/ J. Kevin Wolfe, Esq.
    Harvey & Stuckel, Chtd.
    331 Fulton, Ste. 650
    Peoria, IL 61602
    Telephone: 309/671-4900
    Fax: 309/671-5473
    E-mail: jkwolfe@hslaw.us

Date: _____

_____
Judge

3

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Kevin Wolfe                    jkwolfe@hslaw.us

By: s/ Andrew D. Cassidy
      CASSIDY & MUELLER
      416 Main Street, Suite 323
      Peoria, IL 61602
      Telephone: 309/676-0591
      Fax: 309/676-8036
      E-mail: dcassidy@cassidymueller.com

**RHEMA Enterprises, LLC**

P. O. Box 127

Tiskilwa, IL 61368

Phone 815-872-1590

Fax 815-872-1590

March 12, 2004

Mr. Tom Moshage
Carus Chemical Company
1500 Eight Street
LaSalle, IL 61301

Dear Tom:

I have put together the pricing you requested regarding the boiler treatment chemicals. I think you will be pleased with the pricing being it is fixed for a minimum of 2 years and hopefully 3. This will be the equivalent of a 12-15% savings over the next 3 years. As you know your current supplier just passed a 6% increase for this year and has followed the industry with one every year. Performance is, of course, the key to maintaining high efficiencies and an economical program. We will complete this task in addition to saving Carus Chemical money over the next several years. Our products will perform exactly the same as your current products and we will have very little overhead to maintain. The manufacturer of these specialty chemicals is one of the best known commodity chemical suppliers in the country and is one of your very own customers. Ulrich Chemical Company will make all of the deliveries with their trained personnel. The way we are expecting to be able to maintain these fixed costs is by working with our customers and providing "just in time" deliveries. Large inventories are not required to be kept or stored so as to only benefit from volume orders. We will be able to deliver in 330 gallon quantities, or multiples, with only a few days notice once all our inventories are in place. We can even transfer 55 gallon drums into your holding tanks should the need arise. In return we are asking that our customers help us in keeping the payment cycle on track as close as possible to the 60 day net goal. We will also be providing the test reagent and equipment ordering service through Hach and the various equipment companies as part of our regular service. Please find listed below the comparison pricing for this quote.

|  | Old | New | Rhema |
|---|---|---|---|
| Current Supplier | xxxx x.xx/lb | x.xx/lb | x.xx/lb |
|  | xxx x.xx | x.xx | x.xx |
|  | xxxx x.xx | x.xx | x.xx |
|  | xxxx x.xx | x.xx | x.xx |

Sincerely,


Michelle Kinsman
President


EXHIBIT
3
M. KINSMAN

E-FILED
Friday, 21 July, 2006  12:17:08 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 10 - DEPOSITION OF TOM MOSHAGE (1 OF 2)

U.S. DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

CHEMTREAT, INC., a Virginia Corporation,)
)
Plaintiff,                          )
)
-vs-                           )   NO. 05-CV-1336
)
GREGORY P. KINSMAN; and MICHELLE M. )
KINSMAN, Individually and d/b/a RHEMA )
ELPIS ENTERPRISE, LLC,               )
)
Defendants.                     )

DISCOVERY DEPOSITION

OF: THOMAS CURTIS MOSHAGE

The discovery deposition of THOMAS CURTIS MOSHAGE, called as a witness pursuant to notice and pursuant to the provisions of the Code of Civil Procedure of the State of Illinois, and the Rules of the Supreme Court thereof pertaining to the taking of depositions for the purpose of discovery; taken before ANN L. PELLICAN, C.S.R., a Notary Public in and for the County of LaSalle, State of Illinois, at 654 First Street, LaSalle, Illinois, on the 4th day of May, 2006, commencing at the hour of 1:40 p.m.

1

APPEARANCES:

CASSIDY & MUELLER
Attorneys at Law
BY: MR. ANDREW D. CASSIDY
323 Commerce Bank Bldg.
Peoria, Illinois 61602

appearing on behalf of the Plaintiff;

HARVEY & STUCKEL
Attorneys at Law
BY: MR. J. KEVIN WOLFE
331 Fulton Street, Suite 650
Peoria, Illinois 61602

appearing on behalf of the Defendants;

WINSTON & STRAWN, LLP
Attorneys at Law
BY: MS. MAUREEN L. RURKA
35 West Wacker Drive
Chicago, Illinois 60601-9703

appearing on behalf of Thomas Moshage.

| INDEX | PAGE |
| --- | --- |
| Examination by Mr. Cassidy | 3, 40 |
| Examination by Mr. Wolfe | 28 |
| Exhibit No. 1 marked | 17 |
| Exhibit Nos. 2 & 3 marked | 25 |

RECEIVED

JUL 1 2 2006

CASSIDY & MUELLER

2

1    THOMAS CURTIS MOSHAGE, called as a witness herein,
2  upon being first duly sworn on oath, was examined and
3  testified as follows:
4              (Witness sworn.)
5              EXAMINATION BY:
6              MR. ANDREW D. CASSIDY
7    MR. CASSIDY: Could you state your full name, please?
8    THE WITNESS: Thomas Curtis Moshage.
9    Q.  Mr. Moshage, have you ever given a deposition
10  before?
11   A.  No.
12   Q.  I just -- I'll try to get through this quickly.
13  I've got some questions. Don't have much in rules. But the
14  court reporter is taking down everything we say, so try to
15  avoid uh-huh, huh-uh, nods of the head, things like that
16  because we need to get on the transcript what the answer is.
17  And just, please, if you don't understand my question or it's
18  confusing or I've mumbled it up, please let me know. I'll
19  reask it so we know what we're talking about. Good enough?
20   A.  Yes, sir.
21   Q.  Where do you reside?
22   A.  13716 North Division Extension, Granville,
23  Illinois.
24   Q.  How are you currently employed?

3

1    A.  With Carus Chemical.
2    Q.  Where is Carus Chemical located?
3    A.  1500 Eighth Street, LaSalle, Illinois.
4    Q.  What -- if I'm not familiar with Carus, how would
5  you describe the business for me?
6    A.  We're a chemical producer.
7    Q.  What kind of chemicals do you provide?
8    A.  We produce -- oh, who do we provide to?
9    Q.  Well, both questions I guess. What kind of
10  chemicals are you producing and --
11   A.  The chemicals we produce are used in air and water
12  treatment.
13   Q.  How long have you been with Carus Chemical?
14   A.  30-year anniversary in January of this year.
15   Q.  What's your current position?
16   A.  Senior processing engineer.
17   Q.  How long have you been senior process engineer?
18   A.  Roughly a year.
19   Q.  What was your position immediately prior to that?
20   A.  Process engineer.
21   Q.  How long in that position?
22   A.  Roughly a year and a half.
23   Q.  What did you do -- what was your position prior to
24  that?

