**E-FILED**
Wednesday, 16 August, 2006  03:22:35 PM
Clerk, U.S. District Court, ILCD

**U.S. DISTRICT COURT
FOR CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

| | | |
|---|---|---|
| CHEMTREAT, INC., a Virginia corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 05-CV-1336 |
| | ) | |
| GREGORY P. KINSMAN, and MICHELLE M. KINSMAN, individually and d/b/a RHEMA ELPIS ENTERPRISES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**RESPONSE TO MOTION FOR SUMMARY JUDGMENT
AS TO COUNTS IV, V, X AND RESPONSE TO MOTION
FOR PARTIAL SUMMARY JUDGMENT AS TO COUNTS
I THROUGH III AND COUNTS VI THROUGH IX OF
PLAINTIFF'S SECOND AMENDED COMPLAINT**

Now come Defendants, Gregory P. Kinsman and Michelle M. Kinsman,

individually and d/b/a Rhema Elpis Enterprises, LLC, by their attorney, J. Kevin

Wolfe of Harvey & Stuckel, Chtd., who pursuant to FRCP 56(a) and CDIL Local

Rule 7.1(d)(2) respond to the Motion for Summary Judgment and Motion for Partial

Summary Judgment of Plaintiff, Chemtreat, Inc., a Virginia corporation

("Chemtreat"), as follows:

**INTRODUCTION**

Plaintiff has failed to establish summary judgment is warranted in that

material issues of fact remain concerning the alleged breach of contract in Count I

1

based upon the wording of the contract and Virginia law.  Questions of fact remain as to whether Defendant, Gregory P. Kinsman, "engaged in any other business" as Virginia interprets such phrase.

Plaintiff has failed to establish no genuine issue of material fact with regard to whether there was  purposeful interference by Defendant, Gregory P. Kinsman under Count II and whether there was a causal relationship between any alleged conduct of Defendant and a termination of a business relationship.  Plaintiff has also failed to show damage as a result of any conduct of Defendant, Gregory P. Kinsman.

With regard to Plaintiff's motions on Counts III and IV, both of which allege a fiduciary duty, Defendant, Gregory P. Kinsman, argues that the facts do not clearly show a breach of an employee's fiduciary relationship.  Unlike cases cited by Plaintiff, there are factual questions about whether business opportunities were available to Plaintiff.

With regard to Plaintiff's motion on Count V, seeking enforcement of a covenant not to compete, it is Defendant, Gregory P. Kinsman's, position that he has not nor does he in any form or fashion compete with his former employer.  Defendants, Michelle Kinsman and Rhema Elpis, LLC will argue they are not a "shell company" that indirectly allows Mr. Kinsman to compete with his former employer.

Michelle Kinsman and her company, Defendant, Rhema Elpis, LLC (Rhema),

2

will adopt and set forth the same response to Plaintiff's motion regarding Counts VI and VII, intentional interference with contract, as were set forth with regard to the motion on Count II against Defendant, Gregory P. Kinsman, intentional interference with a business relationship, in that material issues of fact remain as to Defendants intentional conduct, whether any conduct of Defendant was a proximate cause and any damage that resulted from any conduct of Defendants.

Defendant's position with regard to Plaintiff's motions on Counts VIII through X, which allege aiding and abetting against Michelle Kinsman and/or Rhema is Plaintiff must show there is no genuine issue of material fact as to whether or not Michelle Kinsman, and through her Defendant, Rhema, had actual knowledge of any role in an overall tortious activity and that a knowledge requirement should be adopted for the tort of aiding and abetting.  For each of these reasons, as will be specifically outlined, it is Defendants position there exists disputes as to material facts which precludes the entry of summary judgment.

## RESPONSE TO UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 7.1(d)(2)(b)

### 1.  Undisputed material facts.

Defendants admit the following factual statements of Plaintiff, Chemtreat, Inc., are both undisputed and material: Plaintiffs statement of undisputed facts paragraphs 1, 2, 3, 4, 5, 7, 9 through 16, 24, 28, 29.

## 2. Disputed material facts.

(6)    Michelle Kinsman started a "competing" chemical supply business. Both Michelle Kinsman and Tom Moshage have testified it was not a competing business.  With that exception, paragraph 6 is correct and undisputed.

