**E-FILED**

Friday, 15 September, 2006  03:24:11 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| CHEMTREAT, Inc., <br> A Virginia Corporation, <br><br> Plaintiff, <br><br> v. <br><br> GREGORY P. KINSMAN, and <br> MICHELLE M. KINSMAN, <br> Individually and d/b/a/ <br> RMA CHEMICALS, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | No. 05-cv-1336-JBM |

## ORDER

This matter is now before the Court on Plaintiff's Motion for Summary Judgment [Doc. #44]. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as the parties are citizens of different states and the amount in controversy is in excess of $75,000.

## BACKGROUND

This case involves a dispute in which an employer seeks damages and injunctive relief against a former employee and his wife and the company she started. Gregory Kinsman formerly worked for Chemtreat, a Virginia corporation. From 1995 until he was terminated on October 11, 2005, Mr. Kinsman worked as a sales representative and sold water treatment chemicals for use in boilers, cooling towers, air conditioners and similar

equipment.  (Doc. 44 at 3.)  He was the primary Chemtreat sales representative for at least eight Chemtreat customers including Carus Chemical Company, National Manufacturing, Monmouth College, Bob Evans Farms, Duke Energy, Illinois Cement, The Kensington, and St. Mary's Square.  (Doc. 44 at 4-5.)

In March of 2004, Gregory Kinsman's wife, Michelle Kinsman, started a chemical supply business called Rhema Elpis Enterprises, LLC.  At that time, Michelle Kinsman had business training (Doc. 49 at 9) but no experience in the chemical water treatment business (Doc. 44 at 6).

Rhema was able to bring in customers despite the fact that Michelle Kinsman, the sole employee and manager of Rhema, never advertised or made "cold calls" to potential customers.  (Doc. 44 at 7.)  According to Michelle Kinsman, Rhema customers were only obtained after they had been referred to Michelle by Gregory Kinsman.  (M. Kinsman's Dep. at 16-17, 20.)

When Gregory Kinsman was first employed by Chemtreat in 1995 he signed a written Employment Agreement which provides as follows:

> 1. "Employee covenants and agrees that he will devote his entire time and energy exclusively to the business of CHEMTREAT and that during the period of his employment, he will not engage in any other business, either for himself or for the account of any other person, firm or corporation without the prior consent of the Board of Directors of Chemtreat.…

2

6. During the eighteen (18) month period following the effective date of termination by either party of the employment relationship created hereunder, Employee shall not in his own name, or as a consultant, or in any other capacity on behalf of any other person or entity solicit, call upon, communicate with, enter into any sales or servicing agreements with, or attempt to communicate with any CHEMTREAT customer or prospective customer, as defined herein, for the purpose of selling, offering for sale, influencing the purchase of, or otherwise providing any product, service or equipment competitive with any product, service or equipment then sold, offered for sale, provided, or under development by Chemtreat." (Doc. 44 Ex. 1 at 1-4.)

Furthermore, the Employment Agreement includes a Trade Secrets and Confidentiality Agreement which provides as follows:

"I [Gregory Kinsman,] recognize that the corporation has a substantial investment in its development and use of commercially valuable technical and nontechnical information which the corporation desires to protect by patents or by holding such information secret or confidential. Such proprietary information is vital to the corporation's business.… Except as authorized in writing by the corporation, I will not disclose to persons not employed by the corporation … or use directly or indirectly, during or after the employment with the Corporation, any information of the Corporation I obtain during the course of my employment relating to … products, product specifications, processes, procedures, prices, discounts, manufacturing costs, business affairs,… customer lists (customer lists to include among other things customer requirements, products purchased by customers and customer contacts and other business information pertaining to such customer),

3

product formulations, marketing techniques and cost data." (Doc. 44 Ex. 1 at 7.)

In addition, there is a choice of laws provision in the contract which states that the contract is governed by Virginia law.[1] (Doc. 44 Ex. 1 at 5.)

Chemtreat has now brought a ten count complaint against the Kinsmans and Rhema which is partially based upon that contract. The ten counts are as follows:

Count I - Breach of Employment Contract against Gregory Kinsman

Count II - Intentional interference with existing business relationships against Gregory Kinsman

Count III - Breach of fiduciary obligation against Gregory Kinsman

Count IV - Injunctive relief for breach of fiduciary duty against Gregory Kinsman

Count V - Injunctive relief for breach of contract against Gregory Kinsman

Count VI - Intentional interference with an Employment Contract against Michelle Kinsman

Count VII - Intentional interference with an Employment Contract against Rhema.

---

[1] Neither party has contested this choice of law provision. The plaintiff has stated in their motion that only Counts I and V of plaintiff's complaint are governed by Virginia law. (Doc. 44 at 8.) Defendants do not contest that only Counts I and V are governed by Virginia law. Accordingly, this Court will apply Illinois law to the remaining claims even though Counts VI and VII are related to the Contract. See, Labor Ready, Inc. v. Williams Staffing, LLC, 149 F.Supp.2d 398, 414 (N.D.Ill. 2001) (applying Illinois law to claims sounding in contract even though the contract chose Washington law because both parties argued the case based upon Illinois law).

Count VIII - Aiding and abetting interference with existing business relationships against Michelle Kinsman and Rhema

Count IX - Aiding and abetting breach of fiduciary obligation against Michelle Kinsman

Count X – Injunctive relief for aiding and abetting breach of fiduciary obligation against Michelle Kinsman and Rhema.