4

1    A.   Superintendent.
2    Q.   What is the basic scope of the employment or the
3 duties of a processing engineer?
4    MS. RURKA:  Objection to form.
5    MR. CASSIDY:  You understand I just want to know what
6 you do on a daily basis.
7    THE WITNESS:  Currently, the senior process engineer
8 role that I have is I take existing processes and operations,
9 and I take a look at them and determine better ways or
10 changes to those processes in order to optimize the
11 performance of the plant.
12    Q.   Would that involve both the processes for the
13 producing the chemicals as well as the plant operations?
14    A.   The entire operation.
15    Q.   What was the extent of your formal education?
16    A.   Graduated high school, equivalent probably two
17 years of college credits.
18    Q.   Do you have any chemical degree or anything that
19 led you to this job?
20    A.   No.
21    Q.   Everything you know about this you learned on the
22 job?
23    A.   Yes.
24    Q.   Among your present duties with Carus Chemical, are
      5

1 you responsible for purchase of water treatment chemicals for
2 the plant?
3    A.   Yes, but not solely me.
4    Q.   How long have you been involved in the -- in that
5 role of purchasing water treatment chemicals?
6    MS. RURKA:  Objection.  Misstates his testimony.
7    MR. CASSIDY:  I'm sorry.  What was the objection?
8    MS. RURKA:  Misstates his testimony.
9    You can answer the question, if you understand it.
10    THE WITNESS:  Could you restate the --
11    MR. CASSIDY:  How long have you been involved in the
12 water treatment chemical purchasing?
13    THE WITNESS:  Since roughly 2000.
14    Q.   I'm just kind of curious.  Carus Chemical produces
15 the type of chemicals that are used for water treatment, but
16 you buy your -- they do not?
17    A.   No.  It's different.  We make a product -- the main
18 product line that we have is called potassium permanganate.
19 It's an extremely strong oxidizer.  It's used in air and
20 water purification.  It's used in municipalities, waste water
21 treatment, ground remediation.  It's also used at our site to
22 make another chemical called sodium permanganate which is
23 also used in ground remediation, circuit board etching, et
24 cetera.
      6

1    Q.   What are the applications within the Carus plant
2 that water treatment is necessary?  Are there boilers?
3    A.   There are boilers.  There's the phosphate plant.
4    Q.   Cooling towers?
5    A.   No.  We don't do any water treatment for the
6 cooling towers.  Water treatment for filter press water.
7    Q.   Who does Carus Chemical currently buy their water
8 treatment chemicals from?
9    A.   Rhema.
10    (The reporter requested
11    clarification.)
12    THE WITNESS:  R-h-e-e-m-a, I think.
13    MR. CASSIDY:  I think it's only one E actually,
14 R-h-e-m-a.
15    Prior to that were you buying them from Chemtreat?
16    THE WITNESS:  Yes.
17    Q.   Do you know how long you were with Chemtreat?
18    MS. RURKA:  Objection.  Vague.
19    THE WITNESS:  How long Carus has been with Chemtreat?
20    MR. CASSIDY:  Yes.
21    THE WITNESS:  Early to middle '90s.
22    Q.   Are you familiar with -- if we go back past 2000
23 when you indicated you started becoming involved in
24 purchasing water treatment chemicals, are you going to know
      7

1 where the chemicals were being purchased from, who the sales
2 rep was, those types of things?  Or is your knowledge pretty
3 much limited to 2000 forward?
4    A.   Supplier we had before Chemtreat was Nalco.
5    Q.   Do you know when that switch took place?
6    A.   It would have been roughly when we started with
7 Chemtreat.
8    Q.   Do you know whether or not the switch from Nalco to
9 Chemtreat was related to the change of employment by Greg
10 Kinsman from Nalco to Chemtreat?
11    A.   No, I don't.
12    Q.   Let's just talk about when you primarily have been
13 involved, in 2000, and prior to the switch to Rhema, what is
14 expected from Carus of their chemical -- or their water
15 treatment representative?
16    MS. RURKA:  Objection.  Vague.
17    THE WITNESS:  To provide chemicals used in the treatment
18 of water at the lowest possible cost and usage rate.
19    MR. CASSIDY:  Okay.  Are they -- does Carus have its own
20 operators?
21    THE WITNESS:  Yes.
22    Q.   Does it have its own technical engineers or people
23 who service the boilers?
24    A.   Yes.
      8

1  Q.  Does Carus rely upon its chemical sales rep -- and
2  let's try to make this a lot easier.
3      The sales rep for Chemtreat was Greg Kinsman,
4  correct?
5  A.  Correct.
6  Q.  Let's just talk about Greg then.  It might be a
7  little easier.
8      Did you count on Greg Kinsman to do any inspection
9  of the boiler equipment?
10  A.  No.
11  Q.  Did he do any troubleshooting when there were
12  problems with the boiler equipment?
13  A.  Initially.
14  Q.  Okay.  When was that?
15  A.  Right after I started with assuming control of the
16  boiler house.
17  Q.  So if there was some problem with the operation of
18  the boiler, he would be called in and asked to take a look at
19  it?
20  A.  No.
21  Q.  Explain to me what you mean when you say he was
22  involved initially?
23  A.  There was analysis that he would do that would
24  indicate elevated or reduced chemical usage.

9

1  Q.  So you're referring to water analysis?
2  A.  Yes.
3  Q.  At some point did his role change where he was no
4  longer expected to do water analysis testing?
5  A.  Can you rephrase or say that again?
6  Q.  Sure.  You indicated that the water analysis was
7  something he did initially.  I'm wondering if at some point
8  that stopped.
9  A.  Yes, it did stop.
10  Q.  When did that change and why?
11  MS. RURKA:  Objection.  Compound question.
12  THE WITNESS:  It changed sometime last year.
13  MR. CASSIDY:  2005?
14  THE WITNESS:  Yes.
15  Q.  How often did you expect your chemical salesman,
16  Greg Kinsman, to conduct water analysis testing?
17  A.  Did I expect him to?
18  Q.  Yeah.
19  A.  I didn't.
20  Q.  Do you know how often he was doing it?
21  A.  Roughly once a week.
22  Q.  Okay.  Which is roughly whenever he called on the
23  plant, correct?
24  A.  Correct.

10

1  Q.  When he would call on the plant on a weekly basis,
2  in addition to the water analysis testing and I assume taking
3  orders or filling orders for additional chemicals, was there
4  any other duties that he would undertake?
5  A.  No.
6  MS. RURKA:  Objection.  Assumes facts not in evidence.
7  MR. CASSIDY:  Is Rhema currently the exclusive chemical
8  supplier for Carus?
9  THE WITNESS:  It's vague what you're asking.  We have a
10  lot of chemical suppliers.
11  Q.  With respect to the water treatment, is Rhema the
12  exclusive provider?
13  A.  No.
14  Q.  Whom else do you purchase water treatment chemicals
15  from?
16  A.  Chemtreat, Nalco, I believe Betz.
17  Q.  Currently, there's cross-purchasing from three
18  different companies that you know of, Rhema, Chemtreat and
19  Nalco?
20  A.  And I believe Betz.
21  Q.  I'm sorry?
22  A.  I believe Betz, B-e-t-z.
23  Q.  Thank you.  How do you determine which chemicals
24  are going to be bought from which companies?  Is it just on

11

1  price?
2  A.  It's based on price and the individual doing
3  purchasing.
4  Q.  Do you buy simultaneously from all of these
5  companies or just regularly switch based upon the current
6  price?
7  A.  No.  Simultaneously.
8  Q.  Would sales -- were there regular calls to Carus
9  from sales reps from the other companies besides Chemtreat?
10  A.  Yes.
11  Q.  Would those sales reps also conduct water analysis?
12  A.  Yes.
13  Q.  How long have you been purchasing from Rhema?
14  A.  I truly don't know.
15  Q.  Was there some point in time, the best you can
16  recall, where a decision was made by yourself to go away from
17  Chemtreat due to the cost of their chemicals?
18  A.  Repeat, please.
19  Q.  Do you have any recollection of a point in time
20  where you decided to stop using Chemtreat due to the cost of
21  their chemicals?
22  A.  Yes.
23  Q.  Do you know when that was?
24  A.  No.  I don't remember the date.