(8)  Michelle Kinsman testified the company was formulated after her husband complained of losing sales based on price increases that were coming through which he didn't have an option to bypass, and several customers were looking elsewhere.  (M. Kinsman dep. p.11-12).  These were customers who quit their relationship with Chemtreat and she did not see it as competitive by nature.

(17)    Tom Moshage testified he mentioned to Greg Kinsman that in the future he was seeing representatives from other competitors to do a price comparison.  Greg had mentioned there might be another price increase and Tom Moshage, representative of Carus Chemical, wanted to know what effect a price increase was going to have.  Greg Kinsman told him he was going to lose customers and may have to put his wife work.  A week later Kinsman told Moshage, "something like she's starting her own business."  Moshage then asked what type of business and was told it was a water treatment business.  Moshage then told Greg Kinsman to have Michelle give him a call and he would have her as one of his competitive pricing entities. (Moshage dep. p.14-15).  There is no testimony that Greg Kinsman told Tom Moshage that he was thinking of setting his wife up in a competing business.

4

(18)    Tom Moshage stated that he did not understand the company being created by Michelle Kinsman was a competing company.  Tom Moshage wanted competitive pricing from various companies, not necessarily quotes to replace those being sold by Chemtreat.  (Moshage dep. p. 14-15).

(19)    Tom Moshage requested competitive pricing not a "competing quote." (Moshage dep.p.15).

(20)    The proprietary nature of Chemtreat pricing is not established, nor is where pricing information came from.  Michelle Kinsman stated she did not recall where pricing information came from. (M. Kinsman dep.p.57).  Greg Kinsman testified he did not give the pricing information. (G. Kinsman dep.p.93).  Tom Moshage testified he didn't give the pricing information. (Moshage dep.p.19).  There is no indication this is Chemtreat proprietary pricing information.

(21)    Greg Kinsman testified that only when companies said they were seeking competitive bids, or when the customers told him they were leaving or quitting, did he advise them they could contact and get a competitive bid from his wife's business (G. Kinsman dep.p.108,140).

(22)    Defendant, Greg Kinsman, didn't testify his wife would undercut Chemtreat prices and likely take the business but rather testified that all of the competitors of Chemtreat would undercut him and try to take his business.  (G. Kinsman dep.p.122-123).

(31)    Michelle Kinsman testified that hypothetically she would agree that if she went after business that was going to stay with Chemtreat that she would actually be taking her husband's business away.  She further testified that whether or not Carus, through Tom Moshage, took the Rhema price or not, he was still going to discontinue his relationship with Chemtreat and it was further her understanding that a rock solid firm decision had been made for these companies to switch suppliers.  (M. Kinsman dep.p.61-62).

(32)    Greg Kinsman has denied that he made sales and/or service calls to Carus Chemical Company on behalf of Rhema (G. Kinsman dep.p.91-92).

(33)    Defendant made the calls, but it was in an attempt to service and salvage Chemtreat business (G. Kinsman dep.p.113-115).

(34)    Exhibit 4 does not indicate a "sales call."

(36)    Plaintiffs exhibit 6 does not indicate for whom Greg Kinsman was performing boiler inspections and under what circumstances that was being performed.

(37)    Defendants have testified throughout their depositions their knowledge that the Rhema customers were no longer customers of Chemtreat and those sales that were made were not made to customers wrongfully procured by Greg Kinsman.

### 3. Immaterial Facts

(26) & (27)   Whether Michelle Kinsman or Rhema advertised or made phone calls, met representatives in person or visited the plants is immaterial to whether or she and her company successfully bid for the business of the various customers that called upon her.

(30)   Whether or not Rhema received a call for a price quote or sale from a customer who previously was a Chemtreat customer is immaterial to a determination under summary judgment as to whether or not Greg Kinsman breached his contract, breached his fiduciary duties, or whether Michelle Kinsman aided and abetted or in any form or fashion interfered with the business relationship.

(35)   Exhibit 5 doesn't indicate Gregory Kinsman was engaged in any business on behalf of Rhema and as such is immaterial to the issues raised in this lawsuit.