In contesting these counts, Gregory Kinsman testifies that it was only when companies said they were seeking competitive bids, or when the customers told him they were leaving or quitting, that he advise them they could contact and get a competitive bid from his wife's business. (Doc. 49 at 5.; G. Kinsman's Dep. at 107)

However, he does not deny that he engaged in these and certain other activities while still employed by Chemtreat. First, he referred customer who were seeking bids to his wife or her business. (G. Kinsman Dep. at 108.) He called in orders to Rhema's supplier Ulrich Chemical Company, (G. Kinsman Dep. at 155) picked up containers of chemicals for Rhema customers (G. Kinsman Dep. at 158.) and used his experience on behalf of Rhema to have particular Chemical products modified for Rhema customers (G. Kinman Dep. at 181). Also, he does not deny that he put himself forward as a "Technical Representative" acting on behalf of Rhema and in that capacity produced "Boiler Service Reports"(Doc. 44 Ex. 4 at 5-24). And he does not deny that he

5

sent e-mails to Rhema customers explaining various technical and pricing matters on behalf of Rhema (Doc. 44 Ex. 4 at 1-5).

Furthermore, he does not deny that in the weeks after he was dismissed he performed boiler inspections for Monmouth College which was followed up with an e-mail offering technical advice. (Doc. 44 Ex. 7 at 2; G. Kinsman Dep. at 92).

## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court as to portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Once the movant has met its burden, to survive summary judgment the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which [s]he bears the burden of proof at trial." Warsco v. Preferred Tech. Group, 258 F.3d 557, 563 (7th Cir. 2001); see also Celotex Corp., 477 U.S. at 322-24. "The nonmovant may not rest upon mere

allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence." Chemsource, Inc. v. Hub Group, Inc., 106 F.3d 1358, 1361 (7th Cir. 1997).

This Court must nonetheless "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). In doing so, this Court is not "required to draw every conceivable inference from the record -- only those inferences that are reasonable." Bank Leumi Le-Isreal, B.M. v. Lee, 928 F.2nd 232, 236 (7th Cir. 1991). Therefore, if the record before the court "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of material fact exists and, the moving party is entitled to judgment as a matter of law. McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 796 (7th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). However, in ruling on a motion for summary judgment, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

## ANALYSIS

### I.   THE DEFENDANTS DEFINITION FOR ENGAGING IN BUSINESS IS INAPPLICABLE IN THIS CASE.

Under Count I Chemtreat seeks damages for breach of the Employment Contract and the accompanying Confidentiality Agreement against Gregory Kinsman. Chemtreat argues that Gregory Kinsman violated the provision which requires Mr. Kinsman to "devote his entire time and energy exclusively to the business of CHEMTREAT." (Doc. 44 Ex. 1 at 1.) Furthermore, they allege that while still employed, Mr. Kinsman violated the provision which states that "he will not engage in any other business, either for himself or for the account of any other person, firm or corporation without the prior consent of the Board of Directors of CHEMTREAT." (Id.) Specifically, they argue that Mr. Kinsman engaged in other business on behalf of his wife's company when he produced boiler service reports as a technical representative, when he sent technical and pricing matters to Rhema customers who had formerly been customers of Chemtreat, and when he advised former Chemtreat customers that they could get a better price from his wife's business.

In defense, Defendant's counsel has passed over the typical arguments against a non-compete clause[2] because they likely would

---

[2] These arguments typically include claiming that the restrictive covenant is unenforceable because it is not narrowly drawn to protect the employer's legitimate business interests, unduly

8

not apply.  Instead, the Defendants have reached into the depths of Virginia tax law to argue that only a jury can determine whether Gregory Kinsman was engaged in any other business.

The Defendants rely on Young v. Town of Vienna, Va., 123 S.E.2d 388 (Va. 1962) to argue that the term "engaged in business" has a specific interpretation in Virginia law.  In Young, the town of Vienna, Virginia levied a license tax upon every person who should "engage in the business of renting… commercial property."  Id. at 390.  The town sought a declaration that the statute applied to a housewife's single act of leasing property for $125 per month for commercial purposes. The Court held that

> "the term 'engage in business' as expressed in statutes and ordinances, has a well defined meaning in law.  It means a course of dealing which requires the time, attention and labor of the person so engaged for the purpose of earning a livelihood or profit.… In giving the language 'engage in the business' its usual and commonly accepted meaning when used in statutes and ordinances, it is clear that the one act of the appellant in leasing her land does not bring her within the terms of the ordinance requiring the payment of an annual license tax…." Id.

The Defendants now seek to extend that definition to Virginia contract law and argue that only a jury can determine

---

burdensome on the employee's ability to earn a living, and is against public policy.  See Omniplex World Wervices Corp. v. United States Investigation Services, Inc., 618 S.E.2d 340 (Va. 2005).

whether Gregory Kinsman was so engaged in working for Rhema that his purpose was to earn a livelihood or profit.

The first problem with the Kinsmans' argument is that their definition is only used under Virginia tax law. The term 'engage in business' certainly can be a term of art for tax purposes. See, e.g., 5 Seattle Municipal Code 5.30.030 (setting forth a thirty one point definition of the term "engaging in business" for purposes of levying a municipal licensing tax); Berliner Handels-Gesellschaft v. United States, 30 F.Supp. 490 (Ct.Cl. 1939) (providing a lengthy explanation on the phrase 'engaged in business' for tax purposes). As a result, Virginia courts have realized that the term has a unique application under tax law. Vaughn Realty of Front Royal, Inc. v. Town of Front Royal, 29 Va. Cir. 135 (Va.Cir. 1992)(noting that while a company was no longer 'engaged in business' for tax purposes but was still infact conducting business). Accordingly, there is no basis for taking the term 'engaged in business' as defined under Virginia tax law and extrapolate that definition to a contractual setting.