12

1  Q.  Okay.  And -- but you did not stop using Chemtreat,
2  as you indicated.  You're still buying chemicals from them,
3  correct?
4  A.  Correct.
5  Q.  Who is the sales rep for Chemtreat currently
6  calling on you?
7  A.  No one.
8  Q.  You just call in orders --
9  A.  Yes.
10  Q.  -- to the corporate?
11  A.  Yes.
12  Q.  Tell me how you first became aware of the existence
13  of the company known as Rhema?
14  A.  Through Greg.
15  Q.  You say Greg.  You mean Greg Kinsman?
16  A.  Greg Kinsman.
17  Q.  Do you have any recollection as to when Greg
18  Kinsman first brought to your attention the existence of the
19  company known as Rhema?
20  A.  No.
21  Q.  Do you know whether or not that was done at the
22  plant during one of his service calls to the plant?
23  A.  No, it wasn't done during that time.
24  Q.  You're personal friends with Greg in addition to

13

1  working with him?
2  MS. RURKA:  Objection.
3  THE WITNESS:  I'm work friends.  Does that make sense?
4  MR. CASSIDY:  Um-hum.  Best you can recall, tell me how
5  the conversation came up with Greg Kinsman that brought to
6  your attention the existence of Rhema?
7  THE WITNESS:  I mentioned to Greg that in the near
8  future he may see representatives from Nalco and from Garrett
9  Callahan because I was doing another price comparison, which
10  I was doing annually.  At that time Greg had mentioned that
11  Chemtreat might be having another price increase at the
12  beginning of the year.  And I said, well, how is that going
13  to affect you.  And he said -- this is all trying to
14  remember.  He said something like if it keeps going like
15  this, I'm going to lose some of my customers, and I'll have
16  to put my wife to work.
17      I believe the following week we were together, and
18  I asked him if he found his wife a job yet, laughing.  And he
19  said something like she's starting her own business.  And I
20  said what business was that.  And he said she's getting into
21  the water treatment business.  And I said what kind of water
22  treatment business, and he said all types of water treatment.
23  And so I asked him does she -- or will she be handling things
24  like boiler chemicals.  He said yes.  I said have her give me

14

1  a call tomorrow, and I'll have her be one of my competitive
2  pricing, something to that effect.
3  Q.  Did you understand when he told you that his wife
4  would be getting into the water treatment chemical business
5  that this business would actually be in direct competition
6  with Chemtreat?
7  MS. RURKA:  Objection.  Calls for speculation.
8  THE WITNESS:  Okay.  Could you rephrase it now?
9  MR. CASSIDY:  Sure.  When this conversation took place
10  and Mr. Kinsman indicated to you that his wife was going to
11  start selling water treatment chemicals, was it your
12  understanding that this company she was creating would be
13  competing with Chemtreat?
14  THE WITNESS:  I didn't think of it that way at the time,
15  no.
16  Q.  Okay.  When you did your price comparison -- first
17  of all, do you know what year this was?
18  A.  I can make a speculative guess.
19  Q.  Let me try to put it in context.  Maybe that'll
20  help you.  The first sale that we've been able to document
21  from Rhema to Carus Chemical was in March of 2004.  Assuming
22  I'm correct on that, does that help refresh your recollection
23  as to what year this conversation would have taken place?
24  A.  I would venture a guess that it would have been in

15

1  the fall of 2003.
2  Q.  When you did your price comparison that year, did
3  Chemtreat also submit new prices?
4  A.  We were at current pricing level with them.  I
5  don't --
6  Q.  Did --
7  A.  As far as I know for the pricing, when Chemtreat
8  had an increase, they would send a letter to our purchasing
9  agent.
10  Q.  Did Greg Kinsman, as the sales rep for Chemtreat,
11  work with you in any respect to see if he could lower his
12  prices in order to keep the business?
13  A.  No.
14  Q.  Did you know Michelle Kinsman prior to this
15  conversation where he told you that his wife was going to
16  start working?
17  A.  I believe I met her once.
18  Q.  Did Michelle Kinsman follow up with you, give you a
19  call, as you suggested, during this conversation?
20  A.  Yes.
21  Q.  Do you know when that was in relation to that
22  initial conversation?
23  A.  It was the next day.
24      (Moshage Deposition Exhibit

16

No. 1 was marked for
identification.)

MR. CASSIDY: I'm going to hand you what we've marked as
Moshage Deposition Exhibit No. 1, ask you to take a quick
look at that. Do you recall ever seeing that letter before?

THE WITNESS: Yes. It was sent to me.

Q. Okay. Now, a similar letter -- or the exact same
letter was produced by the Kinsmans in this case showing a
date of March 12th, 2004. This document that was produced by
your company in response to a subpoena has a date of February
16th, 2006. Do you know why that date appears on that
document?

A. This came from my computer as there was a question
on some pricing back during this period of time as in respect
to the initial quoted cost that we were paying for -- I
believe it was amine as that we were paying currently.
And so it was questioned by our accountant as to why was
there an increase and no notification.

Q. From Rhema?

A. From Rhema. So what I did was I contacted Rhema
and asked them to send me the original letter with the
pricing. That's why it shows old, new.

Q. And she sent it to you electronically?

A. Yes.

17

Q. So when it printed off of your computer, it just
took the date and printed it off on that?

A. I don't know if it was that or if that's when she
sent it to me. But what she sent me was probably the date
that she sent it to me the second time.

Q. Do you have a recollection of this letter coming to
you back in March 2004 or about then?

A. Yes, I do.

Q. When she was -- when you were initially doing your
price comparison for that year; is that right?

A. Yes.

Q. Would this have been the only documentation that
was received from Rhema during that price comparison and
Michelle Kinsman trying to get the business?

A. To me, yes.

Q. Okay. Do you -- did you ever meet with Michelle
Kinsman between her phone call to you shortly after you first
becoming aware of Rhema and the submission of this written
price quote?

A. Concerning Carus business?

Q. Yes.

A. No.

Q. Do you know how many times you might have spoken to
Michelle Kinsman between the date of your initial phone
18

conversation with her and the submission of this price quote?

A. Twice.

Q. During those discussions did you ever provide her
with pricing information that you were currently paying to
Chemtreat?

A. No.

Q. Did you ever advise her that -- that Chemtreat was
raising their prices?

A. No.

Q. I assume then that you didn't specifically tell her
that that price increase would be six percent, if you didn't
tell her there was any increase?

A. I didn't know what the increase was going to be
from Chemtreat.

Q. Would it be fair to say then that this letter
wherein she shows your current supplier, the current
supplier's old price, the current supplier's new price, and
Rhema's price would be information that she gained from some
source other than you?

A. I have no idea how she got the information.

Q. Did you go with Rhema in response to this pricing
letter for at least these four chemicals -- or three
chemicals identified?

A. There's four.

19

Q. Four of 'em. I'm sorry. Were those all --

A. It wasn't just that price. It was the two-year
fixed also.

Q. Okay. As far as why you decided to go with them?

A. Correct.

Q. Were those four chemicals all chemicals that you
were purchasing from Chemtreat before switching to Rhema?

A. Yes. I purchased a polymer, a chelate, an amine,
and an erythorbate.

Q. I hope you got all of that because it means nothing
to me.

(A conversation was held off
the record.)

MR. CASSIDY: Would those -- are you familiar with the
term a commodity chemical as opposed to a blended
formulation?

THE WITNESS: No.

Q. Are these all chemicals that any chemical supplier
would provide, basically generic chemicals that aren't
specifically being blended for Carus?

A. Amine is a chemical group. There are a lot of
different types of amines. The same with chelate. It has
different names. It's also called EDTA, et cetera, and there
are different types. Once again, with the polymers, same
20

ANN L. PELLICAN, CSR

17

1 thing; and I don't know about the erythorbate.