### 4. Additional Material Facts

1.   Tom Moshage, Senior Processing Engineer for Carus Chemical of LaSalle, Illinois did not think creation of Rhema was a competing company to Plaintiff, Chemtreat.  (Moshage dep.p.15)

2.   When Carus received a bid from Rhema they also received a bid from Garrett-Callahan, which was a reference bid to determine if Carus was getting the best pricing (Moshage dep.p.30)

7

3.    At the time of the Rhema bid Moshage already had the pricing from Chemtreat along with the quotes Rhema.  His decision was all based upon money and not in any form or fashion on any encouragement by Greg Kinsman.  (Moshage dep.p.31)

4.    Tom Moshage told Greg Kinsman that he would see price comparisons coming in from Nalco and Garrett-Callahan, competitors of Chemtreat.  The reason for this was to make Chemtreat aware that just because they were a supplier to Carus didn't mean they were going to stay a supplier to Carus always.  It was always based on money.  (Moshage dep.p.32)

5.    If Carus was not purchasing water treatment chemicals from Rhema, that does not mean they would be purchasing them from Chemtreat.  It was based on the best pricing.  The fact that Carus purchased water treatment from Chemtreat for a period of years didn't guarantee they would be purchasing them from Chemtreat today.  According to Mr. Moshage, Rhema received business as a result of a competitive bidding process as opposed to a diversion of business. (Moshage dep.p37-38).

6.    If a chemical supplier was not giving them the best price, Carus was not going to do business with them.  According to Moshage, he doesn't have time to "play those games."  (Moshage dep.p.43).

7.    In the Spring of 2004 National Manufacturing, Monmouth College, Carrus Chemical and Bob Evans told Greg Kinsman they were leaving or

8

considering leaving Chemtreat (G. Kinsman dep.p.108).

8.      Michelle Kinsman has a B.S. in Business Administration from the University of Wisconsin, River Falls, has 10 years of bookkeeping experience and helped operate a financial services company with her husband.  (M.Kinsman dep.p.5-7).

## **ARGUMENT**

### **Count I - Breach of Contract**

Plaintiff states, and Defendant agrees, the contract is governed by Virginia law.  Based upon Virginia law, a question of the fact exists as to whether or not the conduct of Gregory Kinsman constituted a breach of the terms of the agreement. Specifically, a question of fact exists as to whether or not Gregory Kinsman's conduct amounted to engaging in other business while he was employed by Chemtreat and whether or not he disclosed pricing information in violation of the Trade Secrets and Confidentiality Agreement.

As cited by Plaintiff, the employment agreement provides, in relevant part, "[employee] covenants and agrees that he will devote his entire time and energy exclusively to the business of Chemtreat and during the period of his employment he will not engage in any other business, either for himself or on account of any other person, firm or corporation ..." (Plaintiff's Exhibit 1, p.1).  The term "engage in business" has been interpreted under Virginia law.

In *Young v. Town of Vienna, Va.* 203 Va 265, 123 S.E.2d 388 (Spr. Ct. App.

9

Va., 1962), a petition for declaratory judgment challenging a business privilege license tax was brought by an individual leasing property for commercial purposes on a month to month basis. The town ordinance of the Town of Vienna placed a property tax on anyone engaged in business, and Plaintiff sought a declaration the ordinance was not applicable to her because she did not engage in a continuous and regular course of dealing subject to the tax. The issue was whether or not she was engaged in the business of renting commercial property "within the meaning of the ordinance." The Supreme Court of Appeals of Virginia defined "engaged in the business" to mean "a course of dealing which requires the time, the attention and labor of the person so engaged for the purpose of earning a livelihood or profit." "It implies a continuous and regular course of dealing, rather than irregular or isolated transactions, in the absence of a statute specifically providing otherwise." *Young,* 203 Va at 267, 123 S.E.2d at 390. While the Town of Vienna characterized Plaintiff's activities as more than 300 instances of renting property based upon the month to month lease, the Court found her single act of renting the property did not constitute a continuous and regular course of dealing for the purpose of earning a livelihood or profit and granted her petition. *See* also, *Walton v. Commonwealth,* 187 Va 275, 282, 46 S.E.2d 373, 377 (1948) (interpreting the Virginia embalmers statute not to include a single act as a violation of the statute).