The second problem with the Kinsman's definition is they are defining the wrong phrase. The contract does not forbid Gregory Kinsman from 'engaging in business' – it forbids him from 'engaging in any other business.' The use of the word 'any' adds meaning and context to the prohibition. In Virginia the

phrase 'engage in business' is typically seen in tax cases where a licensing tax is levied against the operator of a business. See, e.g., Video Engineering Co. v. Foto-Video Electronics, Inc., 154 S.E.2d 7 (Va. 1967); McDaniel v. Com., 99 S.E.2d 623 (Va. 1957); Woods v. Com. Dept. of Motor Vehicles, 495 S.E.2d 505 (Va.App. 1998); City of Richmond v. Fary, 171 S.E.2d 257 (Va. 1969). However, the phrase 'engage in *any* business' is more typically scene in a non-compete clause. See, e.g., Harris v. T.I., Inc, 413 S.E.2d 605 (Va. 1992); Texas Co. v. Zeigler, 14 S.E.2d 704 (Va. 1941); Thornhill v. Donnkenny, Inc., 823 F.2d 782 (4th Cir. 1987); Consolidated Indus. Roofing v. Williams, 17 Va.Cir. 341 (Va.Cir. 1989); But see, Fallon Florist v. City of Roanoke, 58 S.E.2d 316 (Va. 1950). It makes sense that applying a licensing tax upon individuals for 'engaging in business' would only be appropriate when that individual is so engaged in that business that it has become the source of their livelihood. At the same time, it makes sense that a restrictive covenant in which an employer who seeks to prevent an employee from competing against the employer would use words that require a stricter interpretation. To the employer it is irrelevant whether or not the employee's competitive activities can provide a livelihood to the employee – what matters to the employer is that business is being taken away from him. By preventing a former employee from involving themselves with 'any business'

11

the employer can prevent the employee from taking away business, regardless of whether it amounts to a livelihood for the employee. Accordingly, it is important for this Court to make sure that it is defining the correct term.

The third problem with the Kinsmans' definition is that it does not fit with the rest of the contract. While the Defendants could delve even deeper into the bowels of case law to find a case interpreting the phrase 'in any business'[3] it is important to remember that this is a modern contract dispute and should be interpreted using modern contract law.

Under modern Virginia contract law, the court will construe clear and unambiguous terms of the contract according to their plain meaning. American Spirit Insurance Co. v. Owens, 541 S.E.2d 553 (Va. 2001). Also, the court will construe the contract as a whole, without giving emphasis to isolated terms Lansdowne Development Co. v. Xerox Realty, 514 S.E.2d 147 (Va. 1999). Furthermore, the contract must be construed in a manner so as not to render meaningless any portion of the contract if a reasonable meaning can be given. Westmoreland - LG&E; Partners v. VEPCO, 486 S.E.2d 289 (Va. 1997). And lastly, the court must

---

[3] For example, in Pirkey Bros. v. Commonwealth, 114 S.E. 764 (Va. 1922) the Court strictly interpreted a 'Sunday Law' which prohibited any person from laboring "in any business" on the Sabbath. However, it would clearly not be appropriate for this Court to rely upon such an inapplicable interpretation in this case.

interpret a contract consistently with the intent plainly declared by the written language.  <u>Lenders Fin. Corop. V. Talton</u>, 455 S.E.2d 232, 237 (1995); <u>SDG Development Co., L.P. v. Watkins Land, LLC</u>, 60 Va.Cir. 124 (Va.Cir. 2002).

In this case, Chemtreat clearly did not intend to allow their employees to moonlight as competitors.  In the same paragraph as the phrase in question, the contract states that Gregory Kinsman "will devote his entire time and energy exclusively to the business of Chemtreat."  While this Court is not inclined to look strictly at this phrase and hold Gregory Kinsman in breach for spending time away from work, this Court must not ignore the phrase either.  <u>Westmoreland</u>, 486 S.E.2d 289.  Accordingly, the phrase requiring employees to spend their time and energy exclusively on the business of Chemtreat makes clear the plain intent of the parties - at the very least employees were forbidden from moonlighting as or for competitors.

The last problem with the Kinsmans' definition is that it leads to an absurd result.  It would be absurd to interpret this contract as only preventing employees from engaging in competitive business practices which were significant enough to amount to a livelihood for the employee.  Here it is important to remember that this covenant prevented Gregory Kinsman from competing with Chemtreat while he was still employed at

13

Chemtreat.   It would be absurd for a covenant to prevent only that competition which amounted to a livelihood, because at that time Gregory Kinsman's livelihood was already provided for by working for Chemtreat.  Since a contract should not be construed under Virginia law so as to achieve an absurd result, <u>Providence Square Associates, LLC v. G.D.F. Inc.</u>, 211 F.3d 846 (4th Cir. 2000), this Court will not adopt the Defendants' definition for 'engaging in any other business.'

## II.  THE PLAINTIFFS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT UNDER COUNT I FOR BREACH OF THE EMPLOYMENT AGREEMENT.

The Defendants' second argument against summary judgment under Count I is that this case is governed by <u>Linville v. ServiSoft of Virginia, Inc.</u>, 174 S.E.2d 785 (Va.App. 1970).  In <u>Linville</u>, an employer brought an action against a former employee to enjoin a violation of a covenant not to compete. The contract imposed two levels of restraints upon the employee – one for when he was employed and the other for after he left the employer.  The Trial Court erred in issuing the injunction because the Trial Court's injunction followed the wrong set of restraints.   The injunction followed the set of restraints intended for when the employee was still employed.  Since the employee was no longer employed, the Trial Court, if issuing an injunction at all, should have followed those restraints which the contract intended for post-employment.