2 Q. When chemicals -- water treatment chemicals arrive

3 at the Carus plant from whatever supplier, I assume they need

4 to be put into the system to treat the water in some

5 percentages. You're combining --

6 A. Correct.

7 Q. Who does that?

8 A. Myself, but primarily the operators.

9 Q. Does the -- do any of your sales reps have anything

10 to do with the mixing and putting the chemicals in your

11 system?

12 A. No.

13 Q. Do the -- at the initial outset of going with a

14 water treatment chemical company, do the sales reps take the

15 water analysis and tell you what percentages of products --

16 of different chemicals you should use?

17 A. What they'll do is they come in over a very

18 extended period of time grabbing samples at different points

19 to try and determine a treatment scheme that they feel would

20 best serve Carus.

21 Q. Once that's determined and agreed upon by Carus,

22 it's your operators who mix those chemicals up as they come

23 in?

24 A. Don't mix 'em up. They are introduced into the

21

1 system at controlled feed rates based on analysis.

2 Q. After you started selling --

3 A. I don't sell.

4 Q. I'm sorry. I was going to correct myself. After

5 you started purchasing from Rhema, did Greg Kinsman continue

6 to call on you?

7 A. Yes.

8 Q. And did he call on you on behalf of Chemtreat?

9 MS. RURKA: Objection.

10 THE WITNESS: Yes. He was calling on me on behalf of

11 Chemtreat.

12 MR. CASSIDY: Okay. Did he ever call upon you and

13 indicate that he was there on behalf of his wife's company,

14 Rhema?

15 THE WITNESS: Yes.

16 Q. Did he actually take orders when he would be at the

17 plant for Rhema products?

18 A. All orders go from me to our order agent, and she

19 calls into Rhema.

20 Q. Does Greg Kinsman take orders for Chemtreat, or is

21 it the same way with all of your companies?

22 A. No. Greg doesn't take any orders.

23 Q. What would Greg Kinsman do on behalf of Rhema when

24 he would call on the plant?

22

1 A. He did some water analysis.

2 Q. Did Michelle Kinsman ever make service calls to the

3 plant?

4 A. No.

5 Q. Are there any other representatives or employees of

6 Rhema other than Greg Kinsman who have ever called upon the

7 plant that you know of?

8 A. No.

9 Q. When was the last time that Greg Kinsman called

10 upon you at the plant in a professional capacity?

11 A. Sometime last year.

12 Q. Are you aware that Mr. Kinsman no longer works for

13 Chemtreat?

14 A. Yes.

15 Q. Do you know when that occurred?

16 MS. RURKA: Objection. Calls for speculation.

17 THE WITNESS: Sometime last year.

18 MR. CASSIDY: Okay. If I tell you that he was

19 terminated from Chemtreat in October 2005, just to put a

20 frame of reference, do you have any recollection as to

21 whether or not he called upon you at the plant after that

22 date?

23 THE WITNESS: Yes.

24 Q. Okay. And is it your understanding --

23

1 A. I'm just trying to recall. I'm sorry.

2 Q. I understand. And I know the dates. I think it

3 was October 11th actually is the date that he stopped at

4 Chemtreat.

5 If -- or based upon your recollection that he

6 called upon you after that day, was it your understanding

7 that he was calling upon you as a representative of Rhema?

8 A. No. I think he came to tell me what was going on,

9 that he was being terminated by Chemtreat.

10 Q. When you do your annual price comparisons for

11 chemicals, do you advertise it in any trade magazines?

12 A. Nope.

13 Q. So you basically need to call the companies you

14 want to get prices from and ask 'em to give 'em to you?

15 A. No. They show up regularly.

16 Q. Okay. Has Carus -- I'm sorry if I've asked you

17 this. Is Carus continuing to buy chemicals from Rhema to the

18 present day?

19 A. Yes.

20 Q. Were you aware that there was litigation pending

21 between Chemtreat and the Kinsmans and Rhema Enterprises,

22 LLC?

23 A. Yes.

24 Q. And were you aware that a injunction had been

24

1  issued by the federal court against the Kinsmans and Rhema
2  from continuing to do business with any former Chemtreat
3  customers?
4      A.   No.
5      Q.   You never knew that at any point?
6      A.   Greg I think mentioned at one point that there
7  might have been an injunction coming.
8      Q.   But you were never told that injunction had been
9  issued?
10     A.   No.
11                        (Moshage Deposition Exhibit
12                        Nos. 2 & 3 were marked for
13                        identification.)
14     MR. CASSIDY:  Handing you what I've marked as Moshage
15  Deposition Exhibits 2 and 3, Exhibit 2 being a temporary
16  restraining order against Greg Kinsman and 3 being a
17  temporary restraining order against Michelle Kinsman and
18  Rhema Elpis Enterprise, LLC, have you ever seen either of
19  those documents before me just handing them to you?
20     THE WITNESS:  No, sir.
21     Q.   As shown on the face of both of these exhibits are
22  filed in the United States District Court for the Central
23  District of Illinois on November 9th, 2005.  To your
24  knowledge, has Greg Kinsman called upon you to make sales of
                                                          25

1  chemicals subsequent to that date?
2      A.   I don't know.
3      Q.   To your knowledge has a chemical been purchased
4  from Rhema subsequent to that date?
5      A.   Yes.
6                        (A brief recess was taken.)
7      MR. CASSIDY:  Take just a couple more minutes of your
8  time, Mr. Moshage and see if you can educate me a little bit.
9          According to your records -- when I say your, I
10  mean Carus Chemical records -- this is the first invoice for
11  any purchase from Rhema right here.  Do you recognize the
12  chemicals being ordered on this invoice?
13     MR. WOLFE:  Is there a page reference?
14     MR. CASSIDY:  That's the AO-1.
15     THE WITNESS:  I can guess.
16     Q.   No.  I don't need you to guess.  I want to know if
17  you recognize them.  And do they match up with any of the
18  four chemicals that are quoted in this letter that are marked
19  as Deposition Exhibit 1?
20     A.   These are sampling chemicals.  These are process
21  chemicals.
22     Q.   What's a sampling chemical?
23     A.   When you check water analysis or when you're doing
24  analysis in a certain way, you need to have reagents.  You
                                                          26

1  have to have something to test against.  These are test
2  chemicals.
3      Q.   Okay.  The next invoice is 3/12, 2004.  It's two
4  types of chemicals being purchased, and this is page O-2.
5  And they're denoted as RE-740 and RE-770.  Do you know what
6  those are?
7      A.   If I was at the plant I could tell you.  One of 'em
8  is amine, and I don't know for sure the other one.  Is either
9  a polymer -- I think it might be polymer.
10     Q.   Really, what I'm trying to do is match up the
11  numbers from these invoices with the numbers of chemicals
12  that are identified in the letter marked as Exhibit 1.  Do
13  you know whether those cross-reference and match up?
14     A.   The RE-740, which is amine, is one of the four.
15     Q.   Okay.
16     A.   The same with RE-770.  It is one of the four.
17     Q.   Who -- where do these number designations come
18  from?  Are those --
19     A.   They came from Rhema.
20     Q.   Okay.  So would the number designations indicated
21  on Exhibit 1 to your knowledge be Chemtreat identifying
22  numbers?
23     A.   Chemtreat identifying numbers.
24     Q.   So these are the same chemicals with Rhema
                                                          27