While both *Young* and *Walton* dealt with the interpretation of ordinances and statutes in the Commonwealth of Virginia, and while statutes and ordinances are

strictly construed when they are imposing taxes within the Commonwealth, a contract with similar language as the one at bar was also interpreted by the Supreme Court of Appeals in Virginia.  In *Linville v. ServiSoft of Virginia, Inc.*, 211 Va. 53, 174 S.E.2d 785 (Spr. Ct. App. of Va 1970), an employer  brought an action against a former employee to enjoin a violation of a covenant not to compete.  The employee had agreed he would devote his "full time and effort" to his employer and not engage in any competitive business of any nature whatsoever.  211 Va at 53, 174 S.E.2d at 786.  After the termination he obtained a franchise for a competing soft water business and prepared to open his own business.  Despite the language of the contract, the Court found that his post-employment activities did not violate the terms of the contract.

The record does not so clearly establish a breach of Greg Kinsman's employment contract.  While there are instances in which Greg Kinsman is listed as a representative of Rhema Elpis, they do not establish a regular and continuous course of dealing so as to arise and meet the definition of "engaging in the business" in competition with his former employer.  It is respectfully submitted that a determination as to whether or not there was continuous and regular course of dealing versus an irregular or isolated transactions must be determined by trier of fact in order to determine whether or not Gregory Kinsman breached his employment contract.

In addition to pre-termination breach, Plaintiff alleges Defendant has

11

violated his post employment covenant.  Plaintiff argues the only reasonable

inference from the record is Greg Kinsman provided information to his wife for a

written proposal and pricing information to Carus Chemical.  Plaintiff argues the

only reasonable inference is it came from Greg Kinsman even though Greg Kinsman

denied providing the pricing, Tom Moshage said he didn't remember doing it but

denied providing current pricing information to Michelle Kinsman, and Michelle

Kinsman didn't remember.  It is equally as inferable that Tom Moshage could have

provided the pricing information because Mr. Moshage has the incentive to get the

lowest price possible.  Moshage would have been obtaining pricing information and

would be well aware, as he testified, of what Carus was paying for Chemtreat

chemicals.  Moreover, there was a telephone conversation between Mr. Moshage

and Michelle Kinsman.  Moshage had been involved in this for a number of years

and there would be no reason for him not to know what anticipated price increases

may have been.

The records do not conclusively establish a breach of post-employment

covenants.  For example, Mr. Kinsman testified that after National Manufacturing

closed there was still Chemtreat Chemical that needed to be serviced, which he

performed.  Nothing in the Monmouth College e-mail correspondence indicates that

Mr. Kinsman is doing any business on behalf of Rhema or that the inspection was

not something that he had previously promised or said he would do for Monmouth

College.  Tom Moshage has testified that Mr. Kinsman did sales calls on behalf of

Rhema which Mr. Kinsman has denied.  Mr. Kinsman has acknowledged that he did take occasional phone calls for his wife and did return chemical containers for her; however, none of this rises to the establishment of being engaged in a competing business as a matter of law.  Accordingly, Plaintiff has failed to establish its entitlement to summary judgment and summary judgment on Count I should be denied.

### Count II - Intentional Interference with Business Relationship

While Plaintiff has set forth the necessary elements for intentional interference with a business relationship, a question of fact exists as to the existence of the valid business relationship and whether the continuing relationship presumption has been overcome; whether Defendant's knowledge of  Plaintiffs relationship placed him in the unique position of knowing when that relationship had ended; whether Defendant's conduct, according to this record, amounted to a purposeful interference by him of a business relationship; and whether damages have been conclusively established.

### A.  Existence Of Valid Business Relationship

In arguing a valid business  relationship has been clearly established by the record, Plaintiff concedes any Chemtreat customers could terminate their relationship at any time.   Plaintiff then states that until terminated the relationship will presumptively continue so long as the parties are satisfied.  The issue is how to overcome such a presumption.  Defendant has testified that each of

13

the entities complained of would have or were in the process of ending their

relationship with Plaintiff.  Plaintiff says this is insufficient to raise an issue of fact.

In order for this standard to have meaning, the phrase "until terminated the

relationship created by a contract terminable at will is subsisting and will

presumptively continue in effect so long as the parties are satisfied" must be

interpreted.  Greg Kinsman testified his clients would not be satisfied with the

pricing of Chemtreat products and that it would be difficult, if not impossible, for

him to continue that relationship.  Moreover, he has testified each of them told him

their business relationship with Chemtreat was ending.  Tom Moshage testified

Chemtreat lowering prices was essentially not an option and just because

Chemtreat was a supplier did not mean they would always be a supplier.  The only

information as to the satisfaction of each of the clients complained of by Plaintiff is

they were not.  Tom Moshage says he didn't have time for suppliers who hadn't

given him their best price, confirming Greg Kinsman's testimony.  Accordingly, a

question of fact exists as to the first element, *i.e.* to the existence of a valid business

relationship.