Since <u>Linville</u> only dealt with an employer who violated his contractual obligations after he was terminated, Linville is not applicable to Chemtreat's claim that Gregory Kinsman breached his employment agreement before he was terminated. Furthermore, this Court will heed the warning of <u>Linville,</u> and when considering a permanent injunction, this Court will be certain to follow the contractual restraints in the employment agreement which were intended to apply after Mr. Kinsman was terminated.

The Defendants raise no additional arguments contesting Gregory Kinsman pre-termination breach. Accordingly, this Court agrees with Plaintiff that Gregory Kinsman breached the express terms of his employment contract by engaging in "any other business." Specifically, he produced boiler service reports, tailored chemical orders for customers, put himself forward as a "technical representative" and provided referrals to a competing business – all while still employed at Chemtreat. Thus, this court must conclude that Gregory Kinsman breached the expressed terms of his employment contract with Chemtreat prior to his termination and grant summary judgment on the issue of liability in Plaintiff's favor for breaching the employment agreement.

### III. THE PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT FOR A BREACH OF THE TRADE SECRETS AND CONFIDENTIALITY AGREEMENT

In addition to breaching the employment portion of the contract, Chemtreat also alleges that Gregory Kinsman breached

the Trade Secrets and Confidentiality portion of the agreement. The Trade Secret agreement precludes Gregory Kinsman from disclosing either during or after employment, any information "relating to… products… prices… [and] customer lists…." (Doc. 44 Ex. 1 at 7.)

Chemtreat alleges that Gregory Kinsman disclosed proprietary information including pricing, cost data and information on which products were being purchased by Chemtreat customers. Chemtreat's evidence to support this claim is a letter from Michelle Kinsman to Carus Chemical Company – one of Chemtreat's customers. The letter states that "as you know your current supplier just passed a 6% increase for this year and has followed the industry with [a price increase] every year." (Doc. 44 Ex. 10 at 19.) Furthermore, the letter provides a price comparison for Carus Chemical Company in the following format:

|  | | Old | New | Rhema |
|---|---|---|---|---|
| Current Supplier | 1240 | 1.44/lb | 1.52/lb | 1.40/lb |
|  | 100 | 1.57 | 1.63 | 1.55 |
|  | 1544 | 2.50 | 2.62 | 2.48 |
|  | 4355 | 1.49 | 1.57 | 1.40 |

(Id.)

Chemtreat argues that the only reasonable inference which can be drawn from this evidence is that Gregory Kinsman provided

Chemtreat's proprietary price information to Michelle Kinsman, allowing her to provide a comparison for a potential Rhema customer.   They point out the fact that Mr. Kinsman had discretion as sales representative over what prices to provide to Carus, so this information could only have been provided by Chemtreat.  Furthermore, Chemtreat points to the first column of numbers and notes that those numbers are Chemtreat's product numbers for their chemicals.  (T. Moshage Dep. at 27; M. Kinsman Dep. at 53-54.)   Chemtreat argues that these product numbers could only have been provided to Michelle by her husband.

Defendants accept the accuracy of the price information and the fact that Chemtreat was the "current supplier" for Carus. Instead, they rely upon Gregory Kinsman's testimony that he did not provide pricing information (G. Kinsman's Dep. at 93) and suggest instead that the information was provided by Tom Moshage, the purchasing agent for Carus Chemical Company.

Indeed, the letter is addressed to Tom Moshage and states that the pricing information was put together at his request. (T. Moshage Dep. Ex. 1 at 1.)  However, Tom Moshage testified in his deposition that he never provided pricing information to Michelle Kinsman.  (T. Moshage Dep. at 19.)  On the other hand, when Michelle Kinsman was asked how she knew how to use the Chemtreat product numbers she responded that she did not remember, but that it was "probably from discussion[s] with

17

Tom." (M. Kinsmans's Dep. at 55.) In addition, the fact that Gregory Kinsman had some power to decide prices does not necessarily mean that Michelle found out the prices and product numbers from her husband. All the numbers, including the product numbers, could have been provided by Tom Moshage in the conversation where he requested prices. In the letter Michelle Kinsman states to Tom Moshage that "as you know your supplier just past a 6% increase for this year." (Doc. 44 Ex. 10 at 19.) The implication of this statement is that the parties had previously discussed prices.

Both Defendants' testimonies match their defense that Gregory Kinsman did not provide the pricing information to his wife and that it was instead provided by Tom Moshage. Defendants may have a difficult time defending this claim and convincing a jury of their credibility since their testimony conflicts with Mr. Moshage's testimony. However, credibility determinations cannot be made on summary judgment. <u>Black v. Lane</u>, 824 F.2d 989 (7th Cir. 2003). Accordingly, looking at the evidence in the light most favorable to Defendants, there is a reasonable possibility that Gregory Kinsman did not provide this information to his wife and it was instead provided by Tom Moshage. As a result, this Court can not grant summary judgment for a breach of the Trade Secrets and Confidentiality Agreement.

**IV.  THE PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT FOR GREGORY KINSMAN'S BREACH OF HIS POST-EMPLOYMENT COVENANT NOT TO COMPETE**

Chemtreat also alleges that Gregory Kinsman violated his post employment covenant to not compete.  The covenant prohibits Mr. Kinsman from "communicating with… any CHEMTREAT customer or prospective customer… for the purpose of selling or otherwise providing any product [or] service… competitive with any product [or] service… then sold… by Chemtreat" for a period of eighteen months.  (Doc. 44, Ex. 1 at 1-4.)

Chemtreat points to an e-mail sent by Gregory Kinsman on October 25th (fourteen days after he was terminated) to Monmouth College.  (Doc. 44, Ex. 6 at 1.)  In the letter, Mr. Kinsman describes the boiler inspection which he conducted the day before. He describes several technical problems which Monmouth College was having and suggests solutions.  (Id.)