1  identifying numbers on them.  Is that correct, to your
2  understanding?
3      A.   They're the same type of chemical, yes.
4      Q.   Do you know whether or not these RE numbers are the
5  numbers used by Ulrich Chemical, who is the supplier, or
6  whether or not --
7      A.   I don't know.
8      Q.   They're not Carus designation numbers, right?
9      A.   No.  They're not Carus designated numbers.
10     Q.   That's all I have.
11                    EXAMINATION BY:
12                    MR. KEVIN WOLFE
13     MR. WOLFE:  Mr. Moshage, you mentioned earlier on that
14  there was a purchasing agent at the time that you indicated
15  Michelle had submitted a proposal.  Who was that purchasing
16  agent for your company?
17     THE WITNESS:  The individual who asked for that quote
18  was Sandy Grubich.  She's not a purchasing agent.  She's an
19  accountant.  I don't know her specific title.
20     Q.   Sandy Grubich?
21     A.   Yeah.
22     Q.   Do you know how to spell that?
23     A.   G-r-u-b-i-c-h.
24     Q.   Is she still with the company?
                                                          28

**[Page 29]**

1    A.    Oh, yes.
2    Q.    Was there a person who was a purchasing agent, as
3 you used that term, in and around March of 2004?
4    A.    In this respect, no.  I do my own purchasing for
5 that or my own decisions on what I'm purchasing.
6    Q.    At the time of what has been marked as Exhibit
7 Number 1, you made the decision as to what chemicals to
8 purchase in response to that bid, correct?
9    A.    Correct.
10    Q.    Did you have other bids that you reviewed?
11    A.    At that time, no.
12    Q.    You had mentioned that with respect to water
13 treatment chemicals, other vendors may come into the plant,
14 correct?
15    A.    Correct.
16    Q.    And on or prior to this March 2000- --
17    A.    I don't mean to bother you.  This is Carus.  Can I
18 answer this?
19    MR. WOLFE:  That's fine.  We can go off the record.
20                      (Whereupon there was an outside
21                       interruption, and a
22                       conversation was held off
23                       the record.)
24                      (Record read.)
                                                              29

**[Page 30]**

1    MR. WOLFE:  We've been referring to Exhibit 1, and there
2 had been discussion that that may have been authored, at
3 least from earlier production, on or about March 12th, 2004.
4 Do you have a recollection of vendors coming in at or around
5 that time from either Nalco or Betz that were putting
6 together bids for the type of products that were mentioned in
7 Exhibit 1?
8    THE WITNESS:  Yes.
9    Q.    When you received the bid from Rhema, did you also
10 have the Nalco and Betz bids for comparison?
11    A.    No.  I had another outfit.
12    Q.    What was the other outfit?
13    A.    Garrett Callahan.
14    Q.    Would it be fair to characterize Garrett Callahan
15 as a competing bid to what you had received from Rhema?
16    A.    Yes.  That's a reference bid.
17    Q.    A reference bid.  Can you explain what you mean by
18 the term reference bid?
19    A.    When giving someone the opportunity to come in and
20 quote, I'll use that quote as a reference to other quotes
21 that might come in or current pricing.  I have to prove to my
22 superior that I'm getting the best pricing I can get for the
23 chemicals that I need.
24    Q.    So at the time that you were purchasing the
                                                              30

**[Page 31]**

1 chemicals referenced in what you have in Exhibit 1, you had a
2 reference bid from -- excuse me.  What was the name?
3    A.    I had an older bid from Garrett Callahan.
4    Q.    And is that what you're referring to as a reference
5 bid?
6    A.    Yes.
7    Q.    You had a current pricing of Chemtreat; is that
8 correct?
9    A.    Wherever we were currently purchasing was current
10 pricing, as in the cost at that time was the cost.
11    Q.    And then you had the quotes that you received from
12 Rhema, correct?
13    A.    Correct.
14    Q.    You mentioned that you did your own decisions on
15 purchasing at the time?
16    A.    For this I made the decision to go and switch to
17 Rhema.
18    Q.    Was that decision based in any form or fashion on
19 any encouragement by Greg Kinsman?
20    MS. RURKA:  Objection.  Vague.
21    THE WITNESS:  No.  It's all based on money.
22    MR. WOLFE:  At or around that time -- strike that.
23          You mentioned that you were informed about the
24 current pricing level of Chemtreat at or around the time you
                                                              31

**[Page 32]**

1 had this conversation with Greg about his wife having to get
2 a job.
3    MS. RURKA:  Objection.  Misstates the testimony.
4    THE WITNESS:  Was that a question?
5    MR. WOLFE:  All right.  I want to go back to this
6 conversation where you first learned of Rhema.
7          Did you tell Greg that he may see Nalco and Garrett
8 Callahan coming in for price comparisons?
9    THE WITNESS:  Correct.
10    Q.    When you told him about these price comparisons,
11 had you made any determinations as to whether to continue or
12 discontinue business with Chemtreat?
13    A.    I continue with the supplier that I have until I
14 make a determination whether or not I'm leaving that supplier
15 because of better pricing.
16    Q.    Why did you tell Greg that he may see Nalco and
17 Garrett Callahan for price comparison?
18    A.    It's a tool.
19    Q.    What was the purpose of that tool?
20    A.    To make people aware that just because they are a
21 supplier to Carus does not mean that they're going to stay a
22 supplier to Carus always.  It's always based on money.
23    Q.    Did you ultimately receive a price comparison from
24 Nalco?
                                                              32

1    A.    No.  It's still being worked on.
2    Q.    And I think you've told us about the Garrett
3 Callahan comparison bid, correct?
4    A.    Correct.
5    Q.    He mentioned to you, did he not, that there was
6 going to be a price increase at the end of the year?
7    A.    No.  What I stated was that he had mentioned that
8 Chemtreat may be coming out with a price increase at the
9 beginning of the year.
10   Q.    How would you have been informed of that price
11 increase?
12   A.    From Chemtreat I believe, but I'm not sure.  The
13 letter would have been sent to our purchasing department.
14   Q.    And that would be a letter from Chemtreat corporate
15 in Virginia to your purchasing department?
16   A.    I don't know.
17   Q.    Have you ever seen such a letter?
18   A.    No.
19   Q.    Who would be the person at your company that would
20 have awareness, if you know, of such letters?
21   A.    At that time?
22   MS. RURKA:  You know, I'm going to object.  That calls
23 for speculation.
24   THE WITNESS:  It would either have been Dixie Mills or

33

1 Ramona Brennan.
2    MR WOLFE:  Had you made -- strike that.
3          At the time of this conversation, did you make any
4 complaints to Mr. Kinsman about the pricing that was coming
5 from Chemtreat?
6    THE WITNESS:  Not that I know of.
7    Q.    Did you have any complaints with the service or the
8 products that you received from Chemtreat?
9    A.    No.
10   Q.    Other than telling you that his wife was starting
11 her own business and that you could give her a call, did
12 Mr. Kinsman in any form or fashion promote his wife's
13 business to you on that date?
14   A.    Back up.  I did not give her a call.  She gave me a
15 call.
16   Q.    Let me rephrase it.  Other than him saying to you
17 that his wife was starting a business and other than him
18 saying to you that you should give her a call for competitive
19 pricing, did he in any form or fashion promote or encourage
20 you to use her business or over Chemtreat?
21   MS. RURKA:  Objection.  Misstates the testimony.
22   THE WITNESS:  Right.  You said in the first or the
23 second stage of that that I was calling her for competitive
24 pricing.