### B.  Defendant's Knowledge Of Plaintiffs relationship

Plaintiff argues Greg  Kinsman was employed at Chemtreat for nine years

and was undeniaby aware of the existence of the business relationships and benefits

to Chemtreat which resulted.  It is equally true Greg Kinsman had knowledge of

the status of relationships by his intimate conversations and contact with various

representatives of the customers of Plaintiff, and would know the status of their business relationship and that such relationship was at an end.

### C. Purposeful Interference By Defendant

In order for Plaintiff to establish this element of the cause of action, it must prove Defendant acted intentionally with the aim of injuring Plaintiff's expectancies. *Romanek v. Connelly*, 324 Ill.App.3d 393, 406, 256 Ill.Dec. 436, 447, 753 N.E.2d 1062 (2001). "Intent" is shown by proving a Defendant knew that his conduct would produce an economic harm to Plaintiff. *Cf*, *J. Eck & Sons v. Reuben H. Donnelly*, 213 Ill.App.3d 510, 157 Ill.Dec. 626, 630, 572 N.E.2d 1090, 1094 (1991) (the specific, or ultimate, fact to be established is Defendant knew its actions would produce harm). Plaintiff argues the only reasonable inference drawn from the testimony is that "directing" equals "diversion," which equals "purposeful interference." Yet that is not the law nor does it address the testimony. Defendant, Greg Kinsman, has testified his belief the accounts were lost despite his efforts. (G. Kinsman dep.p.107-108). Moshage has said nothing Kinsman did influenced his decision. Far from the standards set forth in *Eck*, the record establishes Defendant's belief that any information he gave would have little if any impact on the decisions of his customers. His customer testified his activities were of no impact on its decision. Accordingly, Defendant has not established beyond question the purposeful interference element required.

### D. Damages To Plaintiff As A Result Of The Breach

Sales figures do not alone conclusively establish damages. Even if the Court accepts the sales figures, the missing element is whether any damage was sustained as a result of Defendant, Greg Kinsman's, conduct. Merely comparing before and after sales does not satisfy Plaintiff's burden.

In *Chicago Title & Trust Company v. Walsh*, 34 Ill.App.3d 458, 340 N.E.2d 106 (1975), an action to prohibit negotiation of drafts brought an award under theories of breach of express, constructive and implied contracts, and a breach of duty as escrowee, and conversion. In reversing the award, the First Appellate District of Illinois stated, "a Plaintiff is entitled to recover all damages which naturally flow from the commission of a tort .. . the damage must be the natural result of the wrong inflicted . . ." *Walsh*, 340 N.E.2d at 115. The Court noted the need to establish a causal relationship, as opposed to merely an incursion of debt or loss, stating "[plaintiff] would have to establish that these expenditures, *which were for the most part due in any event*, were made in reliance upon the [ ] drafts." 340 N.E.2d at 116 (*emphasis added*). *See also, Rueben H. Donnelly Corp. v. Brauer*, 275 Ill.App.3d 300, 211 Ill.Dec. 779, 790, 655 N.E.2d 1162 (1995)(actual damages directly resulting from inducement to breach contract must be plead). So also must damages be proven. At this summary judgment stage, the inference cannot be conclusively drawn in favor of damages. Damages directly flowing from Defendant, Greg Kinsman's conduct have not been established and at this point are

speculation.

## Counts III and IV - Breach of Fiduciary Duty

Plaintiff argues that a fiduciary duty is found in the relationship of employer/employee and principal and agent. While fiduciary duties do in fact exist, the nature and extent of that duty differs depending upon the relationship. For example, in *Mullaney, Wells and Co. v. Savage*, 78 Ill.2d 534, 37 Ill.Dec. 572 402 N.E.2d 574 (1980), the Supreme Court acknowledged the question of fiduciary duty most often involved defendants who were corporate officers and directors or persons that held a public office. The Supreme Court noted that lower courts had proceeded on the assumption of a principal/agent relationship between an employee and the employer, and therefore, in the case before them, there was a fiduciary obligation. The defendants did not deny a fiduciary relationship. *Mullaney, Wells*, 37 Ill.Dec. at 578, 402 N.E.2d at 580. Illinois Courts have acknowledged, however, there is a difference between corporate officers and directors and employees in general, noting that corporate officers stand on a different footing, with a fiduciary duty of loyalty to their corporate employer not to actively exploit their positions within the corporation for their own personal benefit or hinder the ability of a corporation to continue the business for which it was developed. *Veco Corp. v. Babcock*, 243 Ill.App.3d 153, 183 Ill.Dec. 406, 411, 611 N.E.2d 1054, 1059 (1993). Absent contractual obligations otherwise, employees may plan, form, and outfit a competing corporation while still working for the employer, but may not commence