 The Defendants acknowledge that Mr. Kinsman performed the inspection (G. Kinsman dep. at 92) but argue that Mr. Kinsman was not acting on behalf of Rhema and could have been performing the inspection based upon a promise that he had previously made to the college.[4]  (Doc. 49 at 12.)

---

[4] This Court seriously questions Defendant's argument that he was not acting on behalf of Rhema when visiting Monmouth College. The Court notes the most recent Supplemental Motion for Order to Show Cause filed in this Court (Doc. 53, exb. C) which shows

Even if Mr. Kinsman was at Monmouth College on his own accord and not on behalf of Rhema, he is still in breach. The contract forbids Mr. Kinsman from communicating with any Chemtreat customer or prospective customer for the purpose of selling or otherwise providing any product or service competitive with any product or service then sold by Chemtreat. Monmouth College had been a Chemtreat customer and Mr. Kinsman was communicating with them for the purpose of providing a service – a service which he had formerly provided for them as an employee of Chemtreat. This is a breach of the expressed terms of the contract and as a result, Chemtreat is entitled to partial summary judgment for the breach after termination of Mr. Kinsman's employment.

## V.    SUMMARY JUDGMENT WOULD NOT BE PROPER ON THE CLAIM FOR INTENTIONAL INTERFERENCE WITH A BUSINESS RELATIONSHIP

Under Count II Chemtreat seeks monetary and punitive damages under tort law for intentional interference with Chemtreat's existing business relationships with its customers.[5] Both parties agree that this claim is governed by Illinois law.

To establish a cause of action for the tort of intentional interference with a prospective economic advantage, Illinois law

---

that Rhema recently made a sale of $853 for chemical products or services to Monmouth.

[5] This tort is typically referred to as 'intentional interference with a prospective contractual relation.' RESTATEMENT (SECOND) OF TORTS § 766B.

requires that the following four elements must be proven: (1) the existence of a valid business relationship or expectancy; (2) the defendants' knowledge of plaintiff's relationship or expectancy; (3) purposeful interference by the defendants that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship or termination of the relationship; and (4) damages to plaintiff resulting from such interference. Fellhauer v. City of Geneva, 568 N.E.2d 870 (Ill. 1991); Dowd & Dowd, Ltd. v. Gleason, 816 N.E.2d 754 (Ill. App. Ct. 2004).

Chemtreat argues that they had a valid business relationship with each of the customers that eventually because customers of Rhema. They argue that under Illinois law their relationships with their customers presumptively continue until terminated so long as the parties are satisfied. Dowd & Dowd, 816 N.E.2d at 768; Grund v. Donegan, 700 N.E.2d 157 (Ill. 1988). Specifically, they argue that since the relationships presumptively continue the first element for intentional interference has been met. (Doc. 44 at 14.)

When addressing this issue in pre-trial briefs, Illinois courts have been careful to look at the allegations in the light most favorable to the non-moving party. See e.g., Anderson v. Anchor Organization for Health Maintenance, 654 N.E.2d 675 (Ill.App. 1995). In this case, we must look at the evidence in

the light most favorable to the Kinsmans.   Holland, 883 F.2d 1307 (7th Cir. 1989).   Here the following testimony was given in Gregory Kinsman's deposition:

    Attorney:    Do you know how [your customers] became aware
                 of the existence of Rhema?

    Mr. Kinsman: I told them.

    Attorney:    Why would you do that?

    Mr. Kinsman: Because they had already informed me that they
                 were leaving Chemtreat and were taking bids.
                 (G. Kinsman's dep. at 107.)

    At the time Mr. Kinsman was the sales representative in the best position to be aware of the status of his customers. This court must take as true his statement that the customers were not satisfied and were "leaving Chemtreat."[6]   If the parties have not been satisfied and have terminated their relationship then the first element of Count II has not been met.   This is not to say that Chemtreat may not be entitled to relief under this tort - but only to say that this Court can

---

[6] Gregory Kinsman, upon questioning, goes into further detail in his deposition regarding how he specifically believed that each of his customers had left Chemtreat. The plaintiff argues that it is in this detail that Mr. Kinsman reveals that there still existed some sort of relationship between Chemtreat and its customers. (G. Kinsman's Dep. at 107-120.)   However, reading this evidence in the light most favorable to Mr. Kinsman, and in light of his broader statement that the customers had already informed him that they were leaving Chemtreat, this evidence establishes a reasonable inference that the relationships between Chemtreat and its customers may have ceased.

not grant summary judgment to Plaintiffs on Count II at this stage of litigation.

Furthermore, it is also noted that under Count VIII Chemtreat seeks summary judgment against Michelle Kinsman and Rhema for aiding and abetting Gregory Kinsman in his alleged intentional interference. Since this Court can not grant summary judgment against Gregory Kinsman under Count II it follows that this Court can not grant summary judgment for aiding and abetting under Count VIII.

## VI. CHEMTREAT IS ENTITLED TO PARTIAL SUMMARY JUDGMENT FOR GREGORY KINSMAN'S BREACH OF HIS FIDUCIARY DUTY

Under Count III Chemtreat seeks damages against Gregory Kinsman for breach of his fiduciary duty. Specifically, they argue that he breached his duty as an employee by competing against Chemtreat while he was still employed by Chemtreat. (Doc. 44 at 16.)