34

1    MR. WOLFE:  I think we're passing each other.  Other
2 than him telling you to do that --
3    THE WITNESS:  He did not tell me to do that.
4    Q.    Okay.
5    A.    I asked him to have his wife give me a call.
6    Q.    All right.  That's where I messed up.  I apologize.
7          Other than, therefore, him telling you that his
8 wife was starting her own business, did he in any form or
9 fashion encourage you to leave Chemtreat and go to his wife's
10 business?
11   MS. RURKA:  Objection.  Vague.
12   THE WITNESS:  No.
13   MR. WOLFE:  You had not made any complaints -- strike
14 that.
15          If I understood what you told me earlier, you had
16 not made any complaints about the prices of Chemtreat's
17 products; is that correct?
18   THE WITNESS:  That is correct.
19   Q.    Mr. Cassidy asked you if Mr. Kinsman had done any
20 work to lower their prices.  Did he receive any information
21 from you that there was a necessity for Chemtreat to lower
22 their prices?
23   MS. RURKA:  Objection.  Vague.
24   THE WITNESS:  No.

35

1    MR. WOLFE:  Do you know how much -- strike that.
2          Is it your knowledge that Carus currently purchases
3 from Chemtreat -- chemicals from Chemtreat?
4    MS. RURKA:  Objection.  Vague.
5    THE WITNESS:  I don't understand.  Do we currently
6 purchase chemicals from Chemtreat?  Yes.
7    MR. WOLFE:  Okay.  I just want to know what your
8 knowledge is.  Do you have any knowledge as to how much it's
9 currently purchased from Chemtreat in terms of dollars?
10   THE WITNESS:  No.  Oh, I could make a guess.
11   Q.    Would that guess be based upon your knowledge of
12 the purchasing requirements of Carus and your role as the
13 senior process engineer?
14   MS. RURKA:  Objection.  Vague.
15   THE WITNESS:  Yeah.  I --
16   MR. WOLFE:  You said you could make a guess.  What I
17 want to know is is it a -- what we call a "WAG", or is it a
18 opinion based upon your experience and your knowledge of the
19 operation.
20   THE WITNESS:  We have certain budgets that we're in
21 charge of and that we oversee.  That -- what we oversee, I
22 also can see other people's budgets.  That chemical budget is
23 test chemicals is what it's called, and I know what I spend
24 roughly every month with Chemtreat for those test chemicals.

36

ANN L. PELLICAN, CSR                                    33

```
 1    Q.   How much do you spend every month for test
 2  chemicals with Chemtreat?
 3    A.   Somewhere between 5- and $700 a month.
 4    Q.   If you were not purchasing chemicals -- water
 5  treatment chemicals from Rhema currently, does that mean you
 6  would be purchasing them from Chemtreat?
 7    A.   I don't know.  Whoever gave the best pricing is
 8  where I'd be purchasing.
 9    Q.   The fact that Chemtreat purchased water treatment
10  chemicals for a period of years, at least since 2000, does
11  not guarantee that they would be selling today; is that
12  correct?
13    A.   That is correct.
14    Q.   Is it a fair statement that Rhema received the
15  business as a result of competitive bidding as opposed to a
16  diversion of business?
17    MS. RURKA:   Object to form.
18    MR. CASSIDY:   Well, I'm going to object too because I
19  think both the competitive bidding is the term of art that's
20  not defined, as is the term diversion not being defined,
21  so --
22    THE WITNESS:   You can ask it again now, so --
23    MR. WOLFE:   Can you read 'em back?
24                   (Record read.)
                                                         37
```

```
 1    THE WITNESS:   Yes, it is.
 2    MR. WOLFE:   I'm almost done.
 3        You mentioned to Mr. Cassidy that you believe there
 4  was one occasion where Mr. -- strike that.
 5        Is it your recall that Mr. Kinsman made a business
 6  call on behalf of Rhema to you at Carus?
 7    MS. RURKA:   Object.  Vague.
 8    THE WITNESS:   When?
 9    MR. WOLFE:   Well, that's what I wanted to find out.
10  Because I believe you told Mr. Cassidy when he asked you if
11  he had made a call --- called upon you at Carus, whether he
12  called on behalf of Rhema.
13    THE WITNESS:   Yes.
14    Q.   And you indicated that that had taken place.
15    A.   Yes.
16    Q.   Was that on one occasion or more than one occasion?
17    A.   More than one occasion.
18    Q.   Do you recall when?
19    A.   No.
20    Q.   When you say it was on behalf of Rhema, what
21  information are you relying upon to reach that conclusion?
22    A.   Greg was coming in and doing water testing --
23    Q.   Okay.
24    A.   -- as a Rhema whatever.
                                                         38
```

```
 1    Q.   Did -- did he tell you this?  Was he called in?  Or
 2  how is it that you reached the conclusion that he was doing
 3  it for Rhema?
 4    A.   There were reports that he would put together that
 5  showed our typical water analysis, which is what we currently
 6  do anyway.
 7    Q.   And were -- what were these water reports or these
 8  reports on?
 9    A.   On?
10    Q.   Were they on --
11    A.   Oh, a piece of paper.
12    Q.   With letterhead on it with identifying information
13  on it?
14    A.   I believe so.
15    Q.   And did those come to you?
16    A.   Yes.
17    Q.   Were these similar to what other companies would
18  come in and do a water analysis?
19    A.   As in other companies that were coming in to bid?
20    Q.   Yeah.
21    A.   No.  They would put together a complete package
22  showing what they felt my usage would be and then my total
23  cost.
24    Q.   Was this prior to March of 2004, or do you know?
                                                         39
```

```
 1    A.   Was what prior to 2000-
 2    Q.   This water analysis that you're talking about.  Was
 3  this prior to March of 2004?
 4    A.   No.
 5    Q.   It was after?
 6    A.   Correct.
 7    Q.   Was it before he was terminated by Chemtreat or
 8  after, if you know?
 9    A.   I don't really know because it was just weekly
10  reports.
11    Q.   Okay.
12            EXAMINATION BY:
13            MR. ANDREW D. CASSIDY
14    MR. CASSIDY:   Couple quick follow-up.
15        Do you retain those reports?
16    THE WITNESS:   No.
17    Q.   Okay.  Those are --- and I know they had been asked
18  for before.  It's nothing that's still in the possession of
19  Carus?
20    A.   It's not.
21    Q.   When you allow companies to give you quotes to do
22  your annual price comparison, do you -- go ahead.  Correct me
23  if I'm misstating.
24    A.   I'm supposed to do annual.  Okay?  I don't
                                                         40
```

1  necessarily do it every single year.

2      Q.   When you do it and maybe ask a couple sales reps to

3  send in some pricing, do you give them your current pricing

4  information?

5      A.   Never.

6      Q.   Now, you indicated that -- I think you said you

7  don't even have to ask sometimes because these guys are at

8  your door all of the time wanting to try to sell stuff,

9  correct?

10     A.   Correct.

11     Q.   Michelle Kinsman was never at your door at the

12  plant, correct?

13     A.   That's correct.

14     Q.   Other than Greg Kinsman, there was no sales rep or

15  any representative of Rhema that came to the plant, correct?

16     MS. RURKA:   Objection.  Form.

17     THE WITNESS:   Correct.

18     MR. CASSIDY:   Can you recall any other company in which

19  you asked to submit a bid simply by making a phone call to

20  you without ever personally calling upon you other than

21  Michelle Kinsman with Rhema?

22     THE WITNESS:   Garrett Callahan called and asked if they

23  could come in and make a proposal.

24     Q.   Did they come in and do an analysis to make their

                                                        41

1  proposal?

2      A.   Yes.

3      Q.   Michelle Kinsman did not do that, correct?

4      A.   No.

5      Q.   Would it be fair to say that Michelle Kinsman's

6  ability to submit a bid without ever coming in and doing an

7  analysis or meeting you in person was at least in part due to

8  the fact that she was Greg Kinsman's wife who you were

9  familiar with?

10     MS. RURKA:   Objection.  Calls for speculation.

11     THE WITNESS:   Can you repeat that now again?

12     (Record read.)