17

competition. *Id.* The law governing the right of a former employee to compete is distinct from and irrelevant to a breach of fiduciary duty claimed against officers. *Id.*

Plaintiff has argued that it has conclusively established Defendant had been actively working on behalf of Defendant, Rhema, in competing with Chemtreat prior to the termination of his employment of October, 2005, pointing to plant inspections and customer referrals. These do not establish that Greg Kinsman seized for his own advantage a business opportunity which rightfully belonged to his employer, does not establish the nature and extent of the fiduciary duty being claimed in this case, and as previously stated, does not address the factual questions which have been generated by the testimony not only of Mr. Kinsman but also Tom Moshage. If it is true these customers had quit their relationship with Plaintiff, what business opportunity was thwarted by Defendant? Because the actions and activities of Greg Kinsman are not conclusively shown to be outside of any claimed fiduciary duty, and because it is not conclusively shown that he took advantage of an opportunity that was available to his employer, a genuine issue of material facts exist.

**Count V - Enforcement Of Covenant Not To Compete - Injunctive Relief.**

Defendant, Greg Kinsman, would respond to the motion regarding Count V by stating that he has not worked as a consultant, is not an employee of nor does he work in any capacity for Rhema Elpis, LLC. Defendant, Kinsman, has no objection

18

to not engaging in any type of business in contravention of the eighteen month period set forth in employment agreement.  The only dispute relative to this claim is Plaintiff's assertion that it is reasonable for them to have a eighteen month period in order for a new sales representative to become established.  Tom Moshage has testified no Chemtreat salesperson has come on the property since the termination of Greg Kinsman.  It would seem, if this business was important to Plaintiff, if there was a business opportunity, they would have sought to cover any alleged losses that resulted from any alleged breach by the Defendant.  Nevertheless, Defendant, Greg Kinsman, does not object to enforcement of the covenant not to compete.

Defendants, Michelle Kinsman and Rhema do object to enforcement of this covenant not to compete against them.  They have continued to assert the evidence establishes that Michelle Kinsman is the sole owner of Rhema Elpis, LLC, that she takes orders for Rhema Elpis, LLC, that she contacted the various customers of Rhema on her own and that her business, at least with regard to Carus, was a result of comparison bidding.  She has her own business background and experience.  Accordingly, Plaintiff has not established that Rhema is a "shell entity" that allows Mr. Kinsman to indirectly compete through his former customers and Count V injunctive relief should not apply to Michelle or Rhema in this instance.

### Counts VI and VIII - Intentionable Interference With Contract Michelle Kinsman and Rhema

Count VI and VII seek money damages against Michelle Kinsman (Count VI) and Rhema (VII), and are similar in nature to Count II and the response thereto

incorporates by reference the argument set forth in Count II.  In summary, the Plaintiff has failed to establish an enforceable agreement between Plaintiff and a third party because, as it has been shown, the presumption of a continual relationship between Plaintiff and a third party has been overcome by the testimony of both Greg Kinsman and Tom Moshage.  Secondly, there has been no showing that Defendant, Michelle Kinsman, knew that her conduct would produce an economic harm to Plaintiff.  Quite the opposite; Michelle Kinsman's knowledge was that the business had been lost to Chemtreat and was going elsewhere.  Finally, as argued previously, while there is evidence regarding the amount of sales between Plaintiff and third parties and Defendant, Rhema, and third parties, there is no evidence that the activities of this Defendant caused or contributed to any loss sustained by Plaintiff.  Accordingly, for the reasons set forth in Count II and the reasons stated herein, an issue of fact is presented and summary judgment as to Counts VI and VII must be denied.