Under standard agency doctrine in Illinois an employee is obligated to act solely for the benefit of the plaintiff in all matters connected to his agency. Mullaney, Wells & Co. v. Savage, 402 N.E.2d 574 (Ill. 1980); Citing, RESTATEMENT (SECOND) OF AGENCY § 387, 393 (1958). After the termination of his agency and in the absence of a restrictive agreement, an agent can properly compete with his principal as to matters for which he has been employed. Radiac Abrasives, Inc. v. Diamond Technology, Inc.,

532 N.E.2d 428, 434 (Ill.App. 1988).  Even before an agent is terminated, an agent is entitled to make arrangements to compete.   Id.   On the other hand, an employee is held accountable for breaching his fiduciary duty to his employer only when he goes beyond such preliminary competitive activities and commences business as a rival concern *while still employed*. Radiac, 532 N.E.2d at 434 (emphasis added); Lawter International, Inc. v Carroll, 451 N.E.2d 1338 (Ill.App. 1983). And, it is recognized under Illinois law that an employer can be lulled by trust in the employee's fidelity and loyalty, and as a result can be deprived of the opportunity to compete with that employee.   ABC Trans Nat. Transport, Inc. v. Aeronautics Forwarders, Inc., 379 N.E.2d 1228, 1237 (Ill.App. 1978).

In defense of Chemtreat's claim for breach of fiduciary duty, the Defendants have put forward the following misguided question: "If it is true [Chemtreat's] customers quit their relationship with [Chemtreat], what business opportunity was thwarted by defendant?"  (Doc. 49 at 18.)  However, Defendants put forward no case law to support the supposition that a business opportunity must be thwarted for an employee to breach his fiduciary duty.  In fact, plaintiffs in Illinois have not had to demonstrate that an actual business opportunity be thwarted in order for a court to declare that an employee breached his fiduciary duty.  See, Dolezal v. Plastic and

24

Reconstructive Surgery, S.C., 640 N.E.2d 1359 (Ill.App. 1994)
(noting that a doctor diverted patients away from his employers
and the patients only may have become patients of the employer,
but not requiring proof that they would have become patients of
the employer to hold the doctor in breach).  Instead, plaintiffs
have only needed to demonstrate that the employee commenced
competition prior to his or her termination.  Hill v. Names &
Addresses, Inc., 571 N.E.2d 1085 (Ill.App. 1991) (holding that
an account executive's cooperation in the soliciting her
assistant to join the executive's future employer constituted a
breach of the executive's fiduciary duty); Everen Securities,
Inc. v. A.G. Edwards and Sons, Inc., 719 N.E.2d 312 (Ill.App.
1999) (holding that an employee's efforts to create a customer
data base, extending offers to other employees and soliciting
customers for future employer demonstrated a breach of his
fiduciary duty).

       In this case, Gregory Kinsman used his technical experience
on behalf of Rhema to have particular chemical products modified
for Rhema customers, put himself forward as a "technical
representative" for Rhema, sent e-mails with technical and
pricing information to customers for Rhema, and provided
referrals to his wife's competing business.  The fact that those
customers may have already chosen to leave Chemtreat could only
be relevant for determining damages.  What matters is that

Gregory Kinsman was so involved with this competing business that every one of Rhema's customers was obtained by a referral from Mr. Kinsman. These actions actively assisting and supporting a competing business constitute a clear breach of his fiduciary duty of loyalty to his employer and as such Chemtreat is entitled to summary judgment on the issue of liability on Count III.

## VII. SUMMARY JUDGMENT AGAINST MICHELLE KINSMAN AND RHEMA FOR INTENTIONALLY INTERFERING WITH AN EMPLOYMENT CONTRACT IS NOT APPROPRIATE

Under Counts VI and VII Chemtreat seeks money damages against Michelle Kinsman and Rhema for intentionally interfering with the Employment Contract between Gregory Kinsman and Chemtreat. Chemtreat does not seek injunctive relief under Counts VI and VII.

In order to state a cause of action for tortious interference with a contract, the plaintiff must allege: (1) the existence of a valid and enforceable contract between the plaintiff and a third party; (2) defendant's awareness of the contract; (3) defendant's intentional and unjustified inducement of a breach; (4) defendant's wrongful conduct caused a subsequent breach of the contract by the third party; and (5) damages. Purmal v. Robert N. Wadington and Associates, 820 N.E.2d 86, 98 (Ill.App. 2004). Maliciously inducing an employee to terminate existing employment and enter the employment of

another gives rise to a cause of action. ABC Trans Nat. Transport, Inc. v. Aeronautics Forwarders, Inc., 413 N.E.2d 1299 (Ill.App. 1980). Furthermore, the fact that the contract of employment is terminable at will does not bar recovery. Id.

Defendants do not challenge the existence of contract between Chemtreat and Gregory Kinsman, nor do Defendants allege the Michelle Kinsman was unaware of her husband's employment contract. Instead, Defendants mistakenly argue that Chemtreat failed to establish an enforceable agreement between Chemtreat and Michelle Kinsman. (Doc. 49 at 20.) In Arwell Division of Orkin Exterminating Co. v. Kendrick, 267 N.E.2d 352 (Ill.App. 1971), an Illinois court addressed a similar argument in a case which contained similar facts. A former employee of an exterminating company was bound by a restrictive covenant in his employment contract. Upon leaving the company, the employee's wife set up her own exterminating business. The employee worked for his wife's business in violation of the restrictive covenant. The Court applied the restrictive covenant to both the employee and his wife. In doing so, the Court noted that the wife was a stranger to the contract in both fact and law. Id. at 354. However, the Court noted that if a party knowingly participates or aides another in the violation of the contract, such conduct may be regarded as inducement. Id. Ultimately,

the Court held that business was a thinly veiled subterfuge designed to avoid the husband's obligations under the contract.