13     MS. RURKA:   I'm going to object.  Calls for speculation.

14     THE WITNESS:   I guess.  I don't know.

15     MR. CASSIDY:   In your role in purchasing chemicals, do

16  you have some discretion to allow existing suppliers to keep

17  the business during your bid process?

18     MS. RURKA:   Objection.  Vague.

19     THE WITNESS:   Can you rephrase that again?

20     MR. CASSIDY:   I guess what I'm getting at is do you have

21  any suppliers because you're comfortable with 'em.  You know

22  the sales rep does a nice job; but even though they can be

23  underbid on the price, you might work with them to see if

24  they can match the price so that they can keep the work?

                                                        42

1      THE WITNESS:   Huh-uh.

2      Q.   Okay.

3      A.   Work is work.

4      Q.   Do you give -- do you give existing suppliers an

5  opportunity -- I mean will you tell 'em I'm going to do a

6  price comparison and consider moving, do you give the

7  existing supplier the opportunity to put in new figures, or

8  do you just go by what you're paying on at that time?

9      A.   I go based on what I'm paying.

10     Q.   Okay.  So you don't ask them try to shoot me a

11  better number if you want to?

12     A.   Well, if they're not giving me their best number to

13  begin with -- I don't have time to play games.

14     Q.   That's all I have.  Thank you.

15          Do you want me to explain signature?

16     A.   Signature?

17     Q.   This is going to be typed in transcript form,

18  question, answer.  You have the right, as the witness, to

19  review the transcript to make sure the court reporter took

20  everything down accurately.  You can't change any

21  substantive -- you can just say that's not what I said, or

22  you can simply waive that right.  If you want to reserve it,

23  then we'll send you the transcript.  You'll have to review

24  it, sign off.

                                                        43

1      MS. RURKA:   We're going to reserve.

2      MR. CASSIDY:   Oh, you are reserving?  Okay.  Send it to

3  you?

4      MS. RURKA:   Yeah.  That would be great.

5          (Further deponent saith not.)

6          (Signature reserved.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

                                                        44

**E-FILED**
Friday, 21 July, 2006  12:18:06 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 10 - DEPOSITION OF TOM MOSHAGE (2 OF 2)

STATE OF ILLINOIS )
                 ) SS:
COUNTY OF LASALLE )

I, ANN L. PELLICAN, a Certified Shorthand Reporter and Notary Public in and for the County of LaSalle, State of Illinois, do hereby certify that previous to the commencement of the examination of the said TOM MOSHAGE, he was duly sworn by me to testify the truth in relation to the matters in controversy here insofar as they should be interrogated concerning the same; that said deposition was taken at 654 First Street, LaSalle, Illinois; that the testimony given by said witness was reduced to writing by means of shorthand and computer assisted transcription; and that the foregoing is a true, correct, and complete transcript of my shorthand notes so taken aforesaid.

I further certify that this deposition was taken pursuant to notice to all parties, and that there were present at the taking of this deposition MR. ANDREW D. CASSIDY appearing on behalf of the Plaintiff, MR. J. KEVIN WOLFE appearing on behalf of the Defendant, and MS. MAUREEN L. RURKA appearing on behalf of Thomas Moshage.

I further certify that I am not counsel for nor in any way related to any of the parties to this suit, nor am I in any way interested in the outcome thereof.

45

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Notarial Seal this 11th day of July, 2006.

Ann L. Pellican
ANN L. PELLICAN
Certified Shorthand Reporter
Ill. License No. 084-003080

"OFFICIAL SEAL"
ANN L. PELLICAN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 02-02-2007

46

---

U.S. DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

CHEMTREAT, INC.,                )
                                )
          Plaintiff,            )
                                )
     -vs-                       )  No. 05-CV-1336
                                )
GREGORY P. KINSMAN, et al.,     )
                                )
          Defendants.           )

DEPONENT'S CERTIFICATE

I, THOMAS MOSHAGE, having first been duly sworn oath, state that I have read the foregoing transcript of the testimony given by me at my deposition on the 4th day of May, 2006, and that said transcript constitutes a true and correct record of the testimony given by me at said deposition, except as I have so indicated on the errata sheets provided herein for such.

_____
Deponent

No Corrections (please initial): _____
Number of errata sheets submitted: _____

SUBSCRIBED AND SWORN TO before me this _____ day of _____, 2006.

_____
Notary Public

47

|       | CORRECTIONS |            |        |
|-------|-------------|------------|--------|
| PAGE  | LINE        | CORRECTION | REASON |

48

## RHEMA Enterprises, LLC

P.O. Box 127

Tiskilwa, IL 61368

Phone 815-872-1590
Fax 815-872-1590

February 16, 2006

Mr. Tom Moshage
Carus Chemical Company
1500 Eight Street
LaSalle, IL 61301

Dear Tom:

I have put together the pricing you requested regarding the boiler treatment chemicals. I think you will be pleased with the pricing being it is fixed for a minimum of 2 years and hopefully 3. This will be the equivalent of a 12-15% savings over the next 3 years. As you know your current supplier just passed a 6% increase for this year and has followed the industry with one every year. Performance is, of course, the key to maintaining high efficiencies and an economical program. We will complete this task in addition to saving Carus Chemical money over the next several years. Our products will perform exactly the same as your current products and we will have very little overhead to maintain. The manufacturer of these specialty chemicals is one of the best known commodity chemical suppliers in the country and is one of your very own customers. Ulrich Chemical Company will make all of the deliveries with their trained personnel. The way we are expecting to be able to maintain these fixed costs is by working with our customers and providing "just in time" deliveries. Large inventories are not required to be kept or stored so as to only benefit from volume orders. We will be able to deliver in 330 gallon quantities, or multiples, with only a few days notice once all our inventories are in place. We can even transfer 55 gallon drums into your holding tanks should the need arise. In return we are asking that our customers help us in keeping the payment cycle on track as close as possible to the 60 day net goal. We will also be providing the test reagent and equipment ordering service through Hach and the various equipment companies as part of our regular service. Please find listed below the comparison pricing for this quote.

|                  |      | Old     | New     | Rhema   |
|------------------|------|---------|---------|---------|
| Current Supplier | 1240 | 1.44/lb | 1.52/lb | 1.40/lb |
|                  | 100  | 1.57    | 1.63    | 1.55    |
|                  | 1544 | 2.50    | 2.62    | 2.48    |
|                  | 4355 | 1.49    | 1.57    | 1.40    |



A000044
CONFIDENTIAL

- Page 2

February 16, 2006

Sincerely,


Michelle Kinsman
President

A000045
CONFIDENTIAL

E-FILED
Wednesday, 09 November, 2005  03:19:46 PM
Clerk, U.S. District Court, ILCD

U.S. DISTRICT COURT
FOR CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

**FILED**

NOV - 9 2005

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

CHEMTREAT, INC. a Virginia        )
corporation,                      )
                                  )
              Plaintiff,          )
                                  )
v.                                )        Case No.  05 CV 1336
                                  )
GREGORY P. KINSMAN, and           )
MICHELLE M. KINSMAN, individually )
and d/b/a RHEMA ELPIS ENTERPRISE, )
LLC,                              )
                                  )
              Defendants.         )

## TEMPORARY RESTRAINING ORDER
## AGAINST GREGORY P. KINSMAN

This matter comes on for hearing on Plaintiff's Motion for Temporary Restraining Order,

notice having been give, all parties present by counsel and the Court being fully advised, make the

following findings:

1.    That is has jurisdiction over the subject matter and the parties;

2.    That the Plaintiff possesses a clear right or interest needing immediate protection;

3.    That absent immediate protection, Plaintiff will suffer immediate and irreparable harm including potentially substantial, but difficult to calculate financial losses, loss of proprietary product information and damage to its corporate reputation and good will; and