### Counts VIII Through X - Aiding And Abetting

Counts VIII through X are grounded on a theory of aiding and abetting against Michelle Kinsman and Rhema for aiding and abetting the interference with an existing business relationship and breach of fiduciary duty.  Count X, based upon the same theory, seeks injunctive relief.  A genuine issue of material fact exists as to  Defendants awareness of her role in any tortious activity and as to whether Defendant knowingly and substantially assisted the principal violation.

Summary judgment on each Count must be denied.

Plaintiff has accurately stated the elements of the cause of action as set forth in *Thornwood, Inc. v. Jenner & Block*, 344 Ill.App.3d 15, 27-28, 278 Ill.Dec. 891, 902-03, 799 N.E.2d 756 (2002), and Restatement (Second) of Torts, Section 876 (1979).  This verbiage is reiterated in *Wolf v. Liberis*, 153 Ill.App.3d 488, 106 Ill.Dec. 411, 505 N.E.2d 1202 (1987).  *Wolf* defines what must be found to be liable for aiding and abetting, laying out, *verbatim*, the necessary elements as defined in *Investors Research Corp. v. SEC*, 628 F2d 168, 178 (D.C. Circuit), *cert denied* 449 U.S. 919, 101 S. Ct. 317, 66 L. Ed. 146 (1980).

In *Investors Research*, the District of Columbia Circuit Court of Appeals struggled with the state of mind necessary to assess liability for aiding and abetting under the Securities and Exchange Act.  The Court determined, in assessing the element of whether knowledge that the conduct constitutes a breach of duty was an actual knowledge requirement, found it necessary to make this finding before imposing penalties under the Securities and Exchange Act.  Because the sanctions sought arose out of the act, the Court said "when sanctions can be imposed, the negligence standard provides insufficient protection for those persons whose involvement in securities law violations is in one respect substantial, yet wholly innocent."  628 F.2d at 178.  This actual knowledge requirement was applicable where there was a sanction of an alleged wrongdoer.

*Investors Research* is precedent relied upon by the Illinois Courts, and it

directs the analysis of what is required of an individual who is accused of aiding and abetting a tort action.  With regard to Counts VIII and IX, which seek civil and punitive damages; *i.e.* sanctioning an alleged wrongdoer, there has been no showing of an intentional, knowledgeable wrongdoing.  Accordingly, summary judgment is particularly inappropriate to these counts.  *See also*, *Halberstam v. Welch*, 705 F.2d 472, 477 (C.A.D.C. 1983)  (analyzing the requirement of knowing assistance and state of mind in establishing aiding and abetting liability).

Having established a knowledge requirement for Counts VIII and IX, the question arises whether the same requirement, under Count X, exists.  *Investors Research* case, and the Restatement, all place the actual knowledge requirement on those situations where penalties are sought against an alleged wrongdoer.  They have not done so with regard to injunctive relief.  However, the Restatement, adopted in *Wolf v. Liberas*, *supra* requires an aider and abetter to know the tort feasor's conduct breached a duty and give substantial assistance or encouragement to an individual to so conduct themselves.  The comments to the Restatement look at five factors to determine the extent of knowledge and substantial assistance, one of which includes the Defendant's state of mind.  The state of mind of Michelle Kinsman, according to her own testimony, was her husband had lost business, was unable, despite his best efforts, to keep that business and that the various clients were in fact former clients of Chemtreat.  The evidence supports that Michelle Kinsman was not knowingly assisting in any activity, and she had no reason to

22

believe the customers she was contacting on behalf of Rhema might have been wrongfully diverted by her husband. Even without the strict knowledge requirement for those elements seeking damages, following the Restatement as adopted by *Wolf v. Liberis*, the evidence does not conclusively establish Michelle Kinsman knew or even should have known any different from what she was told. Accordingly, summary judgment with regard to Count XI is inapplicable.

## **CONCLUSION**

Based upon the foregoing, it is respectfully submitted that summary judgment is inappropriate in this instance and that the Plaintiff's Motion should be denied.

> **Gregory P. Kinsman, Michelle M. Kinsman, individually and d/b/a Rhema Elpis Enterprises, LLC**, Defendants
>
>
> By:      s/ J. Kevin Wolfe

J. Kevin Wolfe
**HARVEY & STUCKEL, CHTD.**
331 Fulton Street, Suite 650
Peoria, IL 61602
Telephone:   (309) 671-4900
Facsimile:   (309) 671-5473