In this case, Gregory Kinsman was involved with the business of Rhema by preparing boiler inspection reports and providing technical and pricing information to customers for Rhema while still employed by Chemtreat. His actions constituted a breach of his contract. Michelle Kinsman as his wife and manager of Rhema knowingly participated in the breach of Mr. Kinsman's contract by having him perform those actions on behalf of Rhema or asking him to perform such tasks. (G. Kinsman Dep. at 158.) Under Illinois law, based upon <u>Kendrick</u>, such aid is considered inducement. When asked why he performed some of the activities that amounted to a breach of the contract Mr. Kinsman stated that he performed such tasks "because my wife asked me to." (G. Kinsman Dep. at 158.) Thus, it is acknowledged that Michelle Kinsman's wrongful conduct caused the breach of the contract by Mr. Kinsman.

The fifth element for a claim for intentional interference with an employment contract is damages. Because of Gregory Kinsman's breach, Rhema received the benefit of finding customers. However, Defendants argue that those customers were leaving Chemtreat anyway, thus Chemtreat did not sustain any damages. As has already been discussed, there is a question of fact concerning whether Chemtreat's customers had left for Rhema

because they were referred to Rhema or because they were leaving anyway. However, this is the only element of Counts VI and VII which would be in dispute for a trier of fact. Accordingly, although this Court can not grant summary judgment in Plaintiff's favor on Counts VI and VII because of this factual dispute, in accordance with Fed.R.Civ.P. 56(d) the Court finds that at trial all the other elements of this claim shall be deemed established.

## VIII. PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON COUNT IX AGAINST MICHELLE KINSMAN FOR AIDING AND ABETTING A BREACH OF A FIDUCIARY DUTY

Under Count IX Chemtreat seeks summary judgment against Michelle Kinsman for aiding and abetting in the breach of a fiduciary duty. Defendants have not filed a motion to dismiss in this case nor have they argued in their Response to Plaintiff's Motion for summary judgment (Doc. 49) against the application of the tort of aiding and abetting a breach of a fiduciary duty under Illinois law. Instead, Defendants argue that issues of material fact exist regarding the elements of aiding and abetting.

A claim of aiding and abetting includes the following elements: (1) The party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be generally aware of his role as part of the overall or tortuous activity at the time that he provides the assistance; and (3)

29

the defendant must knowingly and substantially assist the principal violation. Wolf v. Liberis, 505 N.E.2d 1202, 1208 (Ill.App.Ct.1987); Thornwood, Inc. v. Jenner & Block, 799 N.E.2d 756, 767-768 (Ill.App. 2003); Bloomington Partners, LLC v. City of Bloomington, 2005 WL 3536340 (C.D.Ill. 2005).

Defendants argue that the knowledge requirement for aiding and abetting includes a requirement that the defendant have knowledge that the principle violation constitutes a breach of a duty. They then suggest that only a jury can determine if Michelle Kinsman was aware that Gregory Kinsman's conduct constituted a breach of his duty. For authority, they state that Investor Research Corp. v. S.E.C., 628 F.2d 168, 177 (D.C.Cir. 1980) is precedent relied upon by the Illinois courts. Investor Research dealt with aiding and abetting the violation of a federal securities statute. It has only been cited once by Illinois courts in Wolf, 505 N.E.2d at 1208. Wolf only relied upon Investor Research for establishing the elements of aiding and abetting, not for interpreting the knowledge requirement of aiding and abetting. Accordingly, Investor Research is not binding precedent applicable to this case.

Illinois courts have developed applicable law for aiding and abetting that addresses the breach of a fiduciary duty. Under the applicable law Michelle Kinsman could be liable if (a) she committed a tortuous act in concert with Gregory Kinsman or

pursuant to a common design with him, or (b) she knew that Gregory Kinsman's conduct constituted a breach of his fiduciary duty and gave substantial assistance or encouragement to Gregory Kinsman to breach his fiduciary duty, or (c) gave substantial assistance to Gregory Kinsman in accomplishing a tortuous result and her own conduct, separately considered, constitutes a breach of a duty to the third person.    Thornwood, 799 N.E.2d at 768; citing, RESTATEMENT (SECOND) OF TORTS § 876 (1979).

Furthermore, the comments within the Restatement on Torts[7] provide helpful guidance.  The comments state that:

> "parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result.  The agreement need not be expressed in words and may be implied and understood to exist from the conduct itself.  Whenever two or more persons commit tortuous act in concert, each becomes subject to liability for the acts of the others, as well as for his own acts." RESTATEMENT (SECOND) OF TORTS § 876 cmt. a (1979).

In this case, Michelle and Gregory Kinsman were parties working in concert to advance a competitive business.  The advancement of Rhema by the two parties was what made for Gregory Kinsman's breach of his fiduciary duty.  Together, she managed the company and he provided the only advertising which

---

[7] The Restatement on Torts has repeatedly been relied upon by Illinois courts in the area of aiding and abetting.  See, Fortae v. Holland, 778 N.E.2d 159 (Ill.App. 2002); Reuben H. Donnelly Corp. v. Brauer, 655 N.E.2d 1162 (Ill.App. 1995); Thornwood, 799 N.E.2d at 768.

they needed in the form of referrals to former Chemtreat clients.

As such, Michelle Kinsman aided and abetted in the breach of a fiduciary duty and Chemtreat is entitled to partial summary judgment on Count IX.

**IX.     DAMAGES & INJUNCTIVE RELIEF UNDER COUNTS IV, V AND X**

The remaining question of fact stretching across all counts in this case relates to damages and whether Chemtreat actually lost any profits from the Kinsman's actions.  Mr. Kinsman has testified that his customers were leaving Chemtreat regardless of whether he referred them to his wife's business or not. Chemtreat rightly questions the credibility of that testimony since Mr. Kinsman has an obvious interest in having his wife running a profitable business.  This question of fact is relevant to the remaining issues of damages and the remaining counts against the Defendants.  Furthermore, this question of fact can only be determined by a trier of fact.  Dowd and Dowd, 816 N.E.2d at 805-806; Midland Hotel Corp. v. Reuben H Donnelly Corp., 515 N.E.2d 61 (Ill. 1987) (holding that lost profits must be proven with a reasonable degree of certainty).  However, under Counts IV, V and X, Chemtreat seeks the imposition of a constructive trust upon the proceeds realized by Defendants and a permanent injunctive relief against Defendants barring the Kinsmans from continuing to sell to Chemtreat customers.