4.    There exists a likelihood of success on the merits of Plaintiff's cause of action against GREGORY P. KINSMAN.

IT IS THEREFORE ORDERED that GREGORY P. KINSMAN is hereby enjoined from:

a.    Soliciting, calling upon, communicating with, entering into any sales or servicing agreements with, or attempting to communicate with any person or entity that is or was a customer of CHEMTREAT (or any representative of such person or entity) with whom Defendant, GREGORY P. KINSMAN, had any contact, communication, or for which he had supervisory, sales or service



responsibility during any of the eighteen (18) consecutive calendar months preceding his termination of employment with CHEMTREAT for the purpose of selling, offering for sale, influencing the purchase of, or otherwise providing any product, service or equipment competitive with any product, service or equipment sold, offered for sale, provided or under development by CHEMTREAT, either for his own benefit or on behalf of any other person or entity;

b.    Soliciting, calling upon, communicating with, entering into any sales or servicing agreements with, or attempting to communicate with any person or entity (a representative of such entity) for which Defendant, GREGORY P. KINSMAN, performed or participated in a survey or written proposal during the twelve (12) consecutive calendar months preceding his termination of employment with CHEMTREAT for the purpose of selling, offering for sale, influencing the purchase of, or otherwise providing any product, service or equipment competitive with any product, service or equipment sold, offered for sale, provided or under development by CHEMTREAT, either for his own benefit or on behalf of any other person or entity;

c.    Disclosing to any persons or entities any information relating to inventions, products, product specification, processes, procedures, prices, discounts, manufacturing costs, business affairs, future plans, technical data, customer lists, product formulations, marketing techniques and cost data received or learned by him during his course of GREGORY P. KINSMAN'S employment with CHEMTREAT;

d.    Engaging in any business or other endeavor in competition with CHEMTREAT.

This Temporary Restraining Order shall become effective immediately upon Plaintiffs posting of a security bond in the amount of $100.00 in accordance with FRCP 65.1 and shall remain in effect until December 15, 2005 at 1:00 p.m. unless otherwise modified by Order of this Court.

A hearing on Plaintiff's Petition for Preliminary Injunction is set for 1:00 p.m. on the 15th day of December, 2005 before the Honorable Joe Billy McDade at the Federal Courthouse, located in Peoria, Illinois.

2

Approved as to form.

By: s/ Andrew D. Cassidy
CASSIDY & MUELLER
416 Main Street, Suite 323
Peoria, IL 61602
Telephone: 309/676-0591
Fax: 309/676-8036
E-mail: dcassidy@cassidymueller.com

By: s/ J. Kevin Wolfe, Esq.
Harvey & Stuckel, Chtd.
331 Fulton, Ste. 650
Peoria, IL 61602
Telephone: 309/671-4900
Fax: 309/671-5473
E-mail: jkwolfe@hslaw.us

Date: 11/9/05

s/Joe B. McDade
Judge

3

E-FILED
Wednesday, 09 November, 2005 03:21:33 PM
Clerk, U.S. District Court, ILCD

**FILED**

NOV – 9 2005

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

U.S. DISTRICT COURT
FOR CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

CHEMTREAT, INC. a Virginia      )
corporation,      )
      )
      Plaintiff,      )
      )
v.      )      Case No. 05 CV 1336
      )
GREGORY P. KINSMAN, and      )
MICHELLE M. KINSMAN, individually      )
and d/b/a RHEMA ELPIS ENTERPRISE,      )
LLC,      )
      )
      Defendants.      )

### TEMPORARY RESTRAINING ORDER
### AGAINST MICHELLE M. KINSMAN, INDIVIDUALLY
### AND D/B/A RHEMA ELPIS ENTERPRISE, LLC,

This matter comes on for hearing on Plaintiff's Motion for Temporary Restraining Order,

notice having been give, all parties present by counsel and the Court being fully advised, make

the following findings:

    1.    That is has jurisdiction over the subject matter and the parties;

    2.    That the Plaintiff possesses a clear right or interest needing immediate protection;

    3.    That absent immediate protection, Plaintiff will suffer immediate and irreparable
        harm including potentially substantial, but difficult to calculate financial losses,
        loss of proprietary product information and damage to its corporate reputation and
        good will; and

    4.    There exists a likelihood of success on the merits of Plaintiff's cause of action
        against MICHELLE M. KINSMAN, individually and d/b/a RHEMA ELPIS
        ENTERPRISE, LLC.

IT IS THEREFORE ORDERED that MICHELLE M. KINSMAN, individually and d/b/a

RHEMA ELPIS ENTERPRISE, LLC, is hereby enjoined from:



DEPOSITION
EXHIBIT
Moshage
3

a. Soliciting, calling upon, communicating with, entering into any sales or servicing agreements with, or attempting to communicate with any person or entity that is currently a customer of CHEMTREAT (or any representative of such person or entity) with whom Defendant, GREGORY P. KINSMAN, had any contact, communication, or for which he had supervisory, sales or service responsibility during any of the eighteen (18) consecutive calendar months preceding his termination of employment with CHEMTREAT for the purpose of selling, offering for sale, influencing the purchase of, or otherwise providing any product, service or equipment competitive with any product, service or equipment sold, offered for sale, provided or under development by CHEMTREAT;

b. Servicing, selling to or calling upon any former CHEMTREAT customer with is a current customer of RHEMA ELPIS ENTERPRISES, LLC (or any representative of such person or entity) whose current customer relationship resulted from the wrongful conduct of GREGORY P. KINSMAN as alleged in Plaintiff's Complaint;

c. Soliciting, calling upon, communicating with, entering into any sales or servicing agreements with, or attempting to communicate with any person or entity (a representative of such entity) for which Defendant, GREGORY P. KINSMAN, performed or participated in a survey or written proposal during the twelve (12) consecutive calendar months preceding his termination of employment with CHEMTREAT for the purpose of selling, offering for sale, influencing the purchase of, or otherwise providing any product, service or equipment competitive with any product, service or equipment sold, offered for sale, provided or under development by CHEMTREAT, either for his own benefit or on behalf of any other person or entity;

d. Disclosing to any persons or entities any information relating to inventions, products, product specification, processes, procedures, prices, discounts, manufacturing costs, business affairs, future plans, technical data, customer lists, product formulations, marketing techniques and cost data received or learned by it as a result of GREGORY P. KINSMAN'S employment with CHEMTREAT;

This Temporary Restraining Order shall become effective immediately upon Plaintiffs posting of a security bond in the amount of $100.00 in accordance with FRCP 65.1 and shall remain in effect until December 15, 2005 at 1:00 p.m. unless otherwise modified by Order of this Court.

2

A hearing on Plaintiff's Petition for Preliminary Injunction is set for 1:00 p.m. on the 15th day of December, 2005 before the Honorable Joe Billy McDade at the Federal Courthouse, located in Peoria, Illinois.

Approved as to form.

By: s/ Andrew D. Cassidy
    CASSIDY & MUELLER
    416 Main Street, Suite 323
    Peoria, IL 61602
    Telephone: 309/676-0591
    Fax: 309/676-8036
    E-mail: dcassidy@cassidymueller.com

By: s/ J. Kevin Wolfe, Esq.
    Harvey & Stuckel, Chtd.
    331 Fulton, Ste. 650
    Peoria, IL 61602
    Telephone: 309/671-4900
    Fax: 309/671-5473
    E-mail: jkwolfe@hslaw.us

Date: 11/9/05

        s/Joe B. McDade
        Judge