32

A constructive trust arises by operation of law. <u>Salt Creek Rural Park Dist. V. Department of Revenue</u>, 777 N.E.2d 515 (Ill.App. 2002). Under Illinois law a constructive trust is imposed where there is a breach of a fiduciary duty. <u>Suttles v. Vogel</u>, 533 N.E.2d 901 (Ill.App. 1988). A constructive trust may be imposed even when it more than compensates an employer for injury or damage from a breach of loyalty by an employee, because the right to recover from one who exploits his fiduciary position for his personal benefit is triggered by the gain to the agent rather than by the loss to the principal. <u>Hill</u>, 571 N.E.2d at 1096; <u>Chicago ex rel. Cohen v. Keane</u>, 357 N.E.2d 452 (Ill. 1976). The imposition of a constructive trust in such circumstances reflects an implementation of the "wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation." <u>Graham v. Mimms</u>, 444 N.E.2d 549 (Ill.App. 1982).

As has already been discussed, Gregory Kinsman is liable for a breach of his fiduciary duty and Michelle Kinsman is liable for aiding and abetting the breach of his fiduciary duty. Under Illinois law, this Court has authority to impose a constructive trust upon their gains from the breach of that fiduciary duty, even if the size of such a trust more than compensates for the breach of fiduciary duty. <u>Hill</u>, 571 N.E.2d

at 1096.  Furthermore, this Court has the authority to impose such equitable relief upon Rhema.  Preferred Meal Systems, Inc. v. Guse, 557 N.E.2d 506 (Ill.App. 1990) (holding that injunctive relief against individuals without restraining the corporate creature they had created would be without any force or effect).

Accordingly, until a finder of fact can make the factual determination necessary regarding what level of damages Chemtreat has sustained as a result of the Kinsman's actions, this Court imposes a constructive trust.  Defendants are to hold in trust the proceeds realized by Defendants Gregory Kinsman, Michelle Kinsman or Rhema Elpis Enterprises, LLC from any sale of goods or services to any current or former Chemtreat customer.

Lastly, Defendants do not challenge application of the terms of Gregory Kinsman's employment agreement in the form of injunctive relief against Gregory Kinsman under Count V. Furthermore, this Court has the authority under Illinois law to impose those restrictions in an employment contract upon the wife of an employee when she is aiding and abetting in the breach of those restrictive terms.  Kendrick, 267 N.E.2d 352 (Ill.App. 1971).  Nevertheless, a trial court is given discretion regarding the length and breadth of injunctive relief under both Illinois and Virginia law.  Prairie Eye Center, Ltd. v. Butler, 768 N.E.2d 414 at 424 (Ill.App. 2002); Blue Ridge

34

*Poultry & Egg Co. v. Clark*, 176 S.E.2d 323 (Va. 1970). Accordingly, this Court will continue to impose the preliminary injunction against Gregory and Michelle Kinsman equal to the terms of the restrictive covenant in Gregory Kinsman's employment agreement and the Court will consider the length and breadth of a permanent injunction after a full hearing on damages in this case.

## CONCLUSION

IT IS THEREFORE ORDERED THAT Plaintiff's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. Specifically this Court Orders as follows:

Count I – Plaintiff is granted partial summary judgment on this issue of liability for breach of Employment Contract, denied summary judgment for breach of the Trade Secrets and Confidentiality portion of the agreement, and granted partial summary judgment on the issue of liability for breach of the Post-Employment Covenant Not to Compete against Gregory Kinsman.

Count II – Plaintiff is denied partial summary judgment for intentional interference with an existing business relationship.

Count III – Plaintiff is granted partial summary judgment on the issue of liability for a breach of fiduciary obligation against Gregory Kinsman.

Count IV – Plaintiff is granted summary judgment for breach of a fiduciary duty against Gregory Kinsman and a constructive trust will be imposed along with a preliminary injunction pending a full hearing on damages.

Count V – Plaintiff is granted summary judgment for breach of contract against Gregory Kinsman and a

constructive trust will be imposed and along with a preliminary injunction pending a full hearing on damages.

Count VI – Plaintiff is denied summary judgment for intentional interference with an employment contract against Michelle Kinsman.

Count VII – Plaintiff is denied summary judgment for intentional interference with an employment contract against Rhema.

Count VIII – Plaintiff is denied summary judgment for aiding and abetting interference with existing business relationships against Michelle Kinsman and Rhema.

Count IX – Plaintiff is granted partial summary judgment on the issue of liability for aiding and abetting a breach of fiduciary obligation against Michelle Kinsman

Count X – Plaintiff is granted summary judgment for aiding and abetting a breach of fiduciary obligation against Michelle Kinsman and Rhema and a constructive trust will be imposed along with a preliminary injunction pending a full hearing on damages.

Defendants are to hold in trust the proceeds realized by Defendants Gregory Kinsman, Michelle Kinsman or Rhema Elpis Enterprises, LLC from any sale of goods or services to any current or former Chemtreat customer. Defendants are ORDERED to submit to this Court proof of the creation of such a trust by October 16, 2006 and an accounting of all gains, past present and future, which are subject to the trust.

ENTERED this   15th   day of September, 2006.

                              s/ Joe Billy McDade_
                           Joe Billy McDade
                    United States District Judge